UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE (NAACP),
National Headquarters
4805 Mt. Hope Drive,
Baltimore, MD 21215

                Plaintiff,

vs.

DONALD J. TRUMP, in his official
capacity as President of the United States,
1600 Pennsylvania Ave., N.W.
Washington, D.C. 20006;
JEFFERSON BEAUREGARD SESSIONS
III, in his official capacity as the Attorney
General of the United States; ELAINE C.
DUKE, in her official capacity as acting
Secretary of Homeland Security, U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT;
DEPARTMENT OF HOMELAND
SECURITY; AND THE UNITED STATES
OF AMERICA,

                Defendants.

Case No _____

## COMPLAINT

**I.    INTRODUCTION**

1.    The National Association for the Advancement of Colored People ("NAACP") brings this action in its organizational capacity against the President of the United States and the federal government for unlawfully reneging on their promise to protect young, undocumented immigrants of color living in the United States. This action alleges violations of the Due Process

Clause of the Fifth Amendment, the Administrative Procedure Act, and the Regulatory Flexibility Act. This action also seeks declaratory relief pursuant to 28 U.S.C. §2201.

2. The Deferred Action for Childhood Arrivals ("DACA") refers to the United States' immigration policy concerning undocumented immigrants who arrived in America as children. Under this policy, people who immigrated to the United States when they were younger than 16 and have lived in the United States continuously since 2007 were eligible to defer deportation indefinitely, attend school, and receive two-year work permits, among other benefits.

3. The vast majority of DACA registrants—approximately 95%—are people of color. The top 24 countries with the highest acceptance rates for DACA applicants include predominately Black countries in Africa and the Caribbean, predominately Latino countries in South and Central America, and countries in East and Southeast Asia.[1]

4. In exchange for providing the federal government with extensive biographic and biometric information, DACA registrants[2] received the United States' promise that they could build lives for themselves in the United States without fear of prosecution or deportation.

5. However, a little less than two weeks ago, the President of the United States and the United States Attorney General announced their intention to renege on those promises.

6. On September 5, 2017, Attorney General Jeff Sessions, on behalf of President Donald Trump, announced that the Trump Administration was rescinding the DACA program.

---

[1] Eugene Scott, *'Dreamers' aren't just coming from Latin America*, WASH. POST (Sept. 7, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/09/07/dreamers-arent-just-coming-from-latin-america/?utm_term=.223e28c69e55.

[2] The children of undocumented parents who were brought to this country and grew up here became known as DREAMers, after the DREAM Act, a piece of legislation meant to give them a path to citizenship that was first introduced in 2001. Approximately 1.3 million Dreamers were eligible to enroll in DACA, and to date approximately 800,000 have done so.

The same day, the Department of Homeland Security ("DHS") issued a memorandum memorializing the rescission. The Attorney General announced that, effective immediately, DHS would stop processing or accepting new DACA applications, cease allowing DACA registrants to visit their families abroad and return to the United States, and issue renewals only for registrants whose terms expired before March 5, 2018 as long as they applied for renewal by October 5, 2018.

7. The Trump Administration announced this rescission without regard to the Due Process rights of the DACA registrants, and without engaging in the analysis or rulemaking procedures required by the Regulatory Flexibility Act and the Administrative Procedure Act, both of which were enacted to safeguard against government action taken without a legitimate and reasoned basis.

8. As a result, the NAACP, whose membership includes DACA registrants across the United States, respectfully requests that this Court declare the termination of the DACA program unlawful, and enjoin the Trump Administration from effectuating its rescission.

## II. JURISDICTION AND VENUE

9. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

10. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. Several Defendant agencies are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Columbia.

## III. PARTIES

11. The National Association for the Advancement of Colored People (NAACP) is the nation's largest and oldest civil rights grassroots organization. Since its founding in 1909, the mission of the NAACP has been to ensure the political, educational, social, and economic

equality of all persons and to eliminate race-based discrimination. The NAACP has fought in the courts for decades to protect the guarantee of equal protection under law. To advance its mission, the NAACP has represented parties in landmark civil rights cases, perhaps most famously in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), which outlawed segregation in public schools. The NAACP also has filed numerous *amicus* briefs over its decades of existence in cases that significantly impact people of color.

12. NAACP has members throughout the country who are enrolled in the DACA Program. Accordingly, the NAACP brings this action on behalf of those members who are currently enrolled in, and who applied to enroll in, the DACA Program. NAACP members who are DACA registrants reside throughout the United States, including in California, Florida, New York, and Rhode Island, as well as other States.

13. Defendant Donald J. Trump is the President of the United States. He authorized the issuance of the Department of Homeland Security ("DHS") Memorandum that purports to rescind DACA. He is being sued in his official capacity.

14. Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States, and announced the rescission of the DACA Program on September 5, 2017. He has ultimate authority over prosecutions by the Department of Justice for violation of the immigration laws. He is being sued in his official capacity.

15. Defendant Elaine C. Duke is the Acting Secretary of the Department of Homeland Security ("DHS"). She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the United States Citizenship and Immigration Service ("USCIS") and the Immigration and Customs Enforcement ("ICE"). She is being sued in her official capacity.

16.     Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

17.     Defendant USCIS is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

18.     Defendant ICE is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

19.     Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

## IV.   FACTUAL ALLEGATIONS

### A.   The DACA Program Promised Young Immigrants Opportunities and Indefinite Deferral of Deportation in Exchange for Registration in the DACA Program and Disclosure of Their Immigration Status

20.     On June 15, 2012, former Secretary of Homeland Security, Janet Napolitano, issued a memorandum establishing a deferred deportation program. She inveighed against "blindly enforc[ing]" immigration laws to deport those who came to the United States as children, and who have been productive Americans. As part of exercising prosecutorial discretion, the government developed a program that must be meet by Dreamers:

  a.    That they were under the age of 31 as of June 15, 2012;

  b.    That they entered the United States prior to their 16th birthday;

  c.    That they had resided in the United States since June 15, 2007 and were currently present in the U.S.;

  d.    That they were in the United States on June 15, 2012 and physically in the U.S. at the time they requested deferred action;

e. That they entered the United States without border inspection before June 15, 2012, or their immigration status expired prior to June 15, 2012;

f. That they were currently in school, have graduated, or obtained an equivalent certificate of completion from high school, successfully obtained a general education development (GED) certificate, or must have been honorably discharged from the Armed Services of the United States; and

g. That they must not have been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and must not pose a threat to national security or public safety.[3]

21. In addition to meeting these requirements, DACA recipients must provide the following as part of the application process: financial records, medical records, school records (diploma, report card, GED certificate, high-school transcript), employment records, or military records (personnel records, health record).

22. Applicants are also required to provide biographical information, including the date of their arrival in the country, previous departures and previous addresses for both themselves and those with whom they traveled.

23. Applicants are required to send all the forms (including the I-821D form, the I-765 form, the I-765 worksheet and the G-1145 notification) to the USCIS for processing. The Application Package Fee cost $170; processing the USCIS Application Fee cost $495. There is

---

[3] *Prepare Your Deferred Action for Childhood Arrivals (DACA) Application Online!,* AM. IMMIGRATION CTR., https://www.us-immigration.com/deferred-action-application-I-821D.jsp (last visited Sept. 18, 2017).

also a Biometrics Fee of $85.[4] With over 800,000 DACA registrants, those fees exceeded $604,000,000 in revenue paid to the United States.

24. After submitting all documentation to USCIS, applicants are then scheduled for a "Biometric Services Appointment." At this appointment, USCIS agents recorded applicants' signatures, photographs, and fingerprints.[5]

25. USCIS Agents sometimes request samples of DNA for applicants from developing countries who did not have birth certificates, or "when there are suspicious discrepancies within the case."[6]

26. The successful DACA registrant receives a "DACA Approval Notice" that lists only "fraud or misrepresentation" as a basis for revoking their "lawful presence" in the country.

27. Once accepted into the DACA Program, a registrant can only be removed from the program after being provided notice and only on grounds prescribed in the Program rules. The 2013 standard operating procedure (SOP) for the USCIS for the DACA Program states that removal was to be based upon criminal, national security, or public safety risks, or fraud. Furthermore, and consistent with due process, the DACA registrant had to receive a "Notice of Intent to Terminate" that would thoroughly explain why USCIS was intending to terminate the registrant from the program. The Notice would need to include a "fully documented SOF and any other relevant documents/information." The DACA registrant then had 33 days to submit evidence to "overcome the grounds for termination."

---

[4] *Id.*

[5] *Preparing for Your Biometric Services Appointment*, USCIS, https://www.uscis.gov/forms/forms-information/preparing-your-biometric-services-appointment#What%20to%20Expect (last accessed Sept. 18, 2017).

[6] *What Happens at a USCIS Biometrics Appointment*, CITIZEN PATH, https://citizenpath.com/uscis-biometrics-appointment (last accessed Sept. 18, 2017).

28. The U.S. also promised DACA applicants that the information they provided would not be used against them in deportation proceedings, or against their family members whose undocumented status could also be revealed by applying to the program.[7]

29. The commitment not to use biographical information against applicants was reiterated by then DHS Secretary Jeh Johnson in 2016: "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. **More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determines that a case involves a national security threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."[8]**

30. Secretary Johnson explained that this policy, articulated in connection with the DACA Program, was a "long-standing and consistent practice" followed by the predecessor INS to not use information submitted by people seeking deferred action in enforcement actions.

31. Relying on these promises, DACA Program applicants and registrants provided the federal government with extensive personal identifying information with the understanding it would not be used to deport them.

---

[7] *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions, (last accessed Sept. 18, 2017).

[8] Letter from Jeh Johnson, Sec'y, SEC, to Hon. Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

B. **DACA Program Registrants Relied on the Government's Promises When They Invested in Their Futures in the United States**

32. Assured of indefinite deferral of any risk of deportation, immigrants who enrolled in DACA made investments in their education, property, and careers.

33. In an August 2017 survey, researcher Tom K. Wong found that:

- Annual earnings had increased 80 percent under DACA — from an average of $20,000 to an average of $36,000;

- 65 percent of DACA Program registrants had purchased a first car;

- 16 percent had become homeowners;

- 5 percent had started their own businesses;

- 60 percent of DACA Program registrants above the age of 25 said that, relying on deferral of deportation, they had been able to find jobs that better suited their education and training; and

- 61 percent said they had been able to find jobs that suited the careers they wanted to have.[9]

34. In addition, about 900 DACA registrants are members of the military.[10] These enlistees are part of a Pentagon pilot project called Military Accessions Vital to the National Interest. The program waives certain citizenship requirements for green card holders, refugees and DACA Program registrants with skills that the military considers essential to the national interest.

35. Some of the DACA registrants who are members of the military are also members of the NAACP.

---

[9] *See* Tom K. Wong, et al., *Results from T. Wong, et al. 2017 National DACA Study*, CTR FOR AM. PROGRESS, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf (last accessed Sept. 18, 2017).

[10] Gregory Korte, Alan Gomez and Kevin Johnson, *Trump administration struggles with fate of 900 DREAMers serving in the military*, USA TODAY (Sept. 7, 2017, 3:10 p.m.), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

36. DACA registrants have thrived under the program's protections, secure in the knowledge that the disclosures they made to the government would not be used to deport them.

C. **DACA Registrants and Applicants Now Face Imminent Threat of Deportation**

37. Despite the United States' promises and DACA registrants' reliance on those promises, on September 5, 2017, Defendant Sessions announced that the DACA program was being terminated, and the Trump administration began the countdown to deporting DACA registrants and applicants.

### 1. DACA Applicants

38. As of the date of Defendant Sessions' announcement on September 5, 2017, no new DACA applications will be accepted or processed.[11]

39. Thus, potential registrants who have submitted an application, but whose application has not yet been processed, will not enjoy *any* DACA protection.

40. Nevertheless, because USCIS has access to personal identifying information of DACA Program applicants, including their immigration status, these applicants are subject to heightened risk of deportation.

### 2. DACA Registrants

41. Following the September 5, 2017 announcement, DACA and work permits will only remain valid for registrants until their expiration date.[12]

42. Registrants whose permits are set to expire before March 5, 2018 must apply for a two-year renewal by October 5, 2017.[13]

---

[11] *Deferred Action for Childhood Arrivals 2017 Announcement*, USCIS, https://www.uscis.gov/daca2017 (last accessed Sept. 18, 2017).

[12] *Id.*

[13] *Id.*

43. Following the September 5, 2017 announcement, the Department of Homeland Security will no longer grant DACA registrants permission to travel abroad through DACA's "Advance Parole" program. Moreover, any pending applications for Advance Parole will not be processed.[14]

### D. DACA Registrants Consist Mostly of Immigrants of Color

44. Nearly all of the DACA registrants—more than 95%—are people of color. These 95% of DACA registrants come from Africa and the Caribbean, Central and South America, East Asia and Southeast Asia, and the Middle East.

45. The termination of the DACA Program will therefore disproportionately harm immigrants of color.

## V. CAUSES OF ACTION

### COUNT I
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. §2201

46. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

47. DACA applicants and registrants provided biographical and biometric information about themselves and family members to USCIS and DHS at the time of their application.

48. DACA applicants have been told that they must submit requests to renew work authorizations by October 5, 2017.

49. Defendants have made assurances that information provided to DHS by DACA Program applicants would not be used against them or their family in any deportation proceedings.

---

[14] *Id.*

50. As former DHS Secretary Jeh Johnson assured: "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determine that a case involves a national security threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."

51. In the current version of Frequently Asked Questions published by USCIS and DHS, DACA applicants are told that "Individuals whose cases are deferred pursuant to DACA will not be referred to ICE," and that, "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians."

52. Notwithstanding these assurances, termination of the DACA Program is accompanied by withdrawal of the guarantee that information provided by DACA applicants and registrants will not be used in deportation proceedings.

53. The NAACP, on behalf of its members who are DACA applicants and registrants, seeks a declaration that the Defendants may not use information about their immigration status and means of contacting them and their families in any deportation proceedings that may ensue after the DACA program has ended.

## COUNT II
## VIOLATION OF THE DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT

54. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

55. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Government from depriving any person of life, liberty, or property without due process of law.

56. All DACA registrants relied upon promises made by Federal immigration authorities and the Department of Justice. These included promises not to use information about their immigration status and other personal characteristics against them or family members in enforcement proceedings; promises not to terminate them from the DACA program without justification and notice; and a promise to provide employment authorization to those eligible.

57. As a result of the Defendants' promises regarding the DACA program, DACA applicants voluntarily provided potentially incriminating information to the Defendants that they would not have otherwise provided.

58. As a result of the Defendants' promises regarding the DACA Program, DACA registrants obtained employment authorizations, and purchased property, such as cars and homes. Some also paid college tuition with the expectation that it would eventually lead to graduation with a degree.

59. The Due Process Clause of the Fifth Amendment also requires that immigration enforcement actions taken by the federal government be fundamentally fair and neither arbitrary nor capricious.

60. Defendants will violate the Due Process Clause when they use in deportation proceedings any information provided by DACA applicants that the Defendants elicited through promises that such information would not be used for that purpose.

61. Defendants have also violated the Due Process Clause by reneging on promises that applicants allowed to register in the DACA program could only be deprived of their status as

lawfully present if there was an issue of fraud, criminal, national security, or public safety issue. Moreover, termination required a "notice of an intent to terminate" that provided all reasons and documents supporting the determination. Further, DACA registrants were to be given an opportunity to submit evidence rebutting that determination. The DHS rescission memorandum removes the lawful presence status afforded the DACA registrant and subjects them to an imminent risk of deportation.

62. Defendants' rescission of the DACA program and safeguards to immigrants who qualified as lawfully present residents, absent any cause or justification particular to them, renders this action arbitrary and capricious, in violation of the Due Process Clause of the Fifth Amendment.

63. Defendants' rescission of the DACA program, and the imminent threat of deportation to its registrants and applicants, causes ongoing harm to those DACA program registrants and applicants who are members of the Plaintiff.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### 5 U.S.C. § 706(2)(A) AND (D)

64. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

65. Rescission of the DACA program is governed by the Administrative Procedure Act, as it constitutes an agency action, pursuant to 5 U.S.C. § 551(13), and constitutes a rule making, pursuant to 5 U.S.C. § 551(5).

66. As the action to rescind the DACA program fails to be supported by, or even accompanied by, a rationale that justifies the withdrawal of a longstanding program lawfully instituted and which engendered serious reliance interests by its participants, it is arbitrary,

capricious and an abuse of discretion in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2).

67. In addition, the action to rescind the DACA program constitutes a rulemaking within the meaning of the Administrative Procedure Act because it forbids DHS from continuing to defer deportation of individuals who were lawful registrants of the DACA program.

68. As rescission of the DACA program was undertaken without first submitting the action for notice and public comment, it violates Section 553 of the Administrative Procedure Act and constitutes an unlawful rulemaking.

69. Defendants' violation of the APA causes ongoing harm to the Plaintiff and DACA registrants and applicants that are members of Plaintiff's organization.

## COUNT IV
## VIOLATION OF THE REGULATORY FLEXIBILITY ACT, 5 U.S.C. § 601

70. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs.

71. The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

72. "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

73. The actions that DHS has taken to implement the DHS Memorandum are "rules" under the RFA. 5 U.S.C. § 601(2).

74. The actions that DHS has taken to implement the DACA rescission are likely to have a significant economic impact on a substantial number of small entities, like the Plaintiff. 5 U.S.C. § 602(a)(1).

75.  Defendants have not issued the required analyses of DHS's new rules.

76.  Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

77.  Defendants' violation causes ongoing harm to the DACA registrants and applicants employed by or members of Plaintiff's non-profit organization

### PRAYER FOR RELIEF

Wherefore, the Plaintiff prays that the Court:

a)  Declare that the DHS Memorandum rescinding the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

b)  Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are procedurally unlawful under the APA;

c)  Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are substantively unlawful under the APA;

d)  Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are unlawful under the RFA;

e)  Enjoin Defendants from rescinding the DACA program, pending further orders from this Court;

f)  Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA registrant or applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

g) Award such additional relief as deemed just and appropriate.

September 18, 2017                              Respectfully submitted,

      /s/ Joseph M. Sellers
Joseph M. Sellers (DC # 318410)
Douglas J. McNamara (DC # 494567)
Julia A. Horwitz (DC # 1018561)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
Email: jsellers@cohenmilstein.com
       dmcnamara@cohenmilstein.com
       jhorwitz@cohenmilstein.com


      /s/ Bradford Berry
Bradford Berry
Janette Louard
NAACP National Headquarters
4805 Mount Hope Drive
Baltimore, MD 21215
Telephone: 410-580-5787
Email: bberry@naacpnet.org
       jlouard@naacpnet.org

*Attorneys for Plaintiff, NAACP*