UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, AND THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC, <br><br> Plaintiffs, <br><br> vs. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as the Attorney General of the United States, ELAINE C. DUKE, in her official capacity as acting Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DEPARTMENT OF HOMELAND SECURITY; AND THE UNITED STATES OF AMERICA, <br><br> Defendants. | Case No.1:17-cv-01907 |

**[PROPOSED] FIRST AMENDED COMPLAINT**

**I.   INTRODUCTION**

1.  The National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union, AFL-CIO, CLC ("UFCW") bring this action in their organizational capacities against the President of the United States and the federal government for unlawfully

reneging on their promise to protect young, undocumented immigrants of color living in the United States. This action alleges violations of the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, and the Regulatory Flexibility Act. This action also seeks declaratory relief pursuant to 28 U.S.C. §2201.

    2.      The Deferred Action for Childhood Arrivals ("DACA") refers to the United States' immigration policy concerning undocumented immigrants who arrived in America as children. Under this policy, people who immigrated to the United States when they were younger than 16 and have lived in the United States continuously since 2007 were eligible to defer deportation indefinitely, attend school, and receive two-year work permits, among other benefits.

    3.      The vast majority of DACA registrants are people of color. More than 80% of registrants are of Mexican origin.

    4.      In exchange for providing the federal government with extensive biographic and biometric information, DACA registrants[1] received the United States' promise that they could build lives for themselves in the United States without fear of prosecution or deportation.

    5.      However, a little less than two weeks ago, the President of the United States and the United States Attorney General announced their intention to renege on those promises.

    6.      On September 5, 2017, Attorney General Jeff Sessions, on behalf of President Donald Trump, announced that the Trump Administration was rescinding the DACA program. The same day, the Department of Homeland Security ("DHS") issued a memorandum memorializing the rescission. The Attorney General announced that, effective immediately, DHS

---

[1] The children of undocumented parents who were brought to this country and grew up here became known as DREAMers, after the DREAM Act, a piece of legislation meant to give them a path to citizenship that was first introduced in 2001. Approximately 1.3 million Dreamers were eligible to enroll in DACA, and to date approximately 800,000 have done so.

would stop processing or accepting new DACA applications, cease allowing DACA registrants to visit their families abroad and return to the United States, and issue renewals only for registrants whose terms expired before March 5, 2018 as long as they applied for renewal by October 5, 2018.

7.   The Trump Administration announced this rescission without regards to the Due Process rights of the DACA registrants, and without engaging in the required analysis or rulemaking procedures required by the Regulatory Flexibility Act and the Administrative Procedure Act, both of which are laws put into place to safeguard the public against this very type of impulsiveness by leaders in powerful positions.

8.   As a result, the NAACP, AFT, and UFCW, whose respective memberships include DACA registrants across the United States, respectfully requests that this Court declare the termination of the DACA program unlawful, and enjoin the Trump Administration from effectuating its rescission.

## II.   JURISDICTION AND VENUE

9.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

10.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. Several Defendant agencies are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Columbia.

## III.   PARTIES

11.   The National Association for the Advancement of Colored People is the nation's largest and oldest civil rights grassroots organization. Since its founding in 1909, the mission of the NAACP has been to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination. The NAACP has fought in the courts for

decades to protect the guarantee of equal protection under law. To advance its mission, the NAACP has represented parties in landmark civil rights cases, perhaps most famously in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954), which outlawed segregation in public schools. The NAACP also has filed numerous *amicus* briefs over its decades of existence in cases that significantly impact people of color.

12. NAACP has members throughout the country who are enrolled in the DACA Program. Accordingly, the NAACP brings this action on behalf of those members who are currently enrolled in, and who applied to enroll in, the DACA Program. NAACP members who are DACA registrants reside throughout the United States, including in California, Florida, New York, and Rhode Island, as well as other States.

13. The American Federation of Teachers ("AFT"), an affiliate of the AFL-CIO, was founded in 1916, and today represents approximately 1.7 million members who are employed across the nation in K-12 and higher education, public employment, and healthcare. The AFT has a longstanding history of supporting and advocating for the civil rights of its members and the communities they serve.

14. The AFT has members throughout the country that have received work permits through the DACA program. These members have utilized DACA work permits to obtain employment in institutions that provide essential and necessary services, such as healthcare and education, to the public. AFT members also teach students who have received DACA benefits. These students are integral members of their educational institutions. They contribute to the diversity of experience and viewpoint in classrooms, engage in valuable research projects, and play leadership roles in student life.

15. The United Food and Commercial Workers International Union, AFL-CIO, CLC is a labor organization which represents working men and women across the United States. UFCW's 1.3 million members work in a range of industries, with the majority working in retail food, non-food retail, meatpacking and poultry, food processing, and manufacturing. UFCW is the largest union of young workers with 40% of its members under the age of 30. UFCW's objective is the elevation of its members and other employees engaged in the performance of work through improving their wages, hours, benefits, and working conditions. More broadly, UFCW fights to advance and safeguard full employment, economic security, and social welfare of its members and their communities.

16. UFCW and its predecessor unions have represented immigrants from around the world since the beginning of the last century, particularly workers in the packinghouses and stockyards. Immigrant workers continue to form a vital part of these and other workforces that UFCW represents. In particular, UFCW has members who are DACA recipients across industries in which it represents employees. UFCW is proud that its representation enables DACA recipients to personally advance and contribute to their families and American society generally.

17. Defendant Donald J. Trump is the President of the United States. He authorized the issuance of the Department of Homeland Security Memorandum that purports to rescind DACA. He is being sued in his official capacity.

18. Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States, and announced the purported rescission of DACA on September 5, 2017. He has ultimate authority over prosecutions by the Department of Justice for violation of the immigration laws. He is being sued in his official capacity.

19. Defendant Elaine C. Duke is the Acting Secretary of the Department of Homeland Security. She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the United States Citizenship and Immigration Service ("USCIS") and the Immigration and Customs Enforcement ("ICE"). She is being sued in her official capacity.

20. Defendant DHS is a federal cabinet agency responsible for implementing the DACA program. DHS is a Department of the Executive Branch of the U.S. Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

21. Defendant USCIS is an Operational and Support Component agency within DHS. USCIS is the sub-agency responsible for administering the DACA program.

22. Defendant ICE is an Operational and Support Component agency within DHS. ICE is responsible for enforcing federal immigration law, including identifying, apprehending, detaining, and removing non-citizens.

23. Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

## IV.   FACTUAL ALLEGATIONS

### A.   The DACA Program Promised Young Immigrants Opportunities and Peace of Mind in Exchange for Extensive Personal Data

24. On June 15, 2012, former Secretary of Homeland Security, Janet Napolitano, issued a memorandum establishing a deferred prosecution program. She inveighed against "blindly enforc[ing]" immigration laws to deport those who came to the United States as children, and who have been productive Americans. As part of exercising prosecutorial discretion, the government developed extensive criteria that must be meet by Dreamers

   a. That they were under the age of 31 as of June 15, 2012;

   b. That they entered the United States prior to their 16th birthday;

  c. That they had resided in the United States since June 15, 2007 and currently are present in the U.S.;

  d. That they were in the United States on June 15, 2012 and must be physically in the U.S. at the time of filing for your request for deferred action;

  e. That they entered the United States without border inspection before June 15, 2012, or their immigration status expired prior to June 15, 2012;

  f. That they must be currently in school, have graduated, or obtained an equivalent certificate of completion from high school, successfully obtained a general education development (GED) certificate, or must have been honorably discharged from the Armed Forces of the United States; and

  g. That they must not have been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and must not pose a threat to national security or public safety.[2]

25. In addition to meeting these requirements, DACA recipients had to provide the following as part of the application process: financial records, medical records, school records (diploma, report card, GED certificate, high-school transcript), employment records, or military records (personnel records, health record).

26. Applicants are required to provide biographical information, including their arrival in the country, previous departures, previous addresses of both themselves and those they traveled with.

---

[2] *Prepare Your Deferred Action for Childhood Arrivals (DACA) Application Online!,* Am. Immigration Ctr., https://www.us-immigration.com/deferred-action-application-I-821D.jsp (last visited Sept. 18, 2017).

27. Applicants were required to send all the forms (including the I-821D form, the I-765 form, the I-765 worksheet and the G-1145 notification) to the USCIS for processing. The Application Package Fee cost $170; processing the USCIS Application Fee cost $495. There was also a Biometrics Fee of $85.[3] With over 800,000 DACA registrants, those fees exceeded $604,000,000 in revenue for the United States.

28. After submitting all documentation to USCIS, applicants were then scheduled for a "Biometric Services Appointment." At this appointment, USCIS agents captured applicants' signatures, photographs, and fingerprints, using special machines designed to collect these biometrics.[4]

29. USCIS Agents sometimes requested DNA testing from applicants from developing countries who did not have birth certificates, or "when there are suspicious discrepancies within the case."[5]

30. The successful DACA registrant received a "DACA Approval Notice" that lists only "fraud or misrepresentation" as a basis for revoking their "lawful presence" in the country.

31. Once accepted into DACA, a registrant's removal could not occur without justification and notice. The 2013 standard operating procedure (SOP) for the USCIS for DACA states that removal needed to be based upon criminal, national security, or public safety issues, or fraud. Furthermore, and consistent with due process, the DACA registrant had to receive a "Notice of Intent to Terminate" that would thoroughly explain why USCIS was intending to

---

[3] *Id.*

[4] *Preparing for Your Biometric Services Appointment*, USCIS, https://www.uscis.gov/forms/forms-information/preparing-your-biometric-services-appointment#What%20to%20Expect (last accessed Sept. 18, 2017).

[5] *What Happens at a USCIS Biometrics Appointment*, Citizen Path, https://citizenpath.com/uscis-biometrics-appointment (last accessed Sept. 18, 2017).

terminate the registrant from the program. The Notice would need to include a "fully documented SOF and any other relevant documents/information." The DACA registrant then had 33 days to submit any evidence that he or she felt could "overcome the grounds for termination."

32.     The U.S. also promised DACA applicants that the information they provided **would not be used against them in deportation proceedings, or against their family members whose undocumented status could also be revealed by applying to the program.** [6]

33.     The commitment not to use biographical information against applicants was reiterated by then DHS Secretary Jeh Johnson in 2016: "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. **More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determines that a case involves a national security threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."**[7]

34.     Secretary Johnson explained that this was not just a DACA-related policy by DHS, but even its predecessor (INS) had a "long-standing and consistent practice" of not using information submitted by people seeking deferred action in enforcement actions.

35.     Relying on these promises, DACA Program applicants and registrants provided

the federal government with extensive personal identifying information with the

---

[6] *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions, (last accessed Sept. 18, 2017).

[7] Letter from Jeh Johnson, Sec'y, SEC, to Hon. Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

understanding it would not be used to deport them.

### B. DACA Recipients Relied on the Government's Promises When Investing in Their Own Futures

36. Assured of indefinite deferral of any risk of deportation, immigrants who enrolled in DACA made investments in their education, property, and careers.

37. In an August 2017 survey, researcher Tom K. Wong found that:

- Annual earnings had increased 80 percent under DACA — from an average of $20,000 to an average of $36,000;

- 65 percent of DACA recipients had purchased a first car;

- 16 percent had become homeowners;

- 5 percent had started their own businesses;

- 60 percent of DACA recipients above the age of 25 said that with DACA they'd been able to find jobs that better suited the education and training they already had; and

- 61 percent said they'd been able to find jobs that suited the careers they wanted to have.[8]

38. In addition, about 900 DACA registrants are enrolled in the military.[9] These enlistees are part of a Pentagon pilot project called Military Accessions Vital to the National Interest. The program waives certain citizenship requirements for green card holders, refugees and DACA recipients with skills that the military considers essential to the national interest.

39. Some of the DACA registrants who are members of the military are also members of the NAACP.

---

[8] *See* Tom K. Wong, et al., *Results from T. Wong, et al. 2017 National DACA Study*, Ctr for Am Progress, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf (last accessed Sept. 18, 2017).

[9] Gregory Korte, Alan Gomez and Kevin Johnson, *Trump administration struggles with fate of 900 DREAMers serving in the military*, USA Today (Sept. 7, 2017, 3:10 p.m.), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

40. DACA registrants have thrived under DACA's protections, in reliance on the United States' promises.

41. DACA-recipients will be unable to sustain the lives they have built once their ability to work legally is taken away with the rescission of DACA. In addition, the rescission will place severe burdens on employers, putting them in a position of having to terminate valuable and productive employees while scrambling to fill both high-skilled and entry-level vacancies in their labor force.

### C. DACA Registrants and Applicants Now Face Imminent Threat of Deportation

42. Despite the United States' promises and DACA registrants' reliance on those promises, on September 5, 2017, Defendant Sessions announced that the DACA program was being terminated, and the Trump administration began the countdown to deportment for DACA registrants and applicants.

#### 1. DACA Applicants

43. As of the date of Defendant Sessions' announcement on September 5, 2017, no new DACA applications will be accepted or processed.[10]

44. Thus, potential registrants who have submitted an application, but whose application has not yet been processed, will not enjoy *any* DACA protection.

45. Nevertheless, because USCIS has access to an enormous amount of DACA applicants' personally identifying information, including the fact that they are otherwise undocumented, these applicants are at a dramatically increased risk of deportation.

#### 2. DACA Registrants

---

[10] *Deferred Action for Childhood Arrivals 2017 Announcement*, USCIS, https://www.uscis.gov/daca2017 (last accessed Sept. 18, 2017).

46. Following the September 5, 2017 announcement, DACA and work permits will only remain valid for registrants until their expiration date.[11]

47. Registrants whose permits are set to expire before March 5, 2018 must apply for a two-year renewal by October 5, 2017.[12]

48. Following the September 5, 2017 announcement, the Department of Homeland Security will no longer grant DACA registrants permission to travel abroad through DACA's "Advance Parole" program. Moreover, any pending applications for Advance Parole will not be processed.[13]

### D. DACA Registrants Consist Mostly of Immigrants of Color

49. Nearly all of the DACA registrants—more than 95%—are people of color. These 95% of DACA registrants come from Africa and the Caribbean, Central and South America, East.

50. The termination of DACA will disproportionately affect immigrants of color..

## V. CAUSES OF ACTION

### COUNT I
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. §2201

51. Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

52. DACA applicants and registrants provided biographical and biometric information about themselves and family members to USCIS and DHS at the time of their application.

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

53.     DACA applicants have been told that they must provide any renewals for work authorizations by October 5, 2017.

54.     Defendants have heretofore made assurances that information provided to them as part of the DACA program would not be used against them or their family in any deportation proceedings.

55.     As former DHS Secretary Jeh Johnson assured: "Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. More specifically, the U.S. government represented to applicants that personal information they provided will not later be used for immigration enforcement purposes except where it independently determine that a case involves a national security threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law."

56.     In the current version of Frequently Asked Questions published by USCIS and DHS, DACA applicants are told that "Individuals whose cases are deferred pursuant to DACA will not be referred to ICE," and that, "information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians."

57.     Notwithstanding these assurances, termination of DACA Program is accompanied by withdrawal of the guarantee that information provided by DACA applicants and registrants in deportation proceedings.

58.     Plaintiffs, on behalf of their respective members who are DACA applicants and registrants, seek a declaration that the Defendants may not use information about their

immigration status and means of contacting them and their families in any deportation proceedings that may ensue after the DACA program has ended.

## COUNT II
## VIOLATION OF THE DUE PROCESS CLAUSES OF THE FIFTH AMENDMENT

59. Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

60. The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the Government from depriving any person of life, liberty, or property without due process of law.

61. All DACA registrants relied upon promises made by Federal immigration authorities and the Department of Justice. These included promises not to use information against them or family members in enforcement proceedings; promises not to terminate them from the DACA program without justification and notice; and a promise to provide employment authorization to those eligible.

62. As a result of the Defendants' promises regarding the DACA program, DACA applicants voluntarily provided potentially incriminating information to the Defendants that they would not have otherwise provided.

63. As a result of the Defendants' promises regarding the DACA Program, DACA registrants obtained employment authorizations, and purchased property, such as cars and homes. Some also paid college tuition with the expectation that it would eventually lead to graduation with a degree.

64. The Due Process Clause of the Fifth Amendment also requires that immigration enforcement actions taken by the federal government be fundamentally fair and neither arbitrary nor capricious.

65. Defendants will violate the Due Process Clause when they use in deportation proceedings any information provided by DACA applicants that the Defendants elicited through promises that such information would not be used for that purpose.

66. Defendants have also violated the Due Process Clause by reneging on promises that applicants allowed to register in the DACA program could only be deprived of their status as lawfully present if there was an issue of fraud, criminal, national security, or public safety issue. Moreover, termination required a "notice of an intent to terminate" that provided all reasons and documents supporting the determination. Further, DACA registrants were to be given an opportunity to submit evidence rebutting that determination. The DHS rescission memorandum removes the lawful presence status afforded the DACA registrant and subjects them to an imminent risk of deportation.

67. Defendants' rescission of the DACA program and safeguards to immigrants who qualified as lawfully present residents, absent any cause or justification particular to them, renders this action arbitrary and capricious, in violation of the guarantee of due process by the Fifth Amendment.

68. Defendants' rescission of the DACA program, and the imminent threat of deportation to its registrants and applicants, causes ongoing harm to those DACA program registrants and applicants who are members of the Plaintiffs' organizations.

### COUNT III
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT 5 U.S.C. § 706(2)(A) AND (D)

69. Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

70. Rescission of the DACA program is governed by the Administrative Procedure Act, as it constitutes an agency action, pursuant to 5 U.S.C. § 551(13), and constitutes a rule

making, pursuant to 5 U.S.C. § 551(5).

71. As the action to rescind the DACA program fails to be supported by, or even accompanied by, a rationale that justifies the withdrawal of a longstanding program lawfully instituted and which engendered serious reliance interests by its participants, it is arbitrary, capricious and an abuse of discretion in violation of the Administrative Procedure Act. 5 U.S.C. § 706(2).

72. In addition, the action to rescind the DACA program constitutes a rulemaking within the meaning of the Administrative Procedure Act because it forbids DHS from continuing to defer deportation of individuals who were lawful registrants of the DACA program.

73. As rescission of the DACA program was undertaken without first submitting the action for notice and public comment, it violates Section 553 of the Administrative Procedure Act and constitutes an unlawful rulemaking.

74. Defendants' violation of the APA causes ongoing harm to the Plaintiffs and DACA registrants and applicants that are members of Plaintiffs' organizations.

## COUNT IV
## VIOLATION OF THE REGULATORY FLEXIBILITY ACT, 5 U.S.C. § 601

75. Plaintiffs reallege and incorporate by reference all of the allegations contained in the preceding paragraphs.

76. The Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 ("RFA"), requires federal agencies to analyze the impact of rules they promulgate on small entities and publish initial and final versions of those analyses for public comment. 5 U.S.C. §§ 603-604.

77. "Small entities" for purposes of the RFA includes small businesses, small nonprofits, and small governmental jurisdictions. 5 U.S.C. § 601(6).

78. The actions that DHS has taken to implement the DHS Memorandum are "rules"

under the RFA. 5 U.S.C. § 601(2).

79.     The actions that DHS has taken to implement the DACA rescission are likely to have a significant economic impact on a substantial number of small entities, like the Plaintiff organizations. 5 U.S.C. § 602(a)(1).

80.     Defendants have not issued the required analyses of DHS's new rules.

81.     Defendants' failure to issue the initial and final Regulatory Flexibility Analyses violates the RFA and is unlawful.

82.     Defendants' violation causes ongoing harm to the DACA registrants and applicants employed by or members of Plaintiffs' non-profit organizations.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiffs pray that the Court:

a)     Declare that the DHS Memorandum rescinding the DACA program is unauthorized by and contrary to the Constitution and laws of the United States;

b)     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are procedurally unlawful under the APA;

c)     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are substantively unlawful under the APA;

d)     Declare that the actions that DHS has taken to implement the DHS Memorandum rescinding the DACA program are unlawful under the RFA;

e)     Enjoin Defendants from rescinding the DACA program, pending further orders from this Court;

f)      Enjoin Defendants from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA registrant

      or applicant or member of any DACA applicant's family, or take any action against a DACA applicant's current or former employer; and

g)    Award such additional relief as deemed just and appropriate.

October 23, 2017                              Respectfully submitted,

                                           */s/ Joseph M. Sellers*
                                           Joseph M. Sellers (DC # 318410)
                                           Douglas J. McNamara (DC # 494567)
                                           Julia A. Horwitz (DC # 1018561)
                                           Cohen Milstein Sellers & Toll PLLC
                                           1100 New York Ave. NW ● Fifth Floor
                                           Washington, DC 20005
                                           Telephone:  (202) 408-4600
                                           Fax: (202) 408-4699
                                           Email: jsellers@cohenmilstein.com
                                                   dmcnamara@cohenmilstein.com
                                                  jhorwitz@cohenmilstein.com

                                           Bradford Berry (DC # 426326)
                                           Janette Louard
                                           NAACP National Headquarters
                                           4805 Mount Hope Drive
                                           Baltimore, MD 21215
                                           Telephone: (410) 580-5787
                                           Email:  bberry@naacpnet.org
                                                  jlouard@naacpnet.org

                                           *Attorneys for Plaintiff, NAACP*

David J. Strom (DC # 376233)
Channing Cooper
Jessica Rutter
American Federation of Teachers
555 New Jersey Ave. NW
Washington, DC 20001
Telephone: 202-879-4400
Email: dstrom@aft.org
      ccooper@aft.org
      jrutter@aft.org

*Attorneys for Plaintiff, AFT*


Nicholas W. Clark, General Counsel
Renee L. Bowser, Assistant General Counsel
United Food & Commercial Workers
International Union, AFL-CIO, CLC
1775 K Street, NW
Washington, DC 20006
Telephone: (202) 466-1522
Email: nclark@ufcw.org
      rbowser@ufcw.org

*Attorneys for Plaintiff, UFCW*

## CERTIFICATE OF SERVICE

      I hereby certify that on October 23, 2017, I electronically filed Plaintiffs' Amended Complaint with the Clerk of the Court using ECF, which in turn sent notice to all parties of record.

Dated: October 23, 2017                      /s/ *Julia A. Horwitz*
                                                       Julia A. Horwitz