# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THE NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED
PEOPLE, *et al.*,

        Plaintiffs,

      v.

DONALD J. TRUMP, in his official
capacity as President of the United States, *et
al.*,

        Defendants.

Civil Action No. 17-1907 (CRC)

## DEFENDANTS' MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants
respectfully move the Court to dismiss this action or, in the alternative, to grant summary judgment
to Defendants. *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 8, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/  Kate Bailey
KATE BAILEY
RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-9239
Fax: (202) 616-8470
Email: kate.bailey@usdoj.gov
Member, MD Bar

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Civil Action No. 17-1907 (CRC) |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................5

    A.    Deferred Action Generally..................................................................................5

    B.    DACA and DAPA..............................................................................................6

    C.    The *Texas* Litigation ........................................................................................8

    D.    Rescission of DACA ........................................................................................9

    E.    This Action.....................................................................................................10

LEGAL STANDARDS .......................................................................................................11

ARGUMENT ....................................................................................................................13

I.    THE COURT LACKS JURISDICTION BECAUSE PLAINTIFFS LACK STANDING.........................14

    A.    Plaintiffs Lack Article III Standing.................................................................14

        1.    Plaintiffs lack organizational standing.....................................................14

        2.    Plaintiffs lack representational standing ..................................................16

    B.    Plaintiffs Lack Prudential Standing ................................................................17

II.    THIS CASE IS NOT JUSTICIABLE .....................................................................................18

    A.    The Rescission Policy Is Not Justiciable Because this Immigration
        Enforcement Policy Is a Matter Committed to Agency Discretion
        by Law ............................................................................................................18

    B.    The INA Deprives District Courts of Jurisdiction over Challenges to
        Denials of Deferred Action .............................................................................23

    C.    The Government's Justiciability Objections Are Not Inconsistent with
        the Acting Secretary's Reliance on the Fifth Circuit's Decision ........................25

III.    PLAINTIFFS FAIL TO STATE A CLAIM .............................................................................26

    A.    Plaintiffs Fail to State an APA Claim..............................................................26

1.    The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction ..................................................................................26

2.    The Rescission Policy is exempt from notice and comment ....................33

B.    Plaintiffs Fail to State a Due Process Claim ........................................................36

1.    Plaintiffs identify no actual deprivation of liberty or property .................36

2.    There is no protected liberty or property interest in the receipt of DACA ................................................................................................39

3.    Changes in agency policy do not require individualized process .............41

C.    Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required ............................................................42

D.    Plaintiffs' Declaratory Relief "Claim" States No Independent Cause of Action ..................................................................................................................43

IV.    NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE........................43

CONCLUSION ..................................................................................................................44

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Abhe & Svoboda, Inc. v. Chao,*
    508 F.3d 1052 (D.C. Cir. 2007) ...................................................................... 12

*Ali v. Rumsfeld,*
    649 F.3d 762 (D.C. Cir. 2011) ........................................................................ 43

*Am. Chemistry Council v. Dep't of Transp.,*
    468 F.3d 810 (D.C. Cir. 2006) ........................................................................ 16

*Am. Legal Found. v. FCC,*
    808 F.2d 84 (D.C. Cir. 1987) .......................................................................... 15

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) .......................................................................................... 39

*Am. Nat'l Ins. Co. v. FDIC,*
    642 F.3d 1137 (D.C. Cir. 2011) ...................................................................... 11

*\*Arizona v. United States,*
    567 U.S. 387 (2012) ................................................................................... 5, 20

*\*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015),
    *cert denied,* 136 S. Ct. 900 (2016) ....................................................... *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................. 12, 43

*Bates v. Donley,*
    935 F. Supp. 2d 14 (D.D.C. 2013) .................................................................. 12

*Bd. of Regents v. Roth,*
    408 U.S. 564 (1972) ........................................................................................ 40

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 11, 12

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
    239 U.S. 441 (1915) ........................................................................................ 42

*Botezatu v. INS,*
    195 F.3d 311 (7th Cir. 1999) ..................................................................... 24, 25

vi

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
  419 U.S. 281 (1974) ................................................................................ 29, 30

*Broadgate, Inc. v. USCIS*,
  730 F. Supp. 2d 240 (D.D.C. 2010) ....................................................... 43

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ................................................................. 11

*Califano v. Sanders*,
  430 U.S. 99 (1977) .................................................................................... 20

*Camp v. Pitts*,
  411 U.S. 138 (1973) .................................................................................. 28

*Chaudhry v. Holder*,
  705 F.3d 289 (7th Cir. 2013) .................................................................... 6

*Chevron U.S.A. Inc. v. Echazabal*,
  536 U.S. 73 (2002) .................................................................................... 29

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) .................................................................................. 34

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ............................................................................ 20, 27

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................. 14

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) .................................................................................. 18

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ................................................................. 34

*Consumer Energy Council of Am. v. FERC*,
  673 F.2d 425 (D.C. Cir. 1982) ................................................................. 34

*Davis v. Fed. Bureau of Prisons*,
  517 F. Supp. 2d 460 (D.D.C. 2007) ........................................................ 18

*Davis v. Fed. Bureau of Prisons*,
  334 F. App'x 332 (D.C. Cir. 2009) ......................................................... 18

*De Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ........................................................................... 41

*Decatur Liquors, Inc. v. Dist. of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007) ........................................................................... 42

*Elgharib v. Napolitano*,
    600 F.3d 597 (6th Cir. 2010) ............................................................................ 23

*Elk Grove Unified Sch. Dist. v. Newdow*,
    542 U.S. 1 (2004) .............................................................................................. 15

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ..................................................................................... 27, 28

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
    93 F.3d 897 (D.C. Cir. 1996) ............................................................................ 18

*Fla. Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985) ........................................................................................... 27

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) ........................................................................................... 14

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................................... 15

*Heckler v. Chaney*,
    470 U.S. 821 (1985) .................................................................................... *passim*

*Herbert v. Nat'l Acad. of Scis.*,
    974 F.2d 192 (D.C. Cir. 1992) ........................................................................... 11

*Humane Soc'y of U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988) ............................................................................ 17

*Hurd v. Dist. of Columbia*,
    864 F.3d 671 (D.C. Cir. 2017) ........................................................................... 13

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
    482 U.S. 270 (1987) ............................................................................... 18, 21, 22

*Interstate Nat. Gas Ass'n of Am. v. FERC*,
    494 F.3d 1092 (D.C. Cir. 2007) .................................................................... 16, 17

*Kaempe v. Myers*,
    367 F.3d 958 (D.C. Cir. 2004) ................................................. 39

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989) ................................................................ 40

*Lexmark Int'l, Inc. v. Static Control Components*,
    134 S. Ct. 1377 (2014) ............................................................ 15

*Lewis v. Casey*,
    518 U.S. 343 (1996) ................................................................ 44

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................ 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................ 11, 33

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ................................................ 21

*Madsen v. Women's Health Ctr., Inc*,
    512 U.S. 753 (1994) ................................................................ 44

*Marshall Cty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .............................................. 12

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ................................................................. 26

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ................................................................ 44

*Morgan v. United States*,
    304 U.S. 1 (1938) ................................................................... 28

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) ................................................................. 27

*N.W. Mining Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) ............................................... 43

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) .............................................. 36

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ........................................................... 34

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ...................................................... 14, 15

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ............................................................. 40

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
    506 F.2d 33 (D.C. Cir. 1974) ...................................................... 34, 35

*Patterson v. United States*,
    999 F. Supp. 2d 300 (D.D.C. 2013) ................................................. 13

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ...................................................... 21, 38

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*,
    463 U.S. 1216 (1983) ........................................................................ 34

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ...................................................... 12, 13

*\*Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*),
    525 U.S. 471 (1999) .................................................................. *passim*

*San Luis Obispo Mothers for Peace v. U.S. N.R.C.*,
    789 F.2d 26 (D.C. Cir. 1986) ........................................................... 28

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ......................................................................... 15

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................................................... 15

*Spann v. Colonial Vill., Inc.*,
    899 F.2d 24 (D.C. Cir. 1990) ........................................................... 15

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ......................................................................... 16

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ........................................................... 35

*Syracuse Peace Council v. FCC*,
  867 F.2d 654 (D.C. Cir. 1989) ......................................................................... 30

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ......................................................................................... 13

*\*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .................................................................. *passim*

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) ................................................................................. 39, 40

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) ..................................................................................... 44

*Troy Corp. v. Browner*,
  120 F.3d 277 (D.C. Cir. 1997) ......................................................................... 28

*U.S. Telecom Ass'n v. FCC*,
  400 F.3d 29 (D.C. Cir. 2005) ........................................................................... 43

*United States v. Armstrong*,
  517 U.S. 456 (1996) ......................................................................................... 19

*United States v. Morgan*,
  313 U.S. 409 (1941) ......................................................................................... 28

*United States v. Texas*,
  136 S. Ct. 2271 (2016) ....................................................................................... 8

*United States v. Texas*,
  137 S. Ct. 285 (2016) ......................................................................................... 8

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
  173 F.3d 438 (D.C. Cir. 1999) ......................................................................... 13

*Vasquez v. Aviles*,
  639 F. App'x 898 (3d Cir. 2016) ..................................................................... 24

*Velasco-Gutierrez v. Crossland*,
  732 F.2d 792 (10th Cir. 1984) ................................................................... 40, 41

*Warth v. Seldin*,
  422 U.S. 490 (1975) ......................................................................................... 14

*Yancey v. Dist. of Columbia*,
   991 F. Supp. 2d 171 (D.D.C. Nov. 6, 2013) ........................................................................ 43

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) ............................................................................................. 42

STATUTES

5 U.S.C. § 553 ...................................................................................................... 3, 33, 34

5 U.S.C. § 601 ............................................................................................................ 43

5 U.S.C. § 603 ............................................................................................................ 43

5 U.S.C. § 604 ............................................................................................................ 43

5 U.S.C. § 611 ............................................................................................................ 43

5 U.S.C. § 701 ........................................................................................... 18, 19, 21, 25

5 U.S.C. § 702 ............................................................................................................ 18

5 U.S.C. § 706 ............................................................................................................ 27

6 U.S.C. § 202 ............................................................................................................ 23

6 U.S.C. § 251 ............................................................................................................ 23

6 U.S.C. § 557 ............................................................................................................ 23

8 U.S.C. § 1103 ............................................................................................................ 5

8 U.S.C. § 1154 ............................................................................................................ 6

8 U.S.C. § 1158 ............................................................................................................ 5

8 U.S.C. § 1182 ............................................................................................................ 5

8 U.S.C. § 1227 ............................................................................................................ 5

8 U.S.C. § 1229b ........................................................................................................... 5

8 U.S.C. § 1252(g) ................................................................................... 3, 23, 24, 25

8 U.S.C. § 1324a ......................................................................................................... 37

REGULATIONS

8 C.F.R. § 274a.12(c)(14) ................................................................................... 5, 6, 37


RULES

Fed. R. Civ. P. 12 .............................................................................................. 11, 12

CONSTITUTION

U.S. Const. amend. V ............................................................................................. 39

OTHER AUTHORITIES

2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (5th ed. 2010) .................................. 41

Attorney General's Manual on the Administrative Procedure Act 30 (1947) ............................. 34

USCIS, *Frequently Asked Questions* (Oct. 6, 2017) (DHS DACA FAQ),
    https://go.usa.gov/xngCd ................................................................. 7, 37, 38, 39, 40

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM................................................................................... 29

U.S. Dep't of Justice, Office of Legal Counsel,
    *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
    Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
    https://www.justice.gov/file/179206/download ................................................... 6, 32

USCIS, Policy Memorandum (Nov. 7, 2011),
    https://go.usa.gov/xncPK. ...................................................................................... 7

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states. Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn: the U.S. District Court for the Southern District of Texas issued a nationwide preliminary injunction; the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities. In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options. On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to

current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this case, Plaintiffs—the National Association for the Advancement of Colored People, the American Federation of Teachers, and the United Food and Commercial Workers International Union—challenge the Rescission Policy on a variety of statutory and constitutional grounds, urging the Court to invalidate the policy and enjoin the Acting Secretary from rescinding DACA. There is no basis to do so.

To begin, this case should be dismissed at the outset for lack of standing.  Plaintiffs declare that they bring this case in their organizational capacities, yet they identify no injury whatsoever to their own interests as organizations, and their missions have no apparent nexus to the subject of the suit.  And to the extent that Plaintiffs are suing in their representative capacities, they fail to name any of their members, much less one actually harmed by the Rescission Policy.  Thus, Plaintiffs establish no cognizable injury, and they should not be heard to air their disagreements with the Acting Secretary's policy choices here.

In any event, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *Id.* at 485; *see* 8 U.S.C. § 1252(g).  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Because this claim can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, served contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, the Department of Homeland

Security (DHS) and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the plaintiffs there established a likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. Plaintiffs' Regulatory Flexibility Act claim fails for the same reason, as that Act applies only where notice and comment is required. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' due process claim gets it no further. DACA recipients have no protected liberty or property interest in the continued receipt of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time. Regardless, broad-based changes in agency policy like the Rescission Policy do not require individualized process. Finally, Plaintiffs' separate "claim" for a declaratory judgment is a nonstarter, as a declaratory judgment is a form of relief, not an independent cause of action.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it. This case should be dismissed.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Acting Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

government which gives some cases lower priority"). Although originally "developed without express statutory authorit[y]," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.[1]

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

### B. DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo).

---

[1] *See generally* U.S. Dep't of Justice, Office of Legal Counsel, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present, 38 Op. O.L.C. 1, 12–20 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on its website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). USCIS, *Frequently Asked Questions*, (FAQ No. 19) (Oct. 6, 2017), [hereinafter DHS DACA FAQ], https://go.usa.gov/xngCd; *see* USCIS, *Policy Memorandum*, (Nov. 7, 2011), https://go.usa.gov/xncPK (Notice to Appear Guidance). DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice." DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 ("DAPA Memo"). DAPA made deferred action available to certain unlawfully

present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39). The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years. *Id.* at 3–4 (AR 39–40).

C.    The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority. *Id.* at 168. It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable. *Id.* Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

place.   On November 18, 2016, the parties jointly moved the district court to stay merits

proceedings to allow them to evaluate "how they might choose to move forward" given the

upcoming "change in Administration[s]."   Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*,

No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS

rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.   *See*

Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from

John F. Kelly, Sec'y of Homeland Sec. (June 15, 2017) (AR 235–37).   Plaintiffs do not challenge

that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to

also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as

the DAPA Memo.   *See* AR 238–40 ("Paxton Letter").

### D.    Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on

September 5, 2017, to wind down the DACA policy in an orderly fashion.   *See* AR 252–56

("Rescission Policy" or "Policy").   As the Acting Secretary explained, "[t]aking into consideration

the Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4,

2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be

terminated."   Rescission Policy at 4 (AR 255).   Specifically, she quoted the Attorney General's

September 4 recommendation to rescind DACA, which explained that because DACA "has the

same legal and constitutional defects that the courts recognized as to DAPA, it is likely that

potentially imminent litigation would yield similar results."   *Id.* at 3 (AR 254).   Invoking her

"authority in establishing national immigration policies and priorities," she rescinded the DACA

Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

• For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

• For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

• For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy.

**E.    This Action**

Plaintiffs' amended complaint raises four claims. Count I seeks declaratory relief, but asserts no substantive cause of action. *See* Am. Compl. ¶¶ 51–58, ECF No. 10. In Count II, Plaintiffs claim that the Rescission Policy violates due process by "reneging on promises" allegedly made to DACA recipients (a) not to use information from DACA applications in

immigration enforcement proceedings, (b) not to terminate their DACA status without notice, and (c) to provide them with employment authorization documents. *Id.* ¶ 66; *see id.* ¶¶ 59–68. In Count III, Plaintiffs allege that the Rescission Policy violates the APA because (a) it was issued without notice and comment, and (b) it constitutes a change in agency policy without an adequate explanation. *Id.* ¶¶ 69–74. In Count IV, Plaintiffs allege that the Rescission Policy violates the Regulatory Flexibility Act because it was unaccompanied by a regulatory flexibility analysis assessing its impact on small businesses. *Id.* ¶¶ 75–82. Plaintiffs ask the Court to declare the Rescission Policy unlawful, *see id.* Prayer for Relief ¶¶ (a)–(d), and to "[e]njoin Defendants from rescinding the DACA" policy, *id.* ¶ (e).

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the Court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When considering such a motion, the Court must accept all well-pleaded allegations as true. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). The Court need not, however, accept inferences that are unsupported by facts alleged in the complaint or that amount to mere legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating subject-matter jurisdiction, the court may, when necessary, look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that

a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as ... factual allegation[s]" are "disentitle[d] ... to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider materials incorporated into the complaint by reference, as well as judicially noticeable materials, without converting the motion into one for summary judgment. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

With respect to Plaintiffs' APA claims, "a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment, or it may convert the motion into a motion for summary judgment under Rule 12(d)." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (internal citation omitted). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (alterations in original) (citation omitted); *see also Bates*, 935 F. Supp. 2d at 17. "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage ... and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted). Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously."

12

*Rempfer*, 583 F.3d at 865; *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of … judicial notice." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court may also consider exhibits that are submitted with the complaint, *see Hurd*, 864 F.3d at 678, as well as "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss," such as when the complaint "quotes from and discusses a document extensively." *Patterson v. United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013) (internal citations and alterations omitted).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws—a matter long regarded as the exclusive province of the Executive Branch. The Court need not consider this extraordinary request, however, because Plaintiffs lack standing to make it. They identify no injury to their own interests as organizations, name no members actually harmed by the policy, and have no mission with an apparent connection to this suit. And even if Plaintiffs could establish standing, this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no

deferred action" decisions such as the one here.  In any event, even if Plaintiffs could overcome these hurdles, they fail to state a claim.  This case should be dismissed.

I.     THE COURT LACKS JURISDICTION BECAUSE PLAINTIFFS LACK STANDING

A.     Plaintiffs Lack Article III Standing

1.     Plaintiffs lack organizational standing.

Plaintiffs open their complaint by declaring that they "bring this action in their organizational capacities."  Am. Compl. ¶ 1.  Yet they make no attempt to identify any injury whatsoever to their own interests as organizations.  Their allegations are patently insufficient to establish standing.

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  As the parties invoking the Court's jurisdiction, Plaintiffs bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The standing inquiry is "'especially rigorous'" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Plaintiffs' complaint fails at the first step of the analysis.  Here, Plaintiffs were not the object of any government policy.  Instead, a generous reading of the complaint reveals, at most, dissatisfaction with the alleged effects of a policy decision on "undocumented immigrants of

color." Am. Compl. ¶ 1; *see also id.* ¶¶ 3, 12. But the federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing. *Sierra Club*, 405 U.S. at 739. Accordingly, an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art[icle] III." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor can Plaintiffs show an injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources— constitut[ing] ... more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union*, 68 F.3d at 1433 (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* (citation and alteration omitted). Here, Plaintiffs do not even try to meet this test. *See* Am. Compl. ¶¶ 11–16. They identify no history of immigration advocacy. They point to no

interference with any immigration-related programming.  And they allege no new expenditure of funds—not so much as a dime.  Plaintiffs thus fall well short of their burden to establish a cognizable injury to their own interests.  Their claim of organizational standing should be rejected out of hand.

<div align="center">

**2.      Plaintiffs lack representational standing.**

</div>

While Plaintiffs do not expressly bring suit in their representational capacities, *see id.* ¶ 1, one of them—the NAACP—does allege in passing that it sues "on behalf of [their] members who are currently enrolled in, and who applied to enroll in, the DACA program," *id.* ¶ 12.  But it fails to identify any particular member allegedly harmed by the policy change, and that alone dooms any claim of representational standing.

To establish "representational" (or "associational") standing to sue on behalf of its members, an association must show that (1) at least one of its members has standing to sue in his own right; (2) the interests the association seeks to protect are germane to its purpose; and (3) neither litigation over the claim asserted nor the relief sought requires the participation of an individual member.  *Interstate Nat. Gas Ass'n of Am. v. FERC*, 494 F.3d 1092, 1095 (D.C. Cir. 2007).  To satisfy the first of these prongs, an association must at the very least name a specific member with standing for each claim it asserts.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("identity" of injured member must be "firmly established").  Because the NAACP makes no effort to name any member allegedly harmed by the Rescission Policy, it lacks representational standing.

Even if the NAACP could overcome these barriers, any claim of representational standing would flunk the second prong of the test, as the organization makes no showing that the interests

<div align="center">

16

</div>

it seeks to protect are "germane to its purpose." *Interstate Nat. Gas*, 494 F.3d at 1095; *see Humane Soc'y of U.S. v. Hodel*, 840 F.2d 45, 56–57 (D.C. Cir. 1988) (the germaneness requirement mandates "that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together," and serves to "prevent[] litigious organizations from forcing the federal courts to resolve numerous issues as to which the organizations themselves enjoy little expertise and about which few of their members demonstrably care"). The NAACP alleges that, "[s]ince its founding in 1909, [its] mission ... has been to ensure the political, educational, social, and economic equality of all persons," and that it has filed "numerous amicus briefs ... in cases that significantly impact people of color." Am. Compl. ¶ 11. Conspicuously absent from that description of its mission and activities is any mention of immigration—the focus of this lawsuit. Indeed, immigration is not listed on the NAACP's website as one of the "issues" it pursues, and a search of its website for the term "DACA" returns just a handful of hits, all related to the filing of this case. *See* http://www.naacp.org (last visited Nov. 8, 2017). Thus, the NAACP fails to show that the interests at stake in this case are germane to its mission—an independently sufficient reason to reject any claim of representational standing.[2]

### B.    Plaintiffs Lack Prudential Standing

---

[2] To the extent the allegations of the other two Plaintiffs—the American Federation of Teachers ("AFT") and the United Food and Commercial Workers International Union ("UFCW")—could be read to attempt to invoke representational standing, *cf.* Am. Compl. ¶¶ 13–16, any such claim would fail for the same reasons. Like the NAACP, neither AFT nor UFCW names any member allegedly harmed by the Rescission Policy. And neither makes any showing that the interests it seeks to protect are germane to its purpose. AFT is a teachers' union, and it offers only the general allegation that it has a history of "advocating for the civil rights of its members and the communities they serve." *Id.* ¶ 13. UFCW is a union representing mostly "retail, meatpacking and poultry, food processing, and manufacturing" employees, and it offers the similarly general allegation that it "fights to advance and safeguard full employment, economic security, and social welfare of its members." *Id.* ¶ 15. While UFCW asserts that "immigrants from around the world" are among the workers it represents, *id.* ¶ 16, it alleges no particular expertise in immigration law or any connection between immigration law and its organizational mission.

17

Even if Plaintiffs could establish Article III standing, they would lack prudential standing because they fall outside the zone of interests protected by the INA. The APA does not "allow suit by every person suffering [an] injury in fact." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute ... in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA protects the Plaintiff organizations from bearing any incidental effects of a denial of deferred action. *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

## II.   THIS CASE IS NOT JUSTICIABLE

### A.   The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law

**1.**   The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. *Chaney*, 470 U.S. at 830; *see Davis v. Fed. Bureau of Prisons*, 517 F. Supp. 2d 460, 461 (D.D.C. 2007) ("The APA, however, also provides an exception to the waiver of sovereign immunity ... when ... agency action is committed to agency discretion."), *aff'd in part and remanded*, 334 F. App'x 332 (D.C. Cir. 2009). This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283

(1987).

Among the decisions committed to executive discretion are "an agency's exercise of enforcement power." *Chaney*, 470 U.S. at 833. Such judgments involve "a complicated balancing of … factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831. As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency [] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise jurisdiction over the states' use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38.

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this

violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5–6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to remain and work in

this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

2. As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283. For example, "a common reason

21

for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488, subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law

22

enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law ... must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

### B.    The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether. As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation ... where" the Executive had "chose[n] *not* to exercise it." 525 U.S. at 484. Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." *Id.* at 485 (citation omitted). To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g). *Id.* at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this [Act]." 8 U.S.C. § 1252(g). These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, ... the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

§ 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, if aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy

(emphasis added).

Moreover, at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

### C.    The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable. First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert

jurisdiction in the first place.  Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.  *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.  After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.  Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.

III.    PLAINTIFFS FAIL TO STATE A CLAIM

Even if Plaintiffs could establish standing and justiciability, the Court should dismiss this case in its entirety for failure to state a claim.[4]

A.    Plaintiffs Fail to State an APA Claim

1.    The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.  Am. Compl. ¶¶ 69–74 (Count III).  That argument misapprehends the nature of the inquiry under the APA.  It is black-

---

[4] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

letter law that agencies are free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

1. Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id*. And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729,

743–44 (1985) (citation omitted).  If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973).  This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced.  Contrary to Plaintiffs' suggestion, *see* Pls.' Mot. for Case Mgmt. Order, ECF No. 9, the Court cannot consider additional materials concerning her deliberative process.  It is "not the function of the court to probe the mental processes" of the agency. *Morgan v. United States*, 304 U.S. 1, 18 (1938).  "Just as a judge cannot be subjected to such a scrutiny ... so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941) (citation omitted).  Deliberative materials are therefore not merely protected from disclosure—they do not form part of the administrative record at all.  *See San Luis Obispo Mothers for Peace v. U.S. N.R.C.*, 789 F.2d 26, 45 (D.C. Cir. 1986) (en banc).  Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.**  The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted).  Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515.  And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*.  In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA

program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing

the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA),

she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal

and constitutional defects that the courts recognized as to DAPA, it is likely that potentially

imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting

Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in

another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into

uncertainty.

The Acting Secretary was then "faced with two options:  wind the program down in an

orderly fashion that protects beneficiaries in the near-term while working with Congress to pass

legislation; or allow the judiciary to potentially shut the program down completely and

immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of

DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission,

which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A.*

*Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about

subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that

an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced

the litigation risk of keeping DACA in place with "the administrative complexities associated with

ending the program," and opted for a solution that would "wind it down in an efficient and orderly

fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She

explained her reasonable decision to rescind DACA, and the APA requires no more. *See Bowman*

*Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA

29

satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"). And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.**   Plaintiffs' assertion that the Rescission Policy "fails to be supported by, or even accompanied by, a rationale that justifies the withdrawal of a longstanding program lawfully instituted," Am. Compl. ¶ 71, entirely ignores the Acting Secretary's assessment of litigation risk, which is reason enough to reject their arbitrariness claim.   To the extent Plaintiffs suggest that the Acting Secretary's consideration of the Attorney General's views about DACA's legality somehow rendered her decision arbitrary and capricious, the argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.   Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.   Rescission Policy at 3-4 (AR 254-55).   That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.   *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.   If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably

30

"intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (citation omitted) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254) (citation omitted). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id*. at 172. On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the

31

Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73. Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's view that DACA was unlawful. And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether the Office of Legal Counsel (OLC) was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by the Fifth Circuit. OLC Op. 18 n.8. The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." *Id.* Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176. Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion. *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria" (footnote and citation omitted)). Further, the original DACA program largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

**4.** Plaintiffs also allege that the Rescission Policy is arbitrary and capricious because the Acting Secretary failed to sufficiently consider the "serious reliance interests by [DACA] participants." Am. Compl. ¶ 71. But as set forth in Part II.A, *supra*, the Rescission Memo is

32

merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time.  And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based on the looming risk of a nationwide injunction ending the DACA program altogether.  Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than would an immediate injunction terminating the program.  *See supra* Part III.A.  Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.  Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

**2. The Rescission Policy is exempt from notice and comment.**

Plaintiffs likewise miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment. *See* Am. Compl. ¶¶ 72–73; *see also* 5 U.S.C. § 553(b)–(c). If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. Critically, though, the DACA Memo itself also was not adopted through notice and comment. So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy. That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing (citation omitted)).[5]

In any event, Plaintiffs' claim is erroneous. DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment. That is because such policies, like the Rescission Policy, are not substantive rules at all. Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). Thus, an "agency

[5] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982) *aff'd sub nom, Process Gas Consumers Grp. V. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983). That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445–46. When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the APA 30 n.3 (1947)). It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252. It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the Rescission Policy is a quintessential policy statement—a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831 (citations omitted). It does not immediately deprive any DACA recipients of their current

35

deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice-and-comment process.[6]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming

---

[6] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S. at 832.

### B.    Plaintiffs Fail to State a Due Process Claim

Plaintiffs claim that the Rescission Policy violates due process by "reneging on promises" allegedly made to DACA recipients. Am. Compl. ¶ 66. While Plaintiffs' theory is a bit unclear, their allegations are clearly mistaken, and they identify no actual deprivation of liberty or process. In any event, this claim fails for the simple reason that DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections. Regardless, broad-based changes in agency policy like the Rescission Policy do not require individualized process.

### 1.    Plaintiffs identify no actual deprivation of liberty or property.

Plaintiffs' key due process allegations are demonstrably false: They are flatly contradicted by documents incorporated by reference into the complaint, as well as by other publicly available, judicially noticeable documents. Moreover, Plaintiffs identify no member who has actually been harmed by any of these supposedly "broken promises."

For example, Plaintiffs assert—without citation—that DHS promised "not to terminate [recipients] from the DACA program without justification and notice." Am. Compl. ¶ 61; *see also id.* ¶ 66. In fact, the DACA FAQs state that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated *at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.*" DHS DACA FAQ No. 27 (emphasis added). Regardless, the Rescission Policy does not "terminate" anyone's DACA status—on the contrary, it provides that DHS generally "will *not* terminate the grants of previously issued deferred action ... for the remaining

duration of their validity periods" as part of the rescission.  Rescission Policy at 4 (AR 255) (emphasis added).  Notably, Plaintiffs point to no member whose DACA status was allegedly terminated by the Rescission Policy.

Plaintiffs likewise claim—again without citation—that DHS promised "to provide employment authorization to those eligible."  Am. Compl. ¶ 61.  But Congress vested the Acting Secretary with discretion to determine whether to grant work authorization to aliens accorded deferred action.  *See* 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien" as, *inter alia*, an "alien [who] is not ... authorized to be so employed by this chapter or by the [Acting Secretary]").  And under DHS regulations, work authorization is not an independent guarantee, but a consequence that may flow from a grant of deferred action—one that ends when deferred action ends, which may occur at any time.  *See* 8 C.F.R. § 274a.12(c)(14) (providing for work authorization for "[a]n alien who has been granted deferred action, an act of administrative convenience to the government").  These statutes and regulations are "completely permissive" and provide "no meaningful standards against which to judge the agency's exercise of discretion."  *Perales*, 903 F.2d at 1047, 1049 (citation omitted) (decisions to deny work authorization to a particular class of aliens are committed to agency discretion by law).  Regardless, the Rescission Policy does not rescind anyone's work authorization—indeed, it states that DHS generally "will *not* ... revoke Employment Authorization Documents ... for the remaining duration of their validity periods."  Rescission Policy at 4 (AR 255) (emphasis added).  Again, Plaintiffs identify no member claiming otherwise.

Finally, Plaintiffs contend that DHS withdrew a promise "not to use information" submitted by DACA applicants "against them or [their] family members in enforcement proceedings."  Am. Compl. ¶ 61; *see also id.* ¶ 57 (the "termination of the DACA program is

accompanied by withdrawal of th[at] guarantee"). That is doubly wrong: not only does it misstate DHS's information-sharing policy, but that policy has not in fact changed. Under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added);[7] *see* Notice to Appear Guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy purports to change it, and it currently remains in effect. Notably, Plaintiffs once again point to no member who has been placed in enforcement proceedings, or whose information has been shared with ICE, contrary to this policy.

The Court should not defer to Plaintiffs' obviously incorrect allegations, which identify no "broken promises" at all, much less a violation of due process. *See Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004) (courts need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice" (citation omitted)).

---

[7] The information-sharing policy continues: "Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter." DHS DACA FAQ No. 19.

### 2. There is no protected liberty or property interest in the receipt of DACA.

Even taking Plaintiffs' allegations at face value, their due process claim fails as a threshold matter, for they cannot show that DACA recipients have a protected liberty or property interest in deferred action that would entitle them to due process protections.

The Fifth Amendment provides that "no person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

A benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted).

40

The DACA policy contains no such "explicitly mandatory language." *Id*. at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27.

The D.C. Circuit has recognized that, under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3). Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law. *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectible liberty interest in deferred action, nor does it create a protectible interest in being considered for deferred action status").

### 3.    Changes in agency policy do not require individualized process.

Even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim would fail because changes in agency policy do not require individualized process. Due process doctrine recognizes a "distinction between individualized deprivations, [which] are protected by procedural

due process, and policy-based deprivations of the interests of a class, [which] are not protected by procedural due process." 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 (5th ed. 2010). The rescission of DACA falls squarely in the latter category.

Plaintiffs allege that, under DACA, "termination required a 'notice of an intent to terminate' that provided all reasons and documents supporting the termination," and that "registrants were to be given an opportunity to submit evidence rebutting that termination." Am. Compl. ¶ 66. But Plaintiffs theory is not that individual DACA applications were adjudicated incorrectly (for example, due to factual error)—the sort of mistake that notice and a hearing could conceivably help correct. Instead, Plaintiffs' claim appears to be that DHS cannot alter the DACA policy, even on a prospective basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required. The Supreme Court held long ago that where a government policy "applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," and thus due process does not require individualized pre-deprivation notice. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-board to a large number of people, so "[n]ot only would individualized hearings be impractical, they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard. There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability. *Id.* at 1359. Then, in response to the Iranian hostage crisis, the INS

42

issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days.  *Id.*  Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure."  *Yassini*, 618 F.2d at 1363.  "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required."  *Id.* (citing, *inter alia*, *Bi-Metallic*).  So too here.

### C.   Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required

Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reasons as their notice-and-comment claim, and it can be quickly dispatched.  *See* Am. Compl. ¶¶ 75–82 (Count IV).  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "when an agency promulgates a final rule under section 553 of … title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required.  Because those procedures were not required here, *see supra* at § II(A)(2), the RFA does not apply.  *See also, e.g.*, *Broadgate, Inc. v. USCIS*, 730 F. Supp. 2d 240, 243 (D.D.C. 2010) (the "Regulatory Flexibility Act ... only applies when an agency is required to publish general notice of proposed rulemaking" (citing 5 U.S.C. §§ 603(a), 604(a))).[8]

---

[8] While Defendants have already addressed Plaintiffs' general lack of standing, *see supra* at §I(A), (B), Plaintiffs lacks standing to raise an RFA claim for an additional reason:  They allege no facts to demonstrate that they are "small entities" entitled to seek judicial review under the RFA.  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611 (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also, e.g.*, *N.W. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'").  Plaintiffs' conclusory assertions on this score, *see* Am. Compl. ¶ 79, should not be taken as true on a motion to dismiss.  *See Iqbal*, 556 U.S. at 678, 681.

### D. Plaintiffs' Declaratory Relief "Claim" States No Independent Cause of Action

In Count I, Plaintiffs assert entitlement to declaratory relief, but no substantive cause of action. Am. Compl. ¶¶ 51–58. Because "[d]eclaratory relief is not an independent cause of action, and does not provide an independent source of federal jurisdiction," *Yancey v. Dist. of Columbia*, 991 F. Supp. 2d 171, 180 n.6 (D.D.C. Nov. 6, 2013) (citing *Ali v. Rumsfeld*, 649 F.3d 762, 778 (D.C. Cir. 2011)), this "claim" should also be dismissed.

## V. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE

Plaintiffs also seek injunctive relief preventing "Defendants from rescinding the DACA program," and "from using information obtained in any DACA application or renewal request to identify, apprehend, detain, or deport any DACA registrant … ." Am. Compl., Prayer for Relief. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss the request for nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed*

44

*Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion and dismiss this case.

Dated: November 8, 2017          Respectfully submitted,

                                 CHAD A. READLER
                                 Acting Assistant Attorney General

                                 BRETT A. SHUMATE
                                 Deputy Assistant Attorney General

                                 JENNIFER D. RICKETTS
                                 Director

                                 JOHN R. TYLER
                                 Assistant Branch Director

                                 */s/  Kate Bailey*
                                 KATE BAILEY
                                 RACHAEL WESTMORELAND
                                 Trial Attorneys
                                 United States Department of Justice
                                 Civil Division, Federal Programs Branch
                                 20 Massachusetts Avenue NW
                                 Washington, DC 20530
                                 Phone: (202) 514-9239
                                 Fax: (202) 616-8470
                                 Email: kate.bailey@usdoj.gov
                                 Member, MD Bar

                                 *Counsel for Defendants*

45