# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:17−cv−01907−JDB</u>

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE v. TRUMP et al
Assigned to: Judge John D. Bates
 Case:  1:17−cv−02325−JDB
Cause: 05:551 Administrative Procedure Act

Date Filed: 09/18/2017
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

<u>**Plaintiff**</u>

**NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE**
*(NAACP), National Headquarters*

represented by **Douglas James McNamara**
COHEN, MILSTEIN, SELLERS & TOLL
1100 New York Avenue NW
Suite 500, West Tower
Washington, DC 20005
(202) 408−4600
Email: <u>dmcnamara@cohenmilstein.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph M. Sellers**
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Suite 500 East Tower
Washington, DC 20005
(202) 408−4604
Fax: (202) 408−4699
Email: <u>jsellers@cohenmilstein.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julia Horwitz**
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Suite 500 East Tower
Washington, DC 20005
(202) 408−4600
Fax: (202) 408−4699
Email: <u>jhorwitz@cohenmilstein.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie S. Selesnick**
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Avenue

Suite 500
Washington, DC 20815
(202) 408−4600
Fax: (202) 457−1678
Email: jselesnick@cohenmilstein.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**AMERICAN FEDERATION OF TEACHERS, AFL−CIO**          represented by   **Joseph M. Sellers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie S. Selesnick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC**          represented by   **Joseph M. Sellers**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Julie S. Selesnick**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**DONALD TRUMP**
*in his official capacity as President of the United States*          represented by   **Kate Bailey**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514−9239
Fax: (202) 616−8460
Email: kate.bailey@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514−1280

Fax: (202) 616−8460
Email: rachael.westmoreland@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 305−8576
Fax: (202) 616−8470
Email: stephen.pezzi@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

| | | |
|---|---|---|
| **JEFFERSON BEAUREGARD SESSIONS, III**<br>*in his official capacity as Attorney General of the United States* | represented by | **Kate Bailey**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Rachael Lynn Westmoreland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Defendant**</u>

| | | |
|---|---|---|
| **ELAINE C. DUKE**<br>*in her official capacity as acting Secretary of Homeland Security* | represented by | **Kate Bailey**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Rachael Lynn Westmoreland**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Stephen M. Pezzi**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

<u>**Defendant**</u>

| | | |
|---|---|---|
| **U.S. CITIZENSHIP AND IMMIGRATION SERVICES** | represented by | **Kate Bailey**<br>(See above for address) |

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. IMMIGRATION AND**
**CUSTOMS ENFORCEMENT**

represented by  **Kate Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DEPARTMENT OF HOMELAND**
**SECURITY**

represented by  **Kate Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**UNITED STATES OF AMERICA**

represented by  **Kate Bailey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachael Lynn Westmoreland**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen M. Pezzi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 09/18/2017 | 1 | | COMPLAINT *by NAACP* against DONALD TRUMP, JEFFERSON BEAUREGARD SESSIONS III, ELAINE C. DUKE, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA ( Filing fee $ 400 receipt number 0090−5120614) filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. (Attachments: # 1 Civil Cover Sheet, # 2 Summons US Attorneys Office)(Sellers, Joseph) (Entered: 09/18/2017) |
| 09/18/2017 | | | Case Assigned to Judge Christopher R. Cooper. (md) (Entered: 09/18/2017) |
| 09/19/2017 | 2 | | SUMMONS (1) Issued Electronically as to UNITED STATES OF AMERICA, non party U.S. Attorney (Attachments: # 1 Notice of Consent) (md) (Entered: 09/19/2017) |
| 09/19/2017 | | | SUMMONS (6) Not Issued as to DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT. (SUMMONS WERE NOT SUBMITTED AT THE TIME COMPLAINT WAS FILED) (md) (Entered: 09/19/2017) |
| 09/19/2017 | 3 | | REQUEST FOR SUMMONS TO ISSUE *1) Donald Trump; 2) Jefferson Sessions; 3) Elaine Duke; 4) US Citizenship and Immigration Services; 5) US Immigration and Customs Enforcement; 6) Department of Homeland Security; and 7) US Attorneys Office* re 1 Complaint, filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE. Related document: 1 Complaint, filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE.(Sellers, Joseph) (Entered: 09/19/2017) |
| 09/19/2017 | 4 | | NOTICE of Appearance by Julia Horwitz on behalf of NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Horwitz, Julia) (Entered: 09/19/2017) |
| 09/20/2017 | 5 | | SUMMONS (6) Issued Electronically as to DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, and U.S. Attorney General (znmw) (Entered: 09/20/2017) |
| 09/20/2017 | 6 | | |

| | | | |
|---|---|---|---|
| | | | SUMMONS (1) Reissued Electronically as to UNITED STATES OF AMERICA/U.S. Attorney. (znmw) (Entered: 09/20/2017) |
| 09/25/2017 | 7 | | NOTICE of Appearance by Douglas James McNamara on behalf of NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (McNamara, Douglas) (Entered: 09/25/2017) |
| 10/23/2017 | 8 | | Consent MOTION for Leave to File *Amended Complaint* by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Attachments: # 1 Exhibit A − Amended Complaint, # 2 Exhibit B − Proposed Order)(Sellers, Joseph) (Entered: 10/23/2017) |
| 10/24/2017 | | | MINUTE ORDER: Plaintiff NAACP's 8 Consent Motion for Leave to File Amended Complaint is GRANTED. Signed by Judge Christopher R. Cooper on 10/24/2017. (lccrc1) (Entered: 10/24/2017) |
| 10/24/2017 | 9 | | MOTION for Scheduling Order by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A − N.D. Cal. Scheduling Order, # 3 Exhibit B − E.D.N.Y. Scheduling Order, # 4 Exhibit C − D. Md. Status Conference Order, # 5 Exhibit D − McNamara Email, # 6 Exhibit E − Beckenhauser Email, # 7 Exhibit F − N.D. Cal. Hearing Transcript)(Sellers, Joseph). Added MOTION for Hearing on 10/25/2017 (znmw). (Entered: 10/24/2017) |
| 10/24/2017 | 10 | | FIRST AMENDED COMPLAINT against DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA filed by NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AMERICAN FEDERATION OF TEACHERS, AFL−CIO, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC.(znmw) (Entered: 10/25/2017) |
| 10/26/2017 | | | MINUTE ORDER: It is hereby ORDERED that, on or before October 30, 2017, Defendants shall respond to 9 Plaintiffs' Motion for Status Conference and Adoption of Case Management Order. That response shall include Defendants' positions on the statements made in Plaintiffs' Rule 26(f) report, which is attached to Plaintiffs' motion. Signed by Judge Christopher R. Cooper on 10/26/2017. (lccrc1) (Entered: 10/26/2017) |
| 10/26/2017 | 11 | | NOTICE of Appearance by Rachael Lynn Westmoreland on behalf of All Defendants (Westmoreland, Rachael) (Entered: 10/26/2017) |
| 10/30/2017 | 12 | | NOTICE of Appearance by Kate Bailey on behalf of All Defendants (Bailey, Kate) (Entered: 10/30/2017) |
| 10/30/2017 | 13 | | RESPONSE re 9 MOTION for Scheduling Order MOTION for Hearing filed by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA. (Bailey, Kate) (Entered: 10/30/2017) |
| 11/03/2017 | 14 | | |

| | | | REPLY to opposition to motion re 9 MOTION for Scheduling Order MOTION for Hearing filed by AMERICAN FEDERATION OF TEACHERS, AFL−CIO, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC. (Sellers, Joseph) (Entered: 11/03/2017) |
|---|---|---|---|
| 11/08/2017 | 15 | | MOTION to Dismiss , MOTION for Summary Judgment by DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE, JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES OF AMERICA (Attachments: # 1 Certified Index of Administrative Record, # 2 Text of Proposed Order)(Bailey, Kate) Modified event title on 11/9/2017 (znmw). (Entered: 11/08/2017) |
| 11/09/2017 | | | MINUTE ORDER: The Court directs Plaintiffs to file any opposition to Defendants' Motion to Dismiss on or before November 29, 2017. Defendants' reply is due 14 days after Plaintiffs file their opposition. Signed by Judge Christopher R. Cooper on 11/9/2017. (lccrc3) (Entered: 11/09/2017) |
| 11/09/2017 | | | Set/Reset Deadlines: Response to Dispositive Motions due by 11/29/2017. (lsj) (Entered: 11/09/2017) |
| 11/21/2017 | 16 | | Joint MOTION for Scheduling Order *and Stipulation Regarding Use of Discovery* by AMERICAN FEDERATION OF TEACHERS, AFL−CIO, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC (Sellers, Joseph) (Entered: 11/21/2017) |
| 11/22/2017 | 17 | | SCHEDULING ORDER: See Order for full briefing schedule. The Court will hold a motions hearing on January 31, 2017 at 10:00 AM in Courtroom 27A. Signed by Judge Christopher R. Cooper on 11/22/2017. (lccrc1) (Entered: 11/22/2017) |
| 11/27/2017 | | | Set/Reset Deadlines/Hearings: Dispositive Motions due by 11/22/2017. Response to Dispositive Motions due by 12/15/2017. Reply to Dispositive Motions due by 1/10/2018. Replies due by 1/19/2018. Oral Arguments on Motions set for 1/31/2018 at 10:00 AM in Courtroom 27A before Judge Christopher R. Cooper. (lsj) (Entered: 11/27/2017) |
| 12/15/2017 | 18 | | MOTION for Nine Declarants to Proceed Pseudonymously by AMERICAN FEDERATION OF TEACHERS, AFL−CIO, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC (Attachments: # 1 Text of Proposed Order)(Sellers, Joseph) (Entered: 12/15/2017) |
| 01/03/2018 | 19 | | Case directly reassigned to Judge John D. Bates as related to 17cv2325 (JDB). Judge Christopher R. Cooper is no longer assigned to the case. (ztnr) (Entered: 01/03/2018) |
| 01/10/2018 | 20 | | NOTICE of Appearance by Julie S. Selesnick on behalf of AMERICAN FEDERATION OF TEACHERS, AFL−CIO, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, UNITED FOOD AND COMMERCIAL INTERNATIONAL UNION, AFL−CIO, CLC (Selesnick, Julie) (Entered: 01/10/2018) |

| 01/18/2018 | | | MINUTE ORDER: On the Court's own motion, and upon consideration of the entire record herein, it is hereby ORDERED that this case is CONSOLIDATED with Civil Action No. 17−2325 for purposes of the dispositive motions currently pending in both cases; it is further ORDERED that all filings with respect to those motions shall be made jointly and shall be filed only in 17−2325; it is further ORDERED that counsel of record in both cases shall receive electronic notice of any filings made in either case; and it is further ORDERED that counsel in both cases shall determine how to divide their argument time at the motions hearing currently set for Friday, February 2, 2018 at 9:30 a.m. before Judge John D. Bates. SO ORDERED − by Judge John D. Bates on 1/18/2018. (tb) (Entered: 01/18/2018) |
|---|---|---|---|
| 01/25/2018 | | | Set/Reset Hearings: Telephone Conference set for 1/26/2018 at 02:30 PM in Courtroom 30A before Judge John D. Bates. (tb) (Entered: 01/26/2018) |
| 01/26/2018 | | | Minute Entry for proceedings held before Judge John D. Bates: Telephone Conference call held on 1/26/2018. The Motions Hearing presently scheduled for Friday, February 2, 2018 is continued to a date and time to be determined. (Revised Scheduling Order to be Issued) (Court Reporter: Lisa Moreira) (jth) (Entered: 01/26/2018) |
| 01/28/2018 | | | Set/Reset Deadlines: Plaintiffs' Reply in support of their <u>28</u> Motion for Summary Judgment is due by 2/6/2018. A Joint Status Report representing the parties' respective proposals for scheduling further proceedings in this case is due by 2/22/2018. (jth) (Entered: 01/28/2018) |
| 03/14/2018 | | | Minute Entry: Motion Hearing held on 3/14/2018 before Judge John D. Bates re: <u>15</u> MOTION to Dismiss MOTION for Summary Judgment filed by JEFFERSON BEAUREGARD SESSIONS, III, DONALD TRUMP, UNITED STATES OF AMERICA, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, ELAINE C. DUKE. Motion heard and taken under advisement. (Court Reporter Bryan Wayne) (tb) (Entered: 03/14/2018) |
| 03/15/2018 | <u>21</u> | | TRANSCRIPT OF 3/14/18 MOTIONS HEARING before Judge John D. Bates held on March 14, 2018; Page Numbers: 1−95. Date of Issuance: March 15, 2018. Court Reporter: Bryan A. Wayne. Transcripts may be ordered at www.dcd.uscourts.gov. For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi−page, condensed, PDF or ASCII) may be purchased from the court reporter.**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty−one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. Redaction Request due 4/5/2018. Redacted Transcript Deadline set for 4/15/2018. Release of Transcript Restriction set for 6/13/2018.(Wayne, Bryan) (Entered: 03/15/2018) |
| 04/24/2018 | <u>22</u> | 12 | ORDER granting in part, denying in part, and deferring in part <u>15</u> the government's motion to dismiss; granting in part and denying in part plaintiffs' |

| | | | |
|---|---|---|---|
| | | | motion for summary judgment; and disposing of the remaining motions pending in this case. See text of Order for details. Signed by Judge John D. Bates on 4/24/2018. (lcjdb1) (Entered: 04/24/2018) |
| 04/24/2018 | 23 | 14 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 4/24/2018. (lcjdb1) (Main Document 23 replaced on 4/26/2018) (ztd). (Entered: 04/24/2018) |
| 06/27/2018 | 24 | | SCHEDULING ORDER. See text of Order for details. Signed by Judge John D. Bates on 6/27/2018. (lcjdb1) (Entered: 06/27/2018) |
| 06/27/2018 | | | Set/Reset Deadlines: Motion to revive 69 Order is due by 7/11/2018. Responses due by 7/23/2018 Reply due by 7/27/2018. (tb) (Entered: 06/27/2018) |
| 07/11/2018 | 25 | | NOTICE of Appearance by Stephen M. Pezzi on behalf of All Defendants (Pezzi, Stephen) (Entered: 07/11/2018) |
| 08/03/2018 | 26 | 74 | ORDER denying defendants' motion to revise the Court's April 24, 2018 Order. See text of Order for details. Signed by Judge John D. Bates on 8/3/2018. (lcjdb1) (Entered: 08/03/2018) |
| 08/03/2018 | 27 | 76 | MEMORANDUM OPINION. Signed by Judge John D. Bates on 8/3/2018. (lcjdb1) (Entered: 08/03/2018) |
| 08/03/2018 | | | Set/Reset Deadlines: The stay of the Court's 4/24/2018 Order vacating the DHS's 9/5/2017 decision rescinding the DACA program is continued until 8/23/2018. Defendants shall file by 8/23/2018 any motion seeking a further stay of the Court's Order pending appeal. (jth) (Entered: 08/03/2018) |
| 08/06/2018 | 28 | 10 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 23 Memorandum & Opinion, 22 Order on Motion for Scheduling Order,, Order on Motion for Hearing,, Order on Motion to Dismiss,, Order on Motion for Summary Judgment,, Order on Motion for Miscellaneous Relief, 26 Order, 27 Memorandum & Opinion by ELAINE C. DUKE, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DONALD TRUMP, UNITED STATES OF AMERICA, JEFFERSON BEAUREGARD SESSIONS, III. Fee Status: No Fee Paid. Parties have been notified. (Davis, Kathryn) (Entered: 08/06/2018) |

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE (NAACP), *et al.*,

        Plaintiffs,

    v.

DONALD TRUMP, *et al.*,

        Defendants.

No. 17-cv-1907 (JDB)

## **NOTICE OF APPEAL**

Notice is hereby given that all Defendants in the above-captioned matter hereby appeal to the United States Court of Appeals for the District of Columbia Circuit from the April 24, 2018 Order and Memorandum Opinion and the August 3, 2018 Order and Memorandum Opinion of the Honorable John D. Bates, United States District Judge (ECF Nos. 22, 23, 26, 27). This appeal includes all prior orders and decisions that merge into the Court's April 24 and August 3, 2018 orders.

Dated: August 6, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

1

/s/ *Kathryn C. Davis*
KATHRYN C. DAVIS (DC Bar No. 985055)
STEPHEN M. PEZZI (DC Bar No. 995500)
RACHAEL WESTMORELAND
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED
PEOPLE, et al.,**

        **Plaintiffs,**

        v.

**DONALD J. TRUMP, et al.,**

        **Defendants.**

**Civil Action No. 17-1907 (JDB)**

---

## ORDER

Upon consideration of [15] defendants' motion to dismiss and plaintiffs' motion for summary judgment, which was filed as a joint motion in a related case, <u>see</u> Pls.' Mot. for Summ. J., <u>Princeton v. United States</u>, Civ. Action No. 17-2325 (JDB) (D.D.C. Dec. 15, 2017), ECF No. 28, and for the reasons stated in the Memorandum Opinion issued on this date, it is hereby

**ORDERED** that [15] the government's motion to dismiss is **GRANTED** as to plaintiffs' procedural Administrative Procedure Act ("APA") claim (stated in Count III), their information-sharing claim (stated in Counts I and II), and their Regulatory Flexibility Act claim (Count VI); **DENIED** as to their substantive APA claim (stated in Count III); and **DENIED IN PART AND DEFERRED IN PART** as to their constitutional claims (stated in Count II); it is further

**ORDERED** that [28] plaintiffs' motion for summary judgment is **GRANTED** as to their substantive APA claim but **DENIED** as to their procedural APA claim; it is further

**ORDERED** that the Department of Homeland Security's ("DHS") September 5, 2017 decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program is **VACATED** and **REMANDED** to the agency; it is further

**ORDERED** that the Court's order of vacatur is **STAYED** for ninety days; and it is further

**ORDERED** that the parties shall file, by not later than Friday, July 27, 2018 a joint status report stating whether DHS has issued a new decision rescinding DACA and whether the parties contemplate the need for further proceedings in this case.

Moreover, upon consideration of the remaining motions pending in this case, it is hereby

**ORDERED** that [18] plaintiffs' unopposed motion to submit pseudonymous declarations is **GRANTED**; and it is further

**ORDERED** that [9] plaintiffs' motion for a scheduling order is **DENIED** as moot.

**SO ORDERED.**

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: <u>April 24, 2018</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,** | |
|       **Plaintiffs,** | |
|       **v.** | **Civil Action No. 17-1907 (JDB)** |
| **DONALD J. TRUMP, et al.,** | |
|       **Defendants.** | |
| **TRUSTEES OF PRINCETON UNIVERSITY, et al.,** | |
|       **Plaintiffs,** | |
|       **v.** | **Civil Action No. 17-2325 (JDB)** |
| **UNITED STATES OF AMERICA, et al.,** | |
|       **Defendants.** | |

## MEMORANDUM OPINION

These cases present an array of administrative and constitutional challenges to the Department of Homeland Security's ("DHS") rescission of the Deferred Action for Childhood Arrivals ("DACA") program. Though the government disputes these challenges on the merits, its primary defenses concern the Court's authority to hear the cases: the government contends that most plaintiffs lack standing, that the Immigration and Nationality Act ("INA") deprives the Court of subject-matter jurisdiction, and that the Department's decision to rescind DACA is not subject to review under the Administrative Procedure Act ("APA") because it was committed to agency discretion by law. The government has moved to dismiss the complaint in its entirety, and plaintiffs have moved for summary judgment only on their APA claims.

These are just two of a series of challenges to the September 2017 rescission of DACA that have already been before several district courts, two circuit courts of appeals, and the Supreme Court on two occasions.  At this time, two preliminary injunctions are in place that require DHS to accept applications for the renewal of DACA benefits, but not to accept new DACA applications.  Here, through their pending motions, plaintiffs seek permanent injunctive relief, although only on their APA claims.  And the relief they seek would reach new as well as renewal DACA applications.

For the reasons that follow, the Court concludes that it has both jurisdiction and statutory authority to hear plaintiffs' APA and constitutional claims.  The Court further concludes that, under the APA, DACA's rescission was arbitrary and capricious because the Department failed adequately to explain its conclusion that the program was unlawful.  Neither the meager legal reasoning nor the assessment of litigation risk provided by DHS to support its rescission decision is sufficient to sustain termination of the DACA program.  Thus, plaintiffs' motion for summary judgment will be granted in part, and the decision to rescind DACA will be vacated and remanded to DHS.  Vacatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications.  The Court will stay its order of vacatur for ninety days, however, to allow the agency an opportunity to better explain its rescission decision.

## BACKGROUND

### I.    THE IMPLEMENTATION AND RESCISSION OF DACA

#### A.    Deferred Action for Childhood Arrivals

In 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing the DACA program, which allowed certain undocumented aliens[1] who had been brought to the United States as children to be treated as low priorities for removal under the federal immigration laws.  See AR 1.[2]  According to the Secretary's memorandum (the "DACA Memo"), these young people generally "lacked the intent to violate the law" when they entered the United States as children and, in many cases, "kn[e]w only this country as home" and had "contributed to [the] country in significant ways."  AR 1–2.  DACA was therefore undertaken as "an exercise of . . . prosecutorial discretion" to "ensure that our enforcement resources are not expended on these low priority cases."  AR 1.

DACA was available to any undocumented alien who: (1) came to the United States when she was under the age of sixteen; (2) had lived in the United States continuously since at least June 15, 2007; (3) was enrolled in school or had graduated from high school or been honorably discharged from the military; (4) had not been convicted of certain criminal offenses and posed no threat to national security or public safety; and (5) was under the age of thirty.  AR 1.  Aliens who met these criteria were eligible for renewable, two-year grants of "deferred action" on their

---

[1] Some courts, including the Supreme Court, have referred to aliens who are unlawfully present in the United States as "illegal" instead of "undocumented."  See, e.g., Texas v. United States, 809 F.3d 134, 148 n.14 (5th Cir. 2015) (explaining that this "is the term used by the Supreme Court in its latest pronouncement pertaining to this area of the law" (citation omitted)); but see Mohawk Indust., Inc. v. Carpenter, 558 U.S. 100, 103 (2009) (using the term "undocumented immigrants").  Because both terms appear in the record materials here, and because, as at least one court has noted, "there is a certain segment of the population that finds the phrase 'illegal alien' offensive," Texas v. United States, 86 F. Supp. 3d 591, 605 n.2 (S.D. Tex. 2015), the Court will use the term "undocumented."

[2] Citations to "AR" refer to the administrative record.  See Joint Appendix [ECF No. 60].

removal from the United States.  AR 2–3; <u>see</u> 8 C.F.R. § 274a.12(c)(14) (defining deferred action as "an act of administrative convenience to the government which gives some [removal] cases lower priority").  As the DACA Memo was careful to point out, however, the program "confer[red] no substantive right, immigration status or pathway to citizenship," as "[o]nly the Congress, acting through its legislative authority, can confer these rights."  AR 3.

Individuals who received deferred action under DACA were also eligible for a host of other benefits under preexisting statutes and DHS regulations.  These benefits included work authorization, 8 C.F.R. § 274a.12(a)(11), social security numbers, <u>id.</u> § 1.3(a)(4)(vi), advance parole (i.e., preauthorization to travel to the United States without a visa), <u>id.</u> § 212.5, and a limited class of public assistance, such as state and federal aid for medical emergencies, 8 U.S.C. §§ 1611(b)(1), 1621(b)(1).  Benefits like these allowed DACA recipients to work, travel abroad, access credit, and otherwise lead productive lives during their periods of deferred action.

To be considered for deferred action under DACA, an applicant had to provide DHS with certain identifying information, including her name, mailing address, and contact information.  <u>See</u> Decl. of Maria De La Cruz Perales Sanchez ("Perales Decl.") [ECF No. 28-8] ¶ 11; <u>see also</u> Form I-821D, U.S. Citizenship and Immigration Servs., <u>Consideration for Deferred Action for Childhood Arrivals</u>, https://www.uscis.gov/i-821d.  Although many applicants feared that this information would later be used to initiate removal proceedings against them, <u>see</u> Perales Decl. ¶¶ 10, 24, the Department assured applicants that their information would in most cases be "protected from disclosure to [U.S. Immigration and Customs Enforcement ("ICE")] and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings."  <u>See</u> U.S. Citizenship and Immigration Servs., <u>Instructions for Consideration of Deferred Action for</u>

4

Childhood Arrivals, https://www.uscis.gov/i-821d. Relying on these representations, hundreds of thousands of undocumented aliens applied for and received deferred action under the DACA program. See, e.g., Perales Decl. ¶ 10; Decl. of John Doe #1 ¶ 6; Decl. of John Doe #2 ¶ 5. By late 2017, nearly 800,000 individuals had been granted deferred action under DACA. AR 242.

## B. Deferred Action for Parents of Americans

Two years after DACA's implementation, DHS issued a second memorandum, this time purporting to establish a deferred-action program called Deferred Action for Parents of Americans ("DAPA"). AR 37–41. As its name suggests, DAPA would have offered deferred action to parents of U.S. citizens or lawful permanent residents who were themselves unlawfully present in the United States.[3] AR 40–41. The DAPA memorandum also purported to expand the DACA program in certain respects: it would have removed the thirty-year age cap, made the deferred-action grants last for three years instead of two, and required that an alien need only have been present in the United States since January 1, 2010 to be eligible. AR 39–40.

Before DAPA took effect, a coalition of states, led by Texas, sued to block its implementation on grounds that it violated both the APA and the Take Care Clause of the Constitution. See Texas, 86 F. Supp. 3d at 604 & n.1, 607 (citing U.S. Const. art. II, § 3). The district court granted the states' motion for a preliminary injunction, concluding that they were likely to succeed on their procedural APA claim that DAPA (including its expansion of DACA) should have been promulgated using notice and comment. Id. at 671–72; see 5 U.S.C. § 553. In

---

[3] DAPA would have applied to any alien who: (1) had a son or daughter who was a U.S. citizen or lawful permanent resident; (2) had continuously resided in the United States since before January 1, 2010; (3) was physically present in the United States both on November 20, 2014 and the date of her application; (4) had no lawful basis to be present in the United States on November 20, 2014; (5) did not meet certain enforcement priorities; and (6) did not otherwise raise concerns that would make deferred action inappropriate in the agency's discretion. See AR 40.

5

part, this was because the Department's implementation of <u>DACA</u> suggested that <u>DAPA</u> would not "genuinely leave[] the agency and its employees free to exercise discretion." <u>Texas</u>, 86 F. Supp. 3d at 604 at 670 (emphasis, alterations, and internal quotation marks omitted). The district court found that only about 5% of all DACA applications had been denied, and the government could not say how many of those had been denied for discretionary reasons. <u>Id.</u> at 609. This led the court to conclude that the DAPA Memo's suggestion that immigration officers could exercise case-by-case discretion was "merely pretext." <u>Id.</u> at 669 n. 101; <u>see</u> <u>Texas</u>, 809 F.3d at 173 (agreeing that although "[t]he DACA and DAPA Memos purport to grant discretion, . . . there was evidence from DACA's implementation that DAPA's discretionary language was pretextual").

The Fifth Circuit affirmed, holding that the states had demonstrated a likelihood of success on the merits not only of their procedural APA claim, but also on their substantive APA claim, because DAPA seemed to conflict with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status."[4] <u>Texas</u>, 809 F.3d at 179. But the court expressly declined to address the states' constitutional challenges. <u>See</u> <u>id.</u> at 146 n.3 (finding it "unnecessary" to address those claims "at this early stage of the proceedings"). It also rejected the government's threshold arguments—similar to the ones offered here—that the states lacked standing, <u>see</u> <u>id.</u> at 150–63, that the INA deprived the court of subject-matter jurisdiction, <u>see</u> <u>id.</u> at 164–65, and that DAPA's implementation was unreviewable under the APA, <u>see</u> <u>id.</u> at 165–72.[5] The government petitioned for certiorari, and in June 2016, an eight-Justice

---

[4] According to the Fifth Circuit, under the INA, the parent must generally "(i) have a U.S. citizen child who is at least twenty-one years old, (ii) leave the United States, (iii) wait ten years, and then (iv) obtain one of the limited number of family-preference visas from a United States consulate." <u>Texas</u>, 809 F.3d at 179–80.

[5] All parties agreed that DAPA was "committed to agency discretion by law," 5 U.S.C. §701(a)(2), to the extent that it "involve[d] the Secretary's decision—at least temporarily—not to enforce the immigration laws as to a

Supreme Court affirmed the Fifth Circuit's judgment by an equally divided vote. See United States v. Texas, 136 S. Ct. 2271 (2016) (mem.).

On January 20, 2017, President Donald J. Trump was sworn into office, and his nominee for Secretary of Homeland Security, John F. Kelly, was confirmed that same day. Six months later, Secretary Kelly issued a memorandum rescinding DAPA, including its expansion of DACA, but leaving the original DACA program in place. AR 235–236. The Texas plaintiffs voluntarily dismissed their challenge to DAPA a few months later. See Pls.' Stipulation of Voluntary Dismissal, Texas v. United States, No. 14-CV-254 (S.D. Tex. Sep. 12, 2017), ECF No. 473.

## C. The Rescission of DACA

On September 5, 2017, three months after DAPA's rescission, then-Acting Secretary of Homeland Security Elaine C. Duke issued a five-page memorandum rescinding DACA (the "Rescission Memo").[6] See AR 252–56. The Rescission Memo began by canvassing the procedural history of the Texas litigation, and then noted that "[a]lthough the original DACA policy was not challenged in [that] lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum." AR 253. Specifically, the memorandum noted that "[t]he Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary," and that "[b]oth the district court and the Fifth Circuit concluded that implementation of the program did not comply with the [APA] because the Department did not implement it through notice-and-comment rulemaking." AR 253–54.

---

class of what he deems to be low-priority illegal aliens," Texas, 809 F.3d at 166 ("[Plaintiffs] have not challenged the priority levels [the Secretary] has established, and neither the [district court's] preliminary injunction nor compliance with the APA requires the Secretary to remove any alien or to alter his enforcement priorities"). But the Fifth Circuit nonetheless found DAPA to be reviewable because it was "much more than nonenforcement: [i]t would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." Id.

[6] Secretary Kelly had since been appointed to serve as President Trump's chief of staff.

7

The memorandum also stated that in June 2017, after DAPA had been rescinded but before the Texas litigation was voluntarily dismissed, Texas and the other state plaintiffs in that case had sent a letter to Attorney General Jeff Sessions threatening to challenge DACA in court unless he rescinded the program by September 5, 2017. AR 254; see AR 238–240 (Texas's demand letter). Attorney General Sessions then sent a one-page letter to Acting Secretary Duke (the "Sessions Letter") instructing her to rescind DACA. AR 251. The Sessions Letter explained that the program had been "effectuated by the previous administration through executive action, without proper statutory authority and . . . after Congress' repeated rejection of proposed legislation that would have accomplished a similar result," and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." Id. The letter also noted that because DACA suffered from "the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Id. The letter instructed Acting Secretary Duke to "consider" implementing "an orderly and efficient wind-down process" for the program. Id.

In light of the Texas litigation and the Sessions Letter, the Rescission Memo concluded, "it is clear that the . . . DACA program should be terminated." AR 255. Given "the complexities associated with winding down the program," however, the Department decided to "provide a limited window in which it will adjudicate certain requests for DACA and associated applications." Id. Thus, the Department would adjudicate any properly filed DACA applications that were pending as of September 5, 2017, as well as any new applications for the renewal of DACA benefits that were filed on or before October 5, 2017 by persons whose benefits were set to expire on or before March 5, 2018. It would also honor (in most cases) existing grants of

8

deferred action, work authorization, and advance parole. But it would reject all other DACA applications, including any initial applications filed after September 5, 2017, and all pending and future applications for advance parole under the DACA program. Effectively, then, DACA benefits were made unavailable to any alien who had not already applied, and existing DACA grants would be allowed to expire permanently beginning in March 2018. Finally, like the earlier DACA and DAPA memorandums, the Rescission Memo stated that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." AR 256.

## II.    LEGAL CHALLENGES TO DACA'S RESCISSION

Since September 2017, legal challenges to DACA's rescission have been filed in federal district courts throughout the country. Two of these challenges have made their way to the federal courts of appeals, and one has been to the Supreme Court. Because these challenges generally involve similar administrative and constitutional claims, the Court will not address the plaintiffs' assertions in each case in detail. Nevertheless, a brief overview of this pending litigation landscape will be useful to understand the state of DACA's rescission today.[7]

### A.  Regents of the University of California v. DHS

The first set of challenges to DACA's rescission was filed in September 2017 in federal district court in California. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F. Supp. 3d 1011, 1026 (N.D. Cal. 2018). The plaintiffs in those cases are the University of California, the State of California and several other states, a group of individual DACA recipients,

---

[7] One case, Park v. Sessions, No. 17-cv-1332 (E.D. Va. filed Nov. 21, 2017), was dismissed pursuant to a stipulation by all parties on March 1, 2018, before any relief was granted. The Court will not discuss that case further.

two California municipalities, and a labor union.  See id.  Though not formally consolidated, the cases were all assigned to U.S. District Judge William H. Alsup.  See Case Management Scheduling Order, Regents, No. 17-5211 (N.D. Cal. Sept 22, 2017), ECF No. 49.

Shortly after the actions were filed, the government filed an administrative record consisting of "fourteen documents comprising 256 pages of which 187 consisted of published opinions from the DAPA litigation." Regents, 279 F. Supp. 3d at 1028.  "All non-public materials, some eighty-four documents, actually reviewed by the Acting Secretary remained withheld as privileged."  Id. (citation omitted).  The district court ordered the government to complete the record, denying many of the government's claims of privilege.  Id. at 1028–29.  The government petitioned the Ninth Circuit for a writ of mandamus, but the court of appeals denied the petition. See In re United States, 875 F.3d 1200 (9th Cir. 2017).  The government then sought the same relief from the Supreme Court, which construed the government's mandamus petition as a petition for a writ of certiorari, granted it, vacated the Ninth Circuit's order, and directed the district court to "first resolve[] the Government's threshold arguments," since those arguments, "if accepted, likely would eliminate the need for the District Court to examine a complete administrative record."  In re United States, 138 S. Ct. 443, 444–45 (2017) (per curiam).

While the litigation over the administrative record was pending, the plaintiffs filed a motion for preliminary injunctive relief, and the government moved to dismiss the plaintiffs' complaints both for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).  See Regents, 279 F. Supp. 3d at 1029.  Then, following the Supreme Court's instruction to first address the government's threshold arguments, the district court denied the government's Rule 12(b)(1) motion and granted the plaintiffs' motion for a preliminary

10

injection. Id. at 1036–37. The injunction directed DHS to resume accepting applications for the renewal of DACA benefits, although it did not require the agency to accept new DACA applications or to afford current DACA beneficiaries advance parole. See id. at 1048–49.

In a separate order entered a few days later, the district court denied the government's Rule 12(b)(6) motion except as to the plaintiffs' notice-and-comment and Regulatory Flexibility Act claims. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No 17-CV-05211, 2018 WL 401177, at *2 (N.D. Cal. Jan. 12, 2018). The government appealed both orders, and the Ninth Circuit set an expedited briefing schedule. See Order, Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., No. 18-15068 (9th Cir. Jan. 17, 2018), ECF No. 2. The government also petitioned the Supreme Court for a writ of certiorari before judgment, but the Supreme Court denied the petition. See Order, Dep't of Homeland Sec. v. Regents of the Univ. of Cal., No. 17-1003 (U.S. Feb. 26, 2018). The government's appeal is currently pending before the Ninth Circuit.

## B. Batalla Vidal v. Duke

The second challenge also came about in September 2017 when Martin Batalla Vidal, an individual DACA beneficiary who was already engaged in litigation with the Department over the revocation of his employment authorization, amended his complaint to assert a challenge to DACA's rescission. See Batalla Vidal v. Duke, No. 16-CV-4756, 2017 WL 5201116, at *4 (E.D.N.Y. Nov. 9, 2017). His challenge was later consolidated with two others before Judge Nicholas G. Garaufis of the U.S. District Court for the Eastern District of New York. Id. The plaintiffs in the three cases include Mr. Batalla Vidal, the State of New York, fourteen other states and the District of Columbia, and Make the Road New York, a nonprofit. See id. at *4 & n.5.

Shortly after the consolidation of the three actions, another dispute arose regarding the scope of the administrative record. The district court ordered the government to produce certain

11

documents, see id. at *6–7, and, on the government's petition for mandamus, the Second Circuit stayed discovery pending the district court's resolution of "issues of jurisdiction and justiciability." Id. at *8. The government then filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). Id.

The district court denied the government's Rule 12(b)(1) motion (except as to some plaintiffs that the court found lacked standing), see id. at *20, but it later certified its decision for an interlocutory appeal, see Batalla Vidal v. Nielsen, 16-CV-4756, 2018 WL 333515, at *1 (E.D.N.Y. Jan. 8, 2018). The Second Circuit then held the government's petition for leave to file an interlocutory appeal in abeyance pending the district court's resolution of the government's Rule 12(b)(6) motion and the plaintiffs' motion for a preliminary injunction, which the plaintiffs had filed while issues related to the interlocutory appeal were being litigated. See Certified Order, Nielsen v. Vidal, No. 18-122 (2d Cir. Jan. 31, 2018), ECF No. 46.

A few weeks later, the district court granted the plaintiffs' motion for a preliminary injunction. See Batalla Vidal v. Nielsen, 279 F. Supp. 401, 437–38 (E.D.N.Y. 2018). The scope of the court's injunction was the same as in Regents: it required the Department to resume consideration of renewal applications but did not require the consideration of initial applications or applications for advance parole. Id. at 437–38. The government took an interlocutory appeal, and the next day, the Second Circuit denied the mandamus petition that it had previously held in abeyance and vacated its earlier discovery stay. See Certified Order, In re Nielson, No. 17-3345 (2d Cir. Feb. 21, 2018), ECF No. 181. The Second Circuit thereafter granted the government's motion to expedite the appeal, which is pending at this time. See Certified Order, Vidal v. Nielsen, No. 18-485 (2d Cir. Mar. 8, 2018), ECF No. 62.

12

While the expedited appeal was pending, the district court granted in part and denied in part the government's pending 12(b)(6) motion.[8] See Batalla Vidal v. Nielsen, No. 16-cv-4756, 2018 WL 1532370, at *1 (E.D.N.Y. Mar. 29, 2018). The court denied the motion as to plaintiffs' substantive APA claims for substantially the same reasons that it had previously found a substantial likelihood of success on the merits of those claims, id. at *3, but granted the motion as to their procedural APA and Regulatory Flexibility Act ("RFA") claims. Id. at *5–6. The court also denied the motion as to the plaintiffs' equal protection claims, id. at *6–10, although it granted the motion as to their information-sharing claim, concluding that the plaintiffs had "not plausibly alleged that DHS actually changed its information-sharing policy," id. at *11. Finally, the court granted the motion as to plaintiffs' procedural due process claim, except as to certain plaintiffs who alleged that their renewal applications had been improperly rejected as untimely or were erroneously deemed to contain minor clerical errors. Id. at *14.

## C.      Casa de Maryland v. DHS

The plaintiffs in the third case, CASA de Maryland v. U.S. Dep't of Homeland Security, 284 F. Supp. 3d 758 (D. Md. 2018), are individual DACA recipients and several nonprofit organizations. In March 2018, the district court (Judge Roger W. Titus) ruled that although DACA's rescission was reviewable, it did not violate the APA or the Equal Protection or Due Process Clauses. See id. at 770, 773–77, 779. The district court summarized its decision to depart from the Regents and Batalla Vidal courts on the substantive APA claim as follows:

> The decisions to date by courts in California and New York are premised on the legal conclusion that DACA is lawful, and therefore, a decision to rescind DACA on the basis of unlawfulness is necessarily arbitrary and capricious.

---

[8] That motion also sought dismissal under Rule 12(b)(1) (on standing and mootness grounds) of the Batalla Vidal plaintiffs' procedural due process claim, which had been presented for the first time in their third amended complaint. Batalla Vidal, 2018 WL 1532370, at *12–13. The court denied the motion to dismiss on that ground.

> Respectfully, this Court disagrees. Regardless of the lawfulness of DACA, the appropriate inquiry is whether or not DHS made a reasoned decision to rescind DACA based on the Administrative Record . . . . Given the fate of DAPA, the legal advice provided by the Attorney General, and the threat of imminent litigation, it was reasonable for DHS to have concluded—right or wrong—that DACA was unlawful and should be wound down in an orderly manner. Therefore, its decision to rescind DACA cannot be arbitrary and capricious.

Id. at 767–768 (citation omitted). However, the district court did grant one form of relief not granted by the courts in Regents or Batalla Vidal: it enjoined DHS from "using information provided by Dreamers through the DACA program for enforcement purposes," explaining that so doing would violate applicable principles of equitable estoppel. Id. at 779. As of the date of this decision, neither party has appealed the district court's order, although the time in which to do so has not yet expired. See Fed. R. App. P. 4 (a)(1)(B).

## III.    THE PRESENT CHALLENGES TO DACA'S RESCISSION

The cases currently before this Court, NAACP v. Trump and Princeton v. United States, were filed in September and November 2017, respectively, and have been consolidated for purposes of the dispositive motions pending in each. The plaintiffs in the Princeton action are Princeton University, Microsoft Corporation, and Maria de la Cruz Perales Sanchez, a DACA beneficiary and Princeton undergraduate. See Compl. ("Princeton Compl.") [ECF No. 1] at 12. The plaintiffs in the NAACP action are the National Association for the Advancement of Colored People ("NAACP"), the American Federation of Teachers ("AFT"), and the United Food and Commercial Workers International Union ("UFCW"). See First Amended Complaint at 3–5, NAACP, No. 17-cv-1907 (D.D.C. Oct. 24, 2017), ECF No. 10 ("NAACP FAC"). Both sets of plaintiffs challenge DACA's rescission on various administrative and constitutional grounds, including that it was arbitrary and capricious, see Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J.

14

("Princeton MSJ") at 11–38; that it should have undergone notice-and-comment procedures, see id. at 38–41; that its effects on "small entities" should have been analyzed pursuant to the RFA, 5 U.S.C. §§ 601–12, see NAACP FAC 16–17; and that it violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments, see Princeton Compl. at 35–40.

The government has filed motions to dismiss in both actions. It argues: (1) that plaintiffs' APA claims should be dismissed because DACA's rescission was "committed to agency discretion by law" and is therefore unreviewable under 5 U.S.C. § 701(a)(2), see Mem. of Law in Supp. of Defs.' Mot. to Dismiss ("Princeton MTD") [ECF No. 8] at 14–21; (2) that a provision of the INA, 8 U.S.C. § 1252(g), deprives the Court of subject-matter jurisdiction, see id. at 21–24; (3) that all plaintiffs but Ms. Perales Sanchez lack Article III and prudential standing, see id. at 24–25; Mem. in Supp. of Defs.' Mot. to Dismiss, No. 17-cv-1907 (D.D.C. Nov. 8, 2018) ("NAACP MTD") at 14–18; and (4) that plaintiffs have failed to state a claim under the APA, the RFA, and the Constitution, Princeton MTD at 27–44.

Plaintiffs have moved for summary judgment only on their APA claims, or alternatively, for preliminary injunctive relief "[t]o the extent the Court wishes to see [the discovery] issues [in Regents and Batalla Vidal] litigated before granting final judgment to the Plaintiffs." Princeton MSJ at 3 & n.1. Unlike the plaintiffs in Regents and Batalla Vidal, however, plaintiffs here have not challenged the completeness of the administrative record, see 5 U.S.C. § 706 (providing that, in reviewing agency action, "the court shall review the whole record or those parts of it cited by a party" (emphasis added)), and the government urges the Court to decide the pending motions on the current record, see Princeton MTD at 3 ("[T]he Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside

15

the Rescission Policy if it disagrees."). Finally, plaintiffs have also moved for a preliminary injunction preventing DHS from sharing or otherwise using DACA beneficiaries' personal information for immigration enforcement purposes. See Princeton MSJ at 48–53.

The Court initially set a motions hearing in this case for February 2018, but the hearing was continued at the parties' request pending the government's petition for certiorari before judgment in the Regents case. See January 26, 2018 Min. Order. That petition was denied in late February, and the Court held a motions hearing in mid-March. The parties' motions are now ripe for decision.

## DISCUSSION

I. **SUBJECT-MATTER JURISDICTION**

### A. The Immigration and Nationality Act

The government argues that the Court lacks jurisdiction over all of plaintiffs' claims—administrative and constitutional—under 8 U.S.C. § 1252(g), a provision of the INA that states that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." On its face, that language removes jurisdiction only as to the three listed actions of the Attorney General. The government argues that "[t]he denial of deferred action is a step toward the commencement of removal proceedings against an alien" and that "the INA's careful scheme for [removal] proceedings" suggests that such denials may be challenged only through individual removal proceedings, and hence § 1252(g) strips the Court of jurisdiction over plaintiffs' challenge here. Defs.' Reply in Supp. of their Mot. to Dismiss ("Defs.' Reply") [ECF No. 56] at 10.

16

The government's position contradicts not only the plain language of § 1252(g) but also the Supreme Court's interpretation of that language in <u>Reno v. American–Arab Anti-Discrimination Committee</u> ("<u>AAADC</u>"), where the Court specifically rejected the argument that "the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings." 525 U.S. 471, 482 (1999). Rather, the Court explained, § 1252(g) applies "only to three discrete actions that the Attorney General may take: her 'decision or action' to '<u>commence</u> proceedings, <u>adjudicate</u> cases, or <u>execute</u> removal orders.'" <u>Id.</u> (listing "part[s] of the deportation process" that fall outside of § 1252(g)'s scope, including "decisions to open an investigation, to surveil the suspected violator, to reschedule the deportation hearing, to include various provisions in the final order that is the product of the adjudication, and to refuse reconsideration of that order"). Because the rescission of DACA is neither the commencement of a proceeding, the adjudication of a case, nor the execution of a removal order, § 1252(g) is inapplicable here pursuant to the provision's plain language.

The government's only response is that DACA's rescission is a "step toward" the removal of specific aliens. <u>See</u> Defs.' Reply at 10; <u>but see</u> <u>id.</u> at 2 (stressing elsewhere that rescission "does not, in itself, exert the agency's coercive power over any individual"). True, the Supreme Court said in <u>AAADC</u> that § 1252(g) was "specifically directed at the deconstruction, fragmentation, and hence prolongation of removal proceedings." 525 U.S. at 487. But there is no allegation here that removal proceedings have yet been initiated against any DACA beneficiary, so there are no pending removal proceedings with which plaintiffs' challenge might interfere. <u>Cf.</u> <u>id.</u> (concluding that § 1252(g) stripped jurisdiction over selective deportation claims brought by six aliens who were then in removal proceedings). Thus, the government's reliance on <u>AAADC</u> is misplaced,

17

and § 1252(g) does not bar review here.  Accord Regents, 279 F. Supp. 3d at 1031–1033 (rejecting the government's § 1252(g) argument); Batalla Vidal, 2017 WL 5201116, at *12–13 (same).

**B.  Article III Standing**

The government also asks the Court to dismiss the claims brought by Princeton and Microsoft, Princeton MTD at 24–25, and by all plaintiffs in the NAACP action, see NAACP MTD at 14–17, for lack of Article III standing.  In so moving, the government urges the Court to conduct a "claim-by-claim analysis" of each plaintiff's standing as to each claim.  Defs.' Reply 11.

Such a detailed analysis is unnecessary, however, at least in Princeton.  The government does not dispute that the individual plaintiff, Ms. Perales Sanchez, has Article III standing to assert each claim in the complaint.[9]  See Princeton MTD 24–25 (seeking dismissal only as to the "[n]on-[i]ndividual [p]laintiffs"); Princeton Compl. 30–38 (listing Ms. Perales Sanchez as a plaintiff on each count).  And as the Supreme Court has recently reaffirmed, Article III requires only that "[a]t least one plaintiff . . . have standing to seek each form of relief requested in the complaint."  Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1651 (2017).  In Princeton, that "one plaintiff" is Ms. Perales Sanchez, and no further analysis of any other plaintiff's standing is necessary.

---

[9] Nor could they.  Ms. Perales Sanchez clearly satisfies the "irreducible constitutional minimum" of standing as to DACA's rescission: her inability to renew her DACA benefits is (1) an "injury in fact," which is "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical"; it is (2) "fairly traceable" to DHS's decision to rescind DACA; and it is (3) "likely to be redressed" by a decision of this Court invalidating DACA's rescission.  Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547–48 (2016) (internal quotation marks omitted).  And although the Court ultimately concludes that plaintiffs fail to state a claim as to DHS's alleged plans to share DACA beneficiaries' information with immigration enforcement agencies, the Court concludes—and the government does not dispute—that Ms. Perales Sanchez has standing to assert that claim as well.  See Princeton Compl. ¶ 108 (alleging that DHS has "revised [its] assurances about information sharing" and now "offer[s] only to prevent personal information from being provided 'proactively' to agencies responsible for facilitating removal"); cf. Clapper v. Amnesty Int'l, 568 U.S. 398, 411 (2013) (finding that the plaintiffs' asserted injury was too speculative when it relied on a hypothetical sequence of government actions that culminated in their communications being monitored).

18

In <u>NAACP</u>, however, there is no individual plaintiff. The organizational plaintiffs—the NAACP and two labor unions—therefore must rely on their own standing to survive the government's motion to dismiss. These plaintiffs assert that they have "associational standing," which requires each of them to plead that "(1) at least one of its members would have standing to sue in his or her own right; (2) the interests it seeks to protect are germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the participation of an individual member of the organization in the suit." <u>AARP v. EEOC</u>, 226 F. Supp. 3d 7, 16 (D.D.C. 2016) (citation omitted). As in <u>Princeton</u>, if one of the three <u>NAACP</u> plaintiffs has standing, then an analysis of the remaining plaintiffs' standing is unnecessary.

The parties do not dispute that the <u>NAACP</u> plaintiffs meet the third prong of the test for representational standing—they do. <u>See NAACP</u> MTD at 16–17 (not arguing that the participation of individual members should be required). And although the government contends that the <u>NAACP</u> plaintiffs fail the first prong because their complaint does not "name a specific member with standing," <u>see id.</u> at 16, each plaintiff provided an anonymous affidavit from at least one of its members stating that the member was a DACA beneficiary, <u>see, e.g.</u>, <u>Princeton</u> MSJ, Ex. W [ECF No. 28-17] (declaration of NAACP member), and the government does not seriously dispute—nor could it—that these affidavits are sufficient.[10] Thus, the only remaining issue is whether the rescission of DACA is germane to the organizational plaintiffs' purposes.

---

[10] The government initially argued that the organizational plaintiffs had to name these members. <u>See NAACP</u> MTD at 16. The authority for that proposition is tenuous, however, <u>see Young Am.'s Found. v. Gates</u>, 560 F. Supp. 2d 39, 49 (D.D.C. 2008) ("[I]t is not clear that [associational standing] actually requires a name-specific identification."), <u>aff'd</u>, 573 F.3d 797 (D.C. Cir. 2009); <u>Doe v. Stincer</u>, 175 F.3d 879, 884 (11th Cir. 1999) ("[W]e have never held that a party suing as a representative must specifically name the individual on whose behalf the suit is brought . . . ."), and the government did not renew the argument in its reply brief, <u>see</u> Defs.' Reply at 12–13.

19

The germaneness requirement is "undemanding" and requires "mere pertinence between litigation subject and organizational purpose." Humane Soc. of the U.S. v. Hodel, 840 F.2d 45, 58 (D.C. Cir. 1988). Here, the NAACP has alleged that its purpose is to "ensure the political, educational, social, and economic equality of all persons," particularly "people of color." NAACP Compl. at 3–4. This mission is "pertinent" to the subject of the litigation here, because plaintiffs have alleged that "[n]early all of the DACA registrants—more than 95%—are people of color," id. at 12, and that DACA confers various educational, social, and economic benefits on those individuals, see id. at 2. At this stage of the litigation, these allegations are sufficient to establish the NAACP's standing—which, in turn, is sufficient to establish the standing of the other two plaintiffs in the NAACP action. See Hodel, 840 F.2d at 59 (concluding that an association's "members' aesthetic interest in viewing live animals and birds" was sufficiently germane to a lawsuit whose purpose was "keeping animals and birds alive and well"). Thus, at least one plaintiff has standing to assert every claim in both of the actions currently before the Court, and the government's motions to dismiss for lack of standing will be denied.

## II.   ADMINISTRATIVE CHALLENGES

As noted above, plaintiffs assert various administrative challenges to DACA's rescission, including that it was arbitrary and capricious, that it required notice and comment, and that it ran afoul of RFA's requirement that an agency consider the effects of its actions on small entities. The government raises two threshold arguments that apply only to plaintiffs' administrative claims: first, that DACA's rescission was unreviewable under the APA's carve-out for actions "committed

20

to agency discretion by law," 5 U.S.C. § 701(a)(2);[11] and second, that plaintiffs fall outside the "zone of interests" protected by the APA and RFA. The Court will first address the government's threshold arguments and then proceed to the merits of plaintiffs' claims.

## A. Reviewability

The APA "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has explained the difference between § 701(a)(1) and (a)(2) as follows:

> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is <u>drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion</u>. In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely.

<u>Heckler v. Chaney</u>, 470 U.S. 821, 828 (1985) (emphasis added). Thus, in determining whether a particular agency action is "committed to agency discretion by law," courts ask whether "statutes are drawn in such broad terms that in a given case there is no law to apply." <u>Id.</u> (citations and internal quotation marks omitted); <u>see also</u> <u>Drake v. FAA</u>, 291 F.3d 59, 70 (D.C. Cir. 2002) ("[T]he 'no law to apply' formula has come to refer to the search for substantive legal criteria against which an agency's conduct can be seriously evaluated.").

One category of agency action that the Court has held to be "presumptively unreviewable" under § 701(a)(2) is an agency's decision "not to institute enforcement proceedings." <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993) (citing <u>Chaney</u>, 470 U.S. at 831). The Supreme Court first

---

[11] "[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." <u>Sierra Club v. Jackson</u>, 648 F.3d 848, 854 (D.C. Cir. 2011) (citations omitted).

identified this presumption in <u>Chaney</u>, a case in which a group of death-sentenced prisoners petitioned the Food and Drug Administration ("FDA") to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. <u>See</u> 470 U.S. at 823. The FDA refused, explaining not only that was it "unclear" that it had "jurisdiction over the unapproved use of approved drugs for human execution," but also that given the absence of any "danger to the public health or a blatant scheme to defraud," even if the agency did have jurisdiction, it would "decline to exercise [that jurisdiction] under [its] inherent discretion to decline to pursue certain enforcement matters." <u>Id.</u> at 824–25. The plaintiffs filed suit, seeking an order directing the FDA to take enforcement action. The district court granted summary judgment for the agency, holding that its decision not to act was unreviewable under § 701(a)(2), but the court of appeals reversed with instructions to order the agency to "fulfill its statutory function." <u>Id.</u> at 825–27.

The Supreme Court granted certiorari and reversed. "[A]gency decisions to refuse enforcement," the Court explained, are "general[ly] unsuit[able] for judicial review" for several reasons. <u>Id.</u> at 831. Such decisions call for "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies." <u>Id.</u> Moreover, nonenforcement decisions generally do not involve the exercise of "<u>coercive</u> power over an individual's liberty or property rights"; they provide no "focus for judicial review"; and they "share[] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." <u>Id.</u> at 832. For these reasons, such decisions have "traditionally been 'committed to

22

agency discretion,' and we believe that the Congress enacting the APA did not intend to alter that tradition." Id. Thus, the Court concluded, "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." Id. The Court was careful to note, however, that this presumption of unreviewability "may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833. Critically for purposes of this case, moreover, the Court reserved judgment on whether the presumption applies where an agency "refuse[s] . . . to institute proceedings based solely on the belief that it lacks jurisdiction." Id. at 833 n.4 (internal quotation marks omitted).

Although the Supreme Court has not yet answered the question reserved in Chaney, the D.C. Circuit has addressed it. In Crowley Caribbean Transport, Inc. v. Pena, for example, the issue was whether Chaney's presumption of unreviewability applied to the Maritime Administration's refusal to take an enforcement action under a provision of the Merchant Marine Act of 1936 (the "1936 Act") that the agency thought was inapplicable as a matter of law. See 37 F.3d at 672–73. The D.C. Circuit began by noting that Chaney had reserved judgment on almost exactly this issue and then observed that two intervening circuit decisions seemed to have answered the question in contradictory ways. See id. at 675–76 (citing Safe Energy Coal. of Mich. v. U.S. Nuclear Regulatory Comm'n, 866 F.2d 1473, 1477 (D.C. Cir. 1989) (presumption of unreviewability applied to the agency's refusal, based on its interpretation of its own regulations, to take enforcement action against a nuclear reactor); Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock, 783 F.2d 237, 244–45 (D.C. Cir. 1986) (presumption of unreviewability did not apply to the Department of Labor's refusal, based on its interpretation of the labor laws, to take enforcement action in response to a union complaint)).

23

After noting that "[a]s a circuit, we seem to have no explicit rule on how to proceed when we have inconsistent precedents," id. at 675, the court relied on language from an intervening Supreme Court decision, ICC v. Brotherhood of Locomotive Engineers ("BLE"), 482 U.S. 270 (1987), to resolve the intra-circuit split. BLE held that an agency's refusal to reconsider a decision on the basis of "material error"—that is, because it was erroneous when made, not because of changed circumstances or newly discovered evidence—is "committed to agency discretion by law" under § 701(a)(2), even if it is based on the agency's interpretation of a statute. Id. at 278–84. In reaching this conclusion, the Supreme Court rejected what it took to be the concurrence's suggestion that "if [an] agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."[12] Id. at 283. To refute this proposition, the Court explained,

> it is enough to observe that a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction. That is surely an eminently "reviewable" proposition, in the sense that courts are well qualified to consider the point; yet it is entirely clear that the refusal to prosecute cannot be the subject of judicial review.

Id. Citing this passage, the Crowley court concluded that BLE, "though not in the Chaney context, squarely rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions." Crowley, 37 F.3d at 676. Thus, the court held, there was "no basis for review of the Maritime Administrator's single-shot non-enforcement decision." Id.

The D.C. Circuit in Crowley was careful to preserve another line of circuit precedent, however, which holds that Chaney's presumption of unreviewability does not apply to "an

---

[12] The concurrence disputed this characterization of its argument. See id. at 290 n.2 (Stevens, J., concurring in the judgment). Its point was that because an agency's action can be sustained only on the grounds invoked by the agency, "when an agency explains that it has denied a petition for reopening based on . . . its reading of a statute or a constitutional provision, its decision cannot be sustained on the conjecture that it has the discretion to deny reopening on a variety of grounds." BLE, 482 U.S. at 290–291 (Stevens, J., concurring in the judgment).

24

agency's announcement of its interpretation of a statute, even when that interpretation is advanced in the context of a decision not to take enforcement action." Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993) (citations and internal quotation marks omitted).[13] The key difference, the Crowley court explained, was that while the case before it involved an agency's refusal to act on a single complaint, those prior cases involved "an agency's statement of a general enforcement policy" that was either "expressed . . . as a formal regulation after the full rulemaking process . . . or . . . otherwise articulated . . . in some form of universal policy statement." Crowley, 37 F.3d at 676. The court then pointed out the "ample reasons for distinguishing the two":

> [First,] general statements [of enforcement policy] . . . are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as Chaney recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities,' a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy . . . .

Id. at 677 (quoting Chaney, 470 U.S. at 833 n.4). Thus, the court concluded in Crowley, an individual nonenforcement decision is presumptively unreviewable even if it is based solely on legal grounds, even though "an agency's statement of a general enforcement policy may be reviewable for legal sufficiency." Id. at 676–677.

---

[13] See id. (holding that the presumption of unreviewability did not apply to the agency's determination that a statutory requirement applied to the plaintiffs, even though that determination was made in a policy statement that communicated the agency's intent not to enforce that requirement); Nat'l Wildlife Fed'n v. EPA, 980 F.2d 765, 773 (D.C. Cir. 1992) ("[T]he presumption of unreviewability of agency nonenforcement decisions is inapplicable or at least rebutted [where a plaintiff] raises a facial challenge to [an agency's] statutory interpretation embodied in [a regulation] and does not contest a particular enforcement decision.").

The D.C. Circuit has applied Crowley only once, in OSG Bulk Ships, Inc. v. United States, 132 F.3d 808 (D.C. Cir. 1998). In that case, a plaintiff challenged the Maritime Administration's longstanding policy of refusing to enforce a different provision of the 1936 Act against certain vessels. See id. at 811 (explaining that the agency had "long allowed" vessels built with the aid of a federal subsidy that was reserved for ships that would be operated exclusively in foreign trade to enter the domestic shipping market at the end of their economic lives). Citing Crowley for the proposition that while "agencies' nonenforcement decisions are generally unreviewable . . . , an agency's adoption of a general enforcement policy is subject to review," the court concluded that the Maritime Administration's policy was not presumptively unreviewable because it was not a "single-shot non-enforcement decision." Id. at 812 (citation omitted).

The government contends that Chaney's presumption of unreviewability applies here. See Princeton MTD at 17. Like the FDA's refusal to take the enforcement actions at issue in Chaney, the government argues, DHS's decision to rescind a deferred-action policy like DACA involves a "complicated balancing" of the agency's enforcement and resource-allocation priorities, and it resembles the "[c]hanges in policy as to criminal prosecutorial discretion" that "regularly occur within and between presidential administrations." Defs.' Reply at 2–3, 26. Moreover, the Supreme Court has said that the concerns that counsel against judicial review in the criminal context are "greatly magnified in the deportation context," where delaying removal "is often the principal object of resistance to a deportation proceeding" and where delays "permit and prolong a continuing violation" of the federal immigration laws. AAADC, 525 U.S. at 490. Nor do Crowley and OSG apply here, the government argues, because those cases involved an agency's

26

interpretation of a specific statutory provision, whereas this case involves the agency's evaluation of its overall statutory authority.

Plaintiffs resist the application of Chaney's presumption on two grounds. First, they argue, Chaney itself involved a decision not to enforce a statute, whereas DACA's rescission was, in essence, a decision to resume enforcing the immigration laws. Pls.' Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n") [ECF No. 23] at 6. This matters because two of Chaney's reasons for its presumption apply "unique[ly] to non-enforcement decisions": the absence of the exercise of "coercive power" over any person, and the lack of any "focus for judicial review." Id.

This distinction is unpersuasive. For one thing, the rescission of DACA does not actually require the Department to initiate removal proceedings against any specific alien; rather, it simply removes a mechanism by which certain aliens otherwise could have been considered for deferred action. Thus, like the FDA's nonenforcement decision in Chaney, there are no agency proceedings here to provide a "focus for judicial review," 470 U.S. at 832, and DACA's rescission does not itself involve the exercise of coercive power over any person. [14]

Moreover, Chaney's remaining rationales apply here with equal force. An agency's decision to revoke a nonenforcement policy involves the same prioritization and resource-allocation considerations as its decision to implement such a policy. See Chaney, 470 U.S. at 831.

---

[14] True, there is an element of coercion in the revocation of work authorization and other benefits associated with DACA. But the revocation of those benefits is not itself an enforcement decision and is therefore not properly analyzed under Chaney. See 470 U.S. at 832. Indeed, at least one other court has concluded that the withholding of work authorization and similar discretionary benefits is unreviewable under § 701(a)(2) simply because "[t]here are no statutory standards . . . to apply." See Perales v. Casillas, 903 F.2d 1043, 1048 (5th Cir. 1990) (holding that § 701(a)(2) precluded review of a categorical refusal by a district office of the then-Immigration and Naturalization Service to grant work authorization and pre-hearing voluntary departure to a certain class of eligible aliens over a three-year period); cf. Texas, 809 F.3d at 166–68 (holding that conferring such benefits, especially "in light of the INA's intricate regulatory scheme for changing immigration classifications and issuing employment authorization," was a nondiscretionary determination sufficient to permit APA review).

27

And both types of decisions are substantially immunized from judicial review in the criminal context. See United States v. Armstrong, 517 U.S. 456, 464 (1996) ("[T]he decision whether or not to prosecute . . . generally rests entirely in [the prosecutor's] discretion[,] . . . subject to constitutional constraints." (citations omitted)). Thus, although the D.C. Circuit has at times warned against extending Chaney "outside of [the] context" of "decisions not to take enforcement action," Robbins v. Reagan, 780 F.2d 37, 46 (D.C. Cir. 1985) (rejecting Chaney's application to a decision to withhold federal funding from a homeless shelter), this Court has little difficulty concluding that Chaney extends to the revocation of nonenforcement decisions.

Second, plaintiffs contend that under Crowley and OSG, any general enforcement policy is exempt from Chaney's presumption of unreviewability, regardless of whether it is premised on a legal interpretation. See Pls.' Opp'n at 7; Tr. Of Mots. Hr'g [ECF No. 64] ("Oral Arg. Tr.") at 21:6–11. Concededly, there is some language in the post-Crowley case law to support this view. See, e.g., OSG, 132 F.3d at 812 (stating that "an agency's adoption of a general enforcement policy is subject to review"); Ass'n of Civilian Technicians, Inc. v. Fed. Labor Relations Auth., 283 F.3d 339, 343 (D.C. Cir. 2002) (noting "our assumption in Crowley that a district court might have jurisdiction over an agency's articulation of its general enforcement policy").

But plaintiffs' reading of this language is unpersuasive for at least two reasons. First, it is in substantial tension with Chaney itself, where the plaintiffs had asked the FDA to take "various investigatory and enforcement actions" against drug manufacturers, state prisons, and "all those in the chain of distribution who knowingly distribute or purchase the drugs [at issue] with intent to use them for human execution." 470 U.S. at 824; see id. at 842 (Marshall, J., concurring in the judgment) (noting that "the number of people currently affected by the alleged misbranding is

28

around 200"). These facts suggest that the FDA's refusal to act in that case was more than just a one-off nonenforcement decision.[15] Second, plaintiffs' broad reading of <u>Crowley</u> and <u>OSG</u> is unnecessary to support the holdings of those cases, which both involved nonenforcement decisions based solely on agency statutory interpretation. See <u>Crowley</u>, 37 F. 3d at 672–73; <u>OSG</u>, 132 F.3d at 810  Better, then, to adhere to the lines that the D.C. Circuit and the Supreme Court have actually drawn: between legal interpretations couched as broad enforcement policies (which are reviewable, as in <u>OSG</u>), individual enforcement decisions (which are presumptively unreviewable, as in <u>Crowley</u>), and discretionary enforcement policies (which are presumptively unreviewable, as in <u>Chaney</u> itself).

Indeed, the government's reading of <u>Crowley</u> and <u>OSG</u> proceeds essentially along these lines. In the government's view, those cases stand for the proposition that "if [an] agency's <u>interpretation of a statute</u> is embedded in a non-reviewable enforcement policy, the former may be reviewable as such," but "the enforcement policy itself" is presumptively insulated from review. Defs.' Reply at 6 (emphasis added). Thus, according to the government, <u>Crowley</u> and <u>OSG</u> address the "flipside" of the Supreme Court's <u>dictum</u> in <u>BLE</u>: just as an otherwise unreviewable agency action (like a refusal to reconsider an earlier decision, as in <u>BLE</u>, or a nonenforcement decision, as in <u>Chaney</u> and <u>Crowley</u>) does not become reviewable simply because the agency acts on the basis of its interpretation of a statute, an otherwise reviewable interpretation of a statute does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion. See Oral Arg. Tr. at 15:5–13.

---

[15] Justice Brennan joined the Court's opinion on the understanding that it applied only to "[i]ndividual, isolated nonenforcement decisions." Id. at 839 (Brennan, J., concurring). Seven other justices joined the majority opinion in full, however, and none of them took Justice Brennan's view.

The Court has no quarrel with this statement of the law as a general matter, but it is unpersuaded by the government's attempt to apply that law to this case. The government contends that the Crowley/OSG exception does not apply here because the Rescission Memo "does not contain an embedded interpretation of the INA (or any other statute)." Defs.' Reply at 6. But the Sessions Letter makes clear that DACA's rescission was based (at least in significant part) on the Attorney General's view that the program lacked "proper statutory authority." AR 251.

As best the Court can tell, the government's response is that Crowley and OSG are distinguishable because they involved an agency's determination that a specific statutory provision applied to a particular course of conduct, whereas this case—like Chaney—involves an agency's determination as to the scope of its statutory (and here, also constitutional) authority. See Oral Arg. Tr. at 57:24–58:9 (arguing that Crowley applies only "where there's an interpretation of a substantive provision of the statute"); id. at 8:12–15 ("Plaintiffs nowhere point to any provision in the INA that would substantively constrain the Secretary's decision . . . to rescind or discontinue DACA."). But this strikes the Court as a distinction without a difference. To say that a particular agency action is "without statutory authority" is simply to say that no statutory provision authorizes that action; in a sense, therefore, it is a determination of the substantive content of each statutory provision that might plausibly apply. See, e.g., 6 U.S.C. § 202(5) (authorizing the Department to "[e]stablish[] national immigration enforcement policies and priorities"). The Court fails to perceive any meaningful difference between an agency's conclusion that it lacks statutory authority and its interpretation of a specific statutory provision. See City of Arlington v. FCC, 569 U.S. 290, 299–300 (2013) (rejecting, for purposes of determining the proper standard of judicial review, a similar distinction between "jurisdictional" and "nonjurisdictional" agency

30

interpretations and concluding that "there is <u>no difference,</u> insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority that it unquestionably has"). The government's attempt to avoid <u>Crowley</u> and <u>OSG</u> on these grounds therefore fails.

The government's reliance on <u>BLE</u> is equally unavailing. For one thing, as <u>Crowley</u> recognized, <u>BLE</u> addressed the reviewability of enforcement decisions only in <u>dictum</u>; its actual holding concerned the reviewability of an agency's refusal to reconsider a prior decision. <u>See</u> <u>Crowley,</u> 37 F.3d at 676; <u>BLE</u>, 482 U.S. at 278–84. Moreover, the best account of <u>BLE</u> is the one that the D.C. Circuit actually gave in <u>Crowley,</u> where the court relied on <u>BLE</u> to conclude that <u>Chaney</u>'s presumption of unreviewability applies to <u>individual</u> nonenforcement decisions. <u>See</u> <u>Crowley,</u> 37 F.3d at 676–77. In the same breath, however, the D.C. Circuit reaffirmed its view that general enforcement policies are exempt from <u>Chaney</u>'s presumption of unreviewability where they are predicated solely on the agency's view of what the law requires. <u>See</u> <u>id.</u> This treatment of <u>BLE</u> by the <u>Crowley</u> court is not only sensible—after all, <u>BLE</u>'s <u>dictum</u> concerned a prosecutor's decision not to bring a <u>single</u> criminal charge—but it is also binding on this Court.

Nor do the concerns that counsel against judicial review in the immigration context carry much force where, as here, a party seeks judicial review of a legal judgment embedded in an immigration enforcement policy. Unlike judicial review of individual removal proceedings, review of an enforcement policy does not itself delay the removal of any specific alien. <u>See</u> <u>AAADC,</u> 525 U.S. at 490–91 (noting that delay "is often the principal object of resistance to a deportation proceeding" and that it prolongs "an ongoing violation of United States law"). And there is no danger of "chilling law enforcement by subjecting the [agency's] motives . . . to outside

31

inquiry," since the court need only examine the immigration authority's legal reasoning. Id. at 490 (alteration omitted). Although many immigration decisions touch on subjects that courts are ill-equipped to consider, such as diplomacy or national security, see id. at 491, an agency's interpretation of a statute is a much more natural subject for judicial review. Thus, while immigration policies are generally "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference," there are good reasons to scrutinize a policy more carefully when it is based solely on an agency's reading of domestic statutory law. Saavedra Bruno v. Albright, 197 F.3d 1153, 1159 (D.C. Cir. 1999).

Properly understood, then, the Crowley/OSG exception to Chaney's presumption of unreviewability applies to a legal interpretation phrased as a general enforcement policy, even if that interpretation concerns the scope of the agency's lawful enforcement authority. And that is essentially what we have here.

But the government has one final line of defense. According to the government, DACA was rescinded not only because of its supposed illegality, but also because of the Attorney General's assessment of what the government now calls "litigation risk"—that is, the likelihood that DACA would have been invalidated had it been challenged in the Texas litigation. See Defs.' Reply at 17; AR 254–55. At first blush, this seems to be a "discretionary" consideration that makes this case more like Chaney, where the agency refused to take enforcement action not only because it thought that it lacked jurisdiction (a legal reason), but also because the alleged violations did not implicate the agency's enforcement priorities (a discretionary reason). See 470 U.S. at 824–25.

It is not difficult to imagine a case where a court's preliminary disapproval of an agency's nonenforcement policy could lead the agency to rescind that policy for bona fide discretionary

32

reasons. See Chaney, 470 U.S. at 831 (identifying "whether the agency is likely to succeed if it acts" as one of several such reasons). For example, the agency could conclude that the costs of defending the policy in court would outweigh its benefits to the public, or that the negative publicity that would surround the litigation would undermine the policy's effectiveness. In such cases, the decision to rescind would be "discretionary" in a meaningful sense: the agency would have weighed the policy's costs and benefits and decided that the former outweighed the latter.

But where an agency asserts that a nonenforcement policy is unlawful and then asserts "litigation risk" as a separate ground for the policy's rescission, there are reasons to be more suspicious. After all, if an agency could insulate from judicial review any legal interpretation simply by framing it as an enforcement policy and then offering as an additional, "discretionary" justification the assertion that a court would likely agree with the agency's interpretation, then Crowley would be a dead letter. Moreover, because such an assertion would depend (at least in part) on the correctness of the agency's view of the policy's unlawfulness, it would be unlike the independent discretionary ground that triggered the presumption of unreviewability in Chaney itself. See 470 U.S. at 824–25 (noting the FDA's statement that even if it had jurisdiction, it would still decline to act pursuant to its "inherent discretion to decline to pursue certain enforcement matters"). For these reasons, litigation-strategy justifications deserve closer scrutiny when they are accompanied by agency assertions of unlawfulness.

Here, the Department rescinded DACA for legal reasons—its purported statutory and constitutional defects—and then offered as an additional reason the fact that a federal court of appeals had held that DAPA, a related but distinct deferred-action program, likely suffered from similar defects. See Defs.' Reply at 17 (citing the "litigation risk posed by the proceedings in

33

Texas and the consequent potential for massive disruption were the policy [to be] immediately enjoined"). Although this additional justification was not a bare assertion that a court would likely agree with the agency's view of the law—since it relied on an actual court's view of a concededly similar legal issue—it nonetheless raises many of the same concerns. The Crowley/OSG rule would be seriously undermined if an agency could insulate from judicial review any legal interpretation stated as a general enforcement policy simply by pointing to one case where one court tentatively agreed with the agency on a similar legal issue. Moreover, the Department's conclusion that the Fifth Circuit's decision to uphold a preliminary injunction of DAPA suggests that a court would likely also impose a preliminary injunction of DACA necessarily relies on the Department's legal analysis of the similarities between the two policies—which, like the Department's view of DACA's legality itself, does not qualify for Chaney's presumption of unreviewability. Thus, the Court concludes that the Department's litigation-risk justification was too closely bound up with its evaluation of DACA's legality to trigger Chaney's presumption of unreviewability here.

When the litigation-risk justification falls away, all that is left to support DACA's rescission is the Department's determination that the program was implemented without proper statutory and constitutional authority—a legal determination which, when made in the context of a general enforcement policy, is not subject to Chaney's presumption of unreviewability. Thus, like every other court that has considered the question thus far, the Court concludes that DACA's rescission was not "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); see Regents, 279 F. Supp. 3d at 1029–31; Batalla Vidal, 2017 WL 5201116, at *9–12; Casa De Maryland, 284 F. Supp. 3d at 770. The Court will therefore proceed to the merits of plaintiffs' APA claims.

34

*       *       *

To summarize: an agency's decision whether to take an enforcement action is presumptively unreviewable, and that presumption can normally be rebutted only by pointing to statutory language that constrains the agency's exercise of its enforcement discretion. See Chaney, 470 U.S. at 832–33. Under circuit precedent, however, an enforcement decision is exempt from the presumption of unreviewability if: (1) it is expressed as a general enforcement policy; and (2) it relies solely on the agency's view of what the law requires. See OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–677. This rule not only accords with the applicable case law, but it also preserves the judiciary's role as the ultimate arbiter of statutory meaning while at the same time affording agencies breathing space to adopt enforcement policies for discretionary reasons.

Here, DACA's rescission was a general enforcement policy predicated on DHS's legal determination that the program was invalid when it was adopted. And although the government has sought to cast the Department's assessment of "litigation risk" as a discretionary justification that brings this case within Chaney's ambit, that justification is insufficiently independent from the agency's evaluation of DACA's legality to trigger Chaney's presumption of unreviewability. Thus, the Crowley/OSG exemption applies, and the government's motions to dismiss will be denied to the extent that they assert § 701(a)(2) as a bar to APA review.

### B.      Whether Plaintiffs Possess a Cause of Action Under the APA and RFA

The government also argues that the non-individual plaintiffs "lack a cause of action under the APA" because they "cannot meet the zone-of-interest test" used to determine prudential standing. Defs.' Reply at 13–14; see also NAACP MTD at 18 (framing this argument as one of "prudential standing"). However, "[f]or each claim, if constitutional and prudential standing can be shown for at least one plaintiff, [the Court] need not consider the standing of the other plaintiffs

35

to raise that claim." Mt. States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Thus, because it is undisputed that Ms. Perales Sanchez's interests fall within the zone regulated by the INA,[16] the Court need not consider prudential standing in Princeton. And the NAACP plaintiffs have prudential standing for essentially the same reason as Ms. Perales Sanchez: each has members who are DACA beneficiaries and whose interests consequently fall within the zone of interests regulated by the INA. See Hodel, 840 F.2d at 61 (concluding that, "[f]or similar reasons [that the court found Article III standing], the interests of [the association's] members also fall within the zone of interests protected by the Endangered Species Act").

The NAACP plaintiffs' RFA claims are another matter. See NAACP FAC 75–82 (alleging that the Department failed to conduct an analysis of the effect of DACA's rescission on "small entities," as required by the RFA). "The RFA provides that 'a small entity that is adversely affected or aggrieved by final agency action is entitled to judicial review . . . .'" Nw. Min. Ass'n v. Babbitt, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) (quoting 5 U.S.C. § 611(a)(1)); see also 5 U.S.C. § 601(6) (defining a "small entity" to mean, as relevant here, a "small organization"); id. § 601(4) (defining a "small organization" to be "any not-for-profit enterprise which is independently owned and operated and is not dominant in its field"). Given this statutory language, "the RFA extends standing to seek judicial review only to a 'small entity.'" Babbitt, 5 F. Supp. 2d at 13. But as the government points out, the NAACP plaintiffs' complaint "contains only a single conclusory allegation that [they] fall within the statutory definition, and any factual support for that claim is

---

[16] Nor could there be any dispute. As a DACA beneficiary, Ms. Perales Sanchez is "[her]self the subject of the contested regulatory action." Clarke v. Sec. Indus. Ass'n, 479 U.S. 388, 399 (1987) ("The 'zone of interest' test is a guide for deciding whether . . . a particular plaintiff should be heard to complain of a particular agency decision. . . . [It] denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.").

36

missing from (and arguably contradicted by) the declarations submitted in support of their motion for summary judgment." Defs.' Reply at 14 (citation omitted) (quoting <u>Princeton</u> MSJ, Ex. R at 2595 [ECF No. 28-17] (declaration from the president of the AFT, stating that "[t]he AFT is a national labor union representing approximately 1.7 million members"); <u>id.</u> at 2618 (declaration from the president of the NAACP, stating that "[t]he NAACP is the nation's largest . . . civil rights organization"); <u>id.</u> at 2639–40 (declaration from the president of the UFCW, stating that the union "is a labor organization" representing "1.3 million members")). Thus, the <u>NAACP</u> plaintiffs have not established prudential standing on their RFA claim, and that claim will be dismissed.

### C. Procedural Validity

The Court turns now to the merits of plaintiffs' administrative claims, beginning with their argument that DACA's rescission should have undergone notice-and-comment rulemaking. The APA generally requires notice-and-comment procedures whenever an agency creates, amends, or repeals a rule.[17]  <u>See</u> 5 U.S.C §§ 551(5), 553(b)–(c).  A rule is exempt from this requirement, however, if it is an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice."  <u>Id.</u> § 553(b)(A).  Here, plaintiffs assert that DACA's rescission was a "substantive" or "legislative" rule that should have undergone notice and comment, <u>Princeton</u> MSJ at 38–41, while the government contends that DACA's rescission was "a general statement of policy regarding how DHS will exercise its enforcement discretion," Defs.' Reply at 27.  On this point, the government has the better of the argument.  <u>Accord</u> <u>Regents</u>, 2018

---

[17] The parties do not dispute that DACA's rescission is a "rule" for APA purposes.  <u>See</u> 5 U.S.C. § 551(4) (defining a "rule," in relevant part, as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency"); <u>see also</u> <u>Texas</u>, 809 F.3d at 171 n.122 (noting that the government likewise did not dispute that DAPA was a rule).

37

WL 401177, at \*2 (dismissing the notice-and-comment challenge to DACA's rescission); <u>Batalla Vidal</u>, 2018 WL 1532370, at \*5–6 (same); <u>Casa De Maryland</u>, 284 F. Supp. 3d at 772 (same).

The key question in distinguishing between legislative rules (which must undergo notice and comment) and general statements of policy (which need not) is whether the statement in question has a "present binding effect." <u>Elec. Privacy Info. Ctr. (EPIC) v. DHS</u>, 653 F.3d 1, 7 (D.C. Cir. 2011). "An agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." <u>Id.</u> (citation omitted); <u>see</u> <u>Lincoln</u>, 508 U.S. at 197 (describing general statements of policy as "statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power" (citation omitted)).

Plaintiffs contend that DACA's rescission has a present binding effect because it "<u>presently</u> bars DACA beneficiaries from obtaining advance parole or applying to renew DACA relief" and "<u>presently</u> bars DHS officials from exercising their prior discretion in reviewing DACA applications or advance-parole applications." <u>Princeton</u> MSJ at 40. But this characterization of DACA's rescission is misleading. The Rescission Memo states the Department's intent to "reject all DACA initial requests" filed after September 5, 2017 and "not [to] approve any new . . . applications for advance parole," AR 255; thus, its binding effect is "prospective[]," <u>Lincoln</u>, 508 U.S. at 197 (citation omitted), rather than "present," <u>EPIC</u>, 653 F.3d at 7 (citation omitted).[18] Moreover, the memo expressly states that it places "no limitations . . . on the otherwise lawful enforcement or litigation prerogatives of DHS," AR 255, which further suggests that it is

---

[18] Although technically the memo does "<u>presently</u> bar DHS officials" from considering DACA and advance-parole applications, <u>Princeton</u> MSJ at 40, this argument proves too much. Any general statement of agency policy will presently bind the agency's employees; the question, rather, is whether the statement "purport[s] to bind those subject to it." <u>EPIC</u>, 653 F.3d at 7 (citation omitted). The Rescission Memo does not.

without present binding effect, cf. <u>McLouth Steel Products Corp. v. Thomas</u>, 838 F.2d 1317, 1319 (D.C. Cir. 1988) ("If a statement denies the decisionmaker discretion . . . so that he, she, or they will automatically decline to entertain challenges to the statement's position, then the statement is binding . . . .").

Finally, the fact remains that the Rescission Memo withdrew a prior memorandum, which was itself issued without notice and comment, regarding how DHS intended to "exercise [its] prosecutorial discretion." AR 1. The Rescission Memo is therefore a clear example of a "statement[] by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." <u>Lincoln</u>, 508 U.S. at 197 (citation omitted); <u>see</u> <u>Regents</u>, 2018 WL 401177, at *2 ("For the same reasons that the promulgation of DACA needed no notice and comment, its rescission needed no notice and comment."). Hence, the rescission of DACA was exempt from notice and comment as a general statement of agency policy.[19]

### D. Substantive Validity

The APA provides that a court "shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To satisfy this standard, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Encino Motorcars, LLC v. Navarro</u>, 136 S. Ct. 2117, 2125 (2016) (quoting <u>Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto.</u>

---

[19] Plaintiffs also argue that DACA's rescission "'alter[s] the rights or interests of parties'" (and hence is not a rule of "agency organization, procedure, or practice") and "makes a 'substantive change' to the statutory or regulatory regime" (and hence is not an interpretive rule). <u>Princeton</u> MSJ at 39–40 (quoting <u>EPIC</u>, 653 F.3d at 5–7). The government does not contend that DACA falls under either of these alternative exceptions to the notice-and-comment requirement, however, and the Court therefore will not address these arguments.

Ins. Co., 463 U.S. 29, 43 (1983)). "[I]f an agency relies on two grounds for a decision, a court may sustain it if one is valid and if the agency would clearly have acted on that ground even if the other were unavailable." Syracuse Peace Council v. FCC, 867 F.2d 654, 657 (D.C. Cir. 1989). However, because "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," post hoc explanations that the agency did not articulate when it acted are insufficient. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).

Here, the Department never stated, and the government does not now contend, that DACA's rescission reflected a change in the agency's immigration enforcement priorities. Instead, the government points to two reasons for DACA's rescission: first, the Department's legal conclusion that DACA was unconstitutional and without statutory authority; and second, its assessment of what it now calls "litigation risk"—the likelihood that DACA would have been abruptly enjoined in the Texas litigation. Because these were the only reasons given by the agency, DACA's rescission can be sustained only on those grounds, even if the agency could have validly rescinded DACA as an exercise of its enforcement discretion. See Sea-Land Serv., Inc. v. Dep't of Transp., 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" (citation omitted)).

### 1. The Department's Conclusion that DACA Was Unlawful

Plaintiffs first attack DHS's reliance on DACA's purported unlawfulness as a reason to rescind DACA. They argue both that DHS failed adequately to explain its legal conclusion, see Princeton MSJ at 11–17, and that even if DHS's explanation were adequate, its conclusion was erroneous, see id. at 17–27. The Court agrees that DHS's decision was inadequately explained,

40

and hence it need not address the alternative argument that DHS's conclusion was substantively incorrect.

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." Encino Motorcars, 136 S. Ct. at 2125. Thus, when an agency reverses a prior decision, it must "provide a reasoned explanation for the change." Id. That explanation need not be "more detailed . . . than what would suffice for a new policy created on a blank slate," but it must address the "facts and circumstances that underlay or were engendered by the prior policy," including any "serious reliance interests." Id. at 2125–26 (quoting FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009)); see also id. at 2126 ("[A]n 'unexplained inconsistency' in agency policy 'is a reason for holding an interpretation to be an arbitrary and capricious change . . . .'" (alterations and citation omitted)).

In concluding that DACA was unlawful, DHS purported to identify both statutory and constitutional defects with the program. For its part, the Rescission Memo pointed to "the Supreme Court's and the Fifth Circuit's rulings" in the Texas litigation and then cited the Sessions Letter, see AR 255, which stated that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress's repeated rejection of proposed legislation that would have accomplished a similar result." AR 251. The Sessions Letter also stated that "[s]uch an open-ended circumvention of the immigration laws was an unconstitutional exercise of authority by the Executive Branch," and later, in its concluding paragraph, it cited the Executive's duty to "faithfully execute the laws passed by Congress." Id. It also opined that "the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA." Id.

41

This scant legal reasoning was insufficient to satisfy the Department's obligation to explain its departure from its prior stated view that DACA was lawful. In concluding that DACA was implemented "without statutory authority," neither the Sessions Letter nor the Rescission Memo cited any statutory provision with which DACA was in conflict. Cf. Encino Motorcars, 136 S. Ct. at 2127 (rejecting as inadequate an agency's statement that a particular statutory exemption "does not include [certain] positions and the [agency] recognizes that there are circumstances under which the requirements for the exemption would not be met"). True, both documents pointed to the Fifth Circuit's decision in Texas, which held that DAPA likely conflicted with the INA's "intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status." Texas, 809 F.3d at 179. But the government does not meaningfully dispute that, unlike DAPA, "DACA has 'no analogue in the INA.'" Defs.' Reply at 22 (quoting Regents, 279 F. Supp. 3d at 1042). Thus, the Fifth Circuit's statutory analysis is inapposite.[20] The Department's conclusion that DACA was implemented without statutory authority—based only on an incongruous reference to the Fifth Circuit's decision on DAPA— therefore cannot support the program's rescission.

_____

[20] The Fifth Circuit also concluded that "there was evidence from DACA's implementation that DAPA's discretionary language was pretextual." Texas, 809 F.3d at 173; see id. at 172–176 (upholding the district court's factual finding that although "the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, . . . those statements were 'merely pretext' because only about 5% of [DACA] applications . . . had been denied" and because the government could not identify how many of those had been denied for discretionary reasons (footnote omitted)). But the Fifth Circuit relied on that finding only to conclude that DAPA should have been promulgated using notice-and-comment rulemaking, not that it conflicted substantively with the INA. See id. at 171–178. And although OLC had orally advised the Department that "it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria," AR 21 n.8, neither the Rescission Memo nor the Sessions Letter identified this purported flaw as a reason for DACA's invalidity.

42

The Department's explanation for its conclusion that DACA was unconstitutional was equally opaque. The Sessions Letter made a fleeting reference to the Attorney General's "duty to . . . faithfully execute the laws passed by Congress," AR 251, which could be read to invoke the President's constitutional duty to "take Care that the Laws be faithfully executed." See U.S. Const. art. II, § 3. But the letter made no attempt to explain why DACA breached that duty.[21] This failure was particularly acute in light of a thirty-three page memorandum prepared in 2014 by the Office of Legal Counsel ("OLC"), which deduced "from the nature of the Take Care duty" no fewer than "four general . . . principles governing the permissible scope of enforcement discretion" and concluded that DAPA, a similar deferred-action program, was consistent with all of them. AR 9–10, 14–36.[22] And although the Sessions Letter asserted that DACA suffered from "the same . . . constitutional defects that the courts recognized as to DAPA," AR 251, the Fifth Circuit's decision in Texas did not actually identify any such defects. Indeed, it expressly declined to address the plaintiffs' constitutional claims. See 809 F.3d at 146 n.3. Like its evaluation of its statutory authority to implement DACA, then, the Department's analysis of DACA's constitutionality was so barebones that the Court cannot "discern[]" the "path" that the agency

---

[21] At least one commentator has identified a second possible constitutional argument in the Sessions Letter: "The Obama administration's open-ended reading of certain definitional provisions of the Immigration and Nationality Act (INA) would run afoul of the nondelegation doctrine." See Josh Blackman, Understanding Sessions's Justification to Rescind DACA, Lawfare (Jan. 16, 2018, 8:00 AM) https://www.lawfareblog.com/understanding-sessionss-justification-rescind-daca; see also Texas, 809 F.3d at 150 (noting that the plaintiffs there had asserted "constitutional claims under the Take Care Clause" and the "separation of powers doctrine"). The government does not raise these arguments, however, so the Court will not consider them.

[22] The OLC memorandum did not directly address the Department's authority to implement DACA. See AR 5–14 (discussing the agency's authority to "prioritize the removal of certain categories of aliens over others"); AR 14–36 (discussing the agency's authority to implement DAPA). However, the memo did state that OLC had "orally advised" the Department that DACA was lawful so long as "immigration officials retained discretion to evaluate each application on an individualized basis." AR 21 n.8 ("[T]he concerns animating DACA were . . . consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.").

43

followed. <u>Encino Motorcars</u>, 136 S. Ct. at 2125 (citation omitted).[23] Thus, it too cannot support DACA's rescission.

The Department's failure to give an adequate explanation of its legal judgment was particularly egregious here in light of the reliance interests involved. <u>See</u> <u>Encino Motorcars</u>, 136 S. Ct. at 2126. The Rescission Memo made no mention of the fact that DACA had been in place for five years and had engendered the reliance of hundreds of thousands of beneficiaries, many of whom had structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits.[24] The Supreme Court has set aside changes in agency policy for failure to consider reliance interests that pale in comparison to the ones at stake here. <u>See, e.g.</u>, <u>Encino Motorcars</u>, 136 S. Ct. at 2126 (setting aside the Department of Labor's interpretation of a statutory exemption from the Fair Labor Standards Act's overtime-pay requirements, in part because the agency had failed to address "decades of industry reliance" on its prior view that the exemption applied to a particular class of employees). Because DHS failed

---

[23] Neither <u>Encino Motorcars</u> nor any of its predecessor cases explicitly required an agency to address its prior views on the <u>legality</u> of its prior policy. <u>See, e.g.</u>, <u>Fox</u>, 556 U.S. at 515 (explaining that "[a]n agency may not . . . depart from a prior <u>policy</u> <u>sub silentio</u>" (first emphasis added)). But where, as here, the OLC provides an agency with an opinion that suggests a legal framework for evaluating the legality of a particular program and the agency later rescinds that policy on legal grounds, failure to even consider OLC's thorough analysis is arbitrary and capricious. <u>See</u> Trevor W. Morrison, <u>Stare Decisis in the Office of Legal Counsel</u>, 110 Colum. L. Rev. 1448, 1464 (2010) ("OLC's legal advice is treated as binding within the Executive Branch until withdrawn or overruled."); <u>Hispanic Affairs Project v. Acosta</u>, 263 F. Supp. 3d 160, 178 (D.D.C. 2017) (concluding that an "agency's non-consideration of [certain] OLC memoranda—whether deliberate or inadvertent—is all the more reason to consider them in reviewing the agency's action," because "[a] contrary result would permit agencies to toss aside OLC memoranda that contain legal conclusions contrary to the agency's preferred policy choices").

[24] <u>See, e.g.</u>, Perales Decl. ¶¶ 21–22 (if DACA were rescinded, Ms. Perales Sanchez would have to abandon her plans of conducting postgraduate research in Mexico and then applying to law school, because she could no longer travel abroad, take out student loans, or work lawfully in the United States); Decl. of Jane Doe #2, Ex. S to <u>Princeton</u> MSJ [ECF No. 28-17] ¶¶ 11–13 (current special education teacher and DACA beneficiary would lose her job and would have to abandon her plans of pursuing a doctorate in audiology); Decl. of Jane Doe #5, Ex. X to <u>Princeton</u> MSJ [ECF No. 28-17] ¶ 11 (current undergraduate student and DACA beneficiary would have to abandon her plans of attending law school). Plaintiffs filed a motion for leave to file pseudonymous declarations with their summary judgment motion. <u>See</u> Pls.' Mot. for Leave to Allow Three Declarants to Proceed by Pseudonym [ECF No. 22]. The government did not oppose the motion, so the Court will treat it as conceded and grant it. <u>See</u> Local Civ. R. 7(b).

to even acknowledge how heavily DACA beneficiaries had come to rely on the expectation that they would be able to renew their DACA benefits, its barebones legal interpretation was doubly insufficient and cannot support DACA's rescission.

### 2. Litigation Risk

The Department's second justification for DACA's rescission was its conclusion that, if DACA were challenged in the Texas litigation, the district court there would enter a "nationwide injunction" that "would have prompted an immediate—and chaotic—end to the policy." Defs.' Reply at 15. Plaintiffs contend that this "litigation risk" conclusion was arbitrary and capricious and hence cannot sustain DACA's rescission. Princeton MSJ at 28–36. They are correct.

As an initial matter, plaintiffs assert that the government's litigation-risk argument is an "impermissible post hoc rationalization" of the Department's decision to rescind DACA. Princeton MSJ at 28. Here, plaintiffs miss the mark. Although both the Rescission Memo and the Sessions Letter focused primarily on DACA's statutory and constitutional defects, the Sessions Letter did state that DAPA was "enjoined on a nationwide basis" and that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." AR 251. Moreover, the Rescission Memo went on to cite this concern as grounds for its decision to "wind [DACA] down in an efficient and orderly manner." AR 254. Together, these statements were sufficient to express the Department's concern that a nationwide injunction in the Texas litigation would abruptly shut down the DACA program. See Chenery, 332 U.S. at 196.

Nevertheless, this concern does not withstand review under the familiar arbitrary and capricious standard. See State Farm, 463 U.S. at 43. First, as already noted, there was good reason to doubt that the second of the Fifth Circuit's holdings in Texas—that DAPA conflicted with the express provisions of the INA, see 809 F.3d at 178–86—would extend to DACA, because the INA

45

does not prescribe a statutory naturalization process for DACA-eligible individuals. And although the Fifth Circuit's holding that DAPA should have undergone notice-and-comment rulemaking likely would have extended to DACA,[25] see id. at 170–78, it simply does not follow that the district court in Texas was likely to issue an injunction bringing DACA to an abrupt halt.

For one thing, it is black-letter administrative law that when a court sets aside an agency action as procedurally invalid, the proper remedy is to remand the action to allow the agency an opportunity to conduct the required notice-and-comment procedures. See Sugar Cane Growers Co-op. of Fla. v. Veneman, 289 F.3d 89, 98 (D.C. Cir. 2002) (observing that "[w]e have previously remanded without vacating when the agency failed to follow notice-and-comment procedures"); C. & S.W. Services, Inc. v. EPA, 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur where the agency "may well be able to justify its decision . . . and it would be disruptive to vacate [the challenged] rule"). It is true, as the government points out, that in Texas the district court preliminarily enjoined DAPA based solely on the program's failure to have undergone notice-and-comment rulemaking. See Texas, 86 F. Supp. 3d at 677. DAPA was challenged before it took effect, however. See Texas, 809 F.3d at 149. By contrast, as of September 5, 2017 (the date by which the Texas plaintiffs had threatened to challenge DACA, see AR 239), DACA would have been in place for over five years, and hundreds of thousands of applicants would have already been granted deferred action under the program. Thus, assuming that the district court in the Texas litigation would have found DACA defective only on procedural grounds (as a fair reading of the

---

[25] Because DAPA had not yet been implemented, the Fifth Circuit relied in large part on "extrapolation" from evidence regarding DACA's implementation to conclude that DAPA would not "genuinely leave the agency and its employees free to exercise discretion" and hence was a substantive rule that should have undergone notice and comment. Texas, 809 F.3d at 171–176. The government is correct that "[w]hile that finding had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself," at least as far as notice and comment are concerned. Defs.' Reply at 22 (citations omitted).

Fifth Circuit's opinion would suggest), it seems doubtful that the court would have preliminarily enjoined DACA instead of remanding it to the Department, perhaps without vacatur, to undergo notice-and-comment rulemaking.

On the other hand, if the Texas district court were to find that DACA was substantively invalid—or indeed, unconstitutional—injunctive relief rather than remand may have been the more likely remedy. But it still does not follow that the district court's injunction would have brought the DACA program to an "immediate" and "chaotic" halt. Defs.' Reply at 15. As the Fifth Circuit has repeatedly recognized, district courts have "broad discretion" to "fashion[] equitable relief," Crawford v. Silette, 608 F.3d 275, 278 (5th Cir. 2010), including injunctive relief, see ODonnell v. Harris County, 882 F.3d 528, 537 (5th Cir. 2018) (noting that a district court's injunction is reviewed for abuse of discretion). In light of this discretion, it strains credulity to suggest that the district court would have enjoined DACA immediately and completely without allowing DHS any opportunity to wind the program down. Thus, regardless of the grounds on which the district court in Texas might have ultimately invalidated DACA, the Department's insistence that an "immediate—and chaotic—end to the policy" would have resulted, Defs.' Reply at 15, is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," State Farm, 463 U.S. at 43, and was therefore arbitrary and capricious.

\*       \*       \*

If, as the Court has concluded, see supra Part II.A, an agency's general enforcement policy is reviewable to the extent that it is premised on a legal judgment, it follows that the agency must

47

explain that judgment in sufficient detail to permit meaningful judicial review.[26] See Encino Motorcars, 136 S. Ct. at 2127. Here, the Department's conclusory statements were insufficient to explain the change in its view of DACA's lawfulness.[27] Moreover, the agency's prediction regarding the outcome of threatened litigation over DACA's validity—specifically, that the district court in the Texas litigation would immediately halt the program, without any opportunity for a wind-down—was so implausible that it fails even under the deferential arbitrary and capricious standard. DACA's rescission will therefore be set aside.[28]

---

[26] The parties dispute the standard of review that would apply to the agency's statutory and constitutional analysis had it been adequately explained. The government maintains that it would be reviewed for a "clear error of judgment"—that is, under the ordinary test for arbitrary and capricious agency action. State Farm, 463 U.S. at 43 (citation omitted); see Oral Arg. Tr. at 68:5–18. Plaintiffs contend that review would be de novo. See Teva Pharm. USA, Inc. v. FDA, 441 F.3d 1, 5 (D.C. Cir. 2006) (finding agency action arbitrary and capricious where the agency "mistakenly thought itself bound" by certain D.C. Circuit precedent); Prill v. NLRB, 755 F.2d 941, 947 (D.C. Cir. 1985) ("An agency decision cannot be sustained, however, where it is based not on the agency's own judgment but on an erroneous view of the law."). The district court in Batalla Vidal has suggested a third option: because "neither the Sessions Letter nor the DACA Rescission Memo carry the 'force of law,'" that court concluded, the Department's "interpretation of the legality of the DACA program is [not] entitled to formal or controlling deference." Batalla Vidal, 279 F. Supp. 3d at 421 n.9 (E.D.N.Y. 2018) (quoting Mead, 533 U.S. at 226–27). Rather, it would be treated only as persuasive. See Mead, 533 U.S. at 234–35 (explaining that agency interpretations "contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the Chevron pale" and instead deserve "respect proportional to [their] 'power to persuade'" (quoting Christensen v. Harris Cty., 529 U.S. 576, 587 (2000); then Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)). Because the Court does not reach the merits of the Department's conclusions that DACA lacked statutory and constitutional authority, however, it expresses no opinion as to what standard of review would apply.

[27] The district court in Casa de Maryland reached the opposite conclusion. See 284 F. Supp. 3d at 772 (finding that DHS had a "reasonable basis" to conclude that DACA was unlawful based on "the DAPA litigation, the threatened legal challenge, and the Attorney General's advisory letter"). But that court's brief discussion of the issue failed to address the limited applicability of the Fifth Circuit's Texas decision to DACA, the inadequacy of the Sessions Letter itself, DHS's failure to address DACA beneficiaries' reliance interests, and the implausibility of an injunction issuing in the Texas litigation that would put an immediate end to DACA. Therefore, this Court respectfully disagrees with the Casa de Maryland court's analysis.

[28] The government also urges the Court to construe the Department's statement that DACA was "unconstitutional in part because it was an 'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected" as an "independent policy judgment" that "immigration decisions of [DACA's] magnitude should be left to Congress." Defs.' Reply at 21 (quoting AR 251 and citing Syracuse Peace Council, 867 F.2d at 657–58 (holding that if an agency offers two justifications for its decision, one constitutional and one discretionary, and if a court is "persuaded" that the agency would have reached the same result on discretionary grounds had it "foregone its ruminations on the constitutional issue," the court may avoid the constitutional issue and uphold the agency action only on the discretionary ground)). But the government offers no support for the proposition that an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion. Cf. Chaney, 470 U.S. at 831 (listing such assessments).

48

## E. Remedy

Having concluded that DACA's rescission violated the APA, the question of remedy remains. As an initial matter, the Court will reject the government's invitation to confine its grant of relief strictly to the plaintiffs in this action. <u>See</u> Defs.' Reply at 44–45. As plaintiffs point out, the D.C. Circuit has previously rejected an agency's suggestion that "the named plaintiffs alone should be protected by [an] injunction," explaining that "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." <u>Harmon v. Thornburgh</u>, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989). Moreover, as the Fifth Circuit noted in <u>Texas</u>, the immigration context counsels strongly in favor of nationwide relief: "the Constitution requires 'an <u>uniform</u> Rule of Naturalization,'" 809 F.3d at 187 (quoting U.S. Const. art. I, § 8), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and <u>uniformly</u>,'" <u>id.</u> at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384), "and the Supreme Court has described immigration policy as 'a comprehensive and <u>unified</u> system,'" <u>id.</u> at 188 (quoting <u>Arizona v. United States</u>, 567 U.S. 387, 401 (2012)). Thus, the Court concludes that nationwide relief is appropriate here.

The only remaining issue, then, is what form the Court's relief should take. "[U]nsupported agency action normally warrants vacatur." <u>Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.</u>, 429 F.3d 1136, 1151 (D.C. Cir. 2005). But courts have discretion to remand without vacatur if "there is at least a serious possibility that the [agency] will be able to substantiate its decision," and if "vacating would be disruptive." <u>Radio-TV News Directors Ass'n v. FCC</u>, 184 F.3d 872, 888 (D.C. Cir. 1999) (alteration in original) (citation omitted); <u>see Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n</u>, 988 F.2d 146, 150–51 (D.C. Cir. 1993) ("The decision

49

whether to vacate depends on the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed." (citation omitted)). Alternatively, a court may vacate the unlawful action but stay its order of vacatur for a limited time to allow the agency to attempt to cure the defects that the court has identified. See Friends of Earth, Inc. v. EPA, 446 F.3d 140, 148 (D.C. Cir. 2006) (remanding to the district court with instructions to vacate an agency rule but noting that the district court possessed "remedial discretion . . . to stay [its] order on remand"); Nat. Res. Def. Council, Inc. v. EPA, Civ. Action No. 16-1861 (JDB), 2018 WL 1568882, at *8 (D.D.C. Mar. 30, 2018) (vacating a rule but staying the order of vacatur until such time as the agency promulgated a replacement); see also A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remanding and providing for "automatic[]" vacatur unless the agency justified its decision within 90 days); Rodway v. USDA, 514 F.2d 809, 817–18 (D.C. Cir. 1975) (remanding and giving the agency 120 days to complete the rulemaking process).

Here, the first Allied-Signal factor—the seriousness of the action's defects—favors remand without vacatur, although not unequivocally. On the one hand, it is certainly possible that the Department could articulate a valid reason for DACA's rescission. For example, it could offer a coherent legal argument that DACA conflicts with the INA or violates the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, or it could explain why, as a matter of policy, DACA-eligible individuals should no longer be low-priority targets for removal. Accord Batalla Vidal, 279 F. Supp. 3d at 408 ("Defendants indisputably can end the DACA program."). But there is some evidence in the record to suggest that the Department would not have rescinded DACA but for its supposed illegality. See, e.g., Ex. 119 to Princeton MSJ [ECF No. 28-15] at 2003 (congressional testimony of DHS officials that DACA beneficiaries are "a

50

benefit to the country" and that "[w]e need to regularize their status through some legal means"). And although it seems that no court has yet passed judgment on DACA's constitutionality, at least one court in this district has concluded that DACA was likely "consistent with, rather than contrary to, congressional policy." <u>Arpaio v. Obama</u>, 27 F. Supp. 3d 185, 208–09 (D.D.C. 2014) (concluding that the plaintiff's substantive APA challenge to DACA was unlikely to succeed on the merits), <u>aff'd</u>, 797 F.3d 11 (D.C. Cir. 2015) (affirming only on standing grounds). Thus, although the substantive flaws in DACA's rescission are curable in theory, the Department may face practical obstacles when attempting to remedy them. Nonetheless, there remains a "non-trivial likelihood" that the agency could justify DACA's rescission on remand, <u>WorldCom, Inc. v. FCC</u>, 288 F.3d 429, 434 (D.C. Cir. 2002), so the first <u>Allied-Signal</u> factor supports remand without vacatur.

The second <u>Allied-Signal</u> factor—the risk of disruption—also tips slightly in favor of remand without vacatur. On the one hand, two courts have already preliminarily enjoined DACA's rescission, <u>see</u> <u>Regents</u>, 279 F. Supp. 3d at 1047–50; <u>Batalla Vidal</u>, 279 F. Supp. 3d at 437–38, which suggests that vacatur would cause little disruption, at least initially.[29] On the other hand, neither injunction applies to initial DACA applications, which the Department has stopped accepting. Thus, vacating DACA's rescission could lead to "an interim change"—an influx of initial DACA applications—"that may itself be changed" if DHS later provides a sufficient

---

[29] True, both preliminary injunctions are currently the subjects of expedited appeals. This fact actually favors vacatur, however, because if both injunctions are overturned, then this Court's order of vacatur would preserve DACA pending the Department's revised explanation for the program's rescission, thereby maintaining the status quo.

explanation for DACA's rescission.[30]  Allied-Signal, 988 F.2d at 150–151 (citation omitted).  On balance, therefore, the two Allied-Signal factors tend to favor remand without vacatur.

However, the Court is also mindful that, as several judges of the D.C. Circuit have noted, remand without vacatur "sometimes invites agency indifference."  In re Core Comm'n, Inc., 531 F.3d 849, 862 (D.C. Cir. 2008) (Griffith, J., concurring) (urging courts "to consider the alternatives to the open-ended remand without vacatur"); see Nat. Res. Def. Council v. EPA, 489 F.3d 1250, 1262–64 (D.C. Cir. 2007) (Randolph, J., concurring) ("A remand-only disposition is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such."). This concern is particularly acute here, where each day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action.  Moreover, although the preliminary injunctions in Regents and Batalla Vidal currently protect aliens who have already received DACA grants, those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future. These concerns suggest that time is of the essence here, and the Court need not ignore this reality in crafting a remedy.  Cf. Rodway, 514 F.2d at 817–18 (ordering that regulations concerning the food stamp system be revised "with expedition"—that is, within 120 days—because "[i]n matters as vital as basic nutrition there is no excuse for delay").

---

[30] Nor would it be proper for the Court to vacate DACA's rescission except as to initial applications.  While a court has discretion to craft preliminary injunctive relief based on a number of equitable factors, see Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 24 (2008), its discretion in fashioning administrative remedies is somewhat more limited, see Harmon, 878 F.2d at 494–95 ("Courts ordinarily do not attempt, even with the assistance of agency counsel, to fashion a valid regulation from the remnants of the old rule . . . [or to] draw[] a line which the agency itself has never drawn.").  Here, there is no principled basis to distinguish between initial DACA applications and renewal applications, since the Rescission Memo's substantive invalidity stems chiefly from its inadequately explained rationale.  The Court therefore will not fashion an ad hoc order of vacatur along these lines.

52

In light of the <u>Allied-Signal</u> factors, which tip in favor of remand without vacatur, and the troubling humanitarian consequences of the delays that remedy might invite, the Court will adopt an intermediate course: it will vacate DACA's rescission but stay its order of vacatur for 90 days. During that time, the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its entirety, and the original DACA program will be restored in full. This means, among other things, that the agency will be required to resume accepting initial DACA applications and applications for advanced parole.

## III.  CONSTITUTIONAL CHALLENGES

The government has also moved under Rule 12(b)(6) to dismiss the three constitutional claims asserted in plaintiffs' complaints for failure to state a claim. <u>See</u> <u>Princeton</u> MTD 37–44; <u>NAACP</u> MTD 37–43. Two of these claims—one grounded in equal protection, <u>see</u> Pls.' Opp'n at 24–27, and the other in due process, <u>id.</u> at 27–32—are challenges to DACA's rescission itself. The third argues that the Department may not, consistent with applicable due process principles, use DACA beneficiaries' personal identifying information to initiate immigration enforcement proceedings against them, and plaintiffs seek a preliminary injunction to that effect. <u>Id.</u> at 32–35.

In light of its decision to vacate DACA's rescission, the Court will defer ruling on the government's motion to dismiss plaintiffs' first two constitutional challenges. Because plaintiffs have failed to plausibly allege facts to support their information-sharing claim, however, that claim will be dismissed without prejudice.

53

## A.    Challenges to DACA's Rescission

As noted, plaintiffs' constitutional challenges to DACA's rescission proceed along two lines. First, plaintiffs argue that DACA's rescission violates the equal protection guarantee of the Fifth and Fourteenth Amendments, because it deprives undocumented aliens of certain benefits that remain available to aliens who are lawfully present in the United States. Pls.' Opp'n at 24–27 (citing Plyler v. Doe, 457 U.S. 202 (1982); then Romer v. Evans, 517 U.S. 620 (1996)). Second, plaintiffs maintain that DACA's rescission deprives existing DACA beneficiaries of their liberty and property interests in renewing their DACA benefits without due process of law. Id. at 27–31.

The Court will defer ruling on the government's motions to dismiss these two constitutional claims. To begin with, because the Court has already concluded that DACA's rescission violates the APA, it is not necessary to address plaintiffs' constitutional claims now. See Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 205 (2009) (noting that courts generally avoid deciding constitutional issues unnecessarily); Texas, 809 F.3d at 146 n.3 (declining to reach plaintiffs' constitutional challenges to DAPA and instead affirming only on APA grounds). Moreover, litigation over similar constitutional issues has either reached or progressed past the motion-to-dismiss stage in three other cases, see Regents, 2018 WL 401177, at *2–7; Batalla Vidal, 2018 WL 1532370, at *6–14; Casa de Maryland, 284 F. Supp. 3d at 773–777, and the Court is especially reluctant unnecessarily to address constitutional issues that have already been thoroughly considered by other courts. Finally, the Department could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims.[31] At this stage

---

[31] For example, the Department might provide for procedures through which an existing DACA recipient could contest the revocation of her DACA benefits—something that the current Rescission Memo does not do. Such procedures could, at least in theory, be relevant to plaintiffs' procedural due process claim.

54

of the proceedings, then, the Court will defer ruling on the government's motion to dismiss plaintiffs' constitutional challenges to DACA's rescission.

### B.    Information-Sharing Claim

Plaintiffs seek a preliminary injunction preventing DHS from sharing DACA beneficiaries' personal information with immigration enforcement authorities or otherwise using it for immigration enforcement purposes.  See Princeton MSJ at 48–53; Pls.' Opp'n at 32–35.  The government has moved to dismiss plaintiffs' information-sharing claim, arguing primarily that DHS had previously stated its intent not to use DACA beneficiaries' personal information in this way and that plaintiffs have not plausibly alleged that the agency has since changed its policy.  See Princeton MTD at 41–42; Defs.' Reply at 36–37.  The government also contends that even if the Department had changed its information-sharing policy, there would be no due-process violation, because that policy has always stated that it "may be modified, superseded, or rescinded at any time."  Princeton MTD at 43 (citation omitted); Defs.' Reply at 37–39 (citation omitted).

To secure preliminary injunctive relief, plaintiffs "must establish (1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest."  Winter, 555 U.S. at 20.  Here, the third and fourth prongs of this test—the equities and the public interest—clearly favor plaintiffs, who allege that the Department intends to use DACA beneficiaries' identifying information against them despite its earlier assurances that it would not do so, which induced the beneficiaries to provide the information in the first place.

Plaintiffs have also demonstrated a likelihood of success on the merits—as least as to their legal theory.  Plaintiffs rely on two cases, Cox v. Louisiana, 379 U.S. 536 (1965), and Raley v. Ohio, 360 U.S. 423 (1959), for the general proposition that "[d]ue process forbids the Government

55

from making and then breaking promises about the legal consequences of a specific action." Princeton MSJ at 48. In Raley, the Supreme Court found a due process violation where four individuals were convicted of failing to answer questions posed by Ohio's Un-American Activities Commission after the chairman of that commission had specifically represented to the individuals that they could refuse to answer pursuant to a state-law privilege. See 360 U.S. at 437–38; see also id. at 438 ("[T]o sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him."). And in Cox, the Court, relying on Raley, held that it violated due process to convict demonstrators under a statute that prohibited demonstrating "near" a courthouse where "the highest police officials of the city . . . in effect told the demonstrators that they could meet where they did." 379 U.S. at 571; see also Santobello v. New York, 404 U.S. 257, 262 (1971) (recognizing a substantive due process right to enforce the terms of a plea agreement). This argument is sufficiently persuasive to support preliminary injunctive relief.

The sticking point here is the second prong—the likelihood of irreparable harm. Several factors convince the Court that the harm to DACA beneficiaries of having their information shared with immigration enforcement authorities, though likely irreparable, is insufficiently imminent to justify preliminary injunctive relief. League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (harm is irreparable only if it is "so 'imminent that there is a clear and present need for equitable relief . . . .'" (alterations and citation omitted)). For one thing, the Department has recently reaffirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the

56

DACA policy." USCIS, DHS, Frequently Asked Questions: Rejected DACA Requests Q5, https://www.uscis.gov/daca2017/mail-faqs (last updated Feb. 14, 2018).[32] This fact was enough to persuade one other district court to dismiss a similar information-sharing claim. See Batalla Vidal, 2018 WL 1532370, at *10–11. On the other hand, two courts have reached the opposite conclusion, see Regents, 2018 WL 401177, at *4–5; Casa de Maryland, 284 F. Supp. 3d at 777–79, and one of those courts has already granted the injunctive relief that plaintiffs seek here, see Amended Order, Casa de Maryland, No. 17-cv-2942 (D. Md. Mar. 15, 2018), ECF No. 49 (enjoining the Department from (1) using or sharing DACA beneficiaries' personal information except as originally specified on the DACA application forms and instructions and (2) changing its information-sharing policy without the Court's preapproval). But that injunction now in place further belies any suggestion that irreparable harm to DACA beneficiaries is imminent—their information cannot now be used as they fear. Hence, the Court concludes that plaintiffs have failed to demonstrate that they are entitled to preliminary injunctive relief on their information-sharing claim, and their motion for preliminary injunctive relief will be denied.

The Court also concludes that plaintiffs have failed to state a claim. See Fed. R. Civ. P. 12(b)(6). Plaintiffs point to a discrepancy between a prior statement by the Department that DACA beneficiaries' information would be "protected from disclosure" and a later statement issued on the date of DACA's rescission that the information would not be "proactively" provided to immigration enforcement authorities. See Princeton Compl. ¶ 51. Even if this discrepancy were sufficient to plausibly allege that DACA beneficiaries' information has

---

[32] This document does not appear in the administrative record, but the Court takes judicial notice of it. See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

been or will be used inconsistently with DHS's stated information-sharing policy, the agency has since reaffirmed its commitment to that prior policy, and the Court may take judicial notice of that fact in ruling on the government's motion to dismiss.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); Vasser v. McDonald, 228 F. Supp. 3d 1, 10 (D.D.C. 2016) ("Courts may take judicial notice of matters of a general public nature without converting the motion to dismiss into one for summary judgment." (alterations and citation omitted)).[33]  Thus, the government's Rule 12(b)(6) motion will be granted as to plaintiffs' information-sharing claim.

## CONCLUSION

Executive Branch officials possess relatively unconstrained authority to enforce the law against certain violators but not others.  Ordinarily, the exercise of that authority is subject to review not in a court of law, but rather in the court of public opinion: members of the public know how their elected officials have used their enforcement powers, and they can hold those officials accountable by speaking out, by petitioning their representatives, or ultimately at the ballot box. When an official claims that the law requires her to exercise her enforcement authority in a certain way, however, she excuses herself from this accountability.  Moreover, if her view of the law is incorrect, she may needlessly forego the opportunity to implement appropriate enforcement priorities and also to demonstrate those priorities to the public.

---

[33] For similar reasons, the Court will not address the argument made by amici LatinoJustice PRLDEF (and others) that DHS's breach of the information-sharing policy would violate the Privacy Act of 1974, 5 U.S.C. § 552a, and the agency's own privacy rules.  See Br. of LatinoJustice PRLDEF, et al., as Amicus Curiae [ECF No. 36-2].

Fortunately, neither Supreme Court nor D.C. Circuit precedent compels such a result. Rather, the cases are clear that courts have the authority to review an agency's interpretation of the law if it is relied on to justify an enforcement policy, even when that interpretation concerns the lawful scope of the agency's enforcement discretion. See Chaney, 470 U.S. at 832–33; OSG, 132 F.3d at 812; Crowley, 37 F.3d at 676–77. Under this rule, an official cannot claim that the law ties her hands while at the same time denying the courts' power to unbind her. She may escape political accountability or judicial review, but not both.

Here, the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful. That legal judgment was virtually unexplained, however, and so it cannot support the agency's decision. And although the government suggests that DACA's rescission was also predicated on the Department's assessment of litigation risk, this consideration is insufficiently distinct from the agency's legal judgment to alter the reviewability analysis. It was also arbitrary and capricious in its own right, and thus likewise cannot support the agency's action. For these reasons, DACA's rescission was unlawful and must be set aside.

For the reasons given above, then, the Court will vacate the Department's September 5, 2017 decision to rescind the DACA program. The Court will stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful. The Court will also deny the government's motion to dismiss for lack of subject-matter jurisdiction, its motion to dismiss plaintiffs' APA claims on reviewability grounds, and its motion to dismiss plaintiffs' substantive APA claim; grant the government's motion to dismiss plaintiffs' procedural APA claim, the NAACP plaintiffs' RFA claim, and plaintiffs' information-sharing claim; and defer ruling on the government's motion to dismiss plaintiffs' remaining constitutional claims.

59

Finally, the Court will also grant plaintiffs' motion for partial summary judgment as to their substantive APA claim, deny that motion as to their procedural APA claim, and deny their motion for preliminary injunctive relief on their information-sharing claim. A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: <u>April 24, 2018</u>

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al., | |
|     **Plaintiffs,** | |
|     v. | Civil Action No. 17-1907 (JDB) |
| DONALD J. TRUMP, et al., | |
|     **Defendants.** | |
| TRUSTEES OF PRINCETON UNIVERSITY, et al., | |
|     **Plaintiffs,** | |
|     v. | Civil Action No. 17-2325 (JDB) |
| UNITED STATES OF AMERICA, et al., | |
|     **Defendants.** | |

## ORDER

Upon consideration of [74] defendants' motion to revise [69] the Court's April 24, 2018 Order, and for the reasons stated in the Memorandum Opinion issued on this date, it is hereby

**ORDERED** that the motion is **DENIED**; it is further

**ORDERED** that the stay of the Court's April 24, 2018 Order vacating the Department of Homeland Security's September 5, 2017 decision rescinding the Deferred Action for Childhood Arrivals Program is **CONTINUED** until Thursday, August 23, 2018; and it is further

**ORDERED** that defendants shall file, by not later than Thursday, August 23, 2018, any motion seeking a further stay of the Court's Order pending appeal. See Fed. R. App. P. 8(a).

**SO ORDERED**.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated: August 3, 2018

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-1907 (JDB)** |
| **DONALD J. TRUMP, et al.,** | |
| **Defendants.** | |
| **TRUSTEES OF PRINCETON UNIVERSITY, et al.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 17-2325 (JDB)** |
| **UNITED STATES OF AMERICA, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

This litigation concerns the Department of Homeland Security's ("DHS") September 5, 2017 decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program. In April 2018, this Court held that decision unlawful and set it aside, concluding both that it was reviewable under the Administrative Procedure Act ("APA") and that the reasons given to support it were inadequate. See NAACP v. Trump, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). However, because the Court also determined that DHS could possibly remedy the decision's inadequacies—at least in theory—the Court stayed its order of vacatur for a period of ninety days. See id.

That ninety-day period has now expired. In the interim, DHS has issued a new memorandum "concur[ring] with and declin[ing] to disturb" its September 2017 rescission

decision. Mem. from Sec'y Kirstjen M. Nielsen ("Nielsen Memo") [ECF No. 71-1] at 3.[1]  Also, the government has now moved the Court to revise its April 2018 order, arguing that the Nielsen Memo demonstrates that DACA's rescission was neither unlawful nor subject to judicial review. See Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Mot.") [ECF No. 74].

For the reasons explained below, the government's motion will be denied.  Although the Nielsen Memo purports to offer further explanation for DHS's decision to rescind DACA, it fails to elaborate meaningfully on the agency's primary rationale for its decision: the judgment that the policy was unlawful and unconstitutional.  And while the memo offers several additional "policy" grounds for DACA's rescission, most of these simply repackage legal arguments previously made, and hence are "insufficiently independent from the agency's evaluation of DACA's legality" to preclude judicial review or to support the agency's decision.  NAACP, 298 F. Supp. 3d at 235.  Finally, the memo does offer what appears to be one bona fide (albeit logically dubious) policy reason for DACA's rescission, but this reason was articulated nowhere in DHS's prior explanation for its decision, and therefore cannot support that decision now.

By choosing to stand by its September 2017 rescission decision, DHS has placed itself in a dilemma.  On the one hand, it cannot rely on the reasons it previously gave for DACA's rescission, because the Court has already rejected them.  On the other, because "an agency's action must be upheld, if at all, on the basis articulated by the agency itself," Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983), DHS also cannot rely on new reasons that it now articulates for the first time.  The government's attempt to thread this

---

[1] Although NAACP v. Trump, Civil Action No. 17-1907, was filed first, at the Court's direction most of the papers in these two cases were filed in Princeton v. United States, Civil Action No. 17-2325.  See Min. Order, Princeton (D.D.C. Jan. 18, 2018).  Thus, unless otherwise noted, references to the docket refer to the Princeton action.

2

needle fails. The motion to revise the Court's April 2018 order will therefore be denied, and the Court's vacatur of DACA's rescission will stand.

## <u>BACKGROUND</u>[2]

The DACA program offers renewable, two-year grants of deferred action to certain undocumented aliens who were brought to the United States as children. See <u>NAACP</u>, 298 F. Supp. 3d at 216 (describing DACA's eligibility criteria in greater detail). A grant of deferred action under DACA guarantees not only that the recipient will not be removed from the United States during the relevant time period, but also that she will be able to live, work, and contribute to society in various ways. See <u>id.</u> at 216–17 (discussing DACA's ancillary benefits). Since DACA's implementation in 2012, nearly 800,000 individuals have received grants of deferred action under the program. <u>Id.</u> at 17.

In 2014, DHS implemented a similar program, Deferred Action for Parents of Americans ("DAPA"), which would have offered renewable grants of deferred action to the noncitizen parents of U.S. citizens or lawful permanent residents. <u>Id.</u> at 217. Before DAPA could take effect, however, several states—led by Texas—challenged it in federal court. <u>Id.</u> A district court preliminarily enjoined DAPA in 2015, and the following year the Supreme Court affirmed the district court's preliminary injunction by an equally divided vote. See <u>id.</u> at 217–18 (citing <u>United States v. Texas</u>, 136 S. Ct. 2271 (2016) (mem)). Litigation over DAPA continued until June 2017, when, following the election of President Trump, DHS rescinded the program. <u>Id.</u> at 18.

On September 5, 2017, purportedly in response to threats from the plaintiffs in the <u>Texas</u> litigation, DHS rescinded the DACA program as well. <u>Id.</u> at 218–19. A flurry of court challenges

---

[2] Because the facts and procedural history of this case were recounted at length in the Court's prior opinion, see <u>NAACP</u>, 298 F. Supp. 3d at 216–223, the Court will review them here only briefly.

followed, each of whose procedural history is described more fully in the Court's prior opinion. See id. at 219–22. For present purposes, it suffices to say that DACA's rescission has been preliminarily enjoined by two district courts, one in California and one in New York, and that the government's appeals of those injunctions are currently pending. See Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec., 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018), appeal docketed, No. 18-15068 (9th Cir. Jan. 16, 2018); Batalla Vidal v. Nielsen, 279 F. Supp. 3d 401, 437–38 (E.D.N.Y. 2018), appeal docketed, No. 18-485 (2d Cir. Feb. 20, 2018). Also currently pending before the Fourth Circuit is an appeal of a Maryland district court's dismissal of a challenge to DACA's rescission. Casa De Maryland v. U.S. Dep't of Homeland Sec., 284 F. Supp. 3d 758, 779 (D. Md. 2018), appeal docketed, No. 18-1522 (4th Cir. May 8, 2018).

The cases before this Court, which present challenges to DACA's rescission on both administrative and constitutional grounds, were filed in late 2017 and consolidated for purposes of the dispositive motions filed in each. See NAACP, 298 F. Supp. 3d at 222–23. After holding a hearing on those motions, the Court entered judgment in plaintiffs' favor on their APA claims. See id. at 223, 249. The Court held, among other things, that: (1) DHS's September 5, 2017 decision to rescind DACA was reviewable under the APA because it was predicated chiefly on the agency's legal judgment that DACA was unlawful, see id. at 226–235; and (2) the decision was arbitrary and capricious because (a) DHS's legal judgment was inadequately explained, see id. at 238–240, and (b) the other reasons offered for DACA's rescission—mainly, the purported "litigation risk" that DACA would be preliminarily enjoined by the district court in Texas—were insufficiently reasoned, see id. at 241–243. Hence, the Court vacated DACA's rescission on

4

administrative grounds, see id. at 243–46, and deferred ruling on the bulk of plaintiffs' constitutional claims, id. at 246.

However, because the Court's decision was based in large part on its conclusion that DHS's legal judgment was "virtually unexplained," the Court stayed its order of vacatur for 90 days to allow DHS "to better explain its view that DACA is unlawful." Id. at 249. During that 90-day period, the Court explained,

> the Secretary of Homeland Security or her delegate may reissue a memorandum rescinding DACA, this time providing a fuller explanation for the determination that the program lacks statutory and constitutional authority. Should the Department fail to issue such a memorandum within 90 days, however, the Rescission Memo will be vacated in its entirety, and the original DACA program will be restored in full.

Id. at 245–46. The order accompanying the Court's opinion directed the parties to inform the Court before the stay expired as to "whether DHS has issued a new decision rescinding DACA and whether the parties contemplate the need for further proceedings in this case." Apr. 24, 2018 Order [ECF No. 69] at 2.[3]

---

[3] Soon after this Court issued its decision, several of the plaintiffs in the Texas litigation filed a new case challenging DACA in a federal district court in Texas. See Texas v. United States, No. 1:18-cv-68 (S.D. Tex. filed May 1, 2018) ("Texas II"). The Texas II plaintiffs assert that DACA is procedurally and substantively invalid under the APA and that it violates the Constitution's Take Care Clause, U.S. Const. art. II, § 3. See Compl. ¶¶ 351–56, Texas II (S.D. Tex. May 1, 2018). The plaintiffs have filed a motion for a preliminary injunction in that case, see Pls.' Mot. for a Prelim. Inj., Texas II (S.D. Tex. May 2, 2018), which is currently pending. The government opposes the motion only insofar as it seeks nationwide relief. See Fed. Defs.' Response to Pls.' Mot. for a Prelim. Inj. at 17, Texas II (S.D. Tex. June 8, 2018). Otherwise, although the government acknowledges that "[i]n similar situations, courts have typically held that the appropriate course is for a district court to refrain from issuing a conflicting injunction," id. at 17 (citations omitted), it nonetheless suggests that, assuming "that preliminary injunctive relief is appropriate," the district court should stay its order for fourteen days to allow the government to seek emergency relief from the Supreme Court, id. at 17–18. Other parties, including the State of New Jersey, have intervened as defendants and opposed the plaintiffs' preliminary injunction motion in full. See, e.g., Def.–Intervenor State of N.J.'s Mem. of Law in Opp'n to Pls.' Mot. for Prelim. Inj., Texas II (S.D. Tex. July 21, 2018). A hearing on the plaintiffs' motion is currently set for Wednesday, August 8, 2018.

5

In late June, Secretary of Homeland Security Kirstjen M. Nielsen issued a memorandum responding to the Court's order. See Nielsen Memo at 1. Instead of issuing a new decision rescinding DACA, as the Court's order had contemplated, Secretary Nielson simply "declin[ed] to disturb" the earlier decision to rescind the program by then-Acting Secretary of Homeland Security Elaine C. Duke.[4] Id. Secretary Nielsen then went on to offer several reasons why "the decision to rescind the DACA policy was, and remains, sound." Id.

Specifically, Secretary Nielsen opined that: (1) "the DACA policy was contrary to law"; (2) regardless of whether DACA was in fact contrary to law, the program "was appropriately rescinded . . . because there are, at a minimum, serious doubts about its legality"; and (3) other "sound reasons of enforcement policy" supported DACA's rescission. Id. at 2. The reasons in this last category included that: (a) DHS "should not adopt public policies of non-enforcement of [federal] laws for broad classes and categories of aliens," particularly aliens whom "Congress has repeatedly considered but declined to protect"; (b) "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis"; and (c) "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." Id. at 2–3. Finally, Secretary Nielsen wrote that although she was "keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country," she nonetheless "do[es] not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons [given] for ending [it]." Id. at 3.

_____

[4] Secretary Nielsen replaced Acting Secretary Duke as Secretary of Homeland Security on December 6, 2017.

6

In July, following the issuance of the Nielsen Memo, the government filed the instant motion to revise the Court's April 24, 2018 order. According to the government, the Nielsen Memo demonstrates that DHS's September 2017 decision to rescind DACA was neither subject to judicial review nor arbitrary and capricious. See Gov't's Mot. at 1–2. This is so, the government contends, because Secretary Nielsen's articulation of "serious doubts" regarding DACA's legality, see id. at 5–13, as well as her "additional" discussion of enforcement-policy concerns, see id. at 14–16, "confirm[]" that the rescission was both an exercise of enforcement discretion (as opposed to a legal judgment) and, at a minimum, reasonable, id. at 1. Thus, the government asks the Court either to dismiss all of plaintiffs' claims (including their constitutional claims) or to enter judgment in its favor. See id. at 18–19. Finally, the government states that, if the Court denies the motion, it intends to seek "a further continuation of the stay of the vacatur order," either "to consider seeking a stay pending appeal or to give DHS time to appropriately prepare" to accept new DACA applications, "which DHS has generally not accepted since September 5, 2017." Id. at 19 n.4.

Plaintiffs offer several arguments in response. First, they contend, the Court should not even consider Secretary Nielsen's memorandum, because it is not "the new agency action [the] Court anticipated [DHS] might take" during the ninety-day stay-of-vacatur period. See Pls.' Opp'n to Defs.' Mot. to Revise the Court's Apr. 24, 2018 Order ("Pls.' Opp'n") [ECF No. 75] at 3–8. Second, they argue that if the Court considers the Nielsen Memo at all, it should consider only the memorandum's legal analysis, because the remainder of the memorandum offers impermissible post hoc rationalizations of DHS's rescission decision. See id. at 8–10 (citing Food Mktg. Inst. v. ICC, 587 F.2d 1285, 1290 (D.C. Cir. 1978)). Third, they contend that even if the Court considers the Nielsen Memo in full, its arguments present no reason to reconsider the Court's prior

7

determination that DACA's rescission was both judicially reviewable, see id. at 10–14, and arbitrary and capricious, see id. at 15–20. Therefore, plaintiffs ask the Court to deny DHS's motion and to allow the vacatur of DACA's rescission to take effect. See id. at 20.

## ANALYSIS

### I. THE COURT WILL CONSIDER THE NIELSEN MEMO

As a threshold matter, plaintiffs argue that the Court should refuse to consider the Nielsen Memo it its entirety, because instead of issuing a new rescission decision, the memo simply adopts and further explains DHS's September 2017 rescission decision. See Pls.' Opp'n at 3–8.[5] The government objects that this argument "inappropriately elevate[s] form over substance" and that agencies "routinely rectify decisions that are deemed inadequately supported on remand without vacatur." Reply in Supp. of Defs.' Mot. to Revise the Court's April 24, 2018 Order ("Gov't's Reply") [ECF No. 76] at 1 (citations omitted). Here, the Court agrees with the government. It will therefore consider the Nielsen Memo.

As the government correctly points out, courts regularly remand challenges to agency action for further "elaboration of [the agency's] reasoning." A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C. Cir. 1995). Nonetheless, relying on Judge Silberman's separate opinion in Checkosky v. SEC, 23 F.3d 452 (D.C. Cir. 1994), plaintiffs appear to suggest that courts can consider such further explanations only before holding an agency action unlawful—and that, consequently, this Court is powerless to consider the Nielsen Memo's explanation of DHS's rescission decision because it has already held that decision unlawful. See Pls.' Opp'n at 4

---

[5] Plaintiffs brand DHS's failure to issue a new agency action as a "litigation tactic" that seeks to avoid "major consequences for the litigation pending in the Second and Ninth Circuits—which could potentially include, among other things, triggering remands to the district courts or raising possible mootness questions and prompting new complaints." Pls.' Opp'n at 1, 8.

("[W]hile courts do sometimes solicit further explanation of an action <u>before</u> deciding whether it is arbitrary and capricious, that is not what this Court did here.").

But neither Judge Silberman's opinion in <u>Checkosky</u> nor any of the other cases on which plaintiffs rely go so far. Rather, Judge Silberman explained that "courts will often . . . pause before exercising full judicial review and remand to the agency for a more complete explanation" and noted that "[i]n <u>many</u> of these cases"—but not all of them—courts "make clear" that they "have not found the agency action to be arbitrary and capricious." <u>Checkosky</u>, 23 F.3d at 463 (opinion of Silberman, J.) (emphasis added); <u>see, e.g.</u>, <u>City of Charlottesville v. FERC</u>, 661 F.2d 945, 954 (D.C. Cir. 1981) (reversing an agency's orders because they "were not based upon substantial evidence" and remanding for further proceedings); <u>id.</u> at 955 (Wald, J., concurring) (urging the agency "on remand to attempt a clearer articulation and reconciliation of its" apparently contradictory explanations for its orders). Thus, although it may be true that courts <u>usually</u> consider additional explanation before invalidating an agency's action, plaintiffs cite no authority for the proposition that courts <u>must</u> maintain this order of operations. Indeed, such a rule would be inconsistent with the district courts' broad discretion to reconsider their decisions before they become final. <u>See</u> Fed. R. Civ. P. 54(b); <u>AARP v. EEOC</u>, 292 F. Supp. 3d 238, 241 n.1 (D.D.C. 2017) ("[A] district court order remanding a case to an agency for significant further proceedings is not final." (quoting <u>Pueblo of Sandia v. Babbitt</u>, 231 F.3d 878, 880 (D.C. Cir. 2000))).

Here, the Court gave DHS ninety days to remedy the deficiencies in its September 2017 rescission decision. Although plaintiffs are correct that the Court's opinion and order anticipated

9

that DHS would do so by way of a new agency action (if it did so at all),[6] the Court will not disregard Secretary Nielsen's memorandum simply because she chose a somewhat different path. Instead, the Court will treat the memo as what it purports to be: a "further explanation" of the rescission decision, Nielsen Memo at 1, which the government contends forms a basis for revising the Court's April 2018 order. Likewise, the Court will construe the government's motion for a revised order as a motion for reconsideration of the Court's April 2018 decision. See Gov't's Reply at 3 n.2 (proposing that, "[a]t a minimum, the Court could simply reconsider its [April 2018] Order"); Fed. R. Civ. P. 54(b) (district courts may "revise[]" nonfinal decisions "at any time" prior to the entry of final judgment).

## II.   MOST OF THE NIELSEN MEMO'S ARGUMENTS ARE NOT POST HOC RATIONALIZATIONS

Next, plaintiffs contend that the Court should disregard "nearly the entire Nielsen Memo" because none of the justifications it offers—aside from DACA's purported illegality—were articulated by Acting Secretary Duke in her initial September 5, 2017 memorandum rescinding the DACA program (the "Duke Memo"), J.A. [ECF No. 60] at 252–56. Pls.' Opp'n at 8–10. With one notable exception, the Court disagrees. Although many of the Nielsen Memo's rationales are quite attenuated from those offered in the Duke Memo and its supporting documentation, only one is so far afield as to constitute an impermissibly post hoc rationalization for DACA's rescission.

Although "post hoc rationalizations 'have traditionally been found to be an inadequate basis for review' of agency decisions," the D.C. Circuit has clarified that this rule "does not

---

[6] See Apr. 24, 2018 Order at 2 (directing the parties to inform the court as to whether DHS had "issued a new decision rescinding DACA"); NAACP, 298 F. Supp. 3d at 246 (deferring ruling on plaintiffs' constitutional claims in part because DHS "could, on remand, alter DACA's rescission in ways that might affect the merits of plaintiffs' constitutional claims"); see also Pls.' Opp'n at 5 ("[T]he import of this Court's stay was not that the agency should take another crack at defending the Duke Memo, but that the agency should be afforded an opportunity to replace its void decision seamlessly with a new one.").

10

prohibit [an agency] from submitting an amplified articulation" of the reasons for its decision following a remand. Alpharma, Inc. v. Leavitt, 460 F.3d 1, 6 (D.C. Cir. 2006) (citations omitted). Indeed, the rule's purpose is simply to prevent courts from considering "rationales offered by anyone other than the proper decisionmakers," such as those appearing "for the first time in litigation affidavits and arguments of counsel"; it is not meant to be "a time barrier which freezes an agency's exercise of its judgment . . . and bars it from further articulation of its reasoning." Id. (citation omitted). Hence, when faced with an explanation offered for the first time on remand, a court must determine whether it is an "amplified articulation" of the agency's prior reasoning (which must be considered), Alpharma, 460 F.3d at 6 (citation omitted), or instead "a new reason for why the agency could have" taken the action (which must be disregarded), Delta Air Lines, Inc. v. Export–Import Bank of U.S., 85 F. Supp. 3d 436, 453 (D.D.C. 2015); see Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 217 n.8 (D.C. Cir. 2013) (stating that an agency's further explanation on remand "must be more than a barren exercise of supplying reasons to support a pre-ordained result" (citation omitted)).

Here, plaintiffs argue that the bulk of the Nielsen Memo falls in the latter category. Specifically, they contend, Secretary Nielsen's assertion of "serious doubts" about DACA's legality "does not amplify or explicate" the Duke Memo's prediction that DACA would be abruptly enjoined in the Texas litigation; rather, "it silently abandons it." Pls.' Opp'n at 10. Similarly, plaintiffs argue that the various "purported 'reasons of enforcement policy'" raised in the Nielsen Memo "have no foundation in the Duke Memo at all." See id.

Plaintiffs overstate the novelty of the Nielsen Memo's arguments. Although the Nielsen Memo certainly expands on the Duke Memo's points, most of its arguments are not so detached

11

from the earlier document as to appear post hoc. For example, the Nielsen Memo contends that "serious doubts" about DACA's legality could "undermine public confidence in . . . the rule of law" and lead to "burdensome litigation." Nielsen Memo at 2. Similarly, the Duke Memo expressly relied on a September 4, 2017 letter from Attorney General Jeff Sessions (the "Sessions Letter"), see J.A. at 254–55, which cited "the costs and burdens" associated with rescinding DACA in response to "potentially imminent litigation," and opined that "[p]roper enforcement of our immigration laws is . . . critical . . . to the restoration of the rule of law in our country," J.A. at 251. The Nielsen Memo's "serious doubts" rationale strikes this Court as a permitted amplification, rather than a prohibited post hoc rationalization, of these statements in the Sessions Letter.

The same is true of the Nielsen Memo's remaining "policy" justifications (again, save one). Like the Nielsen Memo, which faults DACA for protecting a class of aliens whom Congress has "repeatedly considered but declined to protect," Nielsen Memo at 2, the Duke Memo relied on "Congress's repeated rejection of proposed legislation that would have accomplished a similar result" as DACA, J.A. at 254. Similarly, the Nielsen Memo's concerns about "individualized, case-by-case" discretion, Nielsen Memo at 3, parallel the Duke Memo's observation that DACA was "meant to be applied only on an individualized case-by-case basis" and that DHS "has not been able to identify specific denial cases . . . based solely upon discretion," J.A. at 253.

The same cannot be said, however, about the Nielsen Memo's concern with "project[ing] a message" to noncitizen children (and their parents) who would attempt to enter the United States unlawfully. Nielsen Memo at 3. Nothing in the Duke Memo or the Sessions Letter even remotely parallels the Nielsen Memo's discussion of a "pattern" of illegal immigration by minors, and neither document mentions the "tens of thousands of minor aliens [who] have illegally crossed or

12

been smuggled across our border in recent years," id.  Indeed, the closest either document comes

is the Sessions Letter's assertion that "[p]roper enforcement of our immigration laws is . . . critical

to the national interest," J.A. at 251, but this statement is far too vague—on some level, nearly any

policy statement could be seen as an explication of an agency's view of the "national interest."

Consequently, the Court will decline to consider the Nielsen Memo's "messaging" rationale,

which appears for the first time on remand and is therefore impermissibly post hoc.  See Food

Mktg. Inst., 587 F.2d at 1290 ("Post-hoc rationalizations by the agency on remand are no more

permissible than are such arguments when raised by appellate counsel during judicial review.").[7]

In sum, although none of the Nielsen Memo's rationales for DACA's rescission relate back

perfectly to the Duke Memo's, only one—the messaging rationale—is so attenuated as to comprise

"a new reason for why the agency could have" rescinded DACA.  Delta Air Lines, 85 F. Supp. 3d

at 453.  The Court will therefore consider all of the Nielsen Memo except its messaging rationale.

III.    **THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER
        DETERMINATION THAT DACA'S RESCISSION WAS SUBJECT TO JUDICIAL REVIEW**

This Court previously held that DHS's September 2017 decision to rescind the DACA

program was subject to judicial review despite the APA's exception for "agency action [that] is

committed to agency discretion by law."  5 U.S.C. § 701(a)(2); see NAACP, 298 F. Supp. at

234.  This was so, the Court explained, because although the Supreme Court has held enforcement

decisions to be "presumptively unreviewable," NAACP, 298 F. Supp. 3d at 234 (citing Heckler v.

Chaney, 470 U.S. 821, 832–33 (1985)), the D.C. Circuit recognizes an exception for "general

enforcement polic[ies]" that "rel[y] solely on the agency's view of what the law requires," id. (first

---

[7] Of course, had Secretary Nielsen opted to issue a new decision rescinding DACA, the explanations offered in her memorandum would be contemporaneous and, consequently, not post hoc.  She did not do this, however.

citing OSG Bulk Ships, Inc. v. United States, 132 F.3d 808, 812 (D.C. Cir. 1998); and then citing Crowley Caribbean Transp., Inc. v. Peña, 37 F.3d 671, 676–77 (D.C. Cir. 1994)).[8] This rule reflects the commonsense notion that "an otherwise reviewable" legal interpretation "does not become presumptively unreviewable simply because the agency characterizes it as an exercise of enforcement discretion." Id. at 231.

The Court held that DACA's rescission was reviewable under this exception because it was "predicated on DHS's legal determination that the program was invalid when it was adopted." Id. at 233. The Court rejected what it took to be the government's attempt to distinguish between an agency's "interpretation of a specific statutory provision" (which the government conceded was reviewable) and its "conclusion that it lacks statutory authority" (which the government contended was unreviewable), explaining that "[t]o say that a particular agency action is 'without statutory authority' is simply to say that no statutory provision authorizes that action." Id. at 232 (citing City of Arlington v. FCC, 569 U.S. 290, 299–300 (2013)).[9] The Court also rejected the government's reliance on what it had termed "litigation risk"—that is, the adverse consequences that would follow if DACA were struck down in litigation—explaining that "Crowley would be a dead letter" if an agency "could insulate from judicial review any legal determination simply by

_____

[8] The D.C. Circuit's recent decision in CREW v. FEC confirms this Court's reading of Circuit law. See 892 F.3d 434, 441 n.11 (D.C. Cir. 2018) ("[I]f [an agency] declines to bring an enforcement action on the basis of its interpretation of [a statute], the [agency's] decision is subject to judicial review.").

[9] In its present motion, DHS attempts to relitigate this issue, contending that "Secretary Nielsen's further explanation of DACA's questionable legality also underscores why Crowley does not permit judicial review of an enforcement decision simply because that decision rests on a legal rationale." Gov't's Mot. at 7. Once again, DHS attempts to draw a "distinction between the non-reviewability of an enforcement decision, and the potential reviewability of the supporting rationale on its own terms," id. at 8, and contends that "even if a general legal rationale in the Duke or Nielsen Memos could be carved out for review on its own terms, that would not justify reviewing the enforcement decision to rescind DACA itself," id. at 9. But the Court rejects this novel proposition. As the D.C. Circuit has recently confirmed, although "[t]he law of this circuit 'rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions," CREW, 892 F.3d at 442 (citation omitted), an agency action is not "non-reviewable" in the first place if it is "based entirely on its interpretation of the statute," id. at 441 n.11.

14

framing it as an enforcement policy" and then tacking on a boilerplate assertion that "a court would likely agree with the agency's interpretation." Id. at 233.

Neither the Nielsen Memo nor the government's motion provides a sufficient basis for reconsidering the Court's earlier determination that DACA's rescission was judicially reviewable. To start with, Secretary Nielsen makes clear that her decision not to disturb DACA's rescission is predicated first and foremost on her view that "the DACA policy was contrary to law." Nielsen Memo at 2. Thus, this case continues to be like Crowley and OSG: at bottom, it involves an enforcement policy that is predicated on the agency's view of what the law requires.

Nor do the Nielsen Memo's remaining rationales immunize from judicial review DHS's decision to rescind DACA. The first of these revolves around Secretary Nielsen's "serious doubts about [DACA's] legality," which she says would lead her to rescind the policy regardless of "whether the courts would ultimately uphold it or not." Id. These doubts, Secretary Nielsen explains, raise concerns like "the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work." Id. According to the government, this rationale renders DACA's rescission unreviewable because it "cannot be meaningfully distinguished from other 'bona fide discretionary reasons' that this Court found acceptable" in its prior opinion, "such as an agency's fear that 'negative publicity . . . would undermine the policy's effectiveness.'" Gov't's Mot. at 7 (quoting NAACP, 298 F. Supp. 3d at 233).

But as the Court's opinion explained in the very next paragraph, it is difficult to conclude that such policy assertions are "bona fide" when they are accompanied by an assertion from the

15

agency that its longstanding policy is "unlawful." NAACP, 298 F. Supp. 3d at 233.[10] In this respect, the "serious doubts" rationale suffers from the same defect as the "litigation risk" rationale: accepting it here would permit agencies to insulate their legal judgments from judicial review simply by couching them as enforcement policies and then adding a boilerplate assertion that any other course of action would lead to litigation and undermine confidence in the rule of law. Judicial review of agency legal determinations cannot be so easily evaded.

Next, the Nielsen Memo asserts a handful of "sound reasons of enforcement policy" that it argues would justify DACA's rescission "regardless of whether . . . the DACA policy [is] illegal or legally questionable." Nielsen Memo at 2. First among these is the memo's claim that, "if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively." Id. at 3. But the Court rejected the government's reliance on this argument in its prior opinion, concluding that the government had failed to explain why "an agency's view as to which branch of government ought to address a particular policy issue is an assessment appropriately committed to the agency's discretion." NAACP, 298 F. Supp. 3d at 243 n.28. Like the litigation-risk and substantial-doubts rationales, then, this legislative-inaction rationale is simply another legal determination dressed up as a policy judgment, and it cannot render DACA's rescission immune from judicial review.

The memo's second "policy" justification asserts that "DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis." Nielsen Memo at 3. This is so, Secretary Nielsen claims, not because "a categorical

---

[10] While the Court's opinion did not suggest that an agency cannot rescind a policy in response to an adverse court judgment notwithstanding the agency's continued belief in the policy's legality, it did suggest that where (as here) the agency rescinds a policy after doing an about-face as to its legality, "there are reasons to be more suspicious." NAACP, 298 F. Supp. 3d at 233.

16

deferred-action policy" like DACA raises legal or constitutional concerns—as previously argued—but rather because such a policy "tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case." Id. In essence, the Secretary claims that even though DACA "on its face . . . allow[s] for individual considerations," id., it should nonetheless be rescinded because its programmatic nature somehow misleads those charged with its implementation into applying it categorically.

As an initial matter, this rationale strikes the Court as specious. It would be one thing for a challenger other than DHS to claim that although DACA calls for case-by-case discretion in theory, its application is categorical in practice. Indeed, this argument was made by the plaintiffs in the Texas litigation. See Texas v. United States, 809 F.3d 134, 171–72 (5th Cir. 2015), aff'd by an equally divided Court, 136 S. Ct. 2271 (2016) (mem). But when made by the agency itself, the argument becomes a non sequitur: if Secretary Nielsen believes that DACA is not being implemented as written, she can simply direct her employees to implement it properly. An agency head cannot point to her own employees' misapplication of a program as a reason for its invalidity.

Specious though it may be, this rationale nonetheless presents as the sort of policy consideration that, when offered as an independent reason for adopting a general enforcement policy, might foreclose judicial review. When viewed in the broader context of this litigation, however, this rationale reveals itself to be yet another attempt to disguise an objection to DACA's legality as a policy justification for its rescission.

Throughout the litigation over DAPA and DACA, the programs' challengers have consistently claimed that although DACA "facially purports to confer discretion," in practice deferred action was categorically granted to anyone who met the program's eligibility criteria.

17

Texas, 809 F.3d at 171–72. This argument was offered by the Texas plaintiffs as a reason that DAPA should have undergone notice-and-comment rulemaking, see id., and by the government in this case as a reason to uphold DHS's conclusion that DACA was unlawful, see Reply in Supp. of Defs.' Mot. to Dismiss or, in the Alternative, Mot. for Summ. J. [ECF No. 55] at 22 ("While [the Fifth Circuit's] finding [that DACA was applied categorically] had to be 'extrapolated' to invalidate DAPA, it directly dooms DACA itself . . . ." (citation omitted)). Likewise, the Duke Memo cast DACA's alleged categorical application as an issue of lawfulness, explaining that deferred action was "meant to be applied only on an individualized case-by-case basis," not to "confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." See J.A. at 253. Even a 2014 memorandum by the Office of Legal Counsel (the "OLC Memo") cautioned that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." J.A. at 21 n.8.

Taken in context, then, Secretary Nielsen's claim that rescinding DACA would further her policy objective of ensuring the distribution of deferred action grants on a "case-by-case" basis is simply a repackaging in policy terms of an oft-repeated objection to DACA's lawfulness. And while a remand provides an agency the opportunity to elaborate on its prior positions in good faith, it is not an opportunity for the agency to alter those positions—particularly where the chief design of doing so appears to be to defeat judicial review. The Court therefore concludes that the Nielsen Memo's individualized-discretion rationale does not preclude judicial review here.

Finally, the memo asserts that "it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration

laws," particularly given that "tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years." Nielsen Memo at 3. As the Court has already explained, this rationale is a post hoc rationalization and hence is not entitled to consideration on remand. See Food Mktg. Inst., 587 F.2d at 1290. But even if the Court were to consider this rationale, it would not immunize DACA's rescission from judicial review.

With this messaging rationale, Secretary Nielsen finally articulates (albeit in a single sentence) what might be properly characterized as a policy reason for DACA's rescission: a judgment that DACA's benefits—whatever they may be—are outweighed by the fact that, in Secretary Nielsen's view, the policy encourages noncitizen children and their parents to enter the United States illegally. Of course, this rationale is not without its logical difficulties: after all, DACA is available only to those individuals who have lived in the United States since 2007, see NAACP, 298 F. Supp. 3d at 216, so the "tens of thousands of minor aliens" who Secretary Nielsen asserts have illegally entered the United States "in recent years" would not even be eligible under the program. But no matter. The question for reviewability purposes is not whether the rationale makes sense, but rather whether it transforms DACA's rescission from a decision based "solely on [DHS's] belief that it lacks jurisdiction," Chaney, 470 U.S. at 833 n.4, into a decision based on "factors which are peculiarly within [DHS's] expertise," such as "whether the particular enforcement action requested best fits the agency's overall policies," id. at 831.

Even if the messaging rationale were sufficiently grounded in the Duke Memo so as to be an amplification rather than a post hoc rationalization, ultimately it would still be too little, too late. Although the Nielsen Memo states several paragraphs earlier that each of its reasons is "separate and independently sufficient" to support DACA's rescission, Nielsen Memo at 1, the

19

document's cursory discussion of the messaging rationale—which is articulated in a single sentence on the last page of the three-page memorandum—does not support this assertion. <u>See</u> NAACP, 298 F. Supp. 3d at 233–34 (noting that, in <u>Chaney</u>, the agency took the position that "even if it had jurisdiction, it would still decline to act pursuant to its 'inherent discretion to decline to pursue certain enforcement matters'" (quoting <u>Chaney</u>, 470 U.S. at 824–25)). The Court would not conclude that this solitary sentence in the Nielsen Memo wholly transmutes the explanation for DACA's rescission from an issue of law into an issue of policy.

In any case, the Court need not reach this conclusion because, as it has already explained, the messaging rationale is merely a <u>post hoc</u> rationalization of DACA's rescission. And because, as explained above, the other rationales offered by the Nielsen Memo are "insufficiently independent from the agency's evaluation of DACA's legality" to defeat review, <u>id.</u> at 235, the Court declines to reverse its prior conclusion that DACA's rescission is reviewable. The government's motion for reconsideration will therefore be denied as to reviewability.

IV. **THE NIELSEN MEMO PROVIDES NO REASON TO REVISE THE COURT'S EARLIER DETERMINATION THAT DACA'S RESCISSION WAS ARBITRARY AND CAPRICIOUS**

The Court now turns to whether the Nielsen Memo provides a basis for revising the Court's prior determination that DACA's rescission was arbitrary and capricious. <u>See id.</u> at 237–43. As explained below, it does not.

Most glaringly, the Nielsen Memo provides almost no meaningful elaboration on the Duke Memo's assertion that DACA is unlawful. The Nielsen Memo again ignores the 2014 OLC Memo laying out a comprehensive framework for evaluating the lawfulness of nonenforcement policies in the immigration context, <u>see</u> J.A. at 4–36—an omission that plaintiffs properly characterize as "mystifying," Pls.' Opp'n at 18, given the Court's prior emphasis on the document, <u>see</u> <u>NAACP</u>,

20

298 F. Supp. 3d at 239 & n. 22.[11]  Instead, like the Duke Memo before it, the Nielsen Memo relies primarily on the one-page Sessions Letter and on the Fifth Circuit's ruling in the DAPA litigation. See Nielsen Memo at 2.  But as this Court has already said, the Sessions Letter's conclusory legal assertions are themselves inadequately explained, and the Fifth Circuit's analysis in the DAPA case is "inapposite" here given the meaningful distinctions between DAPA and DACA, which include DAPA's open-ended nature, broad scope, and apparent conflict with express provisions of the INA.  See NAACP, 298 F. Supp. 3d at 238–40 (citing Texas, 809 F.3d at 179).

In response, Secretary Nielsen states that "[a]ny arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful." Nielsen Memo at 2.  But she does not explain why.  Secretary Nielsen also asserts that the Fifth Circuit's DAPA ruling was based not on any particular statutory conflict, but rather on DAPA's "incompatibility . . . with the INA's comprehensive scheme."  Id.  But as plaintiffs correctly point out, see Pls.' Opp'n at 15–16, even if this were an accurate characterization of the Fifth Circuit's opinion,[12] the Nielsen Memo offers no clue as to how an agency official, a court, or anyone else would go about determining whether a particular nonenforcement policy meets Secretary Nielsen's

---

[11] As was true with respect to the Duke Memo, the mere fact that the OLC Memo appears in the administrative record, even when combined with the Nielsen Memo's statement that Secretary Nielsen has "considered . . . the administrative record," Nielsen Memo at 1, does not amount to meaningful consideration for purposes of the APA. Nor does the Court agree that "the OLC Memo has little significance, especially given that its analysis as to DAPA was later rejected by the Fifth Circuit (in a decision affirmed by an equally divided Supreme Court) as well as by the Attorney General." Gov't's Mot. at 13.  For one thing, the Fifth Circuit did not expressly disapprove the OLC Memo; indeed, the one time it mentioned the memo, it cited it as an authoritative source.  See Texas, 809 F.3d at 184 n.197. And in any case, to the extent that the panel majority's analysis in Texas was inconsistent with OLC Memo, its decision was affirmed by an equally divided Supreme Court and so is not binding outside of the Fifth Circuit.  See Nichols v. United States, 511 U.S. 738, 750 (1994) (Souter, J., concurring in the judgment) (noting that "a decision . . . by an equally divided [Supreme] Court" is "entitled to no precedential value").  Similarly, the one-page Sessions Letter did not directly address the OLC Memo or expressly overrule its analysis.  J.A. at 251.

[12] But see Texas, 809 F.3d at 184 n. 197 ("[O]ur conclusion turns on whether the INA gives DHS the power to create and implement a sweeping class-wide rule changing the immigration status of the affected aliens without full notice-and-comment rulemaking, especially where—as here—the directive is flatly contrary to the statutory text." (emphasis added)).

21

test for "compatibility" with the overall statutory scheme. Thus, like the Duke Memo before it, the Nielsen Memo offers nothing even remotely approaching a considered legal assessment that this Court could subject to judicial review.

Nor do the Nielsen Memo's remaining rationales persuade the Court to revise its prior conclusion that DACA's rescission was arbitrary and capricious. As the Court has already indicated, those rationales carry varying degrees of persuasive force, and some may fall below the APA's standard of rationality. But as the D.C. Circuit has explained, "[w]here . . . an agency has set out multiple independent grounds for a decision," courts will uphold that decision "so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable." Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec., 769 F.3d 1127, 1149 (D.C. Cir. 2014) (citation omitted).

Here, Secretary Nielsen states in a somewhat conclusory fashion that each of the grounds offered in her memo is "independently sufficient" to support DACA's rescission. Nielsen Memo at 1. The Court is skeptical of this assertion, particularly given its conclusion that three of those grounds—the substantial-doubts, legislative-inaction, and individualized-discretion rationales— simply recapitulate the Secretary's inadequately explained legal assessment, and that the remaining ground—projecting a message to would-be illegal immigrants—appears nowhere in the Duke Memo and is therefore post hoc. Even assuming that these rationales are indeed independent and that at least one is sufficiently rational to survive APA review, however, DACA's rescission would still be arbitrary and capricious because the Nielsen Memo—like the Duke Memo before it—fails to engage meaningfully with the reliance interests and other countervailing factors that weigh against ending the program. See NAACP, 298 F. Supp. 3d at 240.

22

Although this time around the Nielsen Memo at least "acknowledge[s] how heavily DACA beneficiaries had come to rely on" the program, id., it does little more than that. Instead of considering DACA's benefits to DACA recipients and to society at large, see Pls.' Opp'n at 19–20, Secretary Nielsen simply states that "the asserted reliance interests" are outweighed by DACA's "questionable legality . . . and the other reasons for ending the policy," and then goes on to suggest that she should not even have to consider those interests. See id. (asserting that "issues of reliance would be best considered by Congress"). However, it is not up to Secretary Nielsen— or even to this Court—to decide what she should or should not consider when reversing agency policy. Rather, the requirements are set by the APA, as interpreted by the Supreme Court: "When an agency changes its existing position, it . . . must . . . be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2125–26 (2016).

Like the Duke Memo, the Nielsen Memo demonstrates no true cognizance of the serious reliance interests at issue here—indeed, it does not even identify what those interests are. "It would be arbitrary and capricious to ignore such matters," Perez v. Mortg. Bankers Ass'n, 135 S. Ct. 1199, 1209 (2015) (citation omitted), and it is so here. Nor, given the inadequacy of the Nielsen Memo's explanation of why DACA is unlawful, can the Court accept as sufficient its bare determination that any reliance interests are outweighed by "the questionable legality of the DACA policy and the other" fatally intertwined reasons listed in the memo. Nielsen Memo at 3. Because the Nielsen Memo fails to provide an adequate justification for the decision to rescind DACA— much less the "more substantial justification" that the APA requires when an agency's "prior

23

policy has engendered serious reliance interests," <u>Perez</u>, 135 S. Ct. at 1209—the Court sees no reason to change its earlier determination that DACA's rescission was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court again concludes that DHS's September 2017 decision to rescind the DACA program, as now explained in the Duke and Nielsen Memos, was both subject to judicial review and arbitrary and capricious. The Court has already once given DHS the opportunity to remedy these deficiencies—either by providing a coherent explanation of its legal opinion or by reissuing its decision for bona fide policy reasons that would preclude judicial review—so it will not do so again. Consequently, the government's motion to reconsider the Court's April 24, 2018 order will be denied. Per the government's request, however, the Court will continue the stay of its order of vacatur for a brief period—twenty days—to permit the government to determine whether it intends to appeal the Court's decision and, if so, to seek a stay pending appeal. In all other respects, the Court's April 24, 2018 order will remain in force.

Finally, a few words about the nature of the relief being granted by this Court. The Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program. Rather, the Court simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision. <u>See</u> 5 U.S.C. § 706(2). A conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or <u>post hoc</u> policy assertions, simply will not

24

do. The Court therefore reaffirms its conclusion that DACA's rescission was unlawful and must

be set aside.[13]  A separate order has been issued on this date.

_____/s/_____

JOHN D. BATES
United States District Judge

Dated:  August 3, 2018

---

[13] The Court also notes that the propriety of so-called nationwide injunctions, such as the ones issued by district courts in California and New York in related litigation, has recently been called into question. See, e.g., Trump v. Hawaii, 138 S. Ct. 2392, 2423 (2018) (noting but declining to address the issue); City of Chicago v. Sessions, 888 F.3d 272, 293 (7th Cir. 2018) (concluding that the district court did not "abuse[] its discretion in determining that the scope of the injunction should be nationwide"), reh'g granted, No. 17-2991 (7th Cir. June 4, 2018) (granting rehearing en banc "only as to the geographic scope of the preliminary injunction entered by the district court").  That debate is not implicated here, however, where the Court is vacating an agency action pursuant to the APA, as opposed to enjoining it as a violation of the Constitution or other applicable law.  See 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."); Harmon v. Thornburgh, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").