**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), AMERICAN FEDERATION OF TEACHERS, AFL-CIO, and THE UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL-CIO, CLC,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, III, in his official capacity as Attorney General of the United States, KIRSTJEN NIELSEN, in her official capacity as Secretary of Homeland Security, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, DEPARTMENT OF HOMELAND SECURITY, UNITED STATES OF AMERICA,<br><br>Defendants. | **PLAINTIFFS' PARTIAL OPPOSITION TO DEFENDANTS' MOTION FOR STAY PENDING APPEAL**<br><br>Civil Action No. 17-cv-1907 (JDB) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, MICROSOFT CORPORATION, and MARIA DE LA CRUZ PERALES SANCHEZ,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA, U.S. DEPARTMENT OF HOMELAND SECURITY, and KIRSTJEN NIELSEN, in her official capacity as Secretary of the Department of Homeland Security,<br><br>Defendants. | Civil Action No. 17-cv-2325 (JDB) |

## <u>INTRODUCTION</u>

Defendants' request that this Court stay its order *in its entirety* during their appeal should be dismissed out of hand. Each of the traditional stay factors weighs heavily against that relief. *First*, Defendants have not demonstrated a likelihood of success on the merits—and while that failure may not be independently fatal to Defendants' stay request, it substantially raises the bar for the showing they must make on the equities. *Second*, Defendants have identified no irreparable harm they will suffer if they are required to continue processing DACA renewals. Indeed, Defendants have been doing just that pursuant to court orders since January and have never before even sought a stay of that obligation. *Third*, staying this Court's order with respect to renewals would threaten Plaintiffs, their similarly situated *amici*, and hundreds of thousands of others with grave and irreparable harm. Most importantly, DACA recipients will begin to lose their status by the hundreds each day. Nothing plausibly justifies inflicting that catastrophic injury pursuant to an agency action that this Court and two others have already found to be unlawful. *Fourth*, for similar reasons, the public interest weighs heavily against Defendants' broad stay request as well.

Defendants' alternative proposal for a stay limited to new applications for DACA or advance parole raises different issues. Although Defendants' position on the merits is no stronger, the equities are different. Plaintiffs believe that DACA should be available to all those eligible, including new applicants, but they also recognize that an imperfect "status quo"—no new applicants, but renewals continue—has developed, and that this interim arrangement has allowed for the orderly consideration of legal issues concerning the rescission of DACA and DACA's legality. For reasons and on terms explained in more detail below, Plaintiffs do not oppose a limited stay with respect to new applicants.

## ARGUMENT

### I.      Legal Standard.

Courts weigh four factors in deciding whether to grant a stay: "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009); *see, e.g.*, *Doe 1 v. Trump*, No. 17-5267, 2017 WL 6553389, at *1 (D.C. Cir. Dec. 22, 2017).[1]

### II.     The Court Should Not Stay Its Order With Respect To DACA Renewals.

Defendants' request for a broad stay of this Court's order, encompassing even the continued processing of DACA renewals, should be denied. In the context of renewals, each of the stay factors weighs heavily against that relief.

### A.   Defendants Are Very Unlikely To Succeed On The Merits.

Defendants claim that the D.C. Circuit is likely to reverse this Court on appeal, or at least that they will "present a substantial challenge" to this Court's holding. Mot. (Dkt. 82) at 6. But this Court already considered and rejected each of Defendants' arguments in two detailed opinions, and nothing in either opinion suggests that this was a close case. Accordingly, Defendants cannot explain why any of their arguments are likely to prevail on appeal.

---

[1] As this Court has observed, "[t]here is an ongoing debate as to whether courts may still use a 'sliding scale' approach in analyzing these four factors, where a strong showing on one factor may compensate for a weaker showing on another." *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 245 n.1 (D.D.C. 2017) (addressing preliminary injunction standard); *see, e.g.*, *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) (reserving the question). For present purposes, Plaintiffs do not contest that the Court may weigh its assessment of Defendants' likelihood of success on appeal together with the various equities in determining whether—or to what extent—to grant the relief Defendants seek. *See, e.g.*, *Cigar Ass'n of Am. v. FDA*, No. 1:16-cv-01460-APM, --- F. Supp. 3d ---, 2018 WL 3304627, at *3 (D.D.C. July 5, 2018); *accord* Mot. (Dkt. 82) at 4.

First, the D.C. Circuit is very unlikely to hold that the rescission is insulated from review by *Heckler v. Chaney*, 470 U.S. 821 (1985). Indeed, this Court found it "clear" that "courts have the authority to review an agency's interpretation of the law if," as in this case, "it is relied on to justify an enforcement policy." *NAACP v. Trump (NAACP I)*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018). As this Court has now explained on two occasions, that rule simply reflects the limits on *Chaney*'s holding that the D.C. Circuit recognized in *Crowley Caribbean Transport, Inc. v. Peña*, 37 F.3d 671 (D.C. Cir. 1994), and *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998), among other cases. *See NAACP v. Trump (NAACP II)*, No. 17-cv-1907-JDB, --- F. Supp. 3d ---, 2018 WL 3702588, at *7-8 & nn.8-9 (D.D.C. Aug. 3, 2018); *NAACP I*, 298 F. Supp. 3d at 227-34. In fact, as *NAACP II* pointed out, the D.C. Circuit "recently confirmed" in *Citizens for Responsibility & Ethics in Washington v. FEC*, 892 F.3d 434 (D.C. Cir. 2018), that Defendants' reviewability arguments are at odds with "Circuit law." *NAACP II*, 2018 WL 3702588, at *7-8 nn.8-9.

Defendants claim that *International Union, UAW of America v. Brock*, 783 F.2d 237 (D.C. Cir. 1986), shows this Court's analysis to be "susceptible to serious debate." Mot. 6. But to the contrary, *International Union* concluded that when an enforcement decision "is predicated solely on the agency's interpretation of a statute," "the court has law to apply in determining whether the agency erred." 783 F.2d at 245 n.10; *see id.* at 246 ("[I]t seems almost ludicrous to suggest that there is 'no *law* to apply' in reviewing whether an agency has reasonably interpreted a *law*."); *see also NAACP I*, 298 F. Supp. 3d at 228 (citing *International Union* as an example of a *broad* view of reviewability). In any event, it is highly unlikely that the D.C. Circuit will hold that a general policy predicated exclusively or overwhelmingly on a legal judgment is entirely immune from judicial review—such that an agency official may "claim that the law ties her hands while at the

same time denying the courts' power to unbind her" and thereby escape both "political accountability" and "judicial review." *Id.* at 249.[2]

Defendants' merits arguments with respect to Plaintiffs' substantive APA claim are no more persuasive. As this Court has explained, the Duke and Nielsen Memos "offer[] nothing *even remotely approaching* a considered legal assessment that this Court could subject to judicial review." *NAACP II*, 2018 WL 3702588, at *11 (emphasis added). By making clear that its resolution of Plaintiffs' arbitrary-and-capricious challenge was not a close call, this Court has already effectively rejected Defendants' assertion that their contrary position on the same issue is at least "substantial and compelling." Mot. 6. In any case, Defendants' "conclusory assertion that a prior policy is illegal, accompanied by a hodgepodge of illogical or *post hoc* policy assertions," is very unlikely to persuade the D.C. Circuit to reverse. *NAACP II*, 2018 WL 3702588, at *13.[3]

Furthermore, reversal on the merits is especially unlikely because, even if Defendants could somehow persuade the D.C. Circuit of the explanatory sufficiency of the barebones Duke and Nielsen Memos, that would only mean that the question of the *correctness* of Defendants' legal analysis would be squarely presented in the court of appeals. *See, e.g.*, *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 420 (E.D.N.Y. 2018) ("An agency decision that is based on an

---

[2] Defendants' likelihood of success on the reviewability issue is further diminished by the possibility that, even in the unlikely event that the D.C. Circuit rejects this Court's analysis, the court of appeals *still* could hold for Plaintiffs on alternative grounds that this Court rejected. *Compare Regents of Univ. of Cal. v. U.S. DHS*, 279 F. Supp. 3d 1011, 1030-31 (N.D. Cal. 2018) (finding the Duke Memo reviewable in part because it is not a *non*-enforcement decision and rescinds an existing program), *with NAACP I*, 298 F. Supp. 3d at 230-31 (rejecting similar arguments).

[3] Defendants point once again (Mot. 7-8) to the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), but that case remains "'inapposite' here given the meaningful distinctions between DAPA and DACA, which include DAPA's open-ended nature, broad scope, and apparent conflict with express provisions of the INA." *NAACP II*, 2018 WL 3702588, at *11 (quoting *NAACP I*, 298 F. Supp. 3d at 239).

erroneous legal premise cannot withstand arbitrary-and-capricious review."); *see also NAACP I*, 298 F. Supp. 3d at 242 & n.26 (finding it unnecessary to reach this issue in light of Defendants' inadequate explanation). In order to reverse this Court's judgment, therefore, the D.C. Circuit would *also* need to side with Defendants on the ultimate question of DACA's legality. Yet every court to reach DACA's legality thus far has upheld it, and the merits of the legal arguments strongly favor that result. *See Regents of Univ. of Cal. v. U.S. DHS*, 279 F. Supp. 3d 1011, 1042 (N.D. Cal. 2018) (concluding that "DACA was and remains a lawful exercise of authority by DHS"); *Batalla Vidal*, 279 F. Supp. 3d at 426 (similar); *Arpaio v. Obama*, 27 F. Supp. 3d 185, 208-09 (D.D.C. 2014) (concluding that substantive APA challenge to DACA was unlikely to succeed), *aff'd on other grounds*, 797 F.3d 11 (D.C. Cir. 2015); *see also* Pls.' Mot. For Summ. J. ("MSJ") at 17-27 (Dkt. 28-1) (explaining why DACA is legal). Because Defendants will need to win on not one but two long-shot arguments, their compound probability of success on the merits is significantly lower than even their slim chances of clearing either hurdle standing alone.[4]

Defendants emphasize the District of Maryland's disagreement with this Court's ultimate conclusion about the rescission (Mot. 2, 6-7). But that court did not have the benefit of this Court's reasoning, and in any event Defendants do not identify any actual analysis in that court's opinion that is likely to persuade the D.C. Circuit. As the Supreme Court has made clear, "the mere existence … of conflicting authority in state or lower federal courts[ ] does not establish" that both conflicting positions are "reasonable," let alone that they are both substantially likely to be vindicated on appeal. *Chaidez v. United States*, 568 U.S. 342, 353 & n.11 (2013) (internal

---

[4] Defendants' prospects for success are further undermined by the possibility that the D.C. Circuit could affirm on the basis of Plaintiffs' notice-and-comment argument (even though this Court rejected it). And, notably, that challenge to the rescission is wholly independent of Defendants' reviewability arguments. *See Lincoln v. Vigil*, 508 U.S. 182, 195-96 (1993).

quotation marks omitted). Here, the three separate decisions invalidating the Duke Memo are both more persuasive and more predictive than the decision identified by Defendants.

Finally, Defendants stress that, under the sliding-scale approach, they need not show that they are *more likely than not* to prevail on the merits. Mot. 4-5. But if the most the Court can say for Defendants' merits arguments is that they "at least leave 'fair ground for litigation,'" Mot. 7 (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977))—and, for the reasons given above, that is the very most the Court could conclude here— then Defendants' showing on the other stay factors must be unusually robust to compensate for that deficiency.[5] While Defendants' unpersuasive position on the merits is not independently fatal, then, it requires them to make up a great deal of ground on the equitable factors. As explained below, however, Defendants' case on the equities—at least with respect to renewals for current DACA beneficiaries—is only *weaker* than their showing on the merits.

### B.   The Equities Weigh Heavily Against A Stay With Respect To Renewals.

Insofar as DACA renewals are concerned, the practical effect of this Court's vacatur is the same as that of the *Regents* and *Batalla Vidal* injunctions. *Accord* Mot. 10. Thus, this Court's stay decision with respect to renewals will only have any effect in the event that those other injunctions are reversed, narrowed, or stayed while Defendants' appeal is ongoing. As this Court has explained, "although the preliminary injunctions in *Regents* and *Batalla Vidal* currently protect

---

[5] Thus, for example, raising a "serious question" on the merits is only a permissible substitute for establishing a genuine likelihood of success if the movant also shows that "the balance of hardships tips *sharply* in his favor." *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977) (emphasis added); *see id.* (indicating that a genuine probability of success on appeal must be established "when interim relief would cause substantial harm to another party"); *see also Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009) (noting that a "lower standard can be applied for likelihood of success," but only if "the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant").

aliens who have already received DACA grants, those injunctions are both on expedited appeals and hence could be reversed in the not-too-distant future." *NAACP I*, 298 F. Supp. 3d at 245. In addition, those injunctions depend on "the propriety of so-called nationwide injunctions," a "debate [that] is not implicated" by this Court's order. *NAACP II*, 2018 WL 3702588, at *13 n.13; *cf.* Federal Appellants' Opening Brief at 53, *Regents of Univ. of Cal. v. U.S. DHS*, No. 18-15068 (9th Cir. Feb. 13, 2018) (arguing that the *Regents* injunction should at least be narrowed so that it protects only "particular DACA recipients whose loss of DACA would cognizably injure [the *Regents*] plaintiffs"). It is thus possible that the *Regents* and *Batalla Vidal* injunctions could be narrowed in a manner that deprives Plaintiffs and others of their protection.

In light of these circumstances, this Court should weigh the equities bearing on Defendants' stay motion by evaluating the effects that a stay would have if, during the pendency of Defendants' appeal in this case, the *Regents* and *Batalla Vidal* injunctions cease to require DACA renewals (or at least cease to require them on a nationwide basis). As explained below, leaving this Court's order in place with regard to renewals would not inflict any meaningful irreparable harm on Defendants in that scenario, but Plaintiffs and other interested parties would be profoundly injured by the cessation of renewals, and the public interest cuts sharply against allowing that outcome as well.

### 1. Defendants Have Not Established That They Will Suffer Any Meaningful Harm Absent A Stay With Respect To Renewals.

Defendants make a perfunctory assertion that they would suffer irreparable harm from continuing to process renewals, but they focus overwhelmingly on the alleged harm from processing new applications. *See* Mot. 8-10. Setting the latter issue aside for the moment, *see infra* § III (discussing the equities with respect to new applications), Defendants' assertion of harm *from processing renewals* lacks any substance.

First of all, Defendants' one-paragraph discussion rests almost entirely on a generic interest in enforcing the law as they see fit. *See* Mot. 8. Absent a showing of actual, concrete harm from the delay in implementing their preferred policy, however, that boilerplate assertion carries little weight. *Cf. Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (detailing the "ongoing and concrete harm to Maryland's law enforcement and public safety interests"). Indeed, Defendants' failure to actually explain how, in real-world terms, anyone is harmed by continuing DACA renewals echoes their persistent failure, throughout this litigation, to defend their rescission decision on policy grounds. Defendants' abstract claim of injury to the government's enforcement policies is particularly weak when the President himself has argued that, as a policy matter, exposing DACA beneficiaries to the risk of removal would be a grave mistake. *See Regents*, 279 F. Supp. 3d at 1047 ("'Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!'" (quoting a public statement by President Trump)).

In any event, it is simply untrue that this Court's order "prevent[s] the Secretary from exercising her authority … to administer and enforce the INA" (Mot. 8). In fact, the Court took pains in *NAACP II* to disavow any such implication—explaining that "[t]he Court did not hold in its prior opinion, and it does not hold today, that DHS lacks the statutory or constitutional authority to rescind the DACA program," but rather "simply holds that if DHS wishes to rescind the program—or to take any other action, for that matter—it must give a rational explanation for its decision." *NAACP II*, 2018 WL 3702588, at *13; *see also id.* at *7 n.7 (noting that Secretary Nielsen could have "opted to issue a new decision rescinding DACA" on policy grounds but chose not to do so).

Finally, Defendants' claim of irreparable harm in connection with renewal applications is also fatally undermined by their decision not to seek any stay of the *Regents* and *Batalla Vidal* injunctions. The government has already been processing renewals pursuant to those court orders since January. *See Regents*, 279 F. Supp. 3d at 1048; *Batalla Vidal*, 279 F. Supp. 3d at 437. Government agencies suffering serious and irreparable injuries do not ordinarily wait seven months to act. Defendants' unexplained delay in seeking relief from the processing of renewal applications thus eviscerates whatever remains of their claim of irreparable harm. *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 463 U.S. 1315, 1317-18 (1983) (Blackmun, J., in chambers) (explaining that an agency "ha[d] not been particularly expeditious in seeking a stay" and that the "failure to act with greater dispatch tends to blunt [its] claim of urgency and counsels against the grant of a stay"); *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) (Marshall, J., in chambers) ("The applicants' delay in … seeking a stay vitiates much of the force of their allegations of irreparable harm"); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) ("In considering the balance of equities among the parties, we think that plaintiffs' unnecessary … delay in asking for preliminary injunctive relief weighed against their request.").

## 2. A Stay With Respect To Renewals Will Seriously Injure Plaintiffs, Other Interested Parties, And The Public Interest.

Staying this Court's order with respect to DACA renewals would "substantially injure the other parties interested in the proceeding," including both Plaintiffs and their numerous similarly situated *amici*,[6] and it would gravely disserve "the public interest" as well. *Nken*, 556 U.S. at 434. Indeed, under the circumstances, the weight of this factor alone should dispose of the renewals portion of Defendants' stay motion.

---

[6] *See, e.g.*, Dkt. 31 (112 companies); Dkt. 32 (legal aid organizations); Dkts. 33, 34 (numerous colleges and universities).

*First,* as this Court has explained, "DACA … engendered the reliance of hundreds of thousands of beneficiaries, many of whom ha[ve] structured their education, employment, and other life activities on the assumption that they would be able to renew their DACA benefits." *NAACP I*, 298 F. Supp. 3d at 240; *see id.* at 240 n.24 (collecting examples in the record); *see also NAACP II*, 2018 WL 3702588, at *12 (emphasizing again "the serious reliance interests at issue here"). But if renewals are discontinued, DACA recipients will begin to lose their status at an alarming rate—between 500 and 1,000 people per day. *See* DHS Quarterly Summary Report, ex. B, at 1, *Regents*, No. 3:17-cv-5211 (N.D. Cal. July 2, 2018), Dkt. 277-2 (reporting that 17,500 grants expire in September 2018; that 30,320 expire in October 2018; and that 24,040 expire in November 2018). This will be a catastrophic event for each of the affected individuals, as well as for their families and communities. *See NAACP I*, 298 F. Supp. 3d at 245 (noting the "troubling humanitarian consequences" of allowing the rescission to take effect).

The assorted devastating consequences of a lapse in DACA status will be irreversible even if this Court's order is ultimately upheld on appeal. First, the thousands of DACA beneficiaries who lose their DACA status will also lose their work authorization, and consequently their jobs. Many of them will no longer be able to support their families as a result. *See Regents*, 279 F. Supp. 3d at 1047 (explaining that allowing the rescission to take effect "would tear authorized workers from our nation's economy and would prejudice their being able to support themselves and their families"); MSJ App. 2681-82 Topics 9, 10. All who lose status or face the prospect of doing so will also undergo a period of profound disruption and uncertainty, exacting a personal, professional, and psychological toll that cannot be remedied even if the uncertainty is ultimately resolved in their favor. *See* MSJ at 42-43. And worst of all, a lapse in the DACA program will expose thousands of people to an immediate risk of deportation, potentially ripping them from

their families and sending them to countries they may never have known at all—an irreversible

harm that is "the equivalent of banishment or exile." *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010)

(quotation marks omitted). That result is severe under any circumstances, particularly with respect

to people who "were brought to this country as children" and "lacked the intent to violate the law."

AR 1. But it would be particularly harsh to impose this harm pursuant to an agency action that this

Court has *already* adjudged unlawful, and with no way to ensure that those who may be deported

will be able to return to this country and resume their prior status if and when this Court's order is

upheld on appeal.

*Second*, companies that employ DACA beneficiaries, such as Plaintiff Microsoft, will

suffer irreparable harms from a stay as well. As the amicus brief for 112 companies explains in

detail, allowing the rescission to take effect would wreak havoc throughout the economy, with tens

of thousands of trained employees becoming suddenly ineligible to continue in their jobs. *See* Dkt.

31, at 5-11. Because all DACA beneficiaries have at least a high school degree or equivalent, and

many have pursued higher education as well, they are now enmeshed in vital positions throughout

the private sector. Thus, for example, Plaintiff Microsoft and its subsidiary LinkedIn would

potentially forfeit all they have invested to recruit, hire, and train their DACA recipient employees

and bear costs and disruptions imposed by the need to identify, recruit, hire, train, and integrate

new workers. *See* MSJ App. 96-98 (Radu Decl. ¶¶ 3-4, 6, 9).

*Third*, colleges and universities that educate DACA beneficiaries, such as Princeton, will

suffer equally serious harms. As explained in the two amicus briefs submitted by dozens of

colleges and universities, allowing DACA's rescission to proceed will preclude DACA beneficiary

students from deriving the full benefit of their time on campus, Dkt. 34, at 2, and it will preclude

the universities from enjoying the benefits of their full participation, Dkt. 33, at 13-14. Likewise,

the rescission of DACA will disrupt schools' access to a pipeline of talented students with unique contributions to make. Dkt. 34, at 7.

*Fourth*, the Association Plaintiffs will all be irreparably harmed if any of their members' DACA status is lost. For example, NAACP members who are DACA recipients are integral to the organization's local, community-based grassroots work. As those members lose their status, the NAACP will lose the value of the comprehensive training it has provided to them, including with respect to advocacy on issues affecting the African Diaspora. *See* MSJ App. 2623 (Johnson Decl. ¶¶ 22-24). Likewise, the labor union plaintiffs will lose their valued members who are DACA beneficiaries, and the myriad contributions they make to the unions' work, as those individuals lose their work authorization. *See* MSJ App. 2599 (Weingarten Decl. ¶ 20); MSJ App. 2646-47 (Lopez Decl. ¶¶ 23-24).

It simply makes no sense to impose these catastrophic disruptions *before* the court of appeals even addresses the merits of this case, let alone when this Court's order is likely to be affirmed and Defendants face no meaningful harm in the interim.

### III.   A Stay with Respect to Initial DACA Applications Or Advance Parole Presents a Different Question.

Many of the same considerations outlined above also weigh against staying the Court's order with respect to initial DACA applications and advance parole. The merits questions are exactly the same, as this Court pointed out in its original opinion. *See NAACP I*, 298 F. Supp. 3d at 245 n.30. And as this Court also recognized, there is a powerful equitable interest in ensuring prompt relief to initial DACA applicants who have so far been denied the opportunity to seek protection from removal only because of unlawful agency action. *See id*. at 245 ("[E]ach day that the agency delays is a day that aliens who might otherwise be eligible for initial grants of DACA benefits are exposed to removal because of an unlawful agency action."). Indeed, Defendants

report that there are nearly 50,000 people "who were projected to have requested initial DACA in September 2017 and FY 2018, but who were unable to do so due to the rescission of the DACA policy." Renaud Decl. ¶ 9, Dkt. 82-1.

At the same time, the Court's order follows two nationwide injunctions that have compelled the government to continue processing DACA renewals, but not to accept new applications (for DACA status or advance parole). *See Batalla Vidal*, 279 F. Supp. 3d at 437 ("[T]he court finds that the irreparable harms identified by Plaintiffs largely result from Defendants' expected failure to renew existing grants of deferred action and especially work authorization, not from Defendants' refusal to adjudicate new initial DACA applications."); *Regents*, 279 F. Supp. 3d at 1049 ("[W]hile plaintiffs have demonstrated that DACA recipients, as well as their families, schools, employers, and communities, are likely to suffer substantial, irreparable harm as a result of the rescission, they have not made a comparable showing as to individuals who have never applied for or obtained DACA."). Defendants have thus suggested the possibility of a compromise in which this Court's order is stayed only with respect to new DACA applications and advance parole, so that its immediate effect continues to be essentially coterminous with the existing injunctions. *See* Mot. 8-11. Defendants also claim that requiring the processing of new DACA applications in the short term would impose significant administrative burdens that could interfere with the administration of other forms of immigration relief. *Id.* at 9-10; *see* Renaud Decl. ¶ 11, Dkt. 82-1.

Because DACA has not lawfully been rescinded, Plaintiffs believe that DACA should be available to all those eligible, including new applicants. That said, Plaintiffs also recognize that, over the last eight months, multiple courts have drawn a distinction between new applicants and renewals, and that an imperfect "status quo"—no new applicants, but renewals continue—has

developed which has allowed for the orderly consideration of legal issues concerning the rescission of DACA and DACA's legality. The government has generally eschewed emergency relief because it cannot plausibly claim irreparable harm with respect to renewals, and courts have been able to consider DACA matters in the ordinary course (albeit expeditiously). Plaintiffs acknowledge that this orderly progression through the judicial-review process, allowing full and fair consideration of the issues, has significant benefits for Plaintiffs and ultimately for all current and potential DACA beneficiaries.

Plaintiffs are also cognizant that the litigation strategy recently adopted by the State of Texas and other plaintiffs in the Southern District of Texas threatens to upend the interim status quo, with potentially destructive consequences for Plaintiffs and for hundreds of thousands of current DACA beneficiaries. *See Texas v. United States*, No. 1:18-cv-68 (S.D. Tex. filed May 1, 2018) ("*Texas II*"). In particular, the *Texas II* plaintiffs have sought to use the prospect that *new* DACA applications will soon be granted (pursuant to this Court's order) as a basis for a misguided claim of imminent and irreparable harm warranting an urgent preliminary injunction in that case— even though such an order would conflict with the other injunctions, and even though those plaintiffs failed to challenge DACA in any way for more than five years. For example, the States have asserted that this Court's August 3 order imposes a "shot clock [of] August 23rd" for injunctive relief in the *Texas II* case and have specifically "ask[ed] for an injunction now to prevent that unlawful program from coming back into full existence" pursuant to this Court's order. Aug. 8, 2018 Hr'g Tr. at 79-80, *Texas II*, Dkt. 302 (attached hereto as Ex. A).[7]

---

[7] *See also* State Pls.' Post-Discovery Response Br. at 52, *Texas II*, Dkt. 282 ("No need for litigation arose until April 24, 2018, when the district court for the District of Columbia issued its order enjoining DACA's rescission."); Mot. for Prelim. Injunction at 8, *Texas II*, Dkt. 5 (arguing that a preliminary injunction is needed because "the District of Columbia district court recently ordered the Executive to process not only DACA renewals, but *new* DACA applications").

Plaintiffs do not believe that the grant of DACA status to those eligible is a basis for anyone to claim irreparable harm. But Plaintiffs also do not wish to facilitate the States' attempt to use this Court's order in aid of their effort to procure an order that enjoins DACA itself—thereby potentially disrupting the program both for Plaintiffs and for hundreds of thousands of existing beneficiaries who rely on their DACA status. For that reason, Plaintiffs believe that the Court could consider a limited stay of its order with respect to new applicants and advance parole, subject to the following understandings:

- Under the sliding-scale approach, such a limited stay, based on the recognition that multiple courts are currently considering the rescission of DACA and related matters, would not suggest that Defendants are likely to prevail on the merits. *See Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *see also NAACP I*, 298 F. Supp. 3d at 245 n.30 (explaining that "a court has discretion to craft preliminary injunctive relief based on a number of equitable factors," whereas "its discretion in fashioning administrative remedies," such as this Court's underlying vacatur order, "is somewhat more limited").

- Such a limited stay would affirm that the equities favor permitting current DACA beneficiaries to retain their status and to continue to rely on their protection from removal and work authorization while litigation proceeds.

- Such a limited stay would preserve the "status quo" outlined above, allowing for the orderly consideration of the ongoing legal challenges to the rescission of DACA and, Plaintiffs expect, leading ultimately to an affirmance of the legality of DACA (and the illegality of the Duke Memo) by the courts.

Framed in this manner, Plaintiffs do not oppose such a limited stay, despite their belief that DACA should be available to all those eligible.  Plaintiffs adamantly oppose a stay with respect to renewals, in light of all of the profoundly harmful and disruptive consequences such a stay would impose.[8]

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' stay motion with respect to DACA renewals, and Plaintiffs do not oppose Defendants' stay motion with respect to new applications for DACA or advance parole.

Dated: August 15, 2018

By: /s/ Joseph M. Sellers
Joseph M. Sellers (D.C. Bar No. 318410)
Julie S. Selesnick (D.C. Bar No. 485558)
Julia A. Horwitz (D.C. Bar No. 1018561)
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
T: (202) 408-4600
F: (202) 408-4699
jsellers@cohenmilstein.com

*Attorneys for Plaintiffs NAACP; American Federation of Teachers, AFL-CIO; United Food and Commercial International Union, AFL-CIO, CLC*

Respectfully submitted,

By: /s/ Thomas J. Perrelli
Thomas J. Perrelli (D.C. Bar No. 438929)
Lindsay C. Harrison (D.C. Bar No. 977407)
Sam Hirsch (D.C. Bar No. 455688)
Ishan Bhabha (D.C. Bar No. 101567)
Benjamin M. Eidelson (D.C. Bar No. 1031574)
Alex Trepp (D.C. Bar No. 1031036)
Kendall Turner (D.C. Bar No. 144701)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone 202 639-6000
Fax 202 639-6066
tperrelli@jenner.com

*Attorneys for The Trustees of Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez*

---

[8] If the Court does not grant a stay pending appeal with respect to new applications, Plaintiffs do not oppose (1) affording Defendants an initial, fixed-term stay for a reasonable period so that they may operationally prepare for compliance, and (2) affording Defendants a brief administrative stay (with respect to new applications) while they seek a stay pending appeal in higher courts. Plaintiffs oppose any stay with respect to DACA renewals.

# EXHIBIT A

**Transcript of Preliminary Injunction Hearing in**

*Texas v. United States*, **No. 1:18-cv-68 (S.D. Tex. Aug. 8, 2018)**

1              **IN THE UNITED STATES DISTRICT COURT**
            **FOR THE SOUTHERN DISTRICT OF TEXAS**
2                    **BROWNSVILLE DIVISION**

3    STATE OF TEXAS, ET AL        )        NO. 1:18-CV-68
                                  )
4                                 )
     VS.                          )        Houston, Texas
5                                 )        10:00 a.m.
                                  )
6    UNITED STATES OF AMERICA, ET )        AUGUST 8, 2018
     AL                           )
7

8

9      ********************************************************

10                           **HEARING**

11            **BEFORE THE HONORABLE ANDREW S. HANEN**

12                **UNITED STATES DISTRICT JUDGE**

13                       **VOLUME 1 OF 1**

14     ********************************************************

15

16   APPEARANCES:

17   FOR THE PLAINTIFFS:

18        Mr. Warren Kenneth Paxton, Jr.
          Mr. Todd Lawrence Disher
19        Mr. Brantley Starr
          Office of the Attorney General of Texas
20        209 W 14th St
          8th Floor
21        Austin, TX 78701
          Tel:  512-936-2266
22        Email: Todd.disher@oag.texas.gov
               Brantley.starr@oag.texas.gov
23

24

25

```
 1  APPEARANCES:   (CONTINUED)

 2

 3  FOR THE MOVANT, STATE OF NEW JERSEY:

 4       Mr. Gurbir Grewal
         Ms. Rachel Wainer Apter
 5       New Jersey Office of the Attorney General
         25 Market Street
 6       8th Floor
         Trenton, NJ 08625
 7       Tel:  609-376-2702
         Email: Rachel.Apter@njoag.gov
 8
         Mr. Kenneth S. Levine
 9       New Jersey Office of Attorney General
         124 Halsey Street
10       5th Floor
         Newark, NJ 07101
11       Tel:  973-648-2881
         Email: Kenneth.levine@law.njoag.gov
12

13  FOR THE INTERVENOR DEFENDANTS:

14       Mr. Douglas H. Hallward-Driemeier
         Ropes & Gray LLP
15       2099 Pennsylvania Avenue, NW
         Washington, DC 20006-6807
16       Tel:  202-508-4776
         Email: Douglas.hallward-driemeier@ropesgray.com
17
         Ms. Nina Perales
18       Ms. Alejandra Avila
         Ms. Celina Ysela Moreno
19       MALDEF
         110 Broadway
20       Ste 300
         San Antonio, TX 78205
21       Tel:  210-224-5476
         Email: Nperales@maldef.org
22            Aavila@maldef.org
              Cmoreno@maldef.org
23

24

25
```

```
 1  APPEARANCES:    (CONTINUED)

 2  FOR THE DEFENDANT THE UNITED STATES OF AMERICA:

 3        Mr. Brett A. Shumate
          United States Department of Justice
 4        950 Pennsylvania Avenue
          Washington, DC 20530
 5        Tel:  202-514-2331
          Email: Brett.a.shumate@usdoj.gov
 6
          Mr. Jeffrey S. Robins
 7        U.S. Department of Justice
          Office of Immigration Litigation
 8        PO Box 868
          Washington, DC 20044
 9        Tel:  202-616-1246
          Email: Jeffrey.robins@usdoj.gov
10
          Mr. Daniel David Hu
11        Office of the US Attorneys Office
          1000 Louisiana
12        Suite 2300
          Houston, TX 77002
13        Tel:  713-567-9518
          Email: Daniel.hu@usdoj.gov
14
    COURT REPORTER:
15
          Ms. Kathleen K. Miller, CSR, RMR, CRR
16        515 Rusk, Room 8004
          Houston, Texas  77002
17        Tel:  713-250-5087

18  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-assisted transcription.
19

20

21

22

23

24

25
```

1                    P R O C E E D I N G S

2    (Court called to order.)

3            THE COURT:  Thank you.  Be seated.  All right.

4    Good morning.  We are here in B-18-68, Texas, et al vs.

09:58:13    5    United States, et al.

6                    Before we start there are a couple of

7    things I would like to go over.  First of all, I think

8    everybody here knows this is an important case for the

9    parties, and for the states, and for the nation.  And as

09:58:28   10    such, I expect everyone to give due deference, and adopt

11    a -- at least a degree of decorum that is fitting of such

12    an important issue.

13                    Secondly, let me say no one in this case

14    is a bad guy.  Plaintiff States are trying to protect what

09:58:49   15    they think are their best interests.  The government is

16    trying to develop an effective immigration policy and

17    border security policy.

18                    The intervenors are 22 individuals of very

19    good character that are just trying to, you know, live the

09:59:07   20    best life they possibly can.  And the state of New Jersey

21    is trying to do what it thinks is the best for their

22    individuals and their state.

23                    So, there isn't a bad guy in this case,

24    and the reason I am -- I am leading up to this, is because,

09:59:24   25    you know, reasonable people can view the same things

1    reasonably; and as lawyers and judges, we're trained to

2    disagree but in a nice manner.  You can be -- you can

3    disagree on the facts without being disagreeable.

4              In at least one of the pleadings in the --

09:59:47  5    that have been filed in this case by one of the parties, it

6    was suggested that, you know, by participating in this

7    case, that either the lawyers or the parties might be

8    subject to, let's just say, bad behavior.  And let me --

9    let me stress this.  As a Judge, I know in the last case,

10:00:12  10    after I ruled, the last similar case to this, I mean I got

11    nasty letters.  I got hate mail.  I got phone calls.  I got

12    death threats from both sides, actually, and with being a

13    judge that kind of goes with the territory.  But it's not

14    the territory for the lawyers, or the court staff, or the

10:00:35  15    parties, and particularly I am talking about the

16    intervenors.  And if I hear of -- and I am telling the

17    lawyers right now, if I hear of any conduct that is of an

18    intimidating fashion or in any way obstructs their rights,

19    I'll take appropriate action.

10:00:57  20              And Ms. Perales is here representing them

21    today, and I am telling her in front of everybody out loud,

22    if there is -- if you hear of any conduct that is

23    detrimental to your clients, I want to know about it.

24    Okay?

10:01:10  25              All right.  Let's talk law.

1           First of all, let me maybe make things

2 easier for the attorneys in this case.  What I plan to do,

3 the format I plan to follow, is this:  First of all, I am

4 not considering a summary judgment today.  So to the effect

10:01:35   5 that anybody -- I know there is a pleading by the states

6 that said, why don't you just go ahead and grant a summary

7 judgment?  I am not doing that.  And I won't do that

8 without giving everybody a lot of notice that I am going to

9 consider that.

10:01:48   10           So what we're here today on is the

11 injunction motion.  What I'd like to do is I'd like to have

12 each party, all four of you, make a short introductory

13 statement of your positions, and then I want to talk

14 about -- start with jurisdiction and standing, and I am

10:02:14   15 going to ask Ms. Perales and her group to lead off with

16 that because they basically have a motion to dismiss based

17 on that.  And then I am going to move to the merits, and

18 then the merits of the request for an injunction, and when

19 I get to that stage, I am going to ask Mr. Disher and the

10:02:39   20 State of Texas to take the lead on that because that is

21 their motion.

22           But let me start, if I will, and let me

23 ask the State of Texas to lead off in just a short opening

24 statement, if you will.

10:02:51   25           MR. DISHER:  Thank you, Your Honor.

1                    Your Honor, Todd Disher for the State of

2    Texas, and may it please the Court.

3                    I would like to start by just giving a

4    brief overview of where things stand after two months of

10:03:07   5    discovery and two rounds of post-discovery briefing.  Your

6    Honor, the president does not have the sweeping power to

7    grant lawful presence and work authorization in violation

8    of Congress's duly enacted laws.  That is a dangerous

9    conception of Executive power that the Fifth Circuit has

10:03:23  10    struck down.

11                    In other words, the legal issues in this

12    case have already been decided by binding precedent; and

13    after 29 depositions, 12,000 pages of document production,

14    300 pages of briefing, and 7,000 pages of exhibits, the

10:03:37  15    facts really are not in dispute either.

16                    In response, the DACA intervenors do

17    little more than retry arguments that have already been

18    rejected by this Court and the Fifth Circuit, and they have

19    never once acknowledged that the Fifth Circuit affirmed the

10:03:53  20    injunction of not only DAPA but the expansion of DACA as

21    well.

22                    For example, they have filed over 100

23    pages of briefing, and yet they spent just three paragraphs

24    discussing the Fifth Circuit's prior ruling that DAPA was a

10:04:06  25    substantive violation of the APA.  And in those three

1  paragraphs they do not offer any meaningful legal

2  difference between DAPA and DACA.  And on the procedural

3  APA claim, they continue to insist that DACA was a, quote,

4  general statement of policy, not subject to

10:04:23  5  notice-and-comment rulemaking.  But that ignores that the

6  implementation of DACA was the very basis for the Fifth

7  Circuit's rejection of that argument as it applied to DAPA

8  and expanded DACA.

9            In the intervening three years since the

10:04:38  10  Fifth Circuit's rulings, the states claims have only become

11  stronger.  On the substantive APA claim it has come to

12  light that DACA does, indeed, allow some recipients a

13  pathway to citizenship that would not be available to them

14  but for DACA.  And on the procedural APA claim, intervenors

10:04:58  15  themselves admit that DACA granted, quote, authorized

16  presence and the authorization of work.  Those are

17  substantive benefits that require notice-and-comment

18  rulemaking, regardless of whether any individual agents

19  exercise discretion in approving DACA applications, and

10:05:15  20  that alone is enough to grant -- to grant relief for the

21  Plaintiff States.

22            Additionally, as for discretion, USCIS has

23  confirmed that it cannot identify a single application that

24  met DACA's stated criteria and was then denied.  And as

10:05:36  25  Plaintiff States Exhibit 46 shows, the senior staff at the

1  USCIS Texas Service Center confirmed that such

2  discretionary denials simply did not happen.

3                "Good morning, Brendan, I have confirmed

4  with TSC" -- that's the Texas Service Center -- "Docket

10:05:51  5  Supervisor POC that to the best of our knowledge, TSC has

6  not issued a DACA denial purely on discretion when all

7  other DACA guidelines have been met."  And this is from a

8  service center that has processed over 76,000 DACA

9  applications.

10:06:08  10                Your Honor, the Fifth Circuit correctly

11  held that the INA flatly does not permit the

12  reclassification of millions of illegal aliens as lawfully

13  present and thereby make them newly eligible for a host of

14  federal and state benefits, including work authorization.

10:06:32  15                The Executive's doing so was a violation

16  of its duty to take care that the Congress's laws are

17  faithfully executed.  Likewise, the states' standing is

18  even more certain now than it was in the predecessor case.

19  Twenty states have sued over DACA's rescission, and every

10:06:47  20  court has recognized those states' standing.

21                This Court allowed New Jersey to intervene

22  in this case to protect its sovereign, quasi-sovereign, and

23  proprietary interests; and the Plaintiff States have the

24  same right to protect those same interests.

10:07:01  25                The facts supporting the states' standing

1  are not seriously in dispute.  The intervenors' witnesses

2  admit that the states spend money to provide education,

3  healthcare and law enforcement services to DACA recipients.

4              In fact, one of their own witnesses

10:07:17  5  estimated that Texas spends over $250 million every year to

6  provide those services to DACA recipients, and the DACA

7  intervenors own witness confirms that the number of DACA

8  recipients in the Plaintiff States will go down if DACA

9  ends.  Thus the states have a real tangible financial

10:07:36  10  injury that is fairly traceable to the continuation of DACA

11  and redressable by the termination of DACA.

12              In addition, the states have standing to

13  protect the health and well-being of their citizens.

14  Congress has passed laws that define who is eligible for

10:07:50  15  work authorization.  Those laws have serious policy

16  consequences, and how to weigh those consequences is for

17  Congress to decide.

18              But the Texas Association of Business,

19  along with others, acknowledge that DACA recipients have

10:08:04  20  been hired over citizens and other lawfully present

21  workers, and those companies would hire citizens and other

22  lawfully present workers to replace the DACA workers should

23  DACA end.  Those --

24              THE COURT:  But where do I have that?

10:08:18  25              MR. DISHER:  Yes, Your Honor.  That is in the

1  brief of the -- the chambers of commerce filed by the Texas

2  Association of Business as well as others, as well as in

3  some of the exhibits filed by the intervenors, citing

4  declarations filed in the California lawsuit related to

10:08:35   5  the -- the Apple Director of Human Resources as well as

6  Univision.  They indeed, identify the specific number of

7  DACA recipients employed by certain businesses, including

8  businesses in Texas, and then acknowledge that if DACA

9  ends, they will have to spend money to try to hire

10:08:52  10  replacements for those workers.

11               Those business groups are free to lobby

12  their legislators to change the law should they disagree

13  with the policy, but economic concerns do not make lawful

14  what is otherwise unlawful, and the states have standing to

10:09:07  15  protect for their citizens the benefits of Congress's

16  carefully crafted plan.

17               As for the institutional injury the states

18  suffer from the Executive's abdication of Congress's law on

19  a massive scale, the use of advance parole only magnifies

10:09:24  20  the harm previously found by this Court.  And the Fifth

21  Circuit has already confirmed that the causal link between

22  DACA and the state's harm is even more clear than the

23  nonregulation of emissions from new cars on rising sea

24  levels and shrinking coast lines in *Massachusetts vs. EPA,*

10:09:41  25  thus the states are due special solicitude in the standing

1  analysis.

2              Your Honor, this is not a close case.  The

3  issues in front of the Court are legal questions that have

4  already been decided, and there are no serious issues of

10:09:53   5  material fact.  In terms of balancing the equities in the

6  public interest, the intervenors allege reliance interests

7  should not be afforded anyway because of their own claim

8  that DACA's status is revokable at any time.

9              No amount of economic activity or

10:10:08   10  hypothetical public safety benefit justifies such an

11  unlawful and arbitrary erosion of the law, and courts act

12  within the broad public interest when they maintain the

13  balance of the separation of powers.  The laws passed by

14  Congress themselves are a declaration of the public

10:10:24   15  interest.

16              And the 2012 executive memo that created

17  DACA, unilaterally granted lawful presence, work

18  authorization, a new pathway to citizenship, and a host of

19  other benefits in direct defiance of those laws.  In 15

10:10:41   20  days that program will come back in full force and effect

21  without an injunction from this Court.  That means in 15

22  days, DHS will begin accepting new DACA applications, and

23  in 15 days DHS will begin accepting new applications for

24  advance parole.

10:10:56   25              Thank you, Your Honor.

THE COURT: Ms. Perales. Or the government.

MR. SHUMATE: Good morning, Your Honor. May it please the Court, Brett Shumate for the United States.

The Departments of Justice and Homeland

10:11:18 Security have concluded that the prior administration's DACA policy is unlawful. DACA is unlawful because it is an open ended circumvention of the immigration laws. It suffers from the same legal defects as the DAPA and expanded DACA policies which this Court enjoined in an

10:11:35 opinion affirmed by the Fifth Circuit and the Supreme Court.

After reviewing the Attorney General's opinion on this matter, DHS rescinded the prior administration's DACA policy and began an orderly wind down

10:11:47 of DACA in September of 2017. But the current administration has been unable to fully end the DACA policy.

Court's in New York and San Francisco have issued overly broad injunctions that require the government

10:11:59 to continue most of the DACA policy on a nationwide basis. Another court in DC vacated the government's rescission of DACA altogether. Absent a stay of that order, DACA will go back into full effect.

The government is appealing all of those

10:12:14 decisions on an expedited basis, and vigorously defending

1 | the government's decision to rescind DACA as an unlawful

2 | action of the Executive Branch.

3 |        The plaintiffs in this case bring a direct

4 | challenge to the lawfulness of the 2012 DACA policy.  We

10:12:29   5 | have consistently acknowledged in this case, and in all the

6 | others, that DACA is unlawful and it should be rescinded.

7 | We have also consistently maintained our vigorous

8 | opposition to nationwide injunctions, especially the overly

9 | broad injunctions from the New York and San Francisco

10:12:43  10 | courts which require the government to continue DACA

11 | throughout the country, including in Texas and all the

12 | Plaintiff States.

13 |        Nevertheless, if the Court is inclined to

14 | grant an injunction that would conflict with the

10:12:53  15 | injunctions issued by those courts, we would ask the Court

16 | to stay any such injunction for 14 days so the government

17 | can seek emergency relief in all of the courts that have

18 | issued injunctions that might conflict with an injunction

19 | issued by this Court.  Thank you, Your Honor.

10:13:06  20 |       THE COURT:  Thank you, Mr. Shumate.

21 |       MS. PERALES:  Good morning, Your Honor.  We are

22 | going to follow the Court's format that has been

23 | established for this morning, and so I will speak for

24 | perhaps only a minute to introduce some of the arguments

10:13:31  25 | that we are going to make, so that my colleague,

1  Mr. Hallward-Driemeier, may take up some of the

2  jurisdictional arguments that the Court said it wanted to

3  hear first.

4            I have a longer response to some of the

10:13:46   5  merits issues that were raised by my friend Mr. Disher, and

6  will prepare to deliver that after we tackle jurisdiction.

7            THE COURT:  Okay.  That is fine.

8            MS. PERALES:  So just on a quick overview, Your

9  Honor, we do contend that the plaintiffs in this case lack

10:14:03   10  standing, and similarly that they cannot establish

11  irreparable injury, which is a necessary component of

12  obtaining a preliminary injunction.  So that both,

13  plaintiffs are not entitled to a preliminary injunction but

14  also that their lack of standing means that the Court does

10:14:20   15  not have jurisdiction here.

16            We will focus our argument on distinctions

17  between DACA and DAPA, and why we contend that the Fifth

18  Circuit decision in the DAPA case is not a magic wand here

19  that dictates the outcome.

10:14:37   20            We also will highlight for the Court the

21  recent Supreme Court decision in *Trump vs. Hawaii*, which we

22  contend perhaps provides additional guidance to the Court

23  in terms of deference that is due to the Executive when it

24  is making discretionary decisions in the area of

10:14:57   25  immigration.  And then, finally, we will highlight that as

1 a result of the limited and expedited discovery that we

2 have had to date, that the evidence here shows that there

3 is true discretion being exercised with respect to

4 adjudication of DACA applications, and there is no rubber

5 stamping.

6             Thank you, Your Honor.

7             THE COURT:  Thank you.

8             MS. WAINER APTER:  Thank you, Your Honor.

9 Rachel Wainer Apter on behalf of the state of New Jersey.

10 I will also only speak for a minute, and then reserve our

11 substantive responses to the PI portion of the argument.

12             The purpose of a preliminary injunction is

13 to preserve the status quo until a trial can be held on the

14 merits so that the Court's jurisdiction is not rendered

15 futile.  Here, plaintiffs attempt to turn this equitable

16 remedy on its head.  DACA has been the status quo since

17 June 15, 2012, more than six years ago, and plaintiffs

18 request preliminary injunctive relief not to preserve the

19 status quo but, instead, to impact the lives of the 689,800

20 current DACA grantees and the millions of Americans that

21 they impact every day.

22             DACA grantees are full members of the New

23 Jersey community and of the United States.  They're causing

24 no harm to Texas or to any of the Plaintiff States, and yet

25 plaintiffs request an order from this Court upending their

1 lives six years in.

2                    Plaintiffs' main theory of the case is

3 that this case has already been decided by the Fifth

4 Circuit in the DAPA decision.  But that is simply not true

10:16:41    5 as to the likelihood of success on the merits, irreparable

6 harm, balance of the equities or the public interest

7 factors.

8                    On the likelihood of success on the

9 merits, the Fifth Circuit's decision specifically on the

10:16:54   10 substantive APA claim related to portions of the INA that

11 provided a pathway to legal status on -- that someone could

12 get once he or she had a citizen child, and that is not

13 relevant here.  As to whether the Napolitano memo required

14 notice and comment, both the Fifth Circuit and this Court

10:17:19   15 relied on extrinsic evidence; namely, the declaration of

16 Mr. Palinkas, DACA's standard operating procedures, and the

17 denial rate of accepted applications, all of which

18 discovery in this case has shown to be vastly different

19 here.

10:17:33   20                    When it comes to irreparable harm, the

21 Plaintiff States in the DAPA litigation were able to show

22 irreparable harm because of driver's license costs, costs

23 that they would incur in providing driver's licenses to

24 DAPA grantees.  Here they have made no claim as to any harm

10:17:51   25 related to driver's licenses, and have not shown any harm

1   from DACA or DACA grantees.

2              And as to the balance of the equities and

3   the public interest factor, this Court concluded that DAPA

4   should be preliminarily enjoined before it was implemented

10:18:06   5   because if DAPA were permitted to take effect, it would be

6   difficult or even impossible for anyone to unscramble the

7   egg.  Whereas, on the other hand, preliminarily enjoining

8   DAPA's implementation would merely preserve the status quo

9   that had already -- that had always existed.  Here, as I

10:18:23   10   mentioned, it is the complete opposite.

11              THE COURT:  Thank you.  All right.  Let me

12   start with the intervenors and let's talk about the claim

13   of lack of jurisdiction and standing.

14                   Mr. Hallward-Driemeier.

10:18:52   15              MR. HALLWARD-DRIEMEIER:  May it please the

16   Court, Doug Hallward-Driemeier on behalf of the individual

17   defendant intervenors.

18              Just to clarify, there are several

19   jurisdictional arguments as Your Honor's opening indicated.

10:19:09   20   I would like to address what we consider the real threshold

21   questions that are addressed in the motion to dismiss,

22   which are the lack of genuine adversity or redressability

23   on the broader question of standing, which really requires

24   consideration of that factual record that has been

10:19:30   25   developed in discovery.

1          My colleague Ms. Perales will be prepared

2  to address that, and I believe that New Jersey has

3  similarly allocated those issues on its side.

4          So to start with, the -- the issues in the

10:19:48  5  motion to dismiss, there is a fundamental problem that goes

6  to the heart of Article III when the plaintiff and

7  defendant are in agreement about the relief that the Court

8  should provide, because that deprives the Court of the

9  benefit of the adversarial process.  But it is even more

10:20:12  10  dire when the relief that they agree the Court should grant

11  is to contradict an injunction that's been issued by a

12  sister court.

13          The most analogous case of all that have

14  been described in the briefing on this issue is the

10:20:32  15  decision of the Southern District of Alabama in another

16  case that was also very high profile, and engendered strong

17  opinions on both sides, and that was litigation involving

18  Chief Judge Moore's Ten Commandments monument at the

19  Supreme Court of Alabama.

10:20:53  20          And in the *McGinley v. Houston* case that

21  is cited in the briefs, Judge William Steele wrote

22  something that I think really encapsulates the problem and

23  how fundamental it is.  He said that, Law does not allow a

24  party to file a horizontal appeal from one district judge

10:21:14  25  to another.  The other Court's order will remain in place

1  no matter what this Court does.  If the Court were to grant

2  plaintiffs the relief they seek and order the defendants

3  not to remove the monument, chaos would ensue.  The

4  defendants would be forced to choose which of two binding

10:21:31   5  conflicting court orders to follow.  They would be in

6  violation of one of those orders no matter what they did.

7  Under these circumstances, the order of the administration

8  of justice and respect for the rule of law demand that this

9  Court not exercise jurisdiction over the plaintiffs'

10:21:49   10  claims.

11              THE COURT:  Let me ask you, you know,

12  theoretically, of course, no court would disagree with that

13  statement, but, I mean, for instance, let's take The New

14  York District Court case, didn't they enter an order

10:22:06   15  contrary to my injunction?

16              MR. HALLWARD-DRIEMEIER:  Well, Your Honor, the

17  parallel with respect to the earlier litigation involving

18  DAPA would be if a court had gone -- if a Plaintiff State

19  had gone in and asked another court, perhaps while the

10:22:23   20  Obama Administration was still in place, to enter an order

21  requiring the Obama Administration to implement DAPA, which

22  was the program that this Court's order had addressed, and

23  that indeed would have presented precisely the same

24  problem.  It would have been, in Judge Steele's words,

10:22:41   25  chaos contrary to the orderly administration of justice.

1          The remedy for the Obama Administration in

2 that instance of Your Honor's order, was to take an appeal,

3 which they did, and it was unsuccessful.  Here, the

4 government's remedy from the orders of New York,

10:23:01  5 California, the District of Columbia, is to take an appeal

6 from those orders, and they have.  But what they're trying

7 to do is to sidestep, if you will, that normal orderly

8 administration of justice.

9          Now, they went to the Supreme Court after

10:23:18 10 the California district judge entered his preliminary

11 injunction, and they said to the Supreme Court, this is so

12 important that we ought to expedite things.  We ought to go

13 around the normal process, and go straight from the

14 district court to the Supreme Court.  And the Supreme Court

10:23:36 15 said, no, that this case is not one that would warrant

16 evading in any way the normal process.  The normal process

17 is to first go to the Court of Appeals at the Ninth Circuit

18 and then to the Supreme Court.

19          When the plaintiffs in this case

10:23:56 20 explain -- this was in connection with the irreparable harm

21 argument in the PI briefing in their last brief -- why it

22 was they waited, they said there was -- and this is, if you

23 will, at page 15 of ECF 188, I believe.  Oh, I'm sorry, I

24 misspeak.  It was -- in their latest brief they say that

10:24:25 25 there was no basis on which to bring an action until April

1  24, 2018, when the district court for District of Columbia

2  issued its order enjoining DACA's rescission.  That's ECF

3  282 at 52.

4           So they're acknowledging that there was no

10:24:45  5  dispute, and indeed there is still no dispute between the

6  Plaintiff States and the federal defendants.  The thing

7  that gave rise to their supposed injury is the issuance of

8  an injunction of another court.  And in that instance, Your

9  Honor, the remedy for them is to participate as amicus, or

10:25:07  10  intervene perhaps, in the appeal from the injunction from

11  which they disagree.

12           Now, they maintain that that injunction is

13  overly broad, and we don't take a position on that.  What

14  we do take a position on is that it's not a question that

10:25:26  15  the injunction they asked Your Honor to issue is directly

16  to the contrary.  The injunction --

17           THE COURT:  Let me ask you this.  If they -- if

18  Texas, and these other states, hypothetically, if they're

19  being harmed by DACA, and if the federal government, which

10:25:42  20  they indicated they are, they are going to continue DACA at

21  least as long as there is an injunction telling them they

22  have to, isn't Texas continually harmed if the hypothetical

23  damage is occurring?

24           MR. HALLWARD-DRIEMEIER:  Well, Your Honor, that

10:25:57  25  is certainly the argument they make and they say that that

1   is the circumstance -- the circumstance here is the same as

2   in the Supreme Court's decision in *Windsor* and in *Chadha.*

3            THE COURT:  No, let me shift gears on you.

4   Well, let's talk about *Windsor* and *Chadha.*  You brought up

10:26:12   5   *Windsor* and *Chadha.*

6                    *Windsor* involved the Defense of Marriage

7   Act, and in that case the administration says we're not

8   defending the Defense of Marriage.  Even though it was a

9   federal law, we're not defending it.  So you had -- you

10:26:25   10   have the plaintiff saying it's not a law.  We have the

11   defendant saying we're not defending it, and the Supreme

12   Court said there was jurisdiction.

13            MR. HALLWARD-DRIEMEIER:  Right.  And that was

14   because there was no question with respect to

10:26:38   15   redressability in that case.  The -- the Court had

16   jurisdiction over the statute.  It was the statute that was

17   causing Edie Windsor's harm.  She was -- the federal

18   government was applying the statute to her.  They were

19   insisting on withholding several hundred thousand dollars

10:26:57   20   in inheritance tax, and she was not going to get that money

21   back unless the statute was declared unconstitutional by a

22   court.

23            THE COURT:  Well, isn't that what Texas is

24   asking me to do is to hold DACA to be unconstitutional?

10:27:11   25            MR. HALLWARD-DRIEMEIER:  Well, but at this

1  point DACA, in terms of the Executive act, is not what

2  they're complaining about because but for -- and this is

3  what the federal government acknowledges in their brief.

4  They say that -- this is ECF 194 at 2, that they continue

10:27:29   5  to maintain DACA policy only because of the preliminary

6  injunctions issued by order -- other courts.

7              So this isn't an instance as in *Windsor* or

8  as in *Chadha* where the Court can order that the statute is

9  unconstitutional.  Courts do that all the time, that the

10:27:48  10  statute is unconstitutional and they provide the relief.

11  The relief is don't enforce that statute against the party.

12  There is immediate enforcement of that law against the

13  individual who is the party.

14              THE COURT:  So -- so --

10:28:00  15              MR. HALLWARD-DRIEMEIER:  That is not true here.

16              THE COURT:  Help me here then.  What is your --

17  if I follow your argument, you're saying that the New York

18  court that entered an injunction and the DC court that says

19  it is going to enter an injunction, don't have jurisdiction

10:28:11  20  either.

21              MR. HALLWARD-DRIEMEIER:  No.  My point is, Your

22  Honor, that they have injunction -- they have jurisdiction.

23  There are -- in each of those cases in addition to State

24  Plaintiffs, because -- and, again, the state-standing issue

10:28:23  25  is something Ms. Perales will address -- but in addition to

1  State Plaintiffs they have individual plaintiffs in those

2  cases.  So we believe they do have jurisdiction.  Whether

3  they --

4              THE COURT:  So it is all right for them to have

5  a subsequent decision but not all right for the Fifth

6  Circuit to have one?

7              MR. HALLWARD-DRIEMEIER:  Well, Your Honor, in

8  terms of -- the -- again, the -- the chaos that Judge

9  Steele describes, and which I think Your Honor would agree

10 cannot abide, is the equivalent would be in the DAPA

11 litigation if the New York court had ordered the Obama

12 Administration to continue to apply DAPA.  That would be

13 chaos.  That is not the orderly administration of law.  And

14 the Obama Administration did not seek that, and New York

15 did not seek that, and they couldn't have, in our view.

16 There would not -- that would have been the horizontal

17 appeal to the --

18             THE COURT:  To the extent that the Courts are

19 creating chaos, I mean, don't we already have that?

20             MR. HALLWARD-DRIEMEIER:  No, Your Honor.

21             THE COURT:  Don't we have a Maryland case that

22 said they could dissolve DACA?  So Maryland has already

23 decided -- Maryland District Court has decided just the

24 opposite of the California and New York and the Washington

25 case.

MR. HALLWARD-DRIEMEIER: Well, and what has happened, Your Honor, is that those orders are being appealed to the courts of appeals. That's the appropriate process of the administration of justice.

10:29:46 This Court in --

THE COURT: So wouldn't the loser in this case have that same right, to appeal to the Fifth Circuit?

MR. HALLWARD-DRIEMEIER: Well, but, Your Honor, there is no -- there is no other court in which a party is 10:29:59 asking the judge to issue an order to order the defendant to do precisely what another judge -- the opposite -- do precisely what another judge has ordered that party not to do.

What the -- what the plaintiffs here ask 10:30:18 is that the Court enter an order enjoining the defendants from enforcing DACA. That's how they have characterized the relief that they are seeking. Whereas, the other courts have issued injunctions enjoining the federal defendants to continue DACA.

10:30:37 THE COURT: Don't we have exactly the opposite orders, though? We have -- we have Maryland saying it's okay, and we have California saying it is not okay.

MR. HALLWARD-DRIEMEIER: But the Maryland court did not issue an injunction compelling the defendants to do 10:30:51 anything. There are no other conflicting injunctions.

1 And, again, the other part --

2           THE COURT:  So why does that impact

3 my jurisdiction?

4           MR. HALLWARD-DRIEMEIER:  Well, in Texas --

10:30:59   5           THE COURT:  It sounds to me like what you're

6 complaining about is what relief I might grant if I think

7 Texas is right.

8           MR. HALLWARD-DRIEMEIER:  Well, redressability

9 is, in fact, a critical element of Article III

10:31:12  10 jurisdiction.  And the Court can't redress the injury

11 because the federal defendants have already purported to

12 rescind DACA.  If those other orders of those other courts

13 go away, then there is no DACA.  There is nothing for Your

14 Honor to decide.  If those other orders are reversed on

10:31:31  15 appeal, then, DACA has been rescinded.  The plaintiffs have

16 nothing to complain about.

17           THE COURT:  What about --

18           MR. HALLWARD-DRIEMEIER:  So it is not the

19 defendants' actions that they are complaining about.  It's

10:31:41  20 the defendants' actions that they are taking subject to

21 another court's order.  So that's why we say this is

22 different, that they're asking you to review another

23 court's order.

24           THE COURT:  The defendants are still the ones

10:31:52  25 who are operating DACA, though.  They are still maintaining

1  DACA.

2            MR. HALLWARD-DRIEMEIER:  But not --

3            THE COURT:  Doing it reluctantly.  I mean, I

4  think we can all concede --

10:31:59   5            MR. HALLWARD-DRIEMEIER:  Right.

6            THE COURT:  -- if they had won those cases,

7  they wouldn't be doing it.

8            MR. HALLWARD-DRIEMEIER:  And if they were doing

9  it by -- by force of their own Executive action, you would

10:32:09  10  have jurisdiction over that.  If they were doing it by

11  force of a statute that Your Honor could declare

12  unconstitutional, there would be jurisdiction.  But here,

13  the -- the fact is that the thing that is compelling the

14  federal defendants to take the act that the plaintiff

10:32:27  15  complains about is another court's order, not the federal

16  defendants themselves.

17            THE COURT:  So explain to me how the court in

18  Washington had jurisdiction, if you're saying

19  redressability is the key.

10:32:39  20            MR. HALLWARD-DRIEMEIER:  Well, because the

21  plaintiffs came to the court in Washington saying that

22  the -- there is a policy that we have applied for and

23  received deferred action, and they are rescinding that

24  policy.  They are not going to accept my renewal

10:32:55  25  application, give me relief, and that is relief that they

 1  could give at this point.

 2            THE COURT:  Well, no, the California court had

 3  already given them.  What DC did was they went further,

 4  didn't they?  Didn't they further enjoin them or say at

10:33:08   5  least because they hadn't entered the order, as I

 6  understand it, but he has already announced he is going to

 7  enjoin in the future?

 8            MR. HALLWARD-DRIEMEIER:  Right.

 9            THE COURT:  Which -- wait a minute, let me

10:33:18  10  finish.  Which California already said they could collapse

11  it in the future, didn't they?  So, he's redressing

12  something the opposite way than California did and you're

13  okay with that.

14            MR. HALLWARD-DRIEMEIER:  Well, there is not --

10:33:32  15  there is not an inconsistent -- there is not -- there is

16  not an order:  Do X; don't do X.  That's the situation we

17  have here:  Do X; don't do X.

18            THE COURT:  What we do have is we have an order

19  saying, don't do X; and an opinion saying they can do X.

10:33:47  20  Don't you see those in conflict?

21            MR. HALLWARD-DRIEMEIER:  Well, they are not

22  in -- they are not in direct conflict.

23            THE COURT:  If I was the government, I would be

24  saying, help me out here.  What am I going to do?

10:33:56  25            MR. HALLWARD-DRIEMEIER:  They are not in direct

1  conflict.  And to the extent -- Your Honor, it's really not

2  my brief in the sense to defend the extent of any other

3  court's injunction, because if there is any overbreadth to

4  those courts' orders, there is a process to test that.

10:34:16   5  That is take an appeal.

6          THE COURT:  Well, we are going to do that same

7  process here.

8          MR. HALLWARD-DRIEMEIER:  Well --

9          THE COURT:  I mean, it is okay if you get a

10:34:23   10  different decision in the Second Circuit, and a different

11  decision in the Third Circuit, and a different decision in

12  the Ninth Circuit, but not a different decision in the

13  Fifth Circuit?

14          MR. HALLWARD-DRIEMEIER:  Well, Your Honor,

10:34:34   15  again, this would be the first instance -- and the

16  government's presentation here is telling.  I think it is

17  telling in a number of ways.  First of all, it should, in

18  my view, having been a government lawyer for over a decade,

19  I think it sets off alarm bells in my head, I would think

10:34:52   20  for the Court as well, that the -- it's me representing a

21  private party that's here moving to dismiss the plaintiffs'

22  suit as opposed to the United States, who would in any

23  other case be moving to dismiss and arguing no standing,

24  arguing no reviewability, all of the arguments that we're

10:35:10   25  making.  The United States is not making those arguments

1 because they want the Court to enter this order.

2        THE COURT:  Well, that was the same -- wasn't

3 that the same fact pattern in the *Windsor* case?

4        MR. HALLWARD-DRIEMEIER:  No, Your Honor.

10:35:20  5 Because in *Windsor* -- this goes to not the redressability

6 part of the argument, but the adversary process part.  In

7 both *Windsor* and in *Chadha*, there were intervenor

8 defendants who were the parties who had authority over the

9 law that was at stake.  If Congress had passed the law in

10:35:42  10 *Windsor*, Congress had exercised, or one house of Congress

11 has exercised the veto in *Chadha*, they were defending their

12 own constitutional prerogatives in those cases.  They

13 intervened to do that.

14        We don't have any authority over DACA at

10:35:58  15 all, and so we don't cure the lack of adversity.  It has to

16 be --

17        THE COURT:  Aren't you in here arguing that I

18 should not enjoin them?

19        MR. HALLWARD-DRIEMEIER:  Well, Your Honor --

10:36:11  20        THE COURT:  So I do have controversy, don't I?

21        MR. HALLWARD-DRIEMEIER:  No, Your Honor.  The

22 cases are clear.

23        THE COURT:  You are not arguing that DACA

24 should be continued?

10:36:18  25        MR. HALLWARD-DRIEMEIER:  We are arguing that.

1          THE COURT:  Okay.  Then they're arguing it

2  shouldn't be.  Don't I have two people on the opposite side

3  of the fence arguing against each other?

4          MR. HALLWARD-DRIEMEIER:  Well, let's -- so,

10:36:27   5  first of all, the cases are clear that an intervenor that

6  comes in to urge dismissal for lack of jurisdiction cannot,

7  by definition, cure the lack of jurisdiction.

8          And, secondly, with respect to the lack of

9  an adversary process, the adversarial process is designed

10:36:47  10  to ensure that the Court has the benefit of the fullest

11  presentation; and that, Your Honor doesn't have here.  And

12  one of the reasons Your Honor doesn't have that here is

13  because if the government was a true adversary of the

14  plaintiffs, trying to defend DACA, the government would be

10:37:06  15  marshalling the evidence to show that DACA is, in fact,

16  applied in a discretionary case-by-case basis.

17          But they're not marshalling that evidence

18  because they don't want the Court to have the benefit of

19  that.  So we're trying to, like pulling teeth, get that

10:37:23  20  evidence from the defendants.  We issued interrogatories --

21  interrogatories and the government begrudgingly conceded

22  that based on an informal survey, they're aware of some

23  instances in which applications that would otherwise meet

24  all their criteria have been denied.  But it's too

10:37:44  25  burdensome for them to give us any of the details about

1 that.  And then when we seek further discovery of those

2 federal employees, they said, well, we are going to move to

3 quash.  You don't need that.

4               That's depriving the Court of the benefit

10:37:59  5 of the adversarial process that is critical under our

6 system of justice, ensuring that decisions are made on the

7 merits, and not because the plaintiff and the defendant

8 agree on the relief they want the Court to bring.

9               THE COURT:  Didn't y'all take depositions on

10:38:14  10 that very point?

11               MR. HALLWARD-DRIEMEIER:  Your Honor, we have

12 absolutely tried.  But, no, it is not a substitute.  And

13 Ms. Perales can provide you, I am sure, much greater detail

14 than I can about the ways in which we attempted to obtain

10:38:27  15 information.  We were told we could not take depositions of

16 the federal employees.  We were again -- we sought

17 interrogatory responses.  We were given only the most

18 general information.

19               So if the Plaintiff States say here, as my

10:38:41  20 friend from Texas did just recently, that we are not able

21 to identify an individual instance in which an application

22 that otherwise met all of the criteria was denied on a

23 discretionary basis, that is because the federal defendants

24 have that information and won't give it to us.  You have

10:38:59  25 been deprived of the benefit of that most critical element

1 of Article III, the adversary process.

2                    So for all of those reasons, Your Honor,

3 that this is really a horizontal appeal, I realize that

4 there are overlapping issues between the DAPA litigation

10:39:17   5 and this litigation, but they are not the same.  The

6 federal circuit made clear in its opinion that DACA and

7 DAPA are different; that DACA, a much smaller number of

8 potential beneficiaries -- they were people who were very

9 young when they came here.  They have a different history.

10:39:35  10 They are ones who would be most likely to benefit from the

11 favorable exercise of discretion, least likely to have

12 negative exercise of discretion.

13                    These are very -- and we don't have the

14 situation that we had in DAPA where there was a specific

10:39:50  15 INA provision that addressed the exact classes of

16 individuals, parents of U.S. citizens.  We don't have that

17 here.  This case is different.

18                    And when the Courts -- and I -- I am sure

19 Your Honor has read the *Regents* decision in California, and

10:40:10  20 I think that the judge's opinion there very respectfully

21 considers the Fifth Circuit's decision, and acknowledges

22 the ways in which DAPA and DACA are different, and comes to

23 a conclusion that the result for DACA has to be different.

24                    He couldn't simply have applied the DAPA

10:40:29  25 decision, because they are two different -- they're two

1 different memoranda, two different beneficiary sets of

2 individuals, with different characteristics.

3          THE COURT:  So I should ignore the fact that

4 the Fifth Circuit enjoined DAPA, the expansion of DAPA?

10:40:48    5          MR. HALLWARD-DRIEMEIER:  Well, the expansion of

6 DAPA, likewise, is different from the characteristics of

7 the beneficiaries of the original memorandum because, for

8 example, a significant number of the beneficiaries were the

9 individuals who were over 31.  Those, again, are going to

10:41:05   10 be the older population.  They are not the group of people

11 who have been brought here as children, are still in

12 school, are completing their education, who really have

13 only one country to call home, and that is the United

14 States.

10:41:23   15          If Your Honor does not have any further

16 questions...

17          THE COURT:  I am fine.

18          MR. HALLWARD-DRIEMEIER:  Thank you.

19          THE COURT:  Ms. Perales, you want to weigh in

10:41:30   20 on standing?

21          MS. PERALES:  Thank you, Your Honor.

22          With respect to standing, the plaintiffs

23 have not provided evidence that DACA recipients cause costs

24 in the three areas that Texas has identified.  So just to

10:42:01   25 set the table here, Your Honor, the only plaintiff that

1 came forward with a claim of injury due to costs was Texas,

2 and it named the three areas:  Health, education, and law

3 enforcement.  Following discovery, Texas added an

4 additional point, which I'll address separately.

10:42:22   5                    So, another important starting point for

6 us is that Texas does not rely, for the purposes of the

7 preliminary injunction, on costs associated with driver's

8 licenses, and Texas has specifically stated to the Court

9 that it is not relying on costs related to the driver's

10:42:42   10 licenses for this part of the case.  And that's Docket 105

11 at pages 2 and 3.

12                    And so Texas did not provide any discovery

13 on that issue, did not disclose a witness, and further

14 stated that if we sought to try to depose somebody, that

10:43:00   15 Texas would move to quash the subpoena.

16                    And so we are in some different territory

17 than we were in the DAPA case because of the -- because of

18 Texas's statement that it will not rely on driver's license

19 costs.  And so what we're looking at now are the remaining

10:43:24   20 areas where the Court -- where Texas has said it is

21 incurring costs.

22                    So first, education.  Texas only pointed

23 to costs related to public education of children who are in

24 a category mutually exclusive with DACA recipients, and

10:43:46   25 those are, as Texas identified, unaccompanied minors who

1  came across the border after 2014.  So the set of children

2  that -- that Texas identified and looked at costs related

3  to are exactly a group that cannot be DACA recipients

4  because, as the Court knows, DACA recipients have been here

10:44:06  5  since 2007, have come in a much earlier period.  And so

6  there is just no evidence at all of any education costs

7  associated with DACA because the study that Texas did and

8  the amounts of money --

9          THE COURT:  Let me interrupt you for a minute.

10:44:25  10  What's my standard that I judge this on?

11          MS. PERALES:  Well, it has to be something,

12  Your Honor.

13  (Laughter.)

14          MS. PERALES:  It has to be something different

10:44:37  15  than zero.  I am not -- I'm not sure.  I mean, I am

16  standing here.  I would say it has to be a substantial

17  number.  But I don't have to defend that position because

18  here with respect to education costs, there is simply no

19  overlap between the categories of individuals.  And thus

10:44:55  20  moving onto healthcare costs --

21          THE COURT:  Wait a minute.

22          MS. PERALES:  Yes.

23          THE COURT:  What I was really asking you was a

24  different question.  At some point, if I am looking at

10:45:06  25  evidence to create standing, or the evidence that does

1  create the standing, I have to judge that evidence by some

2  evidentiary standard.  Now, clearly, if it is zero, you're

3  right.  But, what is -- what is my beyond a reasonable

4  doubt, preponderance of the evidence?  What is my standard?

10:45:28   5          MS. PERALES:  Well, these are -- these are

6  factual inquiries that Your Honor would have to find the

7  fact to be true, and so I would -- I mean, I would think it

8  would have to be at least by a preponderance of evidence

9  that it is true.  And not just that it's true in some

10:45:49  10  hypothetical sense or some categorical sense, but that it's

11  actually true that there are identified people.

12               And I would like to remind the Court that

13  we are at the preliminary injunction stage.  We are not

14  saying that, you know, there is no set of circumstances

10:46:06  15  under which Texas could try to provide this evidence.  We

16  are only saying that at this point, Texas has not shown

17  that it has standing with respect to these costs.

18               We can't predict what might happen in the

19  future.  But for now, for where we are today, we do not

10:46:24  20  have the evidence that the Court would need to find

21  standing.

22               Moving onto healthcare, Texas has

23  identified a number of social welfare programs that -- for

24  which undocumented immigrants may be eligible.  But, again,

10:46:44  25  Texas cannot identify any healthcare expenditures

1 specifically related to DACA recipients.  What Texas does,

2 and this is why we're seeing these huge numbers being

3 predicted in the briefs, is that Texas estimates the cost

4 of serving undocumented individuals statewide, and then

10:47:01  5 attributes that entire cost to DACA recipients.  That is

6 sort of methodologically flawed, but also fails to identify

7 any particular DACA recipient or any DACA recipients at

8 all -- they don't have to be identified by name -- that are

9 causing these costs.

10:47:20  10            There are further methodological problems

11 with assuming that citizens and noncitizens use services at

12 equal rates with respect to some of these programs where

13 citizens and noncitizens are both eligible.

14            And so the bottom line here, Your Honor,

10:47:33  15 is that undocumented immigrants are eligible for a few

16 state funded healthcare services identified by Texas, but

17 they are eligible for that whether or not they receive

18 DACA.  And there is no evidence suggesting that there are

19 any DACA recipients who are in a slightly better position

10:47:51  20 because they are work authorized and may be earning money

21 that, in fact, makes them financially ineligible for these

22 social welfare programs.

23            With respect to law enforcement, we have

24 no evidence from Texas on any costs of providing law

10:48:08  25 enforcement services to DACA recipients.  And, in fact, we

1  have evidence weighing in the other direction, that DACA is

2  actually quite helpful with respect to law enforcement

3  because it does make people more comfortable to step

4  forward and report crime.

5          THE COURT:  What do I do with the evidence from

6  Dr. Perryman?

7              MS. PERALES:  Uh-huh.  Yes.

8              THE COURT:  Do you have a number for DACA?  Did

9  he say this is the cost attributable to DACA?

10             MS. PERALES:  Well, thank you for the

11 opportunity to talk about Dr. Perryman because he is our

12 witness.

13             THE COURT:  Dr. Perryman -- let me put it this

14 way.  He has got the longest CV of any person.  He is the

15 only person I have ever seen who has a table of contents to

16 his CV.

17 (Laughter.)

18             MS. PERALES:  I apologize for the length of his

19 CV, Your Honor, and I promise to pass that along to him and

20 suggest some edits.

21               Dr. Perryman was our witness.  He does not

22 provide the evidence that Texas lacks here.  What

23 Dr. Perryman did was he assumed for the purposes of his

24 offset analysis that what Texas was seeing was true, that

25 they had costs associated with DACA.  But very importantly,

1 Dr. Perryman did not identify any specific cost

2 attributable to DACA, and he says that over and over again

3 in his deposition and in his report.

4           What he does is what Texas did.  He says,

10:49:28 5 there is money being spent on undocumented individuals.

6 DACA may be some portion of that, and I am going to assume

7 for the purposes of comparison that that's right.  Assuming

8 -- for an expert to assume that something is correct

9 because that's what the plaintiffs are asserting, and then

10:49:48 10 go forward and say, but there is an offset, but the

11 benefits outweigh the costs, is very different from

12 providing the evidence that Texas needs in the first place

13 to establish that it is being injured.

14           And, finally, Dr. Perryman said,

10:50:03 15 repeatedly, that whatever these costs are for serving

16 undocumented individuals, they are going to be spent

17 whether or not an undocumented person has DACA or doesn't

18 have DACA.  And so he was very clear on those points.  You

19 know, Texas has been unable to generate the evidence

10:50:21 20 themselves, and pointing over to Dr. Perryman, who simply

21 makes assumptions for the purposes of comparison, does not

22 fill that evidentiary hole.

23           These are the types of costs and the types

24 of evidence that the Court did look at and comment on in

10:50:41 25 the DAPA case when the Court noted that -- and this is

1 really with respect to redressability -- that granting an

2 injunction would not change the presence of these

3 individuals in this country, nor would it relieve the

4 states of their obligations to pay for any associated

10:51:02  5 costs.  And so the Court has looked at this and found that

6 it was really insufficient to establish standing both

7 because it is not evidence of injury, and because of the

8 issues around redressability.

9            I would like to take one moment, Your

10:51:14  10 Honor, to move to the parens patriae argument, which is

11 about labor market distortion; and this argument largely

12 turns on arguments around the Affordable Care Act, the ACA.

13 Texas has not provided any evidence that the employer

14 mandate under the ACA has been enforced in Texas, and Texas

10:51:39  15 hasn't identified any employers in Texas that would be

16 subject to the mandate, meaning they have -- they are a

17 large employer.  They have over a certain threshold of

18 employees, but at the same time that they don't provide

19 health insurance to their employees.  And that is a very

10:51:57  20 basic requirement that Texas would have to come forward

21 with some kind of information about who is subject to the

22 mandate, if anybody, in terms of employers and whether the

23 mandate is being enforced.

24            There is also no evidence that employers

10:52:11  25 in this position would know that an individual was a DACA

1    recipient before hiring that person.  Because, obviously,

2    the employment authorization document would be presented in

3    the process with HR after the person had already been

4    hired.  There is also no evidence that any DACA recipient

10:52:30    5    has taken a job from a U.S. citizen either because of the

6    ACA or otherwise, and there is no evidence related to the

7    DACA intervenors that -- that provides that -- provides or

8    satisfies that evidentiary showing.

9                    Finally, whether or not employers are

10:52:53    10    behaving a certain way with respect to the ACA is the kind

11    of non-traceable to DACA injury that the Court has already

12    recognized, the acts of third parties that tends not to

13    give standing.

14                    Texas does invoke other cases, other

10:53:11    15    doctrines like *Massachusetts vs. EPA*, but those cases and

16    those special concerns that are raised there do not

17    dispense with the requirement to show injury, to show

18    causation, and redressability.  You still have to show

19    that you're being injured before you move on to some of

10:53:31    20    these other considerations.

21                    And so, finally, Your Honor, the last

22    comment that I have with respect to redressability and

23    causation is that there is simply no evidence that DACA, as

24    opposed to simply being undocumented, causes any of the

10:53:48    25    costs that Texas is invoking here.  DACA also does not

 1  cause increased migration, and the Court noted that in its
 2  DAPA decision.  Claims of influx based on decisions by
 3  other people who are outside the country does not provide
 4  the evidence that is required here.  And the Court noted --
 5  10:54:18          THE COURT:  Let me --
 6          MS. PERALES:  Yes.
 7          THE COURT:  -- correct you there.  I don't
 8  think I said it didn't cause people to want to come to the
 9  United States.  I just said, you can't get relief based on
10  10:54:27  that.
11          MS. PERALES:  Yes, Your Honor.  And I
12  apologize.  Let me correct it.  That the Court was saying
13  that these possible decisions by other individuals would
14  not provide what Texas would need to be able to show its
15  10:54:43  injury.  And the Court said a myriad of reasons support a
16  court's abstention from intervention when damages are
17  premised upon the actions, third parties motivated by
18  reports and misreports of governmental action.
19          And so, there is also, because we have
20  10:54:58  generated a bit of a record here so far, there was
21  testimony by the Texas's expert demographer that he
22  definitely did not look into this.  So, they don't have
23  evidence on that side suggesting that there would be an
24  influx; and then, of course, the evidence from defendant
25  10:55:18  intervenors is that there is no connection between what

1  people hear about DACA and increased migration.

2              Finally, there is a contention by Texas

3  that DACA recipients would leave, the self-deportation

4  theory, if they lost DACA.  The Court noted in its DAPA

10:55:39  5  decision that those contentions are too speculative to be

6  relied upon by this or any other court as a basis of

7  redressability.  That is at page 635 of the reported

8  opinion.  And Texas's expert demographer, again, was unable

9  to provide any kind of estimate of how many people he

10:55:57  10  thought would leave Texas or the United States if they

11  lost --

12              THE COURT:  Don't I have a study presented by

13  y'all that says that, though?

14              MS. PERALES:  No, Your Honor.  If I could just

10:56:04  15  finish --

16              THE COURT:  I mean, as far as I can tell, your

17  experts really helped out Texas; and Texas' experts really

18  helped out you.

19              MS. PERALES:  Well, Texas might say the first

10:56:15  20  part of that, Your Honor, but we would contend that is

21  simply not true.

22              Dr. Wong did not give estimates related to

23  any Texan.  He didn't identify any Texans.  He didn't give

24  any estimates of Texans who would leave.  And, also, we do

10:56:31  25  not rely on that survey.  We did not put it forward as any

1 evidence in the case, and it simply doesn't provide the

2 kind of information that the Court needs.  You know,

3 Dr. Wong identified 600 people nationwide who said they

4 would go.  And Texas also relies on the testimony of an

10:56:49  5 individual from New Jersey saying --

6          THE COURT:  Didn't his study say it was going

7 to be like 22 percent?

8          MS. PERALES:  He said that -- of the people who

9 answered his survey and answered that question, that the

10:57:02  10 actual "n" is 600 people, and from that he extrapolated to

11 say that up to 20 percent of people nationwide.  It is just

12 not the kind of information that the Court can rely on to

13 say that in Texas, there would be individuals who would

14 choose to leave.

10:57:22  15          And, Dr. Potter, who is the Texas

16 demographer, said that he could not estimate a number

17 greater than one.  He said probably more than one but less

18 than all.

19          And so, Dr. Potter, who actually studies

10:57:36  20 Texas demography, was very clear that he could not put a

21 number on this idea of people who might decide to leave.

22 And our -- the testimony of DACA recipients in this case is

23 that they would not want to leave and they would try to do

24 everything in their power to be able to stay, and they

10:57:54  25 don't know anybody else who would leave either.

1                    I would like to make one final point on

2  redressability, Your Honor, which has to do with a comment

3  in the final brief by Texas, that the Court could somehow

4  enjoin or limit its injunction to enjoining future initial

10:58:13   5  grants of DACA in order not to run afoul of other

6  injunctions in the case.  And it's our contention that if

7  that's what Texas is asking for, then it has to make a

8  connection between its claimed injuries and new DACA

9  grants.  And new DACA grants in Texas would be very young

10:58:31  10  children who would be aging up -- you know, the defined

11  class of DACA people, the very youngest, are 11.  There are

12  some number each year that ages up into 15, and --

13                    THE COURT:  Right.

14                    MS. PERALES:  -- that Texas would have to make

10:58:44  15  a tighter connection in order to justify that request.

16                         If the Court has no further questions...

17                    THE COURT:  No.

18                    MS. PERALES:  Thank you.

19                    THE COURT:  Ms. Apter, do you want to weigh in

10:58:58  20  or one of your helpers weigh in on it?

21                    MR. LEVINE:  Good morning, Your Honor, Ken

22  Levine for the state of New Jersey.

23                    I want to bring us back to the case or

24  controversy, first, and then Ms. Wainer, after, will

10:59:10  25  address the standing, if that is permissible.

1          I did hear your exchange with counsel for

2 the other intervenors about case or controversy, and let me

3 see if I can frame it in a little -- differently as to be

4 helpful to the Court.

10:59:23   5          The Case or Controversy Doctrine identify

6 a fundamental flaw in this litigation.  The federal

7 defendants are already doing everything in their power to

8 give the plaintiffs the exact actual relief that the

9 plaintiffs seek.  And the parties do not actually have a

10:59:39  10 dispute between the two of them that they want this Court

11 here to adjudicate.

12          Plaintiffs and federal defendants both

13 contend that DACA is illegal, and both seek to terminate

14 DACA.  And this is not a dispute or a case in controversy.

10:59:53  15 The original plaintiffs, original parties to this case are

16 at this table and that table over there, and they both

17 agree about the legal issues that are at issue here, and

18 they both want to reach the same conclusion.

19          The alignment of interests of the

11:00:09  20 plaintiffs and the federal defendants is clear in the four

21 corners of the amended complaint.  In paragraphs 176 to

22 189, it describes how between June and September 2017, the

23 plaintiffs demanded that DHS rescind DACA because DACA is

24 unlawful; that the Executive announce that DHS is

11:00:31  25 rescinding DACA because it is, quote, an unconstitutional

1 exercise of authority by the Executive Branch; and that the

2 plaintiffs were, quote, satisfied by DHS's rescission.

3             If there is any doubt that plaintiffs and

4 the federal defendants are aligned, it is eliminated with

11:00:46  5 the federal defendants filing in Docket 71 where they say

6 the United States agrees with the state of Texas and other

7 plaintiffs that the policy known as DACA is unlawful, and

8 the federal defendants stand up here today and make the

9 same statements.

11:00:59  10             THE COURT:  But aren't they still running DACA?

11             MR. LEVINE:  They are still running DACA.

12             THE COURT:  They haven't collapsed it.

13             MR. LEVINE:  Right, Your Honor.  The only

14 reason they are still running DACA is not based upon any

11:01:08  15 dispute that is between this table and that table over

16 there.  It has to do with court orders in other courts.

17             THE COURT:  But if Texas is sustaining damages,

18 and the other states are sustaining damages from DACA, it

19 is the program that is causing those damages.

11:01:23  20             MR. LEVINE:  I mean, it --

21             THE COURT:  And they are running the program.

22             MR. LEVINE:  They are running the program only

23 under court orders from New York and Texas, right.

24             THE COURT:  But they are still doing it.

11:01:33  25             MR. LEVINE:  But the redress --

1          THE COURT:  Just because they don't want to do

2 it --

3          MR. LEVINE:  Right.  But there is no case cited

4 anywhere including *Chadha* or *Windsor* where -- where a party

11:01:42   5 under duress, under court instruction, under court

6 injunction, creates a case of controversy because the other

7 side is suing them.

8          The solution for the plaintiffs is clear,

9 Your Honor.  They can intervene in New York, DC, and

11:01:58  10 California, and state their position.  They can file amicus

11 briefs.  But what they're actually asking this Court to do

12 is improper.  They want this Court to issue an advisory

13 opinion that would have no actual effect, but they want

14 this Court to issue an advisory opinion that they can then

11:02:16  15 shop around to New York, California in the other cases.

16          THE COURT:  Well, let me ask you this:  I am

17 sure you have looked at in -- in *Trump vs. Hawaii*, the

18 concurring opinion by Justice Thomas, and all the other

19 articles, Harvard Law Review, BU Law Review, Columbia, NYU,

11:02:39  20 they have all these law articles that say -- about national

21 injunctions.  And one of the criticisms they have about

22 national injunctions is that it prevents a circuit split

23 from happening.

24          In other words, those authors and,

11:02:54  25 presumably, Justice Thomas because he cited some of those

1  articles, thinks it's healthy to have circuit splits.  Why

2  wouldn't it be healthy here to have a circuit split, if I

3  was so inclined, or if the Fifth Circuit was so inclined?

4  Not "I."  It is up to them.

11:03:13  5          MR. LEVINE:  The issue of national injunctions

6  and the issue about circuit splits are both, with all

7  respect, fascinating and interesting issues.  The -- the

8  issue of national injunctions does not have anything to do

9  with here.  I mean, if we come back to the basics, Your

11:03:28  10  Honor, this table on the plaintiff, and the federal -- the

11  table over there with the federal defendants have the same

12  position and seek the same issue.

13          The unfairness that you're identifying

14  about the national injunctions, and the -- and the

11:03:43  15  frustration that this Court feels, I understand.  I mean,

16  this Court handled the DAPA litigation.  But this was

17  Texas's strategic choice to dismiss the DAPA litigation

18  that was before this Court.

19          THE COURT:  Well, it was clear in their -- in

11:03:59  20  their dismissal order, though, that they were doing it

21  because the government had agreed to dissolve the program.

22  I mean, it's stated in the order that was signed by

23  everybody.  Not the order, the file.

24          MR. LEVINE:  Right.  But that was still their

11:04:15  25  strategic choice, and they did that, obviously coming back

1  to my basic point, because at that point their position and

2  the federal defendants' position were exactly aligned.

3  They wanted the same thing for the same reasons.

4          THE COURT:  Why would my order necessarily

11:04:27   5  conflict if, assuming hypothetically, I did what Texas is

6  asking me to do, among other things, is to find that the

7  Fifth Circuit opinion on the DAPA litigation applies to

8  this program --

9          MR. LEVINE:  Right.

11:04:47  10          THE COURT:  -- and that it then finds it

11  illegal; whereas, California, DC, New York, Maryland, all

12  four of those decisions, even though they don't agree with

13  each other, all were asked whether the rescission of the

14  program was actually legal or illegal?

11:05:08  15          MR. LEVINE:  Right.

16          THE COURT:  I am not being asked that question.

17          MR. LEVINE:  Right.  So the question you're

18  being asked is, is the 2012 DACA program legal?  That's the

19  question you're being asked.  And, again, I am going back

11:05:21  20  to the basics.  Article III, Section 2, is there a case in

21  controversy?  2012 DACA memo, this table and that table

22  completely agree on this, and the federal defendants are,

23  in fact, doing everything in their power to provide the

24  exact relief that the plaintiffs are seeking.

11:05:37  25          THE COURT:  But they're forbidden to by law

1 and, I assume -- I am going to ask them as soon as you're

2 done.  It is going to be their turn.  And I am going to ask

3 them if they intend to obey those injunctions, which I

4 assume I am going to get an answer is yes.

11:05:49  5          MR. LEVINE:  Right.  And this gets into the

6 redressability issue, Your Honor.  So, I mean, are the

7 federal defendants actually asking this Court to put them

8 in a conflicted position so that they have to be in

9 contempt of court, of either this Court or New York or

11:06:01 10 California?  And that's not -- that is not a way to redress

11 the -- the issues that -- with respect to the DACA memo.

12 The ways to redress them are -- are simple and laid out.

13          The Courts in New York and California have

14 issued opinions, and issued injunctions regarding the

11:06:21 15 rescission, which is the exact relief that the plaintiffs

16 seek, and the redress -- and the way for the plaintiffs to

17 address those issues are to intervene or to file amicus

18 briefs in those cases.

19          THE COURT:  See, I don't think -- maybe I

11:06:39 20 misread it and I'll go back and look, but I don't think

21 they're asking me to rule if it's rescinded.

22          MR. LEVINE:  Paragraph 9 of the amended

23 complaint, they say specifically we're not talking about

24 the rescission.  We are only talking about the 2012

11:06:52 25 memorandum.

1          THE COURT:  So I was right.

2          MR. LEVINE:  Right.  But then, again, I go back

3 to the basics.  Everyone is in agreement, and these two

4 tables are in agreement about the 2012 memo.

11:07:01  5          I mean, the plaintiffs saying that it is

6 not about the rescission is -- is, respectfully,

7 disingenuous because it is all about the rescission.  I

8 mean, what they are seeking here is improper, is asking

9 this Court to collaterally attack those other decisions.

11:07:17  10 That is exactly what the counsel for the other intervenors

11 is talking about.  And that gets us back to the *McGinley*

12 opinion which applied Fifth Circuit case law, just, you

13 know, extremely extensive discussions about the issues

14 here.

11:07:35  15          THE COURT:  Let me ask you the same question I

16 asked Mr. Hallward-Driemeier and that was, okay, if that's

17 the case, why did New York, Maryland, and DC, have -- have

18 the same problem?

19          MR. LEVINE:  New York, Maryland and DC, the

11:07:50  20 plaintiffs and the defendants --

21          THE COURT:  It was the exact same issue that

22 California had already decided.

23          MR. LEVINE:  Well, I mean, now you're getting

24 to the issue of whether once one injunction is issued,

11:08:01  25 whether other states can also step in and file.

1                THE COURT:  Well, Maryland stepped in and said

2  it was just fine, go ahead and rescind it.

3                MR. LEVINE:  Right.  So California files first.

4  If you are saying, was it improper for New York to file?  I

11:08:12   5  mean, first of all, it is not my issue here.  But second, I

6  mean, New York wants to protect its own interests.  That's

7  one matter.

8                THE COURT:  Doesn't Texas want to protect its

9  own interest?

11:08:23  10                MR. LEVINE:  And as a second matter, New York

11  was seeking relief that was not specifically addressed in

12  the California case.  So New York has every right to bring

13  that case even after California had.

14                THE COURT:  But they have a right and Texas

11:08:35  15  doesn't?

16                MR. LEVINE:  They have a right and Texas

17  doesn't because Texas, the plaintiffs, and the federal

18  defendants are aligned, you know, the --

19                THE COURT:  But they are not aligned with you.

11:08:44  20                MR. LEVINE:  Well, then if the issue is can

21  an --

22                THE COURT:  If they are not aligned with

23  what --

24                MR. LEVINE:  Right.

11:08:49  25                THE COURT:  -- the United States is doing, they

1 may not be -- what is it, unaligned?  They may not --

2          MR. LEVINE:  Misaligned.

3          THE COURT:  They may not disagree on what they

4 would like to do, but they do disagree on what they're

11:09:05  5 doing.

6          MR. LEVINE:  Well, so, first, if the question

7 is, and I'm not sure it was, whether intervenors can kind

8 of breathe life into this case, then the law on that is

9 clearly no.  If there is -- if the case itself is dead on

11:09:21  10 arrival, where there is no case or controversy between the

11 plaintiffs and defendants, you can't, you know, revive the

12 dead by bringing in a plaintiff here -- bringing an

13 intervenor here, I'm sorry.  And if you -- we have a -- we

14 have a case in there that says that, and I don't think --

11:09:40  15 I'm not sure there is any controversy in that.

16          The -- Your Honor, the plaintiffs and

17 defendants are not asking this Court to resolve any dispute

18 between the two of them.  The federal defendants are

19 already doing everything in their power to give the

11:09:58  20 plaintiffs the actual relief that the plaintiffs seek.

21          The plaintiffs are improperly asking this

22 Court to issue a ruling to collaterally attack sister court

23 rulings, and the presence of intervenors cannot serve to

24 breathe life into a case that lacks summary -- subject

11:10:13  25 matter jurisdiction.

1               This Court should dismiss for lack of case

2  in controversy.  Thank you.

3               THE COURT:  Mr. Shumate, you want to weigh into

4  this?

11:10:27  5               MS. WAINER APTER:  I have something outstanding

6  but I can wait until Mr. Shumate --

7               THE COURT:  No.  That's fine.  Sorry, I didn't

8  mean to cut you off.  Go ahead.

9               MS. WAINER APTER:  So I just want to make two

11:10:38  10  brief points, Your Honor, that were not covered by

11  Ms. Perales.

12               One, as you pointed out, Your Honor, Texas

13  does a good job in its brief of trying to rely on defendant

14  intervenors witnesses.  One of those is Diana Gonzalez, who

11:10:51  15  is the Deputy Secretary of Higher Education in New Jersey,

16  and Texas in its reply brief says, you know, even if

17  Mr. Lopez didn't show that Texas has any education costs

18  related to DACA grantees, Ms. Gonzalez's testimony shows

19  that.

11:11:06  20               But Ms. Gonzalez's testimony had

21  absolutely nothing to do with elementary or secondary

22  education costs in either New Jersey or Texas.  So

23  Mr. Lopez, the only Texas witness on education costs, is

24  talking only about elementary or secondary education costs.

11:11:25  25  He doesn't say anything about whether Texas has any public

1  colleges or universities, how it funds them, whether there

2  might be any costs that might be attributable to DACA

3  grantees in those universities.  And so Ms. Gonzalez,

4  therefore, is just no help to Texas.

11:11:41  5        And then the second point, Your Honor, is

6  in terms of the study from Dr. Wong.  So as you recognized,

7  even if Texas had actually pointed to any healthcare or

8  education costs that are attributable to DACA grantees, the

9  claim that these costs would be redressed by a preliminary

11:12:03  10  injunction hinges only on the assertion that these people

11  would not remain in the country, but for renewal of their

12  unlawful DACA status.

13        And as Ms. Perales mentioned, Texas's

14  witness Dr. Lloyd Potter testified at his deposition that

11:12:16  15  he could only say that more than one DACA grantee -- it

16  would be reasonable to conclude that more than one DACA

17  grantee would return to their country of origin if DACA

18  were terminated.

19        THE COURT:  Isn't one enough?  I mean, if --

11:12:30  20  doesn't -- hasn't the Fifth Circuit already said that for

21  standing purposes, we're not going to do an accounting

22  deal?  If you're damaged, you're damaged.

23        MS. WAINER APTER:  No, Your Honor, because

24  there is no evidence that that one person is actually

11:12:43  25  costing Texas any money.  So, first, Texas hasn't actually

1 pointed to any DACA grantees that are costing it any money

2 when it comes to education costs, healthcare costs, or law

3 enforcement costs.  But moreover, according to Texas's

4 witness, Dr. Potter, the DACA grantees who would be most

11:13:00  5 likely to return to their country of origin if DACA were

6 terminated are those who are older, one; two, who have

7 obtained college degrees; and three, have already met their

8 savings goals.

9           So these people are precisely those that

11:13:17  10 Texas is unlikely to be incurring any education or

11 healthcare expenses on behalf of.  Obviously, one who is

12 older, has already obtained a college degree, and has met

13 savings goals, are by definition not in elementary, middle

14 or high school in Texas.  And it is also extremely unlikely

11:13:35  15 that such a person would qualify for emergency Medicaid,

16 Texas's CHIP perinatal coverage, or uncompensated medical

17 care provided by state public hospitals which are all

18 available only to low-income families.

19           One other comment about Texas's attempt to

11:13:56  20 rely on Dr. Wong's survey.  So Dr. Wong asked DACA grantees

21 if they were aware that the Attorney General of Texas and

22 nine other attorneys general had threatened to amend their

23 lawsuit to challenge DACA if the United States government

24 did not rescind.  And he then asked what the DACA grantee

11:14:16  25 -- whether the DACA grantee would leave the country if DACA

1 were ultimately rescinded.  And as you pointed out, 22

2 percent answered that they would.

3                        But, in that question, the survey was

4 asking someone how they would respond to a particular

11:14:31 5 stimulus, and people do not always respond to a stimulus in

6 the way that they predicted that they would.  So, for

7 example, DACA grantee Daniela Velez told a newspaper in

8 February 2018 that she and her sister would leave the

9 United States and return to Venezuela if Congress did not

11:14:52 10 extend DACA by March of 2018.  But when she was questioned

11 about this at her deposition, Ms. Velez testified that she

12 changed her mind, partly because she saw the deterioration

13 of the political party in Venezuela and she realized that

14 it was not safe to return.

11:15:08 15                        And so the point there is just it -- the

16 question was asking people to predict how they would behave

17 in a particular circumstance and people don't necessarily

18 predict their behavior accurately.  More importantly,

19 though, as I mentioned, according to Mr. Potter, it is

11:15:22 20 exceedingly unlikely that if any DACA grantee in Texas were

21 to leave because DACA were terminated, that that person

22 would be anyone who was costing the state any money.

23                        Instead, DACA grantees who are older, have

24 obtained college degrees, and have met savings goals are

11:15:40 25 precisely those who are most likely to be benefitting Texas

1 in all of the ways that we outline in our brief and that

2 the amicus briefs outline.

3          THE COURT:  Ms. Apter, before you sit down --

4 well, you don't have -- you don't need your notebook for

11:16:00  5 what I am going to ask you.

6               I see your boss is in the room.  Do you

7 want to introduce him?

8          MS. WAINER APTER:  Sure.  I would love to

9 introduce the Attorney General of New Jersey, Gurbir

11:16:13  10 Grewal.

11          ATTORNEY GENERAL GREWAL:  Good morning, Your

12 Honor.

13          THE COURT:  Good morning, General Grewal.  Glad

14 to have you here.

11:16:18  15               I assume most people know General Paxton,

16 who is else here.

17          ATTORNEY GENERAL PAXTON:  Good morning.

18          THE COURT:  Most Texans do.  But I wasn't sure

19 they realize who General Grewal was, and we are pleased to

11:16:28  20 have him down here.

21          ATTORNEY GENERAL GREWAL:  Thank you, Judge.

22          MS. WAINER APTER:  Thank you, Your Honor.

23          THE COURT:  Mr. Shumate.

24          MR. SHUMATE:  Thank you, Your Honor.  I don't

11:16:43  25 think there's any question that this is a case or

1  controversy within the meaning of Article III of the

2  Constitution.   I think there are three Supreme Court cases

3  that squarely foreclosed all the arguments in the

4  Intervenors' motion to dismiss:  *Chadha*, *Windsor*, and

11:16:54  5  *Chafin* case.

6              First, *Chadha* and *Windsor* stand for the

7  proposition that simply because the Attorney General agrees

8  with the plaintiff on the merits of a dispute doesn't

9  render the case not a -- case or controversy.  So in

11:17:07  10  *Chadha*, there was a case where the Attorney General agreed

11  that the Line Item Veto Act was unconstitutional, but the

12  Supreme Court said that just because the plaintiffs and the

13  defendants agree doesn't deprive the Court of jurisdiction

14  if the decision will have real meaning and if there's

11:17:22  15  adversariness to the proceeding.  Same thing in the *Windsor*

16  case.

17              And in this case, as you mentioned, the

18  Federal Government continues to operate the DACA program or

19  policy pursuant to the Court orders.  Texas claims that

11:17:33  20  they are injured by that, so we are doing the thing that

21  they claim that they are injured by.  So a decision by the

22  Court would have real meaning.  There is an adversary

23  process here, just like in the *Windsor* case and in the

24  *Chadha* case, because in those cases, Congress was -- was

11:17:46  25  defending the statute.  In this case, the Intervenors are

1  fully and aggressively defending the DACA policy.

2                I'd like to also respond to the

3  Intervenors' argument that we're aren't doing enough to

4  make arguments in this case or that we're frustrating the

11:18:00  5  Court by not providing enough discovery.  On the merits,

6  Your Honor, we think the merits are controlled by the Fifth

7  Circuit's precedent in the DACA case, as well as your own

8  prior decision in that -- in that case.  So we believe we

9  are foreclosed from making a number of arguments, and that

11:18:13  10  is in part why the Attorney General advised DHS that DACA

11  should be rescinded.

12                And on the discovery issues, Your Honor,

13  it's always in the Federal Government's interest to oppose

14  depositions of our witnesses and things like that; however,

11:18:25  15  if you remember from the first hearing, I asked the Court

16  to preclude discovery of the federal defendants, and you

17  denied that.

18                The plaintiffs went to the Court and asked

19  for opportunities to conduct discovery of the federal

11:18:35  20  defendants, and we provided a number of documents and

21  witnesses.  Plaintiffs never came to the Court and filed a

22  motion to compel or sought the deposition of Donald Neufeld

23  or other federal witnesses.  So we are simply litigating

24  this case according to the interests of the United States.

11:18:51  25                THE COURT:  Thank you, sir.

1          Mr. Disher, if you will, please, sir.

2          MR. DISHER:  Yes, Your Honor.  I want to start

3 with the jurisdictional pieces.  And in particular, the

4 intervenors make two arguments, one about the adversarial

11:19:11  5 nature of this proceeding, and then the second is about

6 redressability.

7          In terms of the adversarial nature of this

8 proceeding, *Chadha* and *Windsor* clearly foreclose their

9 arguments.  In those cases, as the Federal Government

11:19:24  10 explained, the -- the Federal Government was still going to

11 continue the activity that the plaintiffs were complaining

12 about, and the Court, the Supreme Court, clearly held that

13 there was, in fact, an adversarial relationship there, and

14 any concerns about whether there would be kind of a

11:19:42  15 prudential full fleshing out of the merits was satisfied by

16 the presence of intervenors, which is, of course, the exact

17 situation we have here.  And as Mr. Shumate said, any

18 concerns about not getting enough information from the --

19 from the federal defendants should have been resolved

11:19:57  20 through motions to compel or the like.

21          So in terms of adversarialness, we think

22 that that is certainly not a bar to the Court hearing this

23 case.

24          On redressability, there are a couple of

11:20:10  25 points to make.  First is to acknowledge that there is not

1 currently an injunction that requires DHS to accept new

2 DACA applications or new applications for advance parole.

3 And so any relief issued by this Court preventing those two

4 governmental activities would not conflict with a pending

11:20:32  5 injunction.  And even in the DC court case, which the order

6 takes effect in 15 days, that is not an injunctive order;

7 it is simply vacating the rescission that happened in 2017.

8 And that really goes to the core question here, which is,

9 our rights as Plaintiff States to seek redress for the

11:20:54  10 injuries that we claim over one Executive action, i.e. the

11 2012 memo cannot be circumscribed by challenges to a

12 different Executive action, i.e., the 2017 attempt to

13 rescind that memo.  Those are different claims by different

14 parties over a different Executive action pending in

11:21:14  15 different courts subject to different jurisdictional

16 precedent.

17             Additionally, as Your Honor noted, four --

18 no less than four of those courts have now ruled on the

19 2017 rescission memos, so even if this case arguably did

11:21:30  20 involve that -- that decision, which it does not, none of

21 those other four cases -- four courts felt that their

22 jurisdiction was restricted in any way.  So the intervenors

23 contend that this Court is the only one without

24 jurisdiction and the Plaintiff States are the only ones

11:21:46  25 without standing, and that simply cannot be right.

1           In terms of standing, Your Honor, you

2  asked a very pointed question about what is the standard

3  here.  And as states, the Supreme Court has made clear that

4  we are due special solicitude.  And before I get into the

11:22:10    5  specific facts of our case, I just want to remind the Court

6  of the facts in *Massachusetts vs. EPA*, a case in which the

7  United States Supreme Court found a state had standing to

8  sue the Federal Government.

9           Massachusetts sued the EPA for its alleged

11:22:28   10  failure to properly regulate the emissions from new cars

11  that were being sold.  Massachusetts did not contend that

12  no new cars should be sold, but they contended that EPA's

13  failure to regulate its emissions perhaps marginally

14  increased the amount of emissions that would come from new

11:22:48   15  cars.  Those additional marginal increase in emissions

16  would potentially cause an increase in global temperatures,

17  which would potentially cause a rise in sea levels, which

18  would potentially cause a decrease of the Massachusetts

19  coastline.

11:23:08   20           And despite all of those potentialities

21  and despite all of those marginal effects that may add up

22  in the long link of causal connection, the Supreme Court

23  found that the state had standing to sue the Federal

24  Government.

11:23:21   25           In this case, Your Honor, the facts are

1 much easier for this Court to decide on any three of our

2 bases for standing:  First, as to educational, healthcare,

3 and law enforcement expenses, the intervenors are perhaps

4 misunderstanding our argument.

11:23:40  5          Our argument is a two-step argument.  The

6 first step is:  These states are, in fact, incurring these

7 expenses to provide these types of services to DACA

8 recipients.  There is not a single witness that disputes

9 that fact.  Some of the witnesses may quibble about how

11:23:58  10 much is spent to provide these services, but nobody says

11 that the state does not incur an expense to provide

12 education to DACA recipients, nobody says that the state

13 does not incur an expense to provide healthcare to DACA

14 recipients, and nobody says that the state does not incur

11:24:15  15 an expense to provide law-enforcement services to DACA

16 recipients.

17          And, in fact, as Your Honor pointed out,

18 Dr. Perryman himself estimated what that -- what that cost

19 was, and it was over $250 million each year just to the

11:24:31  20 State of Texas.  Any attempts to say that that number is

21 not valid overlooks the fact that the intervenors

22 themselves cite to Dr. Perryman his declaration in

23 Paragraph 39, and that estimate, that $250 million

24 estimate, is a basis for Dr. Perryman's testimony sponsored

11:24:53  25 by the intervenors, cited in Paragraph 39 of his

1  declaration.  So that's the first step.  There is, in fact,

2  a cost being incurred by the states to provide these

3  services.

4                   But then the second step is:  How does

11:25:03   5  that relate to DACA?  Yes, the state has the obligation to

6  provide some of these services to all the people in the

7  state, no matter their immigration status, so we have to go

8  to the Step 2, which is:  What effect does DACA have on

9  those costs?  And, again, the testimony is clear in this

11:25:21   10  case that DACA provides an incentive for some amount of

11  DACA recipients to remain in the Plaintiff States.

12                   Nobody -- again, nobody disputes the fact

13  that if DACA -- rather, let me say it a different way.

14                   Nobody testified that if DACA ends, not a

11:25:39   15  single DACA recipient will leave the state.  Nobody

16  testified to that.  And, again, as our demographer

17  testified, and as Dr. Wong's survey results show, that is

18  something that is likely to happen.

19                   So if you add up the fact that the costs

11:25:57   20  we incur are not disputed and the fact that some DACA

21  recipients are likely to leave, the -- the costs incurred

22  by the states for healthcare, education, and

23  law-enforcement services is a much tighter causal

24  connection than the Supreme Court found supported standing

11:26:12   25  in *Massachusetts vs. EPA*.

1          On our second standing, again, under --

2    under the framework of *Massachusetts vs. EPA*, the evidence

3    shows that employers have indeed hired DACA recipients; and

4    if DACA did not exist, those recipients would not be

11:26:29   5    authorized to work.  And then again, another step even

6    further than that, the evidence shows if DACA ends, those

7    companies will make an attempt to hire people who are here

8    either as citizens or -- or lawfully present workers

9    pursuant to Congress's carefully crafted plan about

11:26:48  10    employment authorization.

11          So, again, the record in -- the record in

12    front of you is clear that DACA is violating those

13    Congressional work authorizations.

14          THE COURT:  Where is that evidence?

11:27:02  15          MR. DISHER:  Yes, Your Honor.  It's, again,

16    the -- the Texas Association of Business submitted an

17    amicus brief that details the number -- a number of

18    different Texas-based companies and a specific number of

19    DACA recipients employed by those companies.  And then it

11:27:17  20    goes one step further and says those companies will incur

21    an expense if DACA ends to try to find replacements for

22    those workers.  And, again, also that evidence is included

23    in some of the declarations submitted by the intervenors

24    filed in the California lawsuit, specifically by Apple and

11:27:36  25    Univision.  And then, of course, also there's evidence from

1  our own economist, Dr. Donald Deere, who makes that -- that

2  statement as well.

3                     And then lastly, Your Honor, any attempt

4  to -- any attempt to cast doubt upon our standing similarly

11:28:07  5  overlooks this Court's prior holding that the state has

6  abdication standing in this case to sue the Federal

7  Government, and specifically the Executive Branch, for its

8  massive abdication of Congress's duly enacted laws, and

9  that is only more clear in this case due to the use of

11:28:26  10  advance parole, which does allow some DACA recipients a

11  pathway to citizenship that they would not have but for

12  DACA.  That is a direct violation of Congressional

13  statutes, and we, as a state, have standing to -- to seek

14  redress for that abdication.

11:28:42  15                     THE COURT:  Why does it matter if the companies

16  incur expenses to hire new people?

17                     MR. DISHER:  Your Honor, it doesn't matter that

18  the company incurs expenses, but their statement that they

19  will incur expenses is proof that if DACA ends, they will

11:28:55  20  attempt to hire citizens or lawfully present workers

21  pursuant to Congress's carefully crafted

22  employment-authorization statute -- or statutes, and

23  that -- and those statutes are what DACA does away with.

24  DACA is a violation of those statutes because it grants

11:29:12  25  work authorization to people who Congress has not

1  determined should have work authorization.

2          THE COURT:  I mean, couldn't people assume just

3  the opposite, that, therefore, by keeping DACA, all these

4  companies would save those expenses?

11:29:26  5          MR. DISHER:  If the -- I'm -- I'm sorry.  I

6  don't understand your question.

7          THE COURT:  Well, if they're going to incur

8  these expenses in hiring new people to replace the DACA,

9  wouldn't they save money if we kept DACA and they employed

11:29:40  10  the DACA people?

11          MR. DISHER:  Oh, Your Honor, I understand what

12  you're saying; but, again, our focus here is not on the

13  harm to the companies.  It's on the harm to the citizens

14  and other lawfully present workers in our states.  And we,

11:29:53  15  as states, have parens patriae standing to protect those

16  citizens and other lawfully present workers to -- for them

17  to realize the benefits of Congress's plan.  And DACA has

18  done away with Congress's plan, so we have standing to sue

19  the Federal Government to protect those rights for our

11:30:12  20  citizens.

21          THE COURT:  Let me ask you why -- why didn't

22  you allege the driver's license costs?

23          MR. DISHER:  Yes, Your Honor.

24          THE COURT:  I mean, I have to tell you my law

11:30:20  25  clerks and I are going, Why?

1              MR. DISHER:  Your Honor, it's a difference of

2    degrees.  In DAPA, we were looking at an influx, in Texas

3    alone, of a million potential new driver's license

4    recipients.  We understand that with DACA, the DACA

11:30:36    5    recipients largely already have driver's licenses, and they

6    pay a $24 fee to renew their licenses.

7              THE COURT:  What about the 500 to a million

8    DAPA people waiting out there?

9              MR. DISHER:  That is -- that is certainly

11:30:51   10    something that we could potentially look at; however, at

11    this point --

12              THE COURT:  I'm not encouraging you to look at

13    it.

14              MR. DISHER:  Right, but at this point, Your

11:30:59   15    Honor, based on the facts as they exist today and the

16    people who have driver's licenses, and more importantly,

17    the -- the clear acknowledgment that we do incur other

18    expenses to provide other services, we don't need driver's

19    license costs in this case to support our standing.

11:31:16   20              THE COURT:  All right.  Here is what I'd like

21    to do.  I'd like to take about a ten-minute break.  I'm

22    going to come back.  We're going to start on the merits.

23                    And, Mr. Disher, that means your side

24    starts because you're the one asking for the injunction.

11:31:26   25                    Let's take about a ten-minute break.

1 Thank you.

2          THE LAW CLERK:  All rise.

3        (Proceedings recessed from 11:31 to 11:48.)

4          COURT SECURITY OFFICER:  All rise.

11:48:42   5          THE COURT:  All right.  Be seated.

6              All right.  Mr. Disher, let's talk about

7 the merits of your request for an injunction.  And I think

8 we just take them right through the elements, and so when

9 we talk about likelihood of success, we're going to talk

11:48:57  10 about, you know, the actual merits of the claims.  And then

11 we'll just take them, each of the four elements, and then

12 we'll let the response come through.

13          MR. DISHER:  Yes, Your Honor.  And just to

14 preview for the Court, if we talk about the form of the

11:49:13  15 specific relief that were requested, Mr. Starr is prepared

16 to talk about that today.

17          THE COURT:  That's fine.

18          MR. DISHER:  But in terms of the -- the

19 preliminary injunction factors, first, of course, is

11:49:24  20 substantial likelihood of success on the merits.  It is no

21 surprise that it is the State's position this case and this

22 Court is bound by Fifth Circuit precedent from the

23 predecessor lawsuit that enjoined not only DAPA but

24 the exp- -- but the expansion of DACA as well.

11:49:41  25              In the postdiscovery briefing, I have seen

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1  three attempts to distinguish DAPA and DACA; but, again,

2  no -- no attempts to distinguish expanded DACA and DACA.

3  But in terms of the distinctions between DAPA and DACA,

4  intervenors first point to the pathway to citizenship that

11:50:07  5  certain potential DAPA recipients may have had.  The Fifth

6  Circuit does spend some time discussing that; however, that

7  fact only proves our case.  It only makes our case

8  stronger.

9           First of all, the pathway to citizenship

11:50:22  10  provided to some of the potential DAPA recipients did not

11  apply to all of the DAPA recipients, and yet this Court and

12  the Fifth Circuit found that DAPA en masse was unlawful as

13  it applied to all potential DAPA recipients.

14           Similarly, Your Honor, the fact that there

11:50:43  15  was a pathway to citizenship for certain DAPA recipients

16  only means that the lack of such a pathway to citizenship

17  for DACA recipients moves this case farther away from

18  Congress's statute.  Congress has not spoken on this

19  specific population, and so the lack of that pathway means

11:51:04  20  that DACA is, in fact, farther away from Congress's

21  carefully crafted plan.

22           The second distinction that intervenors --

23           THE COURT:  Didn't you argue the opposite

24  conclusion from that point?

11:51:17  25           MR. DISHER:  Well, Your Honor, no.  We think

1  that -- that the -- that our conclusion is the correct

2  conclusion to reach, because as the Fifth Circuit found,

3  there are certain other statutory mechanisms, and the

4  Executive Branch has indeed, in the past, exercised

11:51:31  5  prosecutorial discretion for people who would then

6  eventually qualify for those different types of immigration

7  status.

8                      That same analogy could be said for the

9  pathway to citizenship for potential DAPA recipients, that

11:51:46  10  DAPA was, in fact, this bridge that the Fifth Circuit

11  termed it; but regardless of that, DAPA, of course, would

12  have applied to people who did not qualify for that pathway

13  to citizenship, and the Fifth Circuit still enjoined all of

14  DAPA all together.

11:52:04  15                      The second distinction that the

16  intervenors try to draw between DAPA and DACA is the number

17  of potential recipients, but their own witness, as cited in

18  our briefing, acknowledges that the number of recipients is

19  not a legal basis to distinguish DAPA and DACA.  Both

11:52:44  20  programs grant lawful presence and work authorization to

21  groups of people that Congress has not granted either

22  lawful presence or work -- work authorization to.  And the

23  fact that one may have applied to 4 million people while

24  another may have applied to 1.4 million people is not a

11:52:41  25  legal distinction between the two programs.

1                    And then the third distinction that the

2    intervenors offer is the age of the potential recipients of

3    DACA and DAPA.  DACA, of course, applies to a younger

4    potential population, but that does not mean that DACA

5    still, in effect, violates Congress's carefully crafted

6    plan in terms of bestowing lawful presence and work

7    authorization.  So simply the age of the recipients of the

8    two programs, again, is not a legal distinction.

9                    Now, the intervenors also try to draw a

10   distinction between the predecessor case and this one in

11   terms of the amount of discretion that is being exercised

12   by the individual Immigration Service officers in

13   adjudicating DACA applications versus DACA -- DAPA

14   applications.

15                   First of all, Your Honor, discretion

16   exercised by individual service -- Immigration Service

17   officers is not relevant to our Take Care Clause claim, and

18   it is not relevant to our claim that DACA violates the

19   substance of the APA, as the Fifth Circuit found.  And even

20   in terms of the procedural violation of the APA, this Court

21   can rule that DACA violated the APA's procedural

22   mechanisms, even without determining whether an individual

23   Immigration Service officer exercised discretion, and

24   that's because DACA bestowed legal benefits and substantive

25   rights upon its recipients; therefore, it was indeed

1 subject to notice and comment and rule making, even without

2 determining the amount of applications that were actually

3 denied.

4         But as I showed you earlier today, USCIS

11:54:30    5 cannot identify a single application that was, in fact,

6 denied for pure discretion, and the Texas Service Center,

7 which has adjudicated 76,000 DACA applications, similarly

8 confirmed that such denials simply did not happen.

9         So on the merits, Your Honor, this case is

11:54:48   10 firmly controlled by Fifth Circuit precedent, precedent

11 that requires that DACA is not only violative of the

12 procedural aspects of the APA, but it also violates the

13 substance of the APA.  And we believe that the evidence

14 also shows that DACA is, in fact, a violation of the

11:55:08   15 Executive's duty to take care that Congress's laws are

16 faithfully executed.

17         Moving to the next preliminary injunction

18 factor, irreparable harm, I just want to make one thing

19 clear about this factor.  The factor does not require the

11:55:28   20 State to show that there will be some massive impending

21 doom that will happen without a preliminary injunction.

22 The State has to show simply that its harm is irreparable.

23         Your Honor, the amount of money that the

24 State spends to provide services to DACA recipients will

11:55:47   25 not come back.  The State cannot sue to get that money

1  back.  And the competitive injury suffered by the State's

2  citizens and other lawfully present workers in terms of

3  competing with DACA recipients for jobs, likewise, is not

4  subject to monetary relief.  And that doesn't even mention

11:56:08  5  the harm that the State suffers from the violation of the

6  separation of powers and the Executive's failure to enforce

7  Congress's duly enacted, carefully crafted immigration

8  scheme, that abdication on a massive scale.

9              And then finally, Your Honor, in terms

11:56:27  10  of both balancing of the equities and the public

11  interest --

12              THE COURT:  Wait, wait.  Let's go back to

13  likelihood of success.

14              While it doesn't necessarily fit under the

11:56:39  15  title of "likelihood of success," most courts look at the

16  fact of whether the plaintiff who is seeking an injunction

17  acted promptly to get relief, and -- and some courts have

18  held that delay, in and of itself, destroys likelihood of

19  success.

11:57:04  20              How do we get around the fact that DACA

21  came into existence in June of 2012 and a suit wasn't filed

22  until, what, April or May of this year?

23              MR. DISHER:  Your Honor, the states should not

24  be punished for our prudence.  When DACA was first

11:57:20  25  announced in 2012, we certainly had concerns about its

1  unlawfulness at that time, but the true scope and effect of

2  DACA and the rights and benefits unlawfully granted to its

3  recipients did not ultimately become clear until the suit

4  over DAPA and expanded DACA in 2014 and early 2015.

11:57:42  5          At that point, we had a pending piece of

6  litigation over these very issues, which was quickly

7  appealed to the Fifth Circuit after this Court granted the

8  injunction.  As soon as that appeal came back down to the

9  states, we told -- well, actually, let me back up.

11:58:01  10          As soon as the appeal came back down to

11  the trial court level, the federal defendants were the ones

12  who asked for the stay and asked for the delay to allow for

13  a new election and a new administration to come in.

14  Eventually, it got to the point where the delay was lasting

11:58:16  15  too long, so we told the federal defendants we are going to

16  sue you unless you rescind DACA.  On that deadline, the

17  federal defendants did attempt to rescind DACA.  And we

18  brought this lawsuit after the DC court had entered an

19  order vacating that rescission.

11:58:35  20          If the Court will remember, at our initial

21  scheduling conference, we asked for relief by July 23rd

22  because that was initially the date that the DC court

23  judgment was going to take effect.  Now, we are here today

24  with a new shot clock, April -- or excuse me --

11:58:52  25  August 23rd.  In 15 days, that DC court opinion is going to

1 take full effect, and so we are asking for an injunction

2 now to prevent that unlawful program from coming back into

3 full existence.

4          THE COURT:  Let me drop back, though.  I mean,

11:59:12   5 the damages you've alleged connected with DACA, I mean,

6 didn't they occur in 2012, 2013, 2014, 2015, 2016, 2017?

7          MR. DISHER:  They did, indeed, Your Honor, and

8 we are in no way saying that were not harmed prior to our

9 filing of -- of this lawsuit; but, again, the full scope of

11:59:37  10 the program and the amount of harm that we were suffering,

11 again, did not start to become apparent until late 2014,

12 early 2015, and at that point, we already had a pending

13 case in this Court over the -- the new program that was

14 going to come into existence that would have caused many of

11:59:55  15 the same harms but on a much larger -- larger scale.

16          So as states, we determined that we should

17 first challenge that program because of its impending

18 nature; and as soon as the Supreme Court equally affirmed

19 the injunction on that program, we told the federal

12:00:12  20 defendants, We are going to sue you over DACA, the

21 underlying 2012 memo.

22          So, Your Honor, lastly, in terms of

23 balancing of the equities and the public interest, the

24 intervenors and certainly the amici who have filed briefs

12:00:34  25 in this case point to three different categories of things

1 that should be considered in balancing of the interests --

2 or balancing of the equities and -- and the public

3 interest.

4               They point to, first, economic activity

12:00:48  5 that occurs because of DACA recipients' ability to work in

6 the states.  They point to the alleged reliance interest by

7 DACA recipients on the continuation of the program.  And

8 then -- well, let's take those -- those one at a time.

9               So first, in terms of the economic

12:01:08  10 activity, again, as I said in my opening, no amount of

11 economic activity makes lawful what is otherwise unlawful.

12 What their real complaint is -- is with the policy

13 underlying the Congressional statutes.  If they think that

14 that policy should change, they are free to lobby their

12:01:26  15 legislators to change that policy; but just simply the fact

16 that economic activity may occur because of some unlawful

17 activity does not mean that that activity then becomes

18 lawful and should be countenanced -- its continu- --

19 continuation should be countenanced.

12:01:44  20               First, the -- or second, the alleged

21 reliance interest is undercut by their own argument that

22 DACA is revokable at any time, and so they cannot really

23 say that they should be given --

24               THE COURT:  Apparently, it's not.

12:01:55  25               MR. DISHER:  Correct, Your Honor, but they have

1 made that argument, and that is one of their arguments for

2 the merits of why DACA is lawful.  And so that argument

3 directly undercuts this later argument that -- that now,

4 somehow they have a continuing reliance interest on it.

12:02:11  5              And then the third factor they point to is

6 some alleged public-safety benefit.  Again, the evidence

7 that they presented to you is not competent evidence,

8 because the folks who have testified about that have not

9 done surveys, have not talked to a number of DACA

12:02:27  10 recipients, and as you'll see is pointed out in our

11 response brief, simply is not competent evidence for the

12 Court to make that finding.  But even if that finding could

13 be made, public safety alone, once again, does not make

14 lawful what is other- -- otherwise unlawful, and all of

12:02:43  15 their law enforcement witnesses recognize and acknowledge

16 that fact.  Just because an individual law-enforcement

17 officer may think that doing something unlawful would make

18 his or her community safer doesn't mean that the

19 law-enforcement officer can do that unlawful activity.

12:03:02  20              So, again, Your Honor, we believe that in

21 terms of the balancing of the equities and the public

22 interest, an injunction is due to the Plaintiff States.

23              THE COURT:  All right.  Thank you, Mr. Disher.

24              Go ahead.

12:03:17  25              MR. STARR:  Brantley Starr, for the Plaintiff

1  States, here to briefly talk about the remedy, which we

2  would only get to if you have jurisdiction, and we've heard

3  today you are the only court who doesn't; and if we have

4  standing, and we have heard we are pretty much the only

12:03:32  5  state who doesn't.  Be that as it may, we think that the

6  remedy in this case is still appropriate to be a nationwide

7  injunction, even in light of the ongoing debate that you

8  alluded to earlier.  So we wanted to give you our cohesive

9  theory of when such an injunction is appropriate or not.

12:03:47  10              Under 5 U.S.C. 705, that's a section of

11  the APA that covers preliminary relief.  And it says, "On

12  such conditions as may be required, to the extent necessary

13  to prevent irreparable injury, the reviewing court... may

14  issue all necessary and appropriate process to," one,

12:04:01  15  "postpone the effective date of agency action," which was

16  the basis for your earlier injunction on DAPA; or, two, "to

17  prefer" [sic] -- "to preserve the status or rights pending

18  conclusion of the review proceedings."

19              That was more akin to your injunction

12:04:14  20  related to expanded DACA and to the injunction that we are

21  requesting here.  It's a government program that's

22  currently in effect that will cause irreparable harm to the

23  parties, to the Plaintiff States specifically, and you can

24  and should issue preliminary injunctive relief to prevent

12:04:30  25  that irreparable harm.

1          THE COURT:  Let me -- let me ask you a question

2   about that.  Now, let's -- let's set aside for a minute the

3   New York and California and D.C. and Maryland for right

4   now.  Don't I have a lot different fact situation here than

12:04:46   5   I did there?  I mean, in the DAPA case, I had 26, 27 states

6   that were, you know, over 50 percent of the population of

7   the United States that covered 11 out of the circuits,

8   where here I only have what, seven states?

9          MR. STARR:  Our coalition is at ten, but yes.

12:05:13  10          THE COURT:  So wouldn't the argument for a

11   nationwide injunction be less?

12          MR. STARR:  Well, it would still be there

13   because of the right to travel, Your Honor.  That

14   constitutional right to travel is why we don't have check

12:05:24  15   points between Texas and Oklahoma.  We welcome Californians

16   with open arms.  We do so --

17          THE COURT:  We ought to have a checkpoint

18   between Texas and Oklahoma.

19   (Laughter.)

12:05:32  20          MR. STARR:  Appreciate that, Your Honor, and

21   perhaps around the time of the Red River Rivalry, we could

22   do so.

23          What I would say, Your Honor, though, is

24   let's take that -- you have seized on the question here on

12:05:43  25   whether or not an injunction is appropriate to ten states,

1 nationwide, and why it might be different than the

2 travel-ban case or the DOJ sanctuary cities case.  It's

3 about the right to travel.

4                   Let's take a hypo of a resident in

12:05:56  5 California, Your Honor, who gets a DACA permit.  If you've

6 issued a ten-state injunction, they can still travel to

7 Texas and impose the irreparable harms we have evidence of

8 that we've talked about earlier.  That right to travel

9 means that a ten-state injunction simply won't avoid the

12:06:10 10 irreparable harm that 5 U.S.C. 705 says you are authorized

11 to prevent.  That is different, completely different, Your

12 Honor, than a situation like travel ban or the DOJ

13 sanctuary cities case.

14                   Travel ban, if you remember, that was

12:06:23 15 Washington State, for example, arguing that individuals

16 outside the United States were admitted to go to the

17 University of Washington.  They couldn't get back in

18 because of the travel ban.  So what happens?  Well, a court

19 could fashion a remedy, a preliminary injunction that lets

12:06:39 20 anyone with those substantial connections to the United

21 States back in.  You know what?  That's exactly what the

22 U.S. Supreme Court did last summer.

23                   We all know the current Justice Thomas

24 opinion from Travel Ban 3.0, but Travel Ban 2.0, we saw

12:06:53 25 what the full nine justices thought of the very broad

1  injunction that was issued in travel ban.  And they lifted

2  it for everybody but those with a substantial connection,

3  like a person who was admitted to the University of

4  Washington.  So Washington can't compel people from coming

12:07:06   5  to Texas pursuant to the travel ban because those

6  individuals have no right to be admitted to the University

7  of Washington.  The right to travel is a domestic right,

8  not an international right, Your Honor.  So that's why

9  travel ban is a different case than this one.

12:07:19   10              That's also true in the sanctuary cities

11  case involving Department of Justice funding.  That's

12  currently a hot topic in Seventh Circuit.  We know Chicago

13  sued.  They won an injunction against a restriction on

14  law-enforcement grant funds that were going to Chicago.

12:07:33   15  The question is:  How do you treat that?  Do you treat it

16  as applying to Chicago, or applying nationwide?

17              The district court applied it nationwide.

18  The Seventh Circuit agreed, but then the Seventh Circuit is

19  granted rehearing on the question of that scope.  And I

12:07:46   20  would submit to you that Chicago can't prevent irreparable

21  harm to itself by mandating that that restriction comes off

22  of funds to Texas.  There's simply no nexus there, Your

23  Honor.  The right to travel is that nexus that connects our

24  ten Plaintiff States to every other state in the union, and

12:08:03   25  that's why an injunction was upheld in the DAPA case and

1  why we believe it's appropriate, even in light of

2  injunctions not being permissible on that same type of

3  scope for travel ban or the sanctuary cities DOJ case.

4              So we believe that the appropriate

12:08:18  5  preliminary injunctive relief, Your Honor, is a request for

6  the federal defendants to not take any new action on DACA

7  permits, renewals, or advance parole, and that should be

8  nationwide and focused.  And that incidental benefit to the

9  other states is perfectly allowable as long as that relief

12:08:33  10  is there to prevent irreparable harm to the Plaintiff

11  States, and that's the case here with our ten-state

12  coalition.

13              One thing, Your Honor, I'd like to preview

14  for is future relief in this case.  Final relief can look

12:08:44  15  different under the APA than preliminary relief can.  We

16  appreciate your ruling earlier in this hearing on not

17  converting this to an MSJ.  At this point in time, if we

18  were to be here today asking you for final relief, we might

19  not ask for an injunction.  We might ask for a vacatur.

12:09:01  20  And that's --

21              THE COURT:  I'm sorry?

22              MR. STARR:  A vacatur, Your Honor, to set it

23  aside.  That's under 5 U.S.C. 706.  The wording of that

24  section is completely different than preliminary relief in

12:09:12  25  Section 705.  It says that the appropriate course of action

1   is to set aside an unlawful rule.  That is what the D.C.

2   court did last Friday.  They set aside the rescission memo

3   and said, We're not touching on this debate on nationwide

4   injunctions because it's simply a vacatur, a set-aside.

12:09:28  5          We believe that the Court would have the

6   power to enjoin under 706, that Congress hasn't displaced

7   the Court's equitable powers with the words it chose, but

8   that given the facts that we're seeing today, it looks like

9   the relief we may request in the future.  The final relief

12:09:41  10  would simply be a set aside or a vacatur of 2012 DACA.

11          If there are no further questions on a

12  remedy, then we will yield our time.

13          THE COURT:  Thank you.

14          MR. STARR:  Thank you.

12:09:50  15          THE COURT:  Ms. Perales, you want to weigh in

16  on the merits of the injunction request?

17          MS. PERALES:  I wasn't sure if we were

18  following the order with the Federal Government next.

19          THE COURT:  Oh.  It matters not to me.

12:10:08  20          MR. SHUMATE:  Your Honor, just four quick

21  points on the merits here.  First, DACA is substantively

22  unlawful for the same reasons that the Fifth Circuit found

23  that DAPA and expanded DACA are substantively unlawful

24  under the INA.  And we think the Fifth Circuit's opinion

12:10:23  25  controls the merits questions here, not least in part

1 because the Fifth Circuit and this Court look to the

2 implementation of DACA to determine the lawfulness of DAPA

3 and expanded DACA.  There is simply no statutory basis in

4 the INA for the government to grant an open-ended reprieve

12:10:39  5 from removal and work authorization to an entirely new

6 category of illegal aliens, particularly when Congress had

7 declined to grant that type of relief in -- in any

8 legislation.

9            The second point I'd like to make is on

12:10:50  10 the plaintiffs' constitutional claims.  We don't think it

11 would be appropriate for the Court to rule on a

12 constitutional basis.  The Fifth Circuit didn't rule on the

13 Take Care Clause issue in -- in the DAPA decision because

14 there was a statutory basis for relief in that case.  And

12:11:04  15 likewise here, the Court can rule that DAPA -- excuse me --

16 DACA is substantively unlawful without getting into any

17 constitutional question.

18            Third, on the -- the balance of the

19 equities, I want to make sure the Court is aware of

12:11:16  20 Secretary Nielsen's rescission memo, which addresses the

21 reliance interests of DACA recipients.  And if you don't

22 mind, I'd like to put that up on the ELMO.

23            This is in the last paragraph of her

24 supplemental rescission memo in which she explains in the

12:11:31  25 highlighted portion, "The DACA policy was announced as a

1 temporary stopgap measure, not a permanent fix.  It was

2 expressly limited to two-year renewal periods.  It

3 expressly conferred no substantive rights and was revocal

4 [sic]" -- "revocable as any time.  In my judgment, neither

12:11:47  5 any individual's reliance on the expected continuation of

6 the DACA policy nor the sympathetic circumstances of DACA

7 recipients as a class overcomes the legal and institutional

8 concerns with sanctioning the continued presence of

9 hundreds of thousands of aliens who are illegally present,

12:12:03  10 in violation of the law as passed by the Congress, a status

11 that the DACA nonenforcement policy did not change.  And in

12 all events, the rescission of the DACA policy does not

13 preclude the exercise of deferred action in individual

14 cases if circumstances warrant."

12:12:16  15              I just want to -- wanted to point that to

16 the Court's attention for consideration when balancing the

17 equities here.  And then the fourth point just on the

18 nationwide scope of relief, the Department of Justice has

19 been consistent that any relief that a court awards should

12:12:32  20 be limited in scope to redress the injury to the plaintiffs

21 in the particular case.

22              We understand the Fifth Circuit upheld the

23 Court's prior nationwide injunction, don't intend to

24 relitigate that question here, but we do just want to

12:12:42  25 emphasize that our view is that injunction should be

1  limited to the plaintiffs -- plaintiffs in the particular

2  case that have demonstrated standing, that are injured, and

3  the injunction should be limited to remedying that

4  plaintiff's injury.

12:12:54  5        THE COURT:  So how would I enforce that?

6        MR. SHUMATE:  I understand it's difficult in

7  this case because of the reasons that Texas has identified;

8  but, for example, if there's a -- there simply is no reason

9  to extend an injunction to the State of Maine.  It's hard

12:13:07  10 to imagine how Texas would be injured by the presence of a

11 DACA recipient in the State of Maine.  I understand there

12 are complications when there's a right to travel; but

13 still, the Court should limit any injunctive relief that it

14 desires to award here to the -- to Texas itself.

12:13:24  15        THE COURT:  All right.  Thank you, sir.

16        MS. PERALES:  I would like to start with

17 Prong 1, irreparable harm, and I'd like to start -- because

18 our sense of the timing of this goes under the category of

19 irreparable harm, Your Honor, so I will address the timing

12:13:49  20 of the filing of this case.

21        THE COURT:  It's really Prong 2, but that's all

22 right.

23        MS. PERALES:  I'm so sorry.  I'd like to start

24 with irreparable harm, if I might.

12:13:58  25        THE COURT:  Go ahead.

                    1          MS. PERALES:  DACA was first implemented in

                    2    2012.  Plaintiffs did not challenge it.  And in 2012 and

                    3    2013, as the Court will see from some of the exhibits in

                    4    the case, was really when the largest number of young

12:14:14   5    people stepped forward to -- to apply and see if they could

                    6    receive a favorable exercise or discretion in DACA.

                    7              In 2014, when most of the current group

                    8    were already DACA recipients and leading their lives and

                    9    going to school, the plaintiffs did file suit, but they

12:14:36  10    specifically chose not to challenge DACA.  Plaintiffs filed

                   11    suit against DAPA and expanded DACA but made clear, as we

                   12    all know from being there, that they were not challenging

                   13    2012 DACA.

                   14              In 2016, after the Supreme Court decision,

12:14:59  15    plaintiffs chose, in the DAPA case, not to amend their

                   16    complaint, to secure a court order or a settlement that

                   17    would wind down or rescind DACA.  And then later in 2016,

                   18    plaintiffs chose to dismiss their lawsuit after other

                   19    lawsuits had already been filed, specifically the

12:15:28  20    California case, challenging the rescission.

                   21              I received a very fine piece of advice

                   22    once from Judge Patrick Higginbotham, who told me, If you

                   23    want something, you need to put it on a string.  And if

                   24    Texas felt strongly, and the other states, that they were

12:15:48  25    being injured by DACA, they certainly could have sued in

1  2012, they could have sued in 2013, they could have sued in

2  2014, and they could have sued in 2015.  And even when the

3  DAPA case was on appeal, plaintiffs were not restrained in

4  any way from filing a lawsuit against DACA if they felt

12:16:07  5  that they were injured and that that was necessary.  And

6  even at the very tail end of the DAPA litigation, when they

7  had the option to amend the complaint and get a court

8  order, something binding, they did not do so.

9          Texas describes this as prudence, and

12:16:27  10  perhaps it was prudent if one was seeking to litigate a

11  policy dispute about DACA, but it certainly doesn't line up

12  with any claim of injury, real injury, or the threat of

13  irreparable harm.

14          I'd like to note that with respect to the

12:16:46  15  actual irreparable harm, this really meets nothing other

16  than the definition of "speculation."  All we have in this

17  case is one number, 115,000 young individuals in Texas who

18  are currently DACA recipients, less than one percent of the

19  Texas population.

12:17:07  20          From that number, 115,000, we have to take

21  a series of imaginary leaps.  We have to imagine that Texas

22  spends money on these particular individuals in education,

23  health, and law enforcement, and then we have to imagine

24  that these -- some group of these people would leave

12:17:30  25  because they're receiving these services and then would

1 choose to leave the country if they no longer had these

2 services.

3          We have to make imaginary leaps that

4 employers in Texas hire DACA recipients over U.S. citizens

12:17:44   5 because they're DACA recipients and there's some peculiar

6 interaction under the Affordable Care Act.  And then we

7 have to further imagine that somehow these DACA recipients

8 would -- would leave the country again if they lost their

9 employment.

12:18:04   10          If anything, common sense suggests that if

11 there were DACA recipients in Texas who lost their DACA,

12 lost their work authorization, and lost their jobs, if

13 anything, there would be a greater reliance on safety-net

14 programs because people would lose their ability to support

12:18:26   15 themselves.

16          I would like to go now to the merits, Your

17 Honor, and touch on four things, but really three things,

18 and the first is reviewability.  I'd like to start with the

19 federal defendants' position in Washington, D.C.  The

12:18:45   20 federal defendants filed a brief last month, on July 11,

21 2018, in the D.C. litigation -- and that's at Docket 74 --

22 in which they incorporate by reference their motion to

23 dismiss at Page 18.  And so their motion to dismiss was

24 Docket 8 in the D.C. case.

12:19:06   25          They have an entire section there

 1  beginning, "This case is not justiciable," and it makes an

 2  entire argument about the lack of justiciability, the lack

 3  of reviewability of decisions related to

 4  immigration-enforcement policy because those decisions are

 5  matters committed to agency discretion by law.

 6              The United States argues that the INA

 7  deprives district courts of jurisdiction over challenges to

 8  denial of deferred action and that nonindividual

 9  plaintiffs' claims are not cognizable.

10              So we simply want to point to those

11  arguments, Your Honor, because they do go to reviewability.

12  They are not being made here, but they were made by the

13  United States just last month in a different forum.

14              THE COURT:  Of course, they lost those

15  arguments.

16              MS. PERALES:  And yet they made them, and they

17  were -- they are arguments that are similar to the

18  arguments that we make, as well.

19              I'm not going to rehash things that are in

20  our brief, Your Honor, because your time --

21              THE COURT:  Thank you.

22              MS. PERALES:  -- your time is precious, Your

23  Honor, but I did want to touch very lightly on two

24  additional things related to reviewability, is that the

25  Fifth Circuit moved through its reviewability analysis, and

1  we believe that there is more information now for the Court

2  to consider that does come from *Trump vs. Hawaii*,

3  specifically with respect to reviewability.  And just to

4  point out, Your Honor, that the Supreme Court in *Trump vs.*

12:20:42   5  *Hawaii*, when it's looking at exercise of discretion and

6  whether that's reviewable, rejects two suggestions from

7  dissenters:  One, that there needs to be a case-by-case

8  adjudication of individual requests in order for this

9  discretionary act to be nonreviewable; and then the other

12:21:07   10  suggestion from the descent is that approval rates somehow

11  bear on reviewability.

12                    And the majority says when something is

13  committed to agency discretion, you're not going to be

14  looking at case-by-case education or reviewal rates with

12:21:21   15  respect to the question of reviewability.  And so we

16  believe that there's a little more to add on that point

17  beyond what the Fifth Circuit did in the DAPA case when it

18  found --

19                    THE COURT:  Connect the dots for me, though.

12:21:34   20  How does that help me or hurt -- hurt them in this case?

21                    MS. PERALES:  Well, to the extent that the

22  Fifth Circuit in DAPA found DAPA reviewable by looking at

23  approval rates or by looking at whether there was

24  case-by-case adjudication --

12:21:55   25                    THE COURT:  Based on my fact-finding?

1          MS. PERALES:  At that time, yes.

2          THE COURT:  So we're talking about the

3 procedural APA violation?

4          MS. PERALES:  No.  Actually, the predecessor

12:22:03   5 question of just reviewability before we get to -- to the

6 procedural APA claim.  Just this question of whether this

7 is something that ought to be looked at at all by a court,

8 there is, we believe, more to inform, that the Fifth

9 Circuit was looking at some subjects that perhaps under

12:22:20  10 *Trump vs. Hawaii*, the Supreme Court is saying, You know

11 what, for the question of reviewability, we shouldn't be

12 looking deep inside how it's being executed but whether or

13 not the agency has been given this discretion in the first

14 place.  So that -- that's just a small point, Your Honor,

12:22:34  15 that we wanted to highlight for you, and it's expanded on

16 in the brief.

17          And then, finally, also that DAPA does, in

18 the -- in the section on reviewability, talk about the size

19 of the group that's getting relief; and I'll talk about

12:22:49  20 that again, but simply that the Fifth Circuit did note that

21 the very, very large size of DAPA mattered to them when

22 they were thinking about this question of reviewability.

23          THE COURT:  How does it matter legally?

24          MS. PERALES:  Well, I can see that the Fifth

12:23:06  25 Circuit --

1            THE COURT:  Well, I can see why they said it.

2   Obviously 4.5 and 1.5 are two -- you know, one is three

3   times bigger; but if they were both implemented and created

4   in the same fashion, they both award the same benefits,

12:23:27   5   they both award legal presence and deferred action -- or

6   it's a granting of deferred action, I mean, how does the

7   number really matter?

8            MS. PERALES:  I have an analogy for Your Honor

9   on this.

12:23:39   10            THE COURT:  Good.

11            MS. PERALES:  We know from the DAPA case that

12   the Fifth Circuit looked at the size of DAPA, at the 4.5

13   million potential beneficiaries, and saw that as basically

14   a third of the estimated number of undocumented people in

12:23:58   15   the United States and linked those two things together,

16   setting aside a third of the undocumented population of the

17   United States to -- to the Fifth Circuit, ultimately, where

18   they discuss the size the most is on whether it exceeds

19   authority under the INA to discretionarily relieve some

12:24:15   20   people of removal.

21            So we have that on the far end, that the

22   Fifth Circuit said that DAPA and its scale and its size

23   suggested that it was beyond Executive authority.

24            At the other end of the spectrum, Your

12:24:30   25   Honor, we have the everyday decisions, the everyday grants

1  of deferred action that are made by USCIS district

2  directors here in Houston, down in San Antonio, where my

3  office is.  We have individual day-to-day grants by ICE in

4  field offices to do deferred action.

12:24:50   5          Your Honor is familiar with when

6  individuals who are undocumented are cooperating with law

7  enforcement, they are granted deferred action for the

8  period in which they are cooperating, and work

9  authorization and those things that flow from deferred

12:25:04  10  action.  And -- and Texas and the other plaintiffs don't

11  appear to challenge that.  And so we have a spectrum

12  where --

13          And also, may I -- may I place on the

14  spectrum, as well, there are groups of people beyond

12:25:17  15  law-enforcement cooperators, who routinely get deferred

16  action from the USCIS.  There are beneficiaries of

17  family-preference petitions who are at the tail end of

18  their adjudication process.  There are many others that are

19  not referenced in the INA.

12:25:30  20          THE COURT:  So we have those that wanted --

21  wanted a shot.  So we have one over here, and we have 4.5

22  over here.

23          MS. PERALES:  We do.  And so the Court's task,

24  really, and why numbers perhaps matter, is the Court's

12:25:43  25  task, understanding that the Fifth Circuit has said that

KATHY MILLER, RMR, CRR  -  kathy@miller-reporting.com

1 the size mattered in their decision in DAPA, and the fact

2 that nobody is challenging the ones and the twos or perhaps

3 the several thousand law-enforcement cooperators or perhaps

4 the tens of thousands of people who are the beneficiaries

12:25:59  5 of family-preference petitions and other deferred-action

6 beneficiaries who are not mentioned in the statute, right?

7 So the statute talks -- the INA talks more broadly about

8 deferred action as being discretionary, right?

9            And so the Court's job is to locate DACA

12:26:15  10 in here somewhere.  And for that reason, size does matter,

11 because DACA is much, much smaller than DAPA ever was.

12 It's only about five percent of the undocumented population

13 in the U.S.  The current number of DACA recipients is

14 702,000 as of May 31st.

12:26:38  15            THE COURT:  Well, but the total population

16 could be as much as 1.9, according to one of your exhibits.

17            MS. PERALES:  Perhaps when it was first

18 announced, Your Honor, but today we know that most people

19 who were eligible for DACA -- those who have come forward

12:26:52  20 have come forward.  We have a small group that's aging in

21 who are children, and then we may have some group of people

22 that have never applied but who could potentially apply at

23 this point, but we know most have come forward.  So we

24 would offer to the Court that the 702,000, which is the

12:27:08  25 number we have today, is -- is really an important number

1  to look at.

2          THE COURT:  Okay.  Because that's not what your

3  exhibits say.  Your exhibits say on the low end, 1.3, and

4  1.9.  So I was kind of saying 1.5 is kind of a midpoint,

12:27:23  5  even though 1.6 would be the technical midpoint of those

6  two figures, but -- so you're saying it's half that much?

7          MS. PERALES:  Well, the estimate when DACA was

8  first promulgated was that potentially eligible people

9  would be about 1.5 million.  That was back in 2012 when it

12:27:40  10  was first promulgated.  Similar to with Family Fairness,

11  when Family Fairness in Bush 1 was first promulgated, it

12  would potentially affect up to 1.5 million people.  1.5

13  million people didn't end up getting --

14          THE COURT:  Well, Dr. Perryman uses 1.3, and

12:27:59  15  that's -- he prepared that for this lawsuit.

16          MS. PERALES:  All I can tell you, Your Honor,

17  is that the exhibits show from USCIS that the current

18  number of people who receive DACA as of May 31st, 2018 is

19  702,000, and then that is the group that we're working with

12:28:12  20  in terms of the -- the folks who are eligible for their

21  renewal.  And -- and so --

22          THE COURT:  I thought there was something that

23  said that 2018 numbers were, like, in the low 8s, like 813,

24  eight-something.

12:28:27  25          MS. PERALES:  That's the total number of people

1  who've ever had a DACA application approved.

2           THE COURT:  So they didn't renew?

3           MS. PERALES:  Yes.

4           THE COURT:  There's a population --

12:28:35   5     MS. PERALES:  That's exactly right, Your Honor.

6  There's a little over 100,000 people who did not renew, so

7  we are working with our 702,000 number.  And then that's

8  the number that the Court is going to place on the spectrum

9  when it's thinking about whether or not the agency has

12:28:48  10  exceeded its authority.

11            And so moving to the procedural claim,

12  Your Honor, a lot of what the Fifth Circuit talked about in

13  the DAPA case turned on its affirmative -- this court's

14  fact-findings related to whether or not DACA was truly

12:29:06  15  discretionary, because if DACA is truly discretionary, it

16  is -- as we've asserted, it's the policy statement.  It's

17  the rule of agency organization, procedure, or practice.

18            Here we have, although not a fully

19  developed record, we have a much better developed record on

12:29:22  20  the question of rubber-stamping.  We've had the opportunity

21  to depose Mr. Palinkas in New York, and -- and he was -- he

22  was very forthright in explaining that he didn't have any

23  firsthand knowledge of how DACA was adjudicated and that

24  he -- he really based his ideas of a rubber stamp more on

12:29:42  25  some of the numbers that he had been reviewing and his

1 personal objection to adjudication being done at what are

2 known as USCIS Service Centers, and there are five of them

3 around the country.

4                 Service centers adjudicate approximately

12:29:58    5 two million different types of USCIS benefits applications

6 every year, and -- and this is the way the agency conducts

7 a good portion of its adjudication.  And those are

8 employment-based visas; those are deferred action; those

9 are VAWA; those are Us; those are Ts.  Lots and lots of

12:30:17   10 things are adjudicated at service centers.  And -- and I

11 don't think that there's any assertion here in this case

12 that adjudicating something at a service center somehow

13 makes it vulnerable to a procedural APA claim.

14                 We also have now have the testimony of

12:30:31   15 Mr. Knowles, who is the current USCIS union president, who

16 took some steps to call union leaders at the two service

17 centers where DACA is currently adjudicated.  That's in

18 California and Nebraska.  And he was able to share the

19 information that he learned from union leaders that they do

12:30:48   20 not rubber-stamp; in fact, that they were surprised to hear

21 that suggestion, because as one USCIS DACA adjudicator put

22 it, it's -- that DACA is the most discretionary application

23 that he's ever had to adjudicate among the various form

24 types that he is trained on.

12:31:08   25                 And so I would like to move to substantive

1  APA now, knowing that there's a great deal more in our

2  briefs, Your Honor, on these points.  And we have just

3  three points that we wanted to emphasize here.

4              And I think the Court mentioned it a

12:31:22  5  little bit earlier, but the Fifth Circuit's substantive APA

6  considerations turned, in part, on concluding that the INA

7  had already set out a process for the parents of U.S.

8  citizen children to gain status; and, you know, the child

9  has to turn 21, and all of these other things have to be in

12:31:44  10  place, and that that was a reason that the Fifth Circuit

11  cited as thinking that it was less likely that Congress

12  intended for discretion to be exercised in this area, with

13  a broader grant of deferred action.  We don't have that

14  here.  DACA is different from DAPA with that respect.

12:32:02  15              The -- the question of size, I've already

16  covered with Your Honor.  And -- and the Fifth Circuit not

17  only talked about size in terms of just the sheer number of

18  people, up to one-third of the -- of the undocumented

19  population; but also talked about it with respect to work

12:32:23  20  authorization, saying that work authorizing that many

21  people could have an effect that Congress didn't intend

22  when it enacted IRCA.  And here again, the size matters

23  with respect to work authorization, as well as being not

24  placed into removal proceedings.

12:32:40  25              THE COURT:  What do you do with the argument

1 that was made in the last case that was never fully

2 answered?  Because I asked the question; Fifth Circuit

3 asked the question; the Chief Justice asked the question,

4 that under this theory, the Executive Branch could admit

12:32:58  5 every illegal alien in the country and give them legal

6 presence.  And -- and basically, they conceded that's

7 right, we could --

8           MS. PERALES:  We would not agree.

9           THE COURT:  -- but wouldn't is what they told

12:33:12  10 the Supreme Court.

11           MS. PERALES:  And the Fifth Circuit says that

12 that's just -- that's just beyond what the agency is -- is

13 authorized to do by Congress.

14               Now, that's different than saying that the

12:33:25  15 agency couldn't take any one particular individual and

16 decide that for whatever reason, the agency would give that

17 person deferred action.  Maybe one person, any particular

18 person, but not everybody, Your Honor, because that

19 would -- you know, Congress gives the agency funds

12:33:45  20 sufficient to prosecute and remove about 450,000 people a

21 year.  As far as we know the agency is definitely doing

22 that.  The agency is putting lots of people into removal.

23 We are -- we are not in that place where we're talking

24 about the authority, and we wouldn't -- we wouldn't --

12:34:06  25 posit --

1            THE COURT:  Let me bring up -- you bring up

2  Congress.  Let's talk about that for a minute.

3               In the DAPA litigation, one of the

4  arguments to find it legal was that Congress hadn't spoken

12:34:21   5  in this area.  In this area, the DACA, it's considered

6  legislation approving this vari- -- variations of this same

7  population ten times, and it's been rejected ten times.  So

8  it has spoken, hasn't it?

9            MS. PERALES:  No, Your Honor, because this is

12:34:40  10  why.  And just to go back to deferred action itself,

11  Congress leaves space for the Executive to make grants of

12  deferred action, even to groups of people.  And in many --

13  in a number of occasions in the past, Congress has been

14  working on legislation at the same time that the agency was

12:35:01  15  shifting groups of people.  So the 1.5 million potentially

16  eligible folks under Family Unity, which then later became

17  a statute, became Family Fairness.  And then there were

18  also modifications of the statutes with respect to U- and

19  T-visas and VAWA.

12:35:16  20            THE COURT:  So the Fifth Circuit

21  interstitial-to-pending-litigation language, it doesn't

22  matter whether the legislation got passed or whether it got

23  rejected?  Because it just got rejected.

24            MS. PERALES:  Well, the -- the Fifth Circuit

12:35:27  25  was talking about interstitial-to-enacted legislation, so

1  my understanding of that decision is that Congress speaks

2  when it enacts legislation.

3              THE COURT:  It also speaks when it considers

4  litigation -- legislation and turns it down.

12:35:41  5              MS. PERALES:  Ah, but --

6              THE COURT:  It -- it says, We don't want this,

7  doesn't it?  I mean, isn't that the effect of it?

8              MS. PERALES:  Right up until they do pass

9  something, Your Honor, and then it is considered --

12:35:50  10  considered interstitial.  I mean, the Fifth Circuit

11  remarked that certain deferred-action initiatives were

12  interstitial, but at the time, they weren't interstitial

13  because Congress hadn't caught up with those

14  deferred-action initiatives.

12:36:01  15              So what was interesting about the Fifth

16  Circuit --

17              THE COURT:  How does Congress send a message

18  that it doesn't like something if it -- if it's not through

19  turning down legislation?  Because it's -- in this case,

12:36:12  20  it's turned it down ten -- I mean, I'm looking since 2003.

21  It's turned it down ten times, including twice in 2009,

22  when it -- when it was controlled by the same party.

23              MS. PERALES:  It's also important, Your

24  Honor --

12:36:25  25              THE COURT:  When both houses were controlled by

1 the same party.

2          MS. PERALES:  It's also important, Your Honor,

3 to note that Congress has also tolerated deferred action

4 before and then subsequently adopted it or let it continue

12:36:38   5 and that during this entire period that Congress has been

6 thinking about what to do, the legislative solution to

7 DREAMers, Congress has also known that deferred action has

8 been in place through DACA.  And this is just as a

9 theoretical matter.  Congress has not acted to end any of

12:36:55   10 that, as well.

11          So what we have is a situation, for what

12 it's worth, of toleration of the status quo, toleration of

13 DACA, no legislative moves to -- to take or limit deferred

14 action so that it could not be granted through DACA, and a

12:37:12   15 continuation to work on this issue.

16          I know that we've sort of --

17          THE COURT:  So if it passes, Congress is in

18 favor of it; and if it's rejected, Congress is in favor of

19 it?

12:37:22   20          MS. PERALES:  No.  Well, no, Your Honor, I

21 wouldn't say that.  I -- I'm loathe to apply legislative

22 intent to efforts to pass legislation that are not

23 successful.  I guess, that's -- I can't be more helpful

24 than that.  I'm sorry, Your Honor.

12:37:38   25          THE COURT:  Okay.

 1          MS. PERALES:  I would like to say that with

 2   respect to those things that come with deferred action, I

 3   just want to make a distinction that is there in our brief

 4   but which I feel is important.

12:37:51   5          Deferred action comes with a reprieve from

 6   removal proceedings.  It comes with work authorization, and

 7   it has since the Bush era, and those are ensconced in

 8   regulation; and with work authorization, the ability to

 9   contribute to the Social Security system and receive

12:38:09  10   retirement at the end of the line; and then finally, also

 11   something which is not immigration status but which is

 12   known as lawful presence, which can be revoked upon the

 13   issuance of an NTA or at any moment's notice.  There are no

 14   due-process pieces attached to that lawful presence, but

12:38:29  15   because of the way that Congress has written REAL ID and

 16   recognized deferred action, we do have the ability in some

 17   states to get driver's licenses.  And I want to acknowledge

 18   that because I want to move to what deferred action does

 19   not do, because the plaintiffs set out a whole series of

12:38:46  20   additional things that they claim that deferred action does

 21   that is in direct contradiction to the INA, which it simply

 22   does not.  And -- and there is quite a bit of confusion

 23   about what the INA provides and doesn't provide, and I

 24   apologize in advance for sort of the dueling briefs on

12:39:03  25   this, but I just want to cover.

1          Deferred action is not a defense to

2 removal under the INA.  Deferred action does not vitiate

3 the -- what are called informally the reentry bars under

4 the INA.  Deferred action does not provide a grounds for

12:39:16   5 adjustment of status.  To the extent that the plaintiffs

6 say Family Unity was not accompanied by work authorization,

7 that is correct.  Deferred action does not entitle

8 recipients to social welfare benefits that were restricted

9 by Congress in 1996 in PRWORA.

12:39:33  10          And then finally, with -- with respect to

11 advance parole, you'll see a sort of shifting position on

12 the part of plaintiffs as perhaps more light was shed on

13 advance parole.  Plaintiffs began by suggesting tens of

14 thousands of people who have DACA and no other way to

12:39:47  15 address status have somehow taken advantage of advance

16 parole.  We know today that there are less than 5,000 DACA

17 recipients who have ever taken advance parole and

18 subsequently applied to adjust their status.  Many have

19 already made a lawful entry because they were visa

12:40:06  20 overstays or otherwise made lawful entries, and so we're

21 talking about --

22          THE COURT:  But DACA does let them have advance

23 parole.  The handbook gives them that right.

24          MS. PERALES:  Yes, it does, and that's already

12:40:17  25 ensconced in statute.  It's the effect of advance parole or

1  the role that advance parole plays that -- that we wanted

2  to shed light on for the Court.  It's a tiny, tiny number

3  of individual DACA recipients who have taken advance parole

4  and subsequently applied to adjust status.  And among that

12:40:37  5  tiny, tiny number, there are still people who never needed

6  to take advance parole but they did so to -- for

7  humanitarian reasons or other reasons.

8           And so Texas, we've been winnowing this

9  down over the course of the briefs, but just to leave it at

12:40:51  10  a very, very tiny number.  And I just want to speak on

11  behalf of two of the clients that Texas said have used

12  advance parole to adjust their status.  That is not

13  correct.  Neither of them have done so, and neither of them

14  need to.

12:41:08  15           This tangle of errors in explaining

16  immigration law, Your Honor, by itself provides grounds for

17  denying a preliminary injunction until a lot of this can be

18  sorted out and clarified.  In the meantime, we really are

19  just talking about deferred action, work authorization, and

12:41:28  20  what is known as lawful presence.  That is not immigration

21  status.

22           With respect to the Take Care Clause, Your

23  Honor, we do believe that the arguments that the plaintiffs

24  have are really subsidiary to the substantive APA.

12:41:43  25           And then, finally, with respect to the

1 balance of the equities and the public interest, as my

2 friend from New Jersey has pointed out, the status quo now

3 is almost the exact opposite of what we were dealing with

4 in DAPA.   In DAPA, we had something that had not commenced,

12:42:01  5 that was not underway.   Here, we have, at the moment,

6 702,000 young individuals in the country who are getting up

7 every morning, they are going to school, they are going to

8 work.   There is no great harm or any identifiable injury

9 from their continued presence in doing what they're doing,

12:42:22  10 and for that reason the balance of the equities in the

11 public interest tip heavily towards maintaining the status

12 quo at least until the Court can develop the record better

13 and come to a merits decision.

14              You know, in DAPA, there was frequently --

12:42:38  15 and particularly the Fifth Circuit noted there was a very

16 large impending change that was going to be very hard to

17 reverse.   Here, the effects have already been felt.

18 Plaintiffs cannot quantify them.   And we don't have the

19 situation of the inability to restore -- to restore the

12:42:57  20 status quo ante.

21              Thank you.

22              THE COURT:   Thank you, Ms. Perales.

23              Ms. Apter?

24              MS. WAINER APTER:   Thank you, Your Honor.   Just

12:43:14  25 a few points that Ms. Perales did not cover.

1           First, when it comes to irreparable harm,

2    as Your Honor pointed out, there was a very long delay

3    here, obviously, of six years.  What plaintiffs don't

4    mention is that when they filed suit to enjoin the Johnson

12:43:32    5    memo in the fall of 2014, at the time, in addition to

6    specifically declining to challenge DACA, they actually

7    claimed that DACA, and I quote, "had and continues to have

8    dire consequences in the Plaintiff States."  And that's at

9    App. 55 and 67 of the original index filed by Texas.

12:43:54    10           And so I think that just makes clear that

11    plaintiffs here made an affirmative choice to sit on the

12    sidelines for six years while 689,800 -- and just to be

13    clear, I'm using the number as of September 2017, which is

14    why it's not --

12:44:08    15           THE COURT:  We have all kinds of numbers.

16           MS. WAINER APTER:  I know, which is why it's

17    not the exact same number used by Ms. Perales, so I

18    apologize.

19           So while people came forward, disclosed

12:44:19    20    their presence to the Federal Government, turned over

21    private information, submitted to biometrics, and then

22    relied on deferred action to plan their careers, obtain

23    advanced degrees, buy homes, and create full lives out in

24    the open in the United States, that alone should be enough

12:44:34    25    to show this Court that plaintiffs are not going to be

1  irreparably harmed, and their motion for a preliminary

2  injunction should be rejected on that basis.

3          THE COURT:  Well, let me ask you this,

4  Ms. Apter, and maybe I should have asked Ms. Perales.

12:44:48  5          If -- if -- and I can't remember which

6  brief it was, but one of the briefs filed by the plaintiffs

7  says something to the effect of, Look, they knew the status

8  was revokable the minute they got it.  Why do they have any

9  right to rely on it?

12:45:10  10          MS. WAINER APTER:  So, Your Honor --

11          THE COURT:  I'm paraphrasing that, but

12  that's -- that's, in essence, what they asked.

13          MS. WAINER APTER:  Understood.  So the

14  Executive always has the ability to reverse course on

12:45:19  15  policies; however, that does not mean --

16          THE COURT:  I keep looking over at this table.

17  They're just laughing.  Their ability to reverse course has

18  not been smooth.

19  (Laughter.)

12:45:31  20          MS. WAINER APTER:  So in theory, the Executive

21  always has the ability to reverse course on any policy, but

22  that does not mean that a policy that is reversible cannot

23  engender reliance interests, and so that's the *Encino Motor*

24  *Cars* decision from the Supreme Court from a few years ago,

12:45:45  25  which says even when an Executive policy can be reversed,

1 you need to take into consideration reliance interests.

2                     And so I think especially when it comes to

3 this Court, when you're trying to balance the equities, I

4 don't think there is any legitimate ground to say you have

12:46:00   5 to close your eyes to the fact that there are 689,800

6 people who came forward, who gave their information to DHS,

7 and that this Court has to ignore that.

8                     Actually, last time around in the DAPA

9 litigation, this Court recognized that for people who did

12:46:18  10 accept DHS's invitation to come out of the shadows, there

11 may be, and I quote, "dire consequences for them if DAPA is

12 later found to be illegal or unconstitutional."

13                     The DHS, whether -- whether under this

14 administration or the next, will then have all pertinent

12:46:35  15 identifying information for these immigrants and could

16 deport them.  And so Your Honor recognized last time around

17 that that is a concern and one that this Court has to weigh

18 when it comes to balancing of the equities.

19                     THE COURT:  Let me ask you one other question,

12:46:49  20 which kind of tails in, you know, I asked Ms. Perales

21 about.  What do I do with the fact that Congress has

22 rejected every iteration of DACA?  What do I do with the

23 fact -- for instance, New Jersey has intervened.  I've got

24 amicus briefs from any number of states that -- that come

12:47:08  25 in basically saying the same thing, the position that New

1 Jersey is taking here.  In 2018, New Jersey voted against

2 the DREAM Kids Act.  Congressional 7 to 5 is the way it's

3 split.  And if you take all of my amicus briefs that are

4 saying, We want DACA, we want DACA, and take their votes

12:47:29  5 that were against DACA and put it on, it would have passed

6 2 to 1.

7           MS. WAINER APTER:  So two points there, Your

8 Honor.  One, DACA is not a DREAM Act, so all of the pieces

9 of legislation --

12:47:41  10           THE COURT:  Well, all of them have different --

11 they're -- they're all different.  They define the

12 population differently.  There's all kinds of -- that's why

13 I said "iterations."  They're not all the same act,

14 obviously.

12:47:52  15           MS. WAINER APTER:  Understood.  But I believe

16 that most of the ones, if not all of the ones, that have

17 been voted on have provided a path to citizenship.  And so

18 it's usually some sort of conditional form of LPR status

19 for a certain number of years, and then the condition can

12:48:07  20 be removed, and then the DACA grantee, who is not a DACA

21 grantee -- the DREAMer -- I'm sorry -- can then become a

22 citizen.

23           And so DACA is different because it's only

24 providing a renewable two years of deferred action.  It

12:48:18  25 does not say that at the end of the two years, you can

1 apply to adjust to LPR status; or at the end of the two

2 years, you can have the conditional nature of your deferred

3 action removed and then you can become a citizen.  And so

4 at the end of the day, the legislation is different than

12:48:32   5 the deferred action here.  And I want to make one more

6 point related to that.

7         So the Family Fairness that you were

8 talking about with Ms. Perales, at the time Congress kept

9 rejecting that also.  And so Family Fairness, the policy

12:48:46  10 originally was from 1987.  At the time, Congress had

11 specifically said, We do not envision that the spouses and

12 unauthorized children of anyone who is legalizing will get

13 any kind of benefit.  They will have to wait in line.  So

14 Congress specifically said, We are not providing for the

12:49:05  15 unauthorized spouses or children in this law.

16         THE COURT:  How did they say that?

17         MS. WAINER APTER:  It was in a Senate report

18 that they would have to wait in line, but Congress had also

19 considered many bills.  So just as Your Honor pointed out

12:49:17  20 that Congress here has considered the DREAM Act, there were

21 many bills between 1987 and 1990 that would have covered

22 the same population of unauthorized children and spouses,

23 and Congress rejected each one until eventually they passed

24 one, and that was in November of 1990.  And when they did

12:49:36  25 that, I think it's very interesting, Your Honor, to note

1 that they didn't pass it and say, And we are very angry

2 that the Executive implemented this discretionary policy in

3 the interim.

4           Instead, they said, Our law is not going

12:49:53  5 to go into effect for another one year.  So this was in

6 November of 1990.  They said, Our law is not going to go

7 into effect until November of 1991.  In the interim, the

8 Executive's discretionary policy remains what covers these

9 people, and so they actually approved.

12:50:09  10         THE COURT:  Isn't there some act here that says

11 that about DACA?  Do I have a -- has Congress spoken in

12 saying, Go ahead and do it, because we're going to pass it

13 next year?

14         MS. WAINER APTER:  No, Your Honor, but at the

12:50:18  15 time, for example, in early 1990, there was no indication

16 that Congress actually would pass it either, because they

17 had rejected it numerous times.  And so that's something

18 that, you know, we have to end up just waiting and seeing

19 what Congress does.

12:50:30  20         THE COURT:  So it would be -- any size group

21 would be legal as long as we think -- and I don't know

22 who -- who gets to make that decision, maybe me -- that we

23 think sometime in the future, Congress may pass something?

24         MS. WAINER APTER:  No, Your Honor, I don't

12:50:44  25 think so.  I think that there are three limits that come

1  from the Fifth Circuit's opinion about what can be

2  accomplished through deferred action.  The first one is it

3  cannot contradict Congress's priorities.  So, for example,

4  Congress has stated that it prioritizes the removal of

12:51:02  5  criminal aliens, it prioritizes the removal of aliens who

6  just crossed the border illegally.

7            The Executive could not attempt a

8  deferred-action policy that applied to criminal aliens or

9  those who just crossed the border illegally, so that is

12:51:14  10  one --

11            THE COURT:  Well, it also has a policy of

12  employing U.S. citizens and not people who came into the

13  country illegally.  It does contradict that.

14            MS. WAINER APTER:  Well, Your Honor, the

12:51:24  15  definition, actually, of an unauthorized worker in the INA

16  is one who is not permitted to work either by statute or by

17  the Attorney General.  And the authority of the Attorney

18  General to grant work authorization have subsequently been

19  transferred to the Secretary of DHS, and the INS actually

12:51:43  20  adjudicated a claim in 1987 that said -- actually DHS, back

21  then the INS, doesn't have any authority to grant work

22  authorization unless Congress has already done so.  And the

23  INS said, No.  The statute intentionally uses the word

24  "or," which means that the statute recognizes someone is

12:52:03  25  only authorized to work when either the statute says so or

 1 when the Attorney General has granted them permission.

 2          THE COURT:  So the Attorney General could grant

 3 11.5 or 11.12 or 13, however -- whatever the current figure

 4 is, for the number of illegal aliens?  They could do it for

 5 the whole population?  That -- that was the same question

 6 the Supreme Court asked and no one could answer.

 7          MS. WAINER APTER:  No.  So going back to my

 8 three proposed limits -- so I'm trying to answer -- one of

 9 the limits was cannot grant it to anyone in violation of

10 Congress's priority.  So, for example, can't grant it to

11 any criminal alien, can't grant it to anyone who just

12 crossed the border illegally.

13               Number 2, cannot --

14          THE COURT:  Well, a lot of the -- a lot of the

15 11.3 million people -- I'm using that Pew study for that

16 figure -- they've been in the country for years.

17          MS. WAINER APTER:  Correct.  And so they

18 wouldn't be addressed by that one.

19          THE COURT:  They might be DAPA except for the

20 age -- they might be eligible for DACA except for their

21 age.

22          MS. WAINER APTER:  But I think there are two

23 other important limitations that can be taken from the

24 Fifth Circuit's opinion.  The second one is, Cannot address

25 a population that Congress has already explicitly provided

12:52:21 (line 5)
12:52:34 (line 10)
12:52:44 (line 15)
12:52:57 (line 20)
12:53:07 (line 25)

1  for.  And so this goes back to the core of the Fifth

2  Circuit substantive APA holding was that at *Chevron* step

3  one, Congress had already direct -- and I quote, "directly

4  addressed the precise question at issue:  how parents may

12:53:23  5  derive an immigration classification on the basis of their

6  child's status."  And the Fifth Circuit actually goes

7  through at length and explains that, according to Congress,

8  there's an intricate process for illegal aliens to derive a

9  lawful immigration classification from their child's

12:53:38  10  immigration status, and that involves having a U.S. child

11  who's at least 21 years old, leaving the U.S., waiting ten

12  years, and then obtaining one of the limited number of

13  Family Preference visas from a U.S. consulate.

14          THE COURT:  Should I give *Chevron* deference in

12:53:52  15  this case?

16          MS. WAINER APTER:  Your Honor, we think

17  that you should give *Chevron* defer- -- deference to the

18  original DACA memo, but we think it doesn't actually

19  matter, because we think even --

12:54:03  20          THE COURT:  Wait, wait.  Back up.  If I give

21  deference to the interpretation of the agency, the agency

22  wants to rescind it now.

23          MS. WAINER APTER:  Correct, but that has been

24  set forth in a very informal way.  And we think even

12:54:14  25  without *Chevron* deference, the question here would be the

1 same.  So the question is not whether Congress has ever

2 specifically enacted the Napolitano memo into the INA.

3                    Instead, the question is whether anything

4 in the INA, which charges secretary with establishing

12:54:30   5 national immigration priorities, establishing such

6 regulations, and performing such other acts as he deems

7 necessary and enforcing the immigration laws, whether --

8 whether anything prohibits that or says that Congress has

9 already spoken to this particular issue.  And that is what

12:54:44   10 was driving the Fifth Circuit in the DAPA decision, and

11 that is not the same here.

12                    The Fifth Circuit actually held that even

13 though DAPA did not confer the full panoply of benefits

14 that a visa would give, DAPA would allow illegal aliens to

12:55:00   15 receive the benefits of lawful presence solely on account

16 of their children's immigration status without complying

17 with any of the requirements that Congress has deliberately

18 imposed.  So that's another limitation.

19                THE COURT:  That's -- that's true of the DACA

12:55:12   20 population except for the children part, isn't it?

21                MS. WAINER APTER:  I'm sorry.  Can you say that

22 again, Your Honor?

23                THE COURT:  Well, I mean, Congress has

24 opposed -- by who they've deemed as admissible into the

12:55:23   25 United States, haven't they imposed limits, and DACA avoids

1 that?  It gives legal presence to every DACA person.

2              MS. WAINER APTER:  Well, so the definition of

3 "unlawful presence" in the INA also recognizes that the

4 Attorney General, now the Secretary of the Department of

12:55:42   5 Homeland Security, does have the power to grant lawful

6 presence.  And that's not the same as lawful status, and so

7 no one here is claiming that DHS can grant lawful status in

8 a way that would constitute a defense to removal or in a

9 way that would constitute a substantive right to remain in

12:55:57   10 the United States; but the way that the statute defines a

11 period of unlawful presence is a period that has not been

12 authorized by the Attorney General.  Here, there is a

13 period that has been authorized by, in this case, the

14 Secretary of DHS.

12:56:12   15              Sorry.  And then just to go back to the

16 third limitation.  So the first one is, cannot conflict

17 with any of Congress's priorities; the second one is,

18 cannot address a population that Congress has explicitly

19 provided for; and then, as Ms. Perales already discussed,

12:56:26   20 the third is just sheer number.

21              And so the Fifth Circuit just said

22 Congress does not -- did not grant to the agency the

23 discretionary authority to deal with 4.5 million people.

24 And I want to suggest, Your Honor, that it's not just 4.5

12:56:44   25 million on one side and --

1          THE COURT:  Well, where did it give them

2   discretion to deal with a million people?

3          MS. WAINER APTER:  So I think from there, it's

4   helpful to look back to the Family Fairness policy, which,

12:56:54  5   as we said, Congress envisioned would apply to 1.5 million

6   people, even though in the end, 1.5 million people did not

7   apply.  And Texas asserts for the first time in its reply

8   that the Family Fairness policy is actually not relevant

9   because it was explicitly authorized by statute.  That is

12:57:12  10  not true, though.  The Voluntary Departure statute that

11  existed at the time, and that's 8 U.S.C. 1254e from 1988

12  and 1990, quoted -- it's not quoted, but it's cited in

13  Texas's reply.  So at the time that statute provided, and I

14  quote, "The Attorney General may, in his discretion, permit

12:57:33  15  any alien under deportation proceedings to depart

16  voluntarily from the United States at his own expense in

17  lieu of deportation."

18          So that statute does not authorize the

19  Family Fairness policy in the way that Texas implies or

12:57:48  20  states that it does in the reply.  First of all, as you

21  heard, it applies only to persons in deportation

22  proceedings, which the Family Fairness policy did not.  It

23  also says nothing about forbearing removal for a period of

24  years or work authorization, both of which the Family

12:58:03  25  Fairness policy specifically provided for.

1           And Texas, here, has actually stated that

2 the Family Fairness policy did not include work

3 authorization, but that is not true.  The McNary memo,

4 which can be found in Texas's appendix at Page 249 to 251,

12:58:18  5 specifically mentions work authorization.

6           Moving on to the procedural question as to

7 whether the Napolitano memo required notice-and-comment

8 rulemaking, there are just a few points that I wanted to

9 make here.

12:58:34  10           As Ms. Perales discussed, the extrinsic

11 evidence that this Court relied on last time, which was the

12 declaration of Kenneth Palinkas, DAPA's -- DACA's -- I'm

13 sorry -- standard operating procedures and the denial rate

14 could not be more different here.  As to Mr. Palinkas, here

12:58:52  15 he sat for a deposition.  He testified at his deposition

16 that he has no personal knowledge of DACA adjudication and

17 a strong personal bias against DACA.

18           As to the standard operating procedures,

19 internal DHS documents that were produced during discovery

12:59:09  20 show that service center adjudicators do exercise

21 discretion on a case-by-case basis.  So, for example, a

22 June 2015 e-mail explained that the Texas Service Center,

23 and I quote, (Reading), Now denies significantly more DACA

24 cases, based on our view of discretionary denials shifting.

12:59:27  25 Every case is different, so we have to review the totality

1  of the circumstances of each one.  For whatever it's worth,

2  the supervisors and I also like to jokingly say that our

3  standard is whether or not you would want to live next door

4  to the person.  That shows that discretion is being

12:59:44   5  exercised.

6              And as to the denial rates this Court

7  previously relied on, it was approximately a foreperson of

8  rate of accepted applications that had been denied.  Since

9  then, the denial rates have shot up.  So it was

12:59:58   10  approximately a 17 percent denial rate in 2014, 22 percent

11  in 2015, 15 percent in 2016, 20 percent in 2017.  Overall,

12  the number is now, I believe, 8.4 percent, except that --

13              THE COURT:  Let me -- I'm not fussing with you

14  about the numbers, but I didn't rely on the rate,

01:00:20   15  necessarily, in the last case.  I denied on the fact the

16  Government told me that they had never denied a DACA -- I

17  mean, sorry -- DAPA -- a DACA application that met the

18  criteria set out by -- by the Secretary.  And so no

19  discretion -- if they -- so it was not -- there was no

01:00:43   20  individual discretion being exercised by the people.

21              Now, that was a different -- that's a

22  different record than we have here, and I'm going to judge

23  this solely on this record, I will assure you of that.

24              MS. WAINER APTER:  So thank you, Your Honor.

01:00:56   25  And moving to the record that we have here, just to point

1  out, in its response to the third set of discovery requests

2  here, the federal defendants wrote, and I quote, that they

3  are aware of several initial DACA requests that were denied

4  because the requester either made false statements or

01:01:12  5  committed fraud in another immigration or nonimmigration

6  context, despite the requester meeting the DACA guidelines

7  outlined in the bulleted points on the first page of the

8  Napolitano memo.

9  And I think that the point there is that

01:01:27  10  it wasn't -- it was -- it was not a denial because the

11  person had committed fraud in this application.  It was a

12  denial because the adjudicator found that at some point in

13  the past, in some other context, the person had committed

14  fraud.  And that is an example of discretionary denial

01:01:43  15  where the person does meet all of the requirements but it

16  has still been denied.

17  And, actually, my last point when it comes

18  to discretionary denials is in their reply, plaintiffs

19  asserted for the first time, and Mr. Disher put up here on

01:01:56  20  the screen, that the USCIS Texas Service Center processed

21  seven thousand six hundred and two hundred and fifty-nine

22  [sic] DACA applications from August 2012 until June of

23  2018, and yet just confirmed as of May that not a single

24  one of those applications was denied for discretionary

01:02:18  25  reasons.

1                   And they block-quoted from an e-mail --

2   this is in their reply brief at Page 23.  They block-quoted

3   from this e-mail from Ms. Tyronda Lee, and that's what they

4   put on the screen.  But Texas did not put the e-mail in the

01:02:30   5   chain that came immediately before that one.

6                   Sorry.  I'll start down here.  So this

7   e-mail is the one that came originally before the

8   responsive e-mail by Tyronda Lee, and this e-mail says --

9   and you can see at the bottom here that it was sent at 8:00

01:02:49   10  a.m.  So this e-mail says that the Texas Service Center was

11  given a total of three hours to respond to this request

12  from the federal defendants.  The request was had there

13  been any of these purely discretionary denials when all the

14  factors were met.  According to Ms. Tracy Renaud from the

01:03:08   15  federal defendants who submitted an affidavit in this case,

16  the federal defendants are not tracking the reason for

17  denials and it would, in fact, take thousands of hours to

18  go through and figure out whether there have been any

19  discretionary denials.

01:03:22   20                  So the three hours that the Texas Service

21  Center was given in this case simply was not sufficient for

22  them to actually go through the paper files and search for

23  discretionary denials.

24                  And then I'm switching to the top part of

01:03:33   25  the e-mail.  Here, the response from the Texas Service

1 Center is, Actually, we haven't been processing a single

2 DACA initial or renewal application in over two years.

3 So the information that Texas put up on

4 the screen from Ms. Lee says nothing about denials since

01:03:51  5 2016.  And so it is very possible that at the Texas Service

6 Center, since 2016, there have been many -- or I'm sorry --

7 obviously, not at the Texas Service Center because they're

8 not adjudicating DACA applications anymore; but at the

9 service centers that have been adjudicating them since

01:04:08  10 2016, that there have been these discretionary denials.

11 And as the Federal Government's witness explains, it would

12 take, according to the Federal Government, thousands of

13 hours to go through the papers and figure it out.

14 And this was raised, just so you know, for

01:04:22  15 the first time in Texas's reply, and so we plan to file

16 this in the record later today, but I have copies if the

17 Court would like, as well.

18 THE COURT:  Why don't you leave them with the

19 case manager.

01:04:31  20 MS. WAINER APTER:  Okay.  Will do.

21 And then just to move on to the balance of

22 the equities and the public interest factors just for a

23 minute.

24 Sorry about that.

01:04:47  25 So when it comes to the balance of the

1 equities, as Ms. Perales mentioned, this Court recognized

2 last time that the balance of the equities were that DAPA

3 was not the status quo and that if DAPA were permitted to

4 go into effect, it would be very difficult to unscramble

01:05:05   5 the egg.  Here, as we said, that is the opposite.  And one

6 example suffices here as to what we're talking about for

7 individual DACA grantees.

8            Joanna Costa explained in her deposition

9 and in her declaration that DACA has been the platform on

01:05:23   10 which she has built her career.  Without DACA, her life

11 would drastically change in ways big and small.  She would

12 lose her job; she would have no source of income; and she

13 would be unable to support the life she had worked so hard

14 to build.  She would also lose the ability to do everyday

01:05:39   15 things that people take for granted, including drive,

16 purchase Sudafed at a CVS -- I think she says "Mucinex" --

17 and enter a public building, all of which require a person

18 to show ID.

19            And when it comes to the public-interest

01:05:55   20 factors, I think the last thing that's worth mentioning is

21 in the DAPA litigation, there were four amicus bring briefs

22 that were submitted in support of Plaintiff State's motion

23 for a PI and four amicus briefs that were submitted in

24 opposition to the motion for PI.

01:06:10   25            I think, as you already noted, Your Honor,

1 here, there are 15 amicus briefs that were submitted

2 opposing plaintiffs' motion for a PI, and they're on behalf

3 of 19 states, 114 companies, 104 religious organizations,

4 71 American institutions of higher education, 28

01:06:28   5 legal-services organizations, 71 current and former

6 prosecutors, and a whole host of others.  There is a total

7 of one amicus brief that was filed supporting plaintiffs'

8 motion for a preliminary injunction, and that was on behalf

9 of six members of Congress.

01:06:41   10            As these amicus briefs explain, the public

11 would be harmed by an injunction in a way that just did not

12 apply to the DAPA litigation, and this Court should deny

13 the motion.

14            THE COURT:  All right.  Thank you, Ms. Apter.

01:06:56   15            Mr. Disher, just a few minutes.

16            MR. DISHER:  Yes, Your Honor.  I'll be brief.

17            First, I want to begin where New Jersey

18 left off, which is the procedural APA claim.  Again, New

19 Jersey continues to focus on whether there is any evidence

01:07:18   20 of truly discretionary denials.  Our contention is that

21 there is not; however, even if there were, that still does

22 not satisfy the procedural APA claim, because DACA granted

23 substantive benefits; therefore, it had to go through

24 notice-and-comment rulemaking, according to the APA.

01:07:37   25            Moving in reverse --

1          THE COURT:  But even if I find that the

2   applicants are truly screened discretionarily on a

3   case-by-case basis, so I -- I totally go with the

4   intervenors, it still has to go through notice and comment?

01:07:56   5          MR. DISHER:  Yes, that is correct, Your Honor,

6   because it confers substantive rights and benefits;

7   therefore, it has to go through notice-and-comment

8   rulemaking.

9          And one additional thing to point out on

01:08:04   10  the discretionary piece, this is a slide, Slide Number 25,

11  from MALDEF's appendix.  This is Slide 25 of a 189-slide,

12  quote, refresher course for how DACA applications go

13  through the review for criminality, public safety, and

14  national security.

01:08:27   15         I would contend, Your Honor, that in this

16  flow chart, there is no room for discretion of individual

17  Immigration Service officers; however, again, as you -- as

18  you asked, even if there was discretion, that does not cure

19  the procedural violation of the APA.

01:08:44   20         On the substantive violation, there has

21  been a lot of talk of the Family Fairness Act.  That is not

22  a new argument.  That exact same argument was made in the

23  DAPA and expanded DACA case, and that exact argument was

24  rejected by the Fifth Circuit.  So that in no way lends

01:09:00   25  additional support to the legality of DACA in this case.

1          Then, lastly, Your Honor, just to respond

2  to a few things that the DACA intervenors argued, first,

3  they said that harm here depends on imaginary leaps.  That

4  is, in fact, not true.  Harm has been established here by

01:09:22  5  our witnesses and by their witnesses, and it is much more

6  certain than the harm at issue in *Massachusetts vs. EPA*.

7          And then they go on to make what I think

8  is kind of a remarkable argument, is that the Executive

9  action in this context is not reviewable because it is in

01:09:41  10  the immigration field.  I don't think that they are really

11  arguing that every action the Executive Branch may take in

12  the immigration context is unreviewable by a court, and

13  indeed no court has found that DACA or the attempted

14  rescission of DACA is an unreviewable action.

01:10:00  15          Then as to *Trump v. Hawaii*, as we've

16  pointed out in our briefing, there is a specific statute

17  that could have not granted broader discretion to the

18  Executive Branch to act pursuant to that statute, and yet

19  the Supreme Court still made clear, even with that most

01:10:15  20  broad grant of discretion, the Executive could not exercise

21  that discretion in a way that violated a Congressional

22  statute.  DACA here does not have a similar statute

23  granting the Executive discretion.  It does indeed violate

24  many of the Congressional statutes.

01:10:35  25          On the delay point, Your Honor, litigation

1    involves a number of weighing of costs and benefits, and

2    litigants are not required to wage a multilawsuit front

3    against issues that are already being adjudicated in a

4    lawsuit that was filed in 2014.  And, again, as soon as

01:10:55    5    that lawsuit came back to this Court, we attempted to -- or

6    we -- we threatened to add this very claim, but the

7    reason -- only reason we didn't is because we thought DACA

8    was going to go away; and now in 15 days, we know that

9    that's not going to happen, absent a ruling from this

01:11:10    10    Court.

11                    On -- in terms of deferred action and

12    the -- the outer limits and -- and contrasting that to some

13    of the smaller uses of deferred action, what the

14    intervenors were talking about is, of course, deferred

01:11:28    15    action in the context of the Reno case.  And in that case,

16    the Supreme Court recognized the Executive does have

17    authority to grant deferred action on individual basis, but

18    that is different than the deferred action we're talking

19    about here, not only in terms of the scope but also in

01:11:42    20    terms of the rights and benefits that go along with

21    deferred action.  That type of deferred action did not come

22    with lawful presence and, importantly, did not come with

23    work authorization.

24                    And then finally, Your Honor, in terms of

01:12:06    25    the status quo, as we sit here today, there is no

1  injunction preventing -- or rather, there is no injunction

2  that requires DHS to grant new DACA applications and new

3  applications of advance parole; however, we know in 15

4  days, that's going to change subject to the ruling from

01:12:26  5  this Court.

6                    In 15 days, new applications will be

7  granted and new applications for advance parole will be

8  granted, which nobody disputes, gives a pathway to

9  citizenship to some unlawfully present aliens that they

01:12:38  10  would not have but for DACA; therefore, Your Honor, we're

11  asking for preliminary injunction before August 23rd in

12  order to prevent those harms.

13                    Thank you.

14            THE COURT:  Thank you, Mr. Disher.

01:12:50  15                    All right, counsel, here's what I'd like.

16  Don't bury me with a bunch of briefs.  You've already done

17  that, and I've read your exhibits and read the briefs.

18                    I do want -- and you can -- I want it

19  limited to five pages.  I want a brief that assumes,

01:13:11  20  hypothetically, that I think there is discretion being

21  given.  Okay?  That I -- I'm sorry.  Assume hypothetically

22  I'm accepting the Intervenor's argument that the

23  applications are being given discretion or discretion is

24  being used, can there still be a violation of the

01:13:36  25  procedural APA?  And either tell me how or tell me no way.

1 And I'd like those by close of business Monday.

2                    I just -- my weekend was going to be bad;

3 I wanted yours to be bad as well.

4 (Laughter.)

01:14:01    5            THE COURT:  And if you will, go ahead and file

6 them; but if you will, send courtesy copies here to

7 Houston.

8                    All right.  Thank you for your

9 participation.  Attorney Grewal, Attorney Paxton, thank

01:14:15   10 y'all for being here.

11            MS. PERALES:  I'm so -- I'm so sorry, Your

12 Honor.  We had two housekeeping matters regarding pending

13 motions.  One was an unopposed motion to withdraw an

14 inadvertently filed exhibit, and the other are

01:14:28   15 cross-motions to exclude exhibits.  I just wanted to get

16 that on the Court's radar, not necessarily to ask time to

17 argue today.

18            THE COURT:  Is there any real problem with the

19 exhibit that's been filed?  I know it -- it was contrary to

01:14:38   20 the agreement or maybe my order but, I mean, is there

21 anything -- a problem with that exhibit?

22            MR. DISHER:  No.  Not with us, Your Honor.

23            THE COURT:  Anybody else object to it?

24            MR. ROBINS:  No.

01:14:47   25            THE COURT:  You want to withdraw it or leave

1  it?

2          MS. PERALES:  The exhibit that we're seeking to

3  withdraw, we would like to withdraw that exhibit.

4          THE COURT:  Okay.

01:14:54   5          MS. PERALES:  There is also a pending

6  cross-motions for exclusion of evidence between Texas and

7  the Perez Defendant intervenors.

8          THE COURT:  On?

9          MS. PERALES:  That is on the Court's desk.

01:15:04   10          THE COURT:  Tell me -- remind me what that's

11  about.

12          MS. PERALES:  We both have declarations from

13  other cases that we filed without listing those declarants

14  as witnesses or doing discovery.  We each have that.  We

01:15:23   15  have each moved to exclude the others, and they are in the

16  same position.

17          THE COURT:  Perfect.  I'm going -- let me take

18  a look at those.

19          MS. PERALES:  Thank you, Your Honor.

01:15:34   20          THE COURT:  I can probably -- I can almost

21  promise you, though, the good for the goose, good for the

22  gander rule is going to control.

23          MS. PERALES:  Thank you.

24          THE COURT:  All right.  Thank y'all.

01:15:42   25          COURT SECURITY OFFICER:  All rise.

1  (Concluded at 1:15 p.m.)

2              COURT REPORTER'S CERTIFICATE

3

4      I, Kathleen K. Miller, certify that the foregoing is a

5  correct transcript from the record of proceedings in the

6  above-entitled matter.

7

8                      /s/_____
   DATE: August 9, 2018   Kathleen K. Miller, RPR, RMR, CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25